```
 1                  UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
 2                           --o0o--

 3   SARAH ANDERSON, ET AL.,     ) Case No. 23-CV-201
                                 ) San Francisco, California
 4                Plaintiffs,    ) July 19, 2023
                                 ) 2:32 p.m.
 5           v.                  )
                                 )
 6   STABILITY AI, LTD., ET AL., ) Re: Motions to dismiss
                                 )
 7                Defendants.    )

 8                  TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE WILLIAM H. ORRICK
 9             SENIOR UNITED STATES DISTRICT JUDGE

10   APPEARANCES:

11   For the Plaintiffs:      JOSEPH SAVERI LAW FIRM, LLP
                              601 California Street, Suite 1000
12                            San Francisco, CA 94108
                         BY:  MR. JOSEPH R. SAVERI
13                            MR. LOUIS ANDREW KESSLER
                              MR. CHRISTOPHER KAR-LUN YOUNG
14
                              LAW OFFICE OF MATTHEW BUTTERICK
15                            1920 Hillhurst Avenue, Suite 406
                              Los Angeles, CA 90027
16                       BY:  MR. MATTHEW BUTTERICK

17   For the Defendant        FRIED FRANK HARRIS SCHRIVER &
     Stability AI:            JACOBSON, LLP
18                            801 17th Street NW
                              Washington, DC 20006
19                       BY:  MR. PAUL M. SCHOENHARD

20       (Appearances cont'd next page.)

21           JENNIFER COULTHARD, RMR, CRR, CSR# 14457
                     Official Court Reporter
22            450 Golden Gate Avenue, Suite 1600
                     San Francisco, CA 94102
23                   jenrmrcrr2@gmail.com
                        (530)537-9312
24
     Proceedings reported via mechanical steno - transcript produced
25   via computer-aided transcription
```

```
1   APPEARANCES (Cont'd):

2

3   For the Defendant        COOLEY, LLP
    Midjourney:              3175 Hanover Street
4                            Palo Alto, CA 94304
                        BY:  MS. ANGELA LUCILLE DUNNING
5                            3 Embarcadero Center, 20th Floor
                             San Francisco, CA 94111
6                       BY:  MR. JUDD LAUTER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   Wednesday - July 19, 2023                        2:32 p.m.

 2                        P R O C E E D I N G S

 3                            --o0o--

 4        (In open court.)

 5        THE CLERK:  Okay.  And I believe that concludes our

 6   video hearings for the day, so we are set to begin case

 7   No. 23-201, Andersen v. Stability AI, Limited.

 8             Counsel, if you would please come forward and state

 9   your appearance for the record.

10        MR. SAVERI:  Good afternoon, Your Honor; Joseph Saveri

11   on behalf of the plaintiffs.

12        THE COURT:  Mr. Saveri.

13        MR. YOUNG:  Good afternoon, Your Honor; Christopher

14   Young on behalf of the plaintiffs.

15        MR. SCHOENHARD:  Good afternoon, Your Honor; Paul

16   Schoenhard on behalf of the Stability defendants.

17        MS. DUNNING:  Good afternoon, Your Honor; Angela

18   Dunning on behalf of Midjourney.  With me in the courtroom is

19   Max Sills from the company, and I have my colleague, Judd

20   Lauter, and several of our summer associates.

21        THE COURT:  Great.

22        MR. GASS:  Good afternoon, Your Honor; Andy Gass for

23   defendant DeviantArt.

24        THE COURT:  Great.

25             All right.  I have a fairly lengthy set of thoughts
```

1    that I'm going to provide to you, so I think sitting down is

2    probably a good idea.

3           **MR. SAVERI:**  You were reading my mind, Your Honor.

4    And then just Mr. Young and I are going to divide the

5    arguments, so it may be a little bit of an up and down,

6    but . . .

7           **THE COURT:**  That's fine.

8           Let me tell you how I'm thinking about this, which may

9    help you with your argument or it may not.

10          The top line is, I'm inclined to dismiss almost

11   everything with leave to amend.

12          I think the plaintiffs need to differentiate the

13   defendants in the complaint and allege how each is liable for

14   each of the claims, because the defendants do different things.

15          Regarding Andersen's copyright claims, I think the

16   plaintiffs need to allege that each of the defendants' products

17   incorporate her work in their entirety in training images

18   present in or used in each product, not just that Stability AI

19   incorporated them in training Stable Fusion.

20          It's unclear to me if the plaintiff is alleging that

21   Deviant Art or Midjourney products conduct image training or

22   rely on Stable Diffusion's training.

23          I think the plaintiffs need to identify the CMI in

24   each of their works that they claim each defendant has stripped

25   or alters in order to make a DMCA claim.

```
 1              I think plaintiffs need to clarify that they're only

 2    seeking misappropriation claims based on the use of names

 3    through user text prompts and that the defendants used their

 4    names for commercial advantage.

 5              And even if you do that, I'm interested in why that

 6    wouldn't be preempted by the Copyright Act.  So in addition, I

 7    don't think McKernan or Ortiz have copyright claims, and

 8    Andersen's are limited to what she registered.

 9              I think the claim that survives is Andersen's direct

10    infringement claim against Stability AI for copying images

11    because that claim and then the process training Stable

12    Diffusion I think is plausible, but I don't think that those

13    same claims work against Deviant Art or Midjourney.

14              And in addition, the plaintiffs have accessed to

15    Stable Diffusion as open-source code, and I don't know why they

16    wouldn't be able to provide more facts if, in fact, their work

17    is being used because otherwise it seems implausible that their

18    works are involved when each of DreamStudio, DreamUp or

19    Midjourney products ran on their 5 billion compressed images.

20              I don't think the claim regarding output images is

21    plausible at the moment because there's no substantial

22    similarity.  It's not clear to me whether Stability AI could

23    supervise the infringing conduct.

24              I'm inclined to dismiss the right of publicity claim

25    to allow the plaintiff to narrow the focus, its focus, and see
```

```
 1   if it can avoid preemption, but I'm also wondering whether

 2   there's standing if the named plaintiff isn't a named artist by

 3   the defendants.

 4          I think the theory of the UCL claim based on the

 5   Lanham Act isn't alleged in the complaint and that the other

 6   allegations need more specificity.

 7          I'm not inclined now to address Deviant Art's special

 8   motion to strike until the amended complaint is filed with a

 9   motion to -- on the motion to dismiss, which I'm going to grant

10   all three of them with leave.  With Deviant Arts there's a

11   breach of contract claim that will need more specificity.

12          And I'm not going to rule on Midjourney's arguments

13   regarding class allegations now or probably at any time until

14   later in the case.

15          So that's -- that's a long list, Mr. Saveri, and you

16   can take comfort in the leave to amend, but why don't you start

17   off on wherever you'd like to start off.

18          **MR. SAVERI:**  Your Honor, if I just had a minute --

19          **THE COURT:**  Sure.

20          **MR. SAVERI:**  -- so we can do a little bit of stage

21   management?

22          **THE COURT:**  Yes.

23       (Brief pause.)

24          **MR. SAVERI:**  So I think if it's okay, Your Honor,

25   Mr. Young is going to -- we'll take some of those out of order.
```

1          **THE COURT:**  Sure.

2          **MR. SAVERI:**  We'll try cover them all.

3          So Mr. Young will begin, he'll let you know which one

4     he's handling, and then I'll go afterwards and do the same.

5          **THE COURT:**  Sounds good.

6          **MR. YOUNG:**  Thank you, Your Honor.  Christopher Young

7     on behalf of the plaintiffs.  I'll be addressing the DMCA claim

8     first followed by the publicity claims, specifically the merits

9     of the publicity claim and the preemption argument.

10          So briefly about the DMCA claim, in kind of a pitch

11     that we've already identified, the CMI, I think you can find at

12     paragraph 25 we've defined training images as not just the

13     image but also the text that comes with it, because the two

14     work together.  These AI -- generated AI models do not work

15     without just the image.  It needs text in order to, you know,

16     search amongst the 5 billion images which ones to draw from to

17     create the output.

18          At paragraph 191 --

19          **THE COURT:**  You probably want to slow down just a

20     little bit for the court reporter.

21          **MR. YOUNG:**  I apologize, Your Honor.

22          In that paragraph 191 we quote that language

23     identifying training images as CMI that is removed or altered

24     by the generative AI model, and we also identify as the

25     signatures that are affixed on to the artist's work.

1    And you can see this as one of the exhibits that's

2    attached to the Lauter declaration submitted in their motion to

3    dismiss.

4    For example, if you look at I believe it's 52-2, which

5    is a collection of Sarah Andersen's work which is pulled from

6    where I have been trained or "Have I been trained" website, you

7    can see fairly clearly that Ms. Andersen, for example, signs

8    each panel of her works, which is parathematic CMI.

9    Now, if Your Honor is interested, I can go into

10   whether -- the other elements of the CMI, but I did note that

11   you had identified that specific element.

12   Okay.  So moving on to removal or altering a CMI, I

13   would note that according to this district just two months ago

14   has found that DMCA claims classes survived under similar

15   circumstances using a very similar generative AI model.  That

16   case involved code; this case involved images.

17   We do know, based off the allegations in the

18   complaint, that the training images, for example, used both the

19   text and the images paired together.  The text, which sometimes

20   contained names, which is parathematic CMI, that is not omitted

21   or that is not omitted as output.  At some point the generative

22   AI models remove or alter that CMI.

23   And I would also refer, Your Honor, to paragraph 74,

24   which shows kind of the diffusion process by which we allege

25   these generative AI models work, which obscure kind of the

 1   image themselves, which necessarily entails alteration of CMI.

 2          In terms of the knowledge elements, we do recognize

 3   that under Stevens there's the double scienter requirement for

 4   the DMCA claim.  We would note that this case is very

 5   distinguishable under the facts of Stevens besides the posture

 6   of Stevens being a summary judgment and this case being a

 7   motion to dismiss.

 8          In Stevens, the software at issue -- the meta data

 9   that was at issue that was not included in the software

10   function was meta data that was incidental to the software's

11   function, and that was the CMI that the photographers were

12   complaining about in that case in Stevens.

13          In this case, the text and text-image pairs is

14   essential to the functioning of these generative AI models, and

15   so they're -- from that we can reasonably infer there is no

16   issue on defendant's part that they were removing this CMI.

17          And in terms of the second element, the second

18   scienter element, knowing that it would induce further

19   infringement, I think that's the point of these generative AI

20   models.  Why would you permit users, for example, to input

21   someone, an artist's name, if not -- knowing that that could

22   then lead to further infringement, especially knowing that you

23   are not, for example, generating someone's watermark or

24   including the text that accompanies all of these images?

25          And, Your Honor, I believe I quickly outlined the

1  bases of our DMCA claims.  I just want to pause to see if there

2  are any specific questions about the DMCA claim?

3          THE COURT:  No, not beyond what I already laid out for

4  you.

5          MR. YOUNG:  Excellent.

6          Well, Your Honor, I do want to touch briefly on the

7  publicity claim.  First, I want to touch upon the preemption

8  issue.  So I do want to note that in that same opinion I

9  identified earlier, the Doe 1 v. GitHub opinion, Judge Tigar

10  noted that state law tort claims concerning unauthorized use

11  are not preempted by the Copyright Act.

12          And I think based on what we are alleging here that

13  there is unauthorized use of our plaintiffs' and class members'

14  names.  These claims are not preempted.

15          For purposes of the state law claims, we are not

16  alleging any of the distribution -- any of the distribution or

17  reproduction of infringing works is at issue.  It is the use of

18  our plaintiffs' names either to promote the products which

19  somehow -- which misassociates our plaintiffs' names with

20  promoting the product.

21          And you can see examples of this, for example, in the

22  exhibits we attached to our opposition to the RJN.

23          THE COURT:  Good.  Did you provide me with the

24  examples involving your specific named plaintiffs?

25          MR. YOUNG:  Your Honor, not in the present version of

1   the complaint, but that's certainly something we can fix in our

2   amendment.

3         **THE COURT:**  Okay.

4         **MR. YOUNG:**  But regardless, I would also argue that

5   based on what we have in the complaint would be sufficient for

6   at least injunctive standing just based off of what we know is

7   in the systems.

8         **THE COURT:**  If you didn't have a named plaintiff, you

9   think you would have injunctive relief possibilities?

10        Anyway, you can go on with your argument.

11        **MR. YOUNG:**  Yes.  In terms of the merits of the, you

12   know, publicity claim, while acknowledging that none of our

13   plaintiffs -- at least as the complaint is presently drafted --

14   are named in there.

15        We do see -- our claim is predicated on the use of the

16   names.  The focus on "in the style of," at least from -- you

17   know, we believe that that is a stretching of the complaint and

18   a misunderstanding of the complaint because the words "in the

19   style of" actually have no real meaning in prompts.  It's akin

20   to, you know, analogizing to a boolean "and" or a boolean "or"

21   in a Westlaw or LEXISNEXIS search.

22        But regardless, that's only one aspect of the

23   publicity claim.  It's only one aspect of the use.  The names

24   are essential to the function and promotion of the products.

25   You can see this on the kind of snapshot of the animation that

1   we attached to -- as an exhibit to the opposition to

2   Midjourney's RJN where artists' names are prominently displayed

3   to promote the product.

4          You know, we had submitted a change law, which no one

5   disputed, to Midjourney's website identifying one of the

6   changes to the website was routing references to artists'

7   names.  So I think from that, that is very strong allegations

8   or evidence that the use of names is very important to the

9   promotion and function of these generative AI models.

10         So unless Your Honor has any questions about the

11  publicity claims, I think I will let Mr. Saveri direct the

12  other --

13         **THE COURT:**  All right.  Thank you, Mr. Young.

14         **MR. YOUNG:**  Thank you.

15         **MR. SAVERI:**  Mr. Butterick, did you want to take the

16  issue of the open source?

17         **MR. BUTTERICK:**  Sure.  Your Honor, Matthew Butterick

18  for the plaintiffs.  Hello.

19         I wanted to return to your point that you made about

20  the open source.  Did I understand you correctly that you said

21  because it's open-source doctrine, you were hoping for more

22  specific allegations as to what?

23         **THE COURT:**  As to anything in the way that I laid it

24  out, but why wouldn't you be able to -- why wouldn't there be

25  information with respect to your clients, for example, that

1    you'd be able to identify through that?

2         **MR. BUTTERICK:**  I'd be happy to address that.   In

3    addition to being a lawyer, I'm a very long-time member of the

4    open-source programming community and even longer time member

5    of the visual arts community.

6         I've looked at Stable Diffusion code.  I can't figure

7    it out.  I mean, there's two parts of the system really.  There

8    is this open-source software, and then there's images, you

9    know, written in Python, and then there's this other thing

10   called the "weights file," and you need to use them together.

11   It's almost like a Super Nintendo and a cartridge.  If they're

12   not together, they can't do anything.  And the problem is that

13   if you inspect the Python code where it is, you can't really

14   inspect anything about the weights file.  It's just a big

15   binary mass of numbers.

16        Now, where does the weights file come from?  That is

17   the file that is exclusively and uniquely derived from training

18   the model on our plaintiffs' works.  So we would love to be

19   able to open up that weights file and look at it, but that's

20   not -- that's not how it works.

21        The best that we can do today is to look at some of

22   the other interrogations; for instance, this dataset that

23   Stability has submitted to using Python on the 5-billion-image

24   set they've said they used.  The problem, though, Your Honor is

25   we don't have a lot of information about exactly how they used

1    it -- did they focus on certain subsets? -- you know, the

2    information is sketchy.

3          The defendant Stability has also pointed to this

4    website called "HaveIbeentrained.com" where a lot of artists,

5    including our plaintiffs -- and we cite to this in the

6    complaint -- have been able to use this to discover that their

7    work is in it.  So that's -- you know, we're kind of having to

8    resort to these sideways methods to get at it.

9          So that's a long way of saying to your question merely

10   having the open-source code available for part of the system

11   doesn't tell us about certain facts about the whole system.

12         And I'll make one more point.  I do feel that the

13   defendant's characterization of this as an open-source system

14   is just marketing -- it's flawed -- because part of what

15   they're distributing is this weights file, which is an artifact

16   derived from the copyrighted work of artists whose work is

17   there without consent, without credit, without compensation.

18   It is not open source.  They're not entitled to distribute it.

19   That's what this case is about.  So I feel like we have to keep

20   in mind that merely calling it open source does not make it so.

21         **THE COURT:**  Fair enough.

22         **MR. BUTTERICK:**  All right.

23         **THE COURT:**  Thank you.

24         **MR. BUTTERICK:**  Thank you.

25         **MR. SAVERI:**  So, Your Honor, I guess then let me pick

1    up a few of the other issues.  And I appreciate Your Honor

2    generally granting leave to amend, so I appreciate that.

3         I think the first kind of set of questions was about

4    the roles of the defendants.  It was early in a long list, and

5    I hope I got them all.

6         **THE COURT:**  Yeah.  It was really -- being able to

7    differentiate what the defendants had done would be really

8    helpful in the amended complaint.

9         **MR. SAVERI:**  Okay.  So I appreciate that, and we can

10   provide more specificity on it.

11        I just want to be clear right now that Stability,

12   which generated the Stable Diffusion product, which is based on

13   the LAION database, was then used by the other defendants,

14   DeviantArt and Midjourney, in their products.  And so, because

15   they're relying and using the Stability product and because of

16   the way the copyright law operates and attaches liability kind

17   of downstream with respect to infringing uses, that's the

18   basis, in large measure, of the copyright claims, both the

19   direct claims and the vicarious claims.

20        And so when they used a product that is an infringing

21   product that contains infringing or reproduces -- depending on

22   what theory of copyright law we're following -- the fact that

23   they are using that and selling it and putting it into the

24   marketplace generally gives rise to the claims.

25        And we can provide more specificity about that and

1  what the relationships are, but I just wanted to be very clear

2  that the -- you know, the gravamen of our case, essentially, is

3  that our clients had works, had products, had property that

4  were used in these models without permission, without

5  compensation and then the product that was developed was put

6  out in the marketplace directly in competition with our

7  clients.

8         And, at a very basic level, that's the story that

9  gives rise to our claims.  There are a number of causes of

10  action which we say arise in connection with that, but that's

11  basically what the claims are.

12        There is some dispute, and you heard part of it just a

13  minute ago, a factual dispute, perhaps, about how the -- how

14  the technology actually operates.  There's a dispute here

15  between plaintiffs and the defendants about whether we have it

16  right or whether we don't know what we're talking about, and

17  they assert that they do.  That seems to me to be a factual

18  issue and not a Rule 8 issue, and we'll take that up on another

19  day.

20        Okay.  So we can provide more specificity about what

21  the respective parties do and the defendants and the part they

22  play in all of this, so -- so I really don't have much to add.

23        We think it was sufficient, I heard you disagree with

24  that, and so we'll take that up later.

25        I just want to be clear about a couple of things.  You

1    indicated about which plaintiffs have copyright claims.  It's

2    only Ms. Andersen that has the registration, and so that's, of

3    course, right.  And so without the copyright registration,

4    we're not asserting copyright claims on behalf of the other two

5    plaintiffs, Ortiz and McKernan.  I just wanted to be clear

6    about that.

7              Again, I won't belabor labor it, but given the fact

8    that under the copyright law I think you indicated that at

9    least at the Stable Diffusion level there are plausible claims

10   stated with respect to copyright.  When we spell out more what

11   the role of the other defendants do, I think we'll be able to

12   show how -- because of what I just described under the

13   copyright law, because it is essentially strict liability

14   because there's downstream liability for the unpermitted

15   copying and reproduction -- that liability attaches to the

16   other defendants.  And we can certainly provide more

17   specificity about that and spell that out.

18             Your Honor, I'm just -- I'm just going through my

19   notes.

20             The UCLL -- I mean, I heard you.  We will take the

21   opportunity to replead.

22             The rest I think had to do with the motions to strike

23   and the class allegations and, you know, we, of course, agree

24   that that's better -- it's not a pleading issue and better left

25   for another day.

1       So with that, Your Honor, I don't really think I have

2  anything additional to add, but if there's specific questions

3  within that, I'm standing here before you, Your Honor.

4       **THE COURT:**  Well, it's always a pleasure to have you

5  before me, Mr. Saveri.  You might stand back up after the

6  defendants say whatever they have to say.

7       **MR. SAVERI:**  Your Honor -- and I guess the other -- I

8  don't know if on your list you raised the anti-SLAPP motion,

9  and maybe I didn't hear it.

10      **THE COURT:**  So I'm not going to deal -- it's not my

11  plan to deal with the anti-SLAPP motion until you've got an

12  amended complaint that addresses my concerns, and then we'll

13  see where we are with respect to it.

14      **MR. SAVERI:**  Okay.  I understand.  Thank you, Your

15  Honor.

16      **THE COURT:**  Okay.  So who would like to say what from

17  the defense?

18      **MR. SCHOENHARD:**  Thank you, Your Honor; Paul

19  Schoenhard again for the Stability defendants.

20      Unless you would like a response to anything you've

21  heard to this point, I simply have a question for clarification

22  for Your Honor.  The clarification is, we are concerned or

23  curious when you referred to the output theory, that being the

24  outputs of the model that being dismissed for lack of

25  substantial similarity, does Your Honor intend to entertain

1   repleading on that in view of plaintiffs' paragraph 93 where

2   they affirmatively stated that no output would likely be

3   similar to any of the training images such that we believe any

4   repleading would be inconsistent with the original complaint on

5   that basis and the output theory should be dismissed with

6   prejudice?

7        THE COURT:  So I'm not -- I am not going to dismiss

8   with prejudice any of the claims.  We'll see what the amended

9   complaint looks like and deal with things at that time.

10       MR. SCHOENHARD:  And I assume then that that is

11  without prejudice to our ability to reraise similar arguments

12  at that time, to the extent they are appropriate?

13       THE COURT:  Well, I have to say I've never really

14  allowed one side to make arguments without the other side

15  responding to it, so --

16       MR. SCHOENHARD:  In that case, Your Honor, unless you

17  have further need for response . . .

18       THE COURT:  No.  Thank you.

19       MR. SCHOENHARD:  Thank you, Your Honor.

20       MS. DUNNING:  Good afternoon, Your Honor; Angela

21  Dunning for Midjourney.

22       With the Court's leave, I would like to point out some

23  of the claims that I'd ask the Court consider should be

24  dismissed with prejudice.  And I'll be very targeted, because I

25  appreciate the list the Court gave.

 1          **THE COURT:**  Okay.

 2          **MS. DUNNING:**  So, in the first instance, I've heard

 3    acknowledgment that Ms. Ortiz and Ms. McKernan are no longer

 4    pleading copyright claims because they lack a registration, and

 5    those claims should be dismissed with prejudice.

 6          Similarly, I would just clarify with respect to

 7    Ms. Andersen, under the case law that we cited, including

 8    Planner5D -- which Your Honor is very familiar with -- our

 9    position is that Ms. Andersen, when she amends, must identify

10    specific registered works that she is alleging have been

11    trained on.  And I submit that shouldn't be very difficult for

12    her to do.  She actually included a reference to the site

13    "HaveIbeentrained.com" where the complaint asserts in paragraph

14    28, footnote 1, that certain of her works in which she has a

15    copyright interest appeared there.

16          The problem with that, Your Honor, is, she doesn't

17    actually say which one of the works that appear there is hers.

18    And there are works that do not appear to be hers that show up

19    on that page.

20          The other problem is, of course, that she hasn't

21    identified any work there that is registered.  And when she

22    uses those -- those words in the complaint in paragraph 28 to

23    say, "I created and have a copyright interest in the works that

24    appear there," that doesn't give rise to an inference that she

25    has a registration because plaintiffs' used those exact words

1   to describe the works of McKernan and Ortiz that appeared at

2   "HaveIBeenTrained.com."  So they really ought to be able to

3   point to specific works that are registered, that are

4   Andersen's, and that she is saying were trained on.

5          Moving on to the output issue, Your Honor, we

6   understand that you are inclined to grant leave to amend so

7   that plaintiffs can plead a claim that taking a specific

8   registered work of Andersen and comparing it to a specific

9   output image from, in my client's case, Midjourney, there is

10  substantial similarity of protected expression such that there

11  is a colorable claim of copying.

12         Plaintiffs have steadfastly refused, until now, to

13  provide the Court with those specifics about what they're

14  accusing because they don't want to -- or at least have

15  resisted thus far -- of providing any sort of substantial

16  similarity analysis.  Instead, they argue they don't have to do

17  that.

18         And the reason they say they don't have to do that is

19  twofold; two arguments I want to make sure I address.  One is,

20  they claim they've alleged direct copying, but direct copying

21  only exists where you've copied the work completely.  It's

22  virtual duplication.  And they've alleged just the opposite in

23  this complaint.  They've said it's not virtual duplication,

24  it's not likely to be similar and, in fact, it's so different

25  that we can't even tell it's our work without CMI.  And so they

1    should not be allowed to contradict their pleading by now

2    saying that the works are, in fact, identical, when they

3    haven't done that.

4         But even if -- so the second theory, the second basis

5    that they've asserted for circumventing the substantial

6    similarity analysis is that every work that emerges from the

7    platform is necessarily an infringing derivative work because

8    it somehow derives from these training images.

9         And we've cited the Court to extensive authority that

10   puts that argument to the side.  It is not -- it is not

11   correct, as a matter of law.  They must plead substantial

12   similarity of protected expression to identify a derivative

13   work.  And that's straight out of the Ninth Circuit's decision

14   in Litchfield.

15        And so to the extent that their theory that they

16   advance in the next version of the complaint is "We don't have

17   to plead substantial similarity because everything is an

18   infringing derivative work," that fails as a matter of law, and

19   they should not be able to rely on that theory going forward.

20        I'm trying to be as brief as I can.

21        Your Honor, one of the exclusive rights of copyright

22   that plaintiffs said was infringed in their complaint is the

23   performance right under 106(4).  We argued -- and they did not

24   oppose our argument or address our argument -- that the

25   performance -- there is no performance right in pictorial

 1    works.  And we cited case law on that in our brief.  And so any

 2    claim based on a violation of Section 106(4) should be

 3    dismissed with prejudice.

 4         With regard to vicarious and direct liability for

 5    copyright infringement, we made another argument that

 6    plaintiffs did not address in their opposition to our motion to

 7    dismiss and that they, therefore, waived, and that is that

 8    several cases have now held that you cannot plead a party is

 9    both directly and vicariously liable for the identical conduct.

10    That's because, of course, in the context of vicarious

11    liability, you have to show that the direct infringement was

12    perpetrated by someone else.

13         So they've contradicted, factually, their own

14    pleading, and courts have dismissed on that basis.  And so I

15    would ask the Court in any order to instruct plaintiffs that

16    they've got to choose, that they can't continue to describe the

17    same conduct both as a direct violation and as a vicarious

18    plea -- a basis for vicarious liability.

19         Moving to the DMCA and the Copyright Management

20    Information claim, Your Honor, of course, issued a decision in

21    the free speech case, which specifically required -- dismissed

22    that claim for failure to identify a specific -- not just the

23    specific work at issue but the specific Copyright Management

24    Information that was supposed to have been in that work and

25    removed.

1          So the argument we heard is that we've told you names

2   are used sometimes, Andersen signs her work.  We've heard that

3   it may appear in text that is included along with the image,

4   but I haven't seen any of that alleged in the complaint with

5   respect to a specific work.

6          For each -- for each work at issue, what is the work,

7   what CMI was included in that work, and who removed it and how.

8   Those are the allegations that they're required to come forward

9   with that they haven't come forward with so far and that should

10  be in any amended complaint.

11         But even -- even if they were to do that, there's a

12  basis and I -- we would argue that dismissal of the DMCA claim

13  should be with prejudice, and here's why:  We have cited

14  numerous cases, numerous cases holding that the removal of CMI

15  has to be from a work such that what results is an otherwise

16  identical copy.  It is the same work but for the removal of

17  CMI.

18         Now, importantly, they pleaded their claim as either

19  alteration or removal.  We don't actually have an alteration

20  claim because the theory they advance, the allegation that they

21  included is that these systems were designed to omit any CMI.

22  So we're talking only about removal.

23         But even as to removal, they cannot plead that CMI was

24  removed from otherwise identical copies because they have

25  pleaded again that what comes out is so unidentifiable to them

1    without the CMI that they can't tell it's theirs.  And that

2    absolutely dooms their CMI claim as a factual and a legal

3    matter.

4          Now, the Doe 1 case that they've cited several times

5    is different.  It's distinguishable because there the

6    allegation was that the code that came out of GitHub was, in

7    fact, identical, and there were specific works.  There were

8    specific pieces of code where the plaintiff said here's the

9    code, here's what came out, it's the same, it just doesn't have

10   our CMI.  They haven't done that here and they can't.  They

11   can't say that anything identical has come out.  They've said

12   just the opposite in their complaint, and they should not be

13   allowed to contradict that fundamental premise of the complaint

14   that they submitted to now try to reformulate a CMI claim that

15   could survive dismissal.

16         Two more things, Your Honor.

17         The UCL claim has to be dismissed with prejudice to

18   the extent that it's premised on a violation of copyright law.

19   They seem to acknowledge that by abandoning that argument in

20   their opposition, but it's plainly preempted under Section 301

21   to the extent it's premised on a copyright violation.  And so

22   that piece, at least, should be dismissed with prejudice.

23         And I'll say one thing about the request for judicial

24   notice, which I didn't expect to get so much play today.  We

25   filed that request for judicial notice because the theory of

 1   plaintiffs' right of publicity claim, as it has evolved through

 2   the briefing, is that Midjourney and these other platforms, on

 3   an indiscriminate basis, have somehow used plaintiffs' again

 4   unidentified and non -- undiscriminated -- somehow used their

 5   names somewhere to promote their platforms.  But they haven't

 6   identified a single example of that anywhere.  They said it's

 7   on the Midjourney website.  They cited to the Midjourney

 8   website in their complaint.  They included the URL.  They said

 9   you'll find it there.

10        So we put our RJN.  Please, Your Honor, go look at the

11   Midjourney website.  You will not find any reference to these

12   plaintiffs.  We don't even know what they're talking about.

13   They've said that they can resolve that in an amendment, and

14   we'll see what they come forward with, but I did want to

15   address the additional -- the additional pieces of evidence

16   that they tried to submit with their opposition to our request

17   for judicial notice.  One of them is pages -- one of them

18   pertains to the Midjourney website.  That's part of our RJN.

19   It's incorporated by reference.  We have no objection to that.

20        To the extent they're asking Your Honor to consider

21   pages they pulled off a third-party website that aren't ours

22   and that authenticity is a big question, those are not the

23   proper subject of judicial notice.  They are not incorporated

24   by reference.  And, in any event, not one of those pieces of

25   paper shows any use of any plaintiffs' names.

1          So thank you for indulging me, but I would urge the

2     Court to consider whether there are certain claims here that

3     really can be resolved once and for all with prejudice so the

4     case can be narrowed.  And I will appreciate a chance to

5     addressing our arguments on the overarching problems with the

6     class claims at a later date.

7          **THE COURT:**  Thank you.

8          **MS. DUNNING:**  Thank you, Your Honor.

9          **THE COURT:**  Hang on just a second.

10         **MR. GASS:**  If it would make sense for Mr. Saveri to

11    respond, I'm happy for him to go, and I can close out the

12    proceeding.  That's fine.

13         **THE COURT:**  Okay.  Well, and I'm interested in one of

14    you addressing the allegation that open source is a marketing

15    term that is used as opposed to someplace where more

16    information could be found, if it exists, with respect to the

17    plaintiffs.  And I think I'd rather hear that first and then

18    let Mr. Saveri take whatever shots he's going to take.

19         **MR. GASS:**  Again, Thank you, Your Honor.

20         Stability AI is actually proud to be committed to the

21    open-source community.  As plaintiffs' counsel acknowledged,

22    the Stable Diffusion model, the code for it, is actually made

23    open-source and available for public use subject to open-source

24    licensing terms.

25         What has been remarked upon as not readily available

1    is the weighting file.  Each entity or each party that may

2    choose to use Stable Diffusion may choose to assign its own

3    weights to different parameters, as it sees fit, so that the

4    model can create whatever types of outputs you might want.

5            You may wish to have the outputs that are of a

6    different size, a different quality.  There are many things

7    that you could alter.

8            The weighting file, itself, is actually just a set of

9    parameters.  It is not code.  The code for Stable Diffusion, to

10   the best of my understanding -- and I believe I understand

11   correctly -- is fully open-source and available to the public.

12           **THE COURT:**  Thank you.

13           **MR. GASS:**  Thank you.

14           **THE COURT:**  All right.  Mr. Saveri, do you want to

15   respond to anything?

16           **MR. SAVERI:**  I wanted to make sure all of my opponents

17   had an opportunity to speak.

18           **THE COURT:**  All right.

19           **MR. GASS:**  I'll very briefly address Your Honor's

20   inclination not to rule on the anti-SLAPP motion, and I would

21   just suggest that the decision to defer ruling on that motion I

22   think is inconsistent with the spirit and purpose of the

23   statute in this instance.

24           The reason the State of California offered defendants

25   this special procedural vehicle is precisely to spare them the

burden of litigating meritless legal claims that would burden

the category of activity that courts call protected activity.

And in this instance, you know, I think we've done that.  We

have shown, as I gather you agree, that the plaintiffs have

failed to state a legal claim on the merits with respect to the

challenged claims.  And I believe we've shown that those claims

arise from protected activity.  So for the statute to serve its

function, I think it's important, in situations like this, not

just to say:  Well, I'm granting the motion to dismiss with

leave to amend so there's no need to deal with this now.

Who knows what the amended complaint will or won't

look like.  We have a complaint.  It asserted meritless legal

claims.  They burdened First Amendment rights.  And,

respectfully, I think it's consistent with the legislative

intent in the Ninth Circuit's decision to incorporate that

procedural vehicle into federal court to address whether you

agree with us, frankly, on the first prong.

**THE COURT:**  Okay.  Thank you.

**MR. SAVERI:**  Your Honor, just briefly, first, I think

that on the request for judicial notice, I mean, what we said

in our opposition was that what was submitted to you and what

the other side asked you to take judicial notice was, in fact,

manufactured, right, and that there was -- that evidence from

the website was not consistent with the way that website looked

at the time that we filed the complaint.  So it was after the

 1    fact, it was incomplete, and we think, in a lot of ways, it was

 2    a half-truth.  Now -- and so on that basis we don't think that

 3    there's any merit to the request for judicial notice.  So I

 4    just want to be very, very clear about that.  But I understand

 5    that that's not entering into what we're doing here today.

 6         Just a couple brief points.  There was an argument

 7    about whether it was our pleading burden I guess under Rule 8

 8    to specify all the instances of infringement within the scope

 9    of the registration.  And we've cited the authority to you for

10    the proposition that as a pleading matter that level of

11    specificity is not required.

12         In particular, we cited the Perfect 10 v. Cybernet

13    Ventures case, which discusses that and notes in particular

14    where the alleged infringement is massive in scope and at

15    scale, as it is here.  As a pleading matter, it's not required

16    to identify each particular instance.  In fact, that Court

17    recognized that -- particularly where the evidence is in the

18    hand of the defendant -- that the number of infringement, the

19    ones that can be identified, might actually change.  In that

20    case it went down, I think, and then it went up.  When they

21    actually got the evidence, it went up.

22         And so that just highlights the fact that that's

23    really a factual matter and -- at least for purposes of Rule

24    8 -- alleging the infringement of works within the scope of the

25    registration is sufficient under Rule 8, and that's our

```
 1    position.

 2            We were also asked or it was suggested that we can go

 3    look at the website that we indicated.  The problem with that

 4    is that while that shows that some of the works were part of

 5    the dataset or part of the model, that's a dynamic thing, and

 6    that changes over time.

 7            So, for our purposes, we're not pointing to that as an

 8    encyclopedic list of what was infringed, but it is an example

 9    and shows that at least some were.

10            I just want to be very clear about what we cited to

11    that.  We weren't saying that that's -- that's going to be the

12    proof we were relying on.  We're just saying that there is a

13    third-party source that validates our claim.  It's not

14    complete, it can change over time, so we want to be very

15    careful about the use.  We think it supports our allegation, it

16    doesn't limit them.

17            So I would also say that we -- it's our position --

18    and I think this is supported by the case law -- that proof of

19    substantial similarity isn't required where we're alleging

20    direct copying, where we have proof of direct copying.  We

21    allege in the complaint direct copying.

22            Substantial similarity is a kind of another way of

23    proving the copying if you don't actually have proof of direct

24    copying.  If you have access and a copy that is similar, you

25    can rely on that proof almost as kind of circumstantial
```

1   evidence of the copying, because you don't have the direct

2   copy.

3            So because we say this is a case involving direct

4   copy, we say that under the case law there's no requirement for

5   substantial similarity.

6            I wasn't very clear about the point about direct

7   versus vicarious points.

8            I'll slow down.

9            It is certainly the case that the same set of facts

10  could give rise both to claims for direct infringement as well

11  as vicarious infringement, and so the fact that they list the

12  same facts and depending on what it is and who it is and what

13  the particular circumstance is, it could be -- those same facts

14  could give rise to direct infringement or vicarious.  And so I

15  think that's not something that should be parsed at this point.

16           There was an argument about 106(4).  I think, again,

17  that's something that depending on what the allegations are,

18  that claim may survive.  We didn't address it.  I agree about

19  that, but we were going to have an opportunity to allege that.

20           Those are my notes.

21           I think there was one point about the DMCA and then

22  thank you, Your Honor.

23           **THE COURT:**  Okay.  Mr. Young?

24           **MR. YOUNG:**  Yes, Your Honor.  Thank you.  Christopher

25  Young for the plaintiffs.  I just wanted to make two quick

1  points about the DMCA.

2        There seemed to be having some suggestion that we need

3  to plead something like the who, what, where, when, why, for

4  the DMCA claim.  I would just note that DMCA claims are

5  governed by Rule 8, not Rule 9.  And to the extent Rule 9 does

6  apply for knowledge, that could be pled generally.

7        The second point is to the extent there's a suggestion

8  that the output must be identical for the purposes of DMCA

9  claim, I would just note that there is no element of the DMCA

10 that requires a technicality.  And, in fact, each of the cases

11 that defendants have cited for this proposition, Dolls Kill,

12 Kirk Kara, Faulkner Press, Frost-Tsuji.

13        **THE COURT:**  Slow down.

14        **MR. YOUNG:**  Sorry, Your Honor.  I got a little

15 excited.  I'm going to take a breath.

16        Each of those cases involve works that could have been

17 recreated independently without necessarily creating --

18 reproducing the CMI; for example, Kirk Kara with the bracelets.

19 Faulkner Press was a case about textbooks, but in that case the

20 copying was by students to sat in the professor's class.  It

21 wasn't a copy of the textbook.  Frost-Tsuji was about

22 architectural plans.

23        And at page 5 of the opinion you can say virtually

24 identical plans could have been created by redrawing

25 Frost-Tsuji's plans and not including Frost-Tsuji's copyright

 1   managed information.  But here we allege that in the process of

 2   training and scraping necessarily exact copies must have been

 3   made, including the CMI; and, because of that allegation, it's

 4   a direct copy.  At some point there was an identical copy made

 5   from which CMI was altered or removed.  Thank you.

 6          **THE COURT:**  Okay.  Thank you.

 7          **MS. DUNNING:**  Your Honor, may I just have a few brief

 8   follow-ups, if you would allow it?

 9          **THE COURT:**  Okay.

10          **MS. DUNNING:**  First, with respect to the pleading

11   burden, we've never argued that plaintiffs need to identify

12   every accused work or every copyrighted work, that they must

13   allege representative infringements.  That's the MultiCraft

14   Imports case, that's Judge Breyer's case in Blizzard.

15   Dismissal is warranted without at least representative

16   examples.

17          And their own cases Perfect 10, Microsoft, Facebook v.

18   Power Ventures, in all of those there were examples of specific

19   works that were supposed to have been infringed and specific

20   accused -- allegedly infringing works.  That's point one.

21          Point two, with respect to how they've been trained,

22   again, it's not sufficient to point to a website that shows

23   works of Andersen.  They have to identify registered works of

24   Andersen that have been trained.  You cannot tell from her

25   copyright registrations what works are covered.  You cannot

tell from how they've been trained what works there are

registered.  They have to tell us.  That information is within

their knowledge and can be shared.

Point three, if I can find it.

Let me skip to point four.

With respect to the vicarious and direct infringement,

I'd point Your Honor to Sound & Color and Smith v. Weeknd --

both cited in our brief -- which hold that you cannot plead

both direct and vicarious liability premised on the same

conduct.  And that's what they've done here, which is why

dismissal is required.

With respect to the identity of input and output for

purposes of the copyright management information claim, their

allegation is that the DMCA was violated when these platforms

generate works without plaintiffs' CMI included.

You've already addressed the fact that they don't

identify which defendant is supposed to have removed what from

which work, and they need to address that.

But, in each of the cases we've cited, the work that

was accused of being infringing or the work that was accused of

violating the DMCA because it lacks CMI was otherwise

identical.

Even in the ICONICS case that plaintiff cited to you,

the works were otherwise identical.  There it was software and

the defendant allegedly went in, took the plaintiffs' name out

1    of the headers of the software files and replaced it with its

2    own, but all the software, everything else, remained identical,

3    even in the case they cite.  That's required and every case

4    we're aware of to consider the issue has held that, and they

5    should not be able to avoid that in their pleading.

6            And then finally, I would just point Your Honor to

7    case law with which you're most likely familiar, but in the

8    Ninth Circuit it's simply not an accurate statement of the law

9    to say that substantial similarity isn't required.  Substantial

10   similarity is required to show a violation of Section 106.

11           One of the reproduction rights under the Ninth

12   Circuit's decision in Roth Greeting Cards it held -- the Ninth

13   Circuit -- substantial similarity between the infringing work

14   and the work copyrighted is required.

15           The Fuzzy Logic case from the Central District

16   similarly holds that, and we cited to that.

17           Similarly, with respect to a derivative work, the

18   Ninth Circuit in Litchfield held, quote, "A work is not

19   derivative unless it has been substantially copied from the

20   prior work.  To prove infringement, one must show substantial

21   similarity."

22           So when we're talking about outputs, what comes out of

23   these models compared to the training material, it's

24   plaintiffs' burden to plead and ultimately prove that there is

25   substantial similarity of protected expression or it's not a

1    derivative work and it can't be infringing.  And so in any

2    amended complaint I hope they will keep that in mind.

3          Thank you, Your Honor.

4          **THE COURT:**  All right.  Thank you all very much for

5    your argument, and I will get an order out when I get an order

6    out.

7          **MR. SAVERI:**  Thank you, Your Honor.

8          **THE COURT:**  Thank you.

9       (Concluded at 3:25 p.m.)

10

11                    C E R T I F I C A T E

12

13       I certify that the foregoing is a true and correct

14    transcript of the record of proceedings in the above-entitled

15    matter.

16

17    _Jennifer Coulthard_                July 21, 2023

18    JENNIFER L. COULTHARD, RMR, CRR              DATE
     Official Court Reporter
19    CA CSR#14457

20

21

22

23

24

25