# EXHIBIT 1

**FILED**
Superior Court of California
County of Los Angeles

**OCT 13 2023**

David W. Slayton, Executive Officer/Clerk of Court

By: L. M'Greene, Deputy

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| Coordinated Proceeding<br>Special Title (Rule 3.550)<br><br>SOCIAL MEDIA CASES | ) CASE NO.  JCCP 5255<br>) Lead Case: 22STCV21355<br>)<br>) This Ruling Relates to:<br>) 22STSCV40543; 22STCV26778; CV2022-<br>) 1472<br>)<br>) **Defendants' Demurrer to Master**<br>) **Complaint and Three Short Form**<br>) **Complaints**<br>)<br>) Hon. Carolyn B. Kuhl<br>) Department 12<br>) Spring Street Courthouse |

   The issue in this case is whether a social media company may maximize its own benefit and advertising revenue at the expense of the health of minor users of that social media company's applications or websites.  Plaintiffs here allege that, as children or minor teenagers, they became addicted to the social media platforms Facebook, Instagram, Snapchat, TikTok and/or YouTube.  Their addictions, they contend, resulted from allegedly manipulative features of those interactive media which sought to maximize the amount of time these young people spent on the sites and thereby maximize advertising revenue for Defendants here, who created and operated these platforms.  Plaintiffs allege that as a result of their addiction,

-1-

they suffered depression and anxiety, engaged in self-harm, became suicidal, and developed eating disorders.

The central question raised by the motion before the court at this stage of the litigation is whether the law provides a remedy for the harm Defendants' policies allegedly caused Plaintiffs.  In order to make this determination, the court must explore whether the common law provides a remedy for the harms alleged and then address whether federal law or the Constitution bars any such remedy.

The court determines that Defendants' social media platforms are not "products" for purposes of product liability claims, but that Plaintiffs have adequately pled a cause of action for negligence that is not barred by federal immunity or by the First Amendment.  Plaintiffs also have adequately pled a claim for fraudulent concealment against Defendant Meta.  The Demurrer is overruled as to these claims but sustained as to all other claims.

## I.      Summary of Factual Allegations

Plaintiffs in this coordinated proceeding are minor users of social media platforms (or parents of those users) who allege they have suffered various types of harm as a result of the use of the platforms.  Plaintiffs bring their claims against multiple Defendants that designed and operated the social media platforms: Facebook, Instagram, Snapchat, TikTok, and YouTube.  Facebook and Instagram are owned, designed, and operated by a group of Defendants who are referred to collectively herein as "Meta."  Snapchat is owned, designed, and operated by Defendant Snap Inc. (Snap).  TikTok is owned, designed, and operated by multiple Defendants who are referred to collectively herein as "ByteDance."  YouTube is owned, designed, and operated by multiple Defendants referred to collectively herein as "Google."

On May 16, 2023, Plaintiffs filed their Master Complaint.  The Master Complaint alleges 13 causes of action:

(1)  Strict Liability – Design Defect (against all Defendants);
(2)  Strict Liability – Failure to Warn (against all Defendants);
(3)  Negligence – Design (against all Defendants);
(4)  Negligence – Failure to Warn (against all Defendants);
(5)  Negligence (against all Defendants);
(6)  Negligent Undertaking (against all Defendants);
(7)  Fraudulent Concealment and Misrepresentation (against Meta);
(8)  Negligent Concealment and Misrepresentation (against Meta);
(9)  Negligence per se (against all Defendants);
(10)  Sex and Age Discrimination (against all Defendants);
(11)  Wrongful Death (against all Defendants);
(12)  Survival Action (against all Defendants); and
(13)  Loss of Consortium and Society (against all Defendants).

Each Plaintiff or family also filed a short-form complaint that adopts some or all of the allegations of the Master Complaint, specifies each Plaintiff's injuries, and adds individual allegations concerning the social media platforms used by the Plaintiff and how those platforms injured him or her.  The current Motion concerns the allegations of the Master Complaint as it applies to three specified short-form complaints.

The Master Complaint consists of 300 pages of allegations and cannot be fully summarized by the court here.  While directing the reader to the many allegations in the Master Complaint, this court nonetheless offers a (relatively) short overview of certain important aspects of the Master Complaint to provide a context for the court's ruling.

"Instagram, Facebook, TikTok, Snap, and YouTube employ many similar defective and dangerous product features that are engineered to induce more use by young people—creating an unreasonable risk of compulsive use and addiction. For instance, all five apps harvest user data and use this information to generate and push algorithmically tailored "feeds" of photos and videos. And all five include methods through which approval can be expressed and received, such as likes, hearts, comments, shares, or reposts."  (Mast. Compl., ¶ 80, internal footnotes omitted.)

"Defendants' apps are designed and engineered to methodically, but

1   unpredictably, space out dopamine-triggering rewards with dopamine gaps. The

2   unpredictability is key because, paradoxically, intermittent variable rewards (or

3   'IVR') create stronger associations (conditioned changes in the neural pathway)

4   than fixed rewards. Products that use this technique are highly addictive or habit

5   forming."  (Mast. Compl., ¶ 81.)

6        "Defendants' apps are designed to purposely withhold and release rewards

7   on a schedule its algorithms have determined is optimal to heighten a specific

8   user's craving and keep them using the product. Defendants incorporate IVR into

9   the design and operations of their respective products in various ways by linking a

10  user's action (like pulling a lever) with a variable reward."  (Mast. Compl., ¶ 84,

11  internal quotation marks, brackets, and footnotes omitted.)  "[E]ach of Defendants'

12  products exploits this physiological reaction among its users, typically using 'likes,'

13  'hearts,' or other forms of approval that serve as the reward and are purposefully

14  delivered in a way to create stronger associations and maximize addiction."

15  (Mast. Compl., ¶ 86.)

16       "Defendants' apps addict young users by preying on their already-

17  heightened need for social comparison and interpersonal feedback-seeking.

18  Because of their relatively undeveloped prefrontal cortex, young people are already

19  predisposed to status anxieties, beauty comparisons, and a desire for social

20  validation. Defendants' apps encourage repetitive usage by dramatically amplifying

21  those insecurities."  (Mast. Compl., ¶ 91, internal footnotes omitted.)

22       "The design of Defendants' apps also encourages unhealthy, negative social

23  comparisons, which in turn cause body image issues and related mental and

24  physical disorders. Given adolescents' naturally vacillating levels of self-esteem,

25  they are already predisposed to comparing 'upward' to celebrities, influencers, and

26  peers they perceive as more popular. Defendants' apps turbocharge this

27  phenomenon."  (Mast. Compl., ¶ 94.)

28       "That is made worse by appearance-altering filters built into Defendants'

apps, which underscore conventional (and often racially biased) standards of beauty, by allowing users to remove blemishes, make bodies and faces appear thinner, and lighten skin-tone." (Mast. Compl., ¶ 94, internal footnotes omitted.)

These defective features of Defendants' social media products "can cause or contribute to (and, with respect to Plaintiffs, have caused and contributed to) the following injuries in young people: eating and feeding disorders; depressive disorders; anxiety disorders; sleep disorders; trauma- and stressor-related disorders; obsessive-compulsive and related disorders; disruptive, impulse-control, and conduct disorders; suicidal ideation; self-harm; and suicide." (Mast. Compl., ¶ 96.)

Plaintiffs allege that the social media platforms were designed "to addict minors and young adults, who were particularly unable to appreciate the risks posed by the products, and particularly susceptible to harms from those products." (Mast. Compl., ¶ 830.) "[E]ach Defendant knew or, by the exercise of reasonable care, should have known that Plaintiffs would use these products without inspection for [their] addictive nature." (Mast. Compl., ¶ 832.)

"Each Defendant defectively designed its respective products to take advantage of the chemical reward system of users' brains (especially young users) to create addictive engagement, compulsive use, and additional mental and physical harms." (Mast. Compl., ¶ 833.)

"Each Defendant failed to test the safety of the features it developed and implemented for use on its respective products. When each Defendant did perform some product testing and had knowledge of ongoing harm to Plaintiffs, it failed to adequately remedy its respective product's defects or warn Plaintiffs." (Mast. Compl., ¶ 834.)

"Children and teenagers are among the ordinary consumers of each of the Defendant's products. Indeed, each Defendant markets, promotes, and advertises its respective products to pre-teen and young consumers. Pre-teen and young

consumers, and their parents and guardians, do not expect Defendants' products to be psychologically and neurologically addictive when the products are used in its intended manner by its intended audience. They do not expect the algorithms and other features embedded by each Defendant in its respective products to make them initially and progressively more stimulative, to maximize young consumers' usage time. They do not expect each Defendant's revenues and profits to be directly tied to the strength of this addictive mechanism and dependent on young consumers spending several hours a day using their respective products." (Mast. Compl., ¶ 835.)

"Each of the Defendant's respective products are likewise defectively designed in that it creates an inherent risk of danger; specifically, a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include but are not limited to dissociative behavior, withdrawal symptoms, social isolation, damage to body image and self-worth, increased risky behavior, exposure to predators, sexual exploitation, and profound mental health issues for young consumers including but not limited to depression, body dysmorphia, anxiety, suicidal ideation, self-harm, insomnia, eating disorders, death, and other harmful effects." (Mast. Compl., ¶ 836.)

"Alternative designs were available that would reduce minors' addictive and compulsive engagement with each of the Defendants' respective products, and which would have served effectively the same purpose of Defendants' products while reducing the gravity and severity of danger posed by those products' defects." (Mast. Compl., ¶ 839.)

For example, Plaintiffs allege that Defendants could have changed the design of their social media products to include such features as "[r]obust age verification," "[e]ffective parental controls," "[d]efault protective limits to the length and frequency of sessions," and tools to prevent child sexual exploitation, among others. (Mast. Compl., ¶ 838.)

1    The alleged purpose of Defendants' actions was to increase revenue.

2   Plaintiffs allege: "Defendants deliberately embedded in their products an array of

3   design features aimed at maximizing youth engagement to drive advertising

4   revenue. Defendants know children are in a developmental stage that leaves them

5   particularly vulnerable to the addictive effects of these features. Defendants target

6   them anyway, in pursuit of additional profit." (Mast. Compl., ¶ 2.)  Plaintiffs allege

7   that Defendants' platorms are "designed, marketed, and operated" in order "to

8   maximize the number of children who download them and use them compulsively."

9   (Mast. Compl., ¶ 52.)  Plaintiffs further allege:

10          Children are more vulnerable users and have more free time on their
            hands than their adult counterparts. Because children use Defendants'
11          products more, they see more ads, and as a result generate more ad
            revenue for Defendants. Young users also generate a trove of data about
12          their preferences, habits, and behaviors. That information is Defendants'
            most valuable commodity. Defendants mine and commodify that data,
13          including by selling to advertisers the ability to reach incredibly narrow
            tranches of the population, including children. Each Defendant placed its
14          app(s) into the stream of commerce and generated revenues through the
            distribution of those apps at the expense of the consuming public and
15          Plaintiffs.

16   (Mast. Compl., ¶ 52.)

17          While these allegations are written to apply to each of the platforms at issue

18   here, Plaintiffs also provide more specific allegations regarding each Defendant;

19   these individualized allegations also allege that Plaintiffs' harms were caused by the

20   design and operation of the platforms.  The allegations regarding Snapchat can be

21   summarized as follows.

22          Plaintiffs allege that Snapchat's design features are addictive to minor users:

23          Once Snap entices children to use its product, it uses a series of product
            features that are designed to addict children. As laid out below, those
24          features can be broadly grouped into two categories that exploit
            techniques discussed earlier in this Complaint. The first are social metrics
25          and other similar psychological manipulation techniques. The second are
            features designed to encourage endless passive consumption of content on
26          the Snapchat product. These features, in tandem with each other and the
            other harmful features described throughout this section and Complaint,
27          induce addiction, compulsive use, and other severe mental and physical
            harm to the child users of the Snapchat product, including Plaintiffs.

28

(Mast. Compl., ¶ 439.)

Plaintiffs provide allegations regarding the design feature "Snap Streak":

457. Snap Streaks contribute to feelings of social pressure and anxiety when users lose or break a Streak. Researchers have found that losing a Streak can cause feelings of betrayal for some users, especially girls, who reported "negative" feelings when losing a Streak with one of their friends.

458. In 2018, Snap conducted its own internal research on Snap Streaks, which found that over a third of users reported it was "extremely" or "very important" to keep a Streak going, and some users reported that the stress level to keep a Streak was "intolerable" or "large." Snap's users reported that Streaks are equally important to "Likes" on Instagram

459. As this research demonstrates, Streaks are important to users. However, these design features do not enhance the communication function of the product. Instead, they exploit users' susceptibility to social pressure and to the compulsive accumulation of other rewards, including Snap Score points and Charms.

(Mast. Compl., ¶¶ 457-459, internal footnotes omitted.)

Plaintiffs provide allegations regarding Snapchat's push notifications:

In addition to Snapchat's in-app reward features, Snap also sends push notifications and emails to encourage addictive engagement and increase use. Notifications are triggered based on information Snap collects from, and about, its users. Snap "pushes" these communications to users excessively and at disruptive times of day. Snap has even designed the format of these notifications to pull users back onto its app by preying on their fear of missing out—never mind the consequences to their health and well-being.

(Mast. Compl., ¶ 460.)  Plaintiffs allege that Snap has designed its platform to make it difficult for users to discontinue use.  (Mast. Compl., ¶ 461.)  Plaintiffs include allegations regarding Snapchat's design feature "Spotlight":

468. In November 2020, Snap launched "Spotlight," a feature that pushes to users "an endless feed" that Snap curates from its 300 million daily Snapchat users. Spotlight functions and appears nearly identical to TikTok, with similar addictive qualities and harms. Snapchat's Spotlight feature allows users to make videos that anyone can view, and Snap pays users whose Spotlight videos go viral, thus serving as yet another reward system that encourages user engagement. After Snap introduced Spotlight, user time spent on the product increased by over 200%.

469. In February 2022, Snap CEO Evan Spiegel told investors that users are spending more time on Spotlight than almost any other aspect of Snapchat. A year prior, Snap announced "Spotlight Challenges," which provided users with cash prizes for creating Spotlight videos with specific lenses, sounds, or topics, further integrating the user into the Snap ecosystem. Snap claims it paid out more than $250 million in cash prizes

to Spotlight Challenge participants in 2021 alone.

(Mast. Compl., ¶¶ 468-469, internal footnotes omitted.)

Like other Defendants in this coordinated proceeding, Snap allegedly has design features that allow users to use lenses and filters, the use of which leads to emotional and mental harm.  (Mast. Compl., ¶¶ 484-485.)  Plaintiffs allege:

> A 2017 study found that these features made Snapchat one of the worst social media products for the mental health of children and adolescents, behind only Instagram. In recent years, plastic surgeons have reported an increase in requests for alterations that correspond to Snapchat's filters. This has led researchers to coin the term "Snapchat Dysmorphia," in which the effect of Snapchat's filters triggers body dysmorphic disorder. The rationale underlying this disorder is that beauty filters on Snapchat create a "sense of unattainable perfection" that leads to self-alienation and damages a person's self-esteem. One social psychologist summarized the effect as "the pressure to present a certain filtered image on social media [which] can certainly play into [depression and anxiety] for younger people who are just developing their identities."

(Mast. Compl., ¶ 486, internal footnotes omitted; brackets in original.)  The provision of such "lenses" and "filters" is alleged to be a tool provided to Plaintiffs for Plaintiffs themselves to produce pictures for Snapchat.

Plaintiffs also allege harm related to Defendants' platforms' age verification—or lack thereof.  "None of the Defendants conduct proper age verification or authentication. Instead, each Defendant leaves it to users to self-report their age. This unenforceable and facially inadequate system allows children under 13 to easily create accounts on Defendants' apps."  (Mast. Compl., ¶ 57.)  Plaintiffs thus seek to hold Defendants liable for "[f]ailing to implement effective protocols to block users under the age of 13."  (Mast. Compl., ¶ 930(a).)  With respect to Meta, Plaintiffs also offer allegations regarding the use of age verification when a parent seeks to have a minor user's account deleted:

> Meta imposes unnecessary barriers to the removal of accounts created by children under 13. Since at least April 2018, Instagram and Facebook both accept reports of accounts created by children under 13. However, before an Instagram or Facebook account is deleted, Meta requires verification that the child is under the age of 13.

(Mast. Compl., ¶ 249, internal footnotes omitted.)

Plaintiffs also allege that Defendants' platforms are designed to make it difficult for minor users' parents to control their children's use of the platforms. Defendants have allegedly failed "to implement effective parental controls." (Mast. Compl., ¶ 930(c).)  Plaintiffs allege that minor users are able to secretly make accounts without their parents becoming aware.  (See, e.g., Mast. Compl., ¶ 493.) For example, Plaintiffs allege as follows with respect to Snapchat's "My Eyes Only" feature:

> This feature enables and encourages users to hide harmful content from their parents in a special tab that requires a passcode. Content cannot be recovered from "My Eyes Only"—allegedly even by Snap itself.

(Mast. Compl., ¶ 476.)

As explained more fully below, the fact that Plaintiffs have adequately alleged that their harms were caused by the design features of Defendants' platforms is critical to this court's decision.  But some allegations of the Master Complaint can be read to state that Plaintiffs' harms are caused by the actual content found on Defendants' platforms, rather than just the design features of those platforms.

For example, the question of whether harm to Plaintiffs is caused by the design of the platforms or by the allegedly harmful third-party content found on those platforms is raised by the allegations that certain Plaintiffs have developed eating disorders.  Plaintiffs allege:

> In 2020, clinical research demonstrated an observable link between youth social media use and disordered eating behavior. The more time young girls spend using Defendants' products, the more likely they are to develop disordered eating behaviors. And the more social media accounts adolescents have, the more disordered eating behaviors they exhibit.

(Mast. Compl., ¶ 116, internal footnotes omitted.)  Such allegations can be read to suggest that an eating disorder like anorexia is caused by the design of the platforms themselves.  But Plaintiffs also offer allegations suggesting that eating disorders are caused by the third-party content found on Defendants' platforms. For example, Plaintiffs allege that content such as "thinspiration" and "fitspiration" "lowered self-esteem, even in those with a self-perceived healthy weight." (Mast.

1    Compl., ¶ 118.)  The Master Complaint also alleges that Meta approved an

2    advertisement that promotes an " 'Ana Tip' [with 'ana' being a euphemism for

3    anorexia] instructing the viewer to 'visit pro-ana sites to feed your motivation and

4    reach your goal' when feeling hungry."  (Mast. Compl., ¶ 359.)

5         In addition to filing a Master Complaint, Plaintiffs also have filed individual,

6    short-form complaints that provide more detail for the many individual minor users

7    who were allegedly harmed by Defendants' platforms.  There are three such short-

8    form complaints that are relevant to the instant proceeding: (1) the Amended Short

9    Form Complaint For Damages And Demand For Jury Trial, *M.C. ex rel. Cramblet v.*

10   *Meta Platforms, Inc., et al.*, Case No. 22STCV40543 (M.C. SFC); (2) the Amended

11   Short Form Complaint For Damages And Demand For Jury Trial, *J.P., et al. v. Meta*

12   *Platforms, Inc., et al.*, Case No. 22STCV26778 (J.P. SFC); and (3) the Amended

13   Short Form Complaint For Damages And Demand For Jury Trial, *J.S., et al. v. Meta*

14   *Platforms, Inc., et al.*, Case No. CV2022-1472 (J.S. SFC) (collectively, Short-Form

15   Complaints).  The three Plaintiffs concerned in the Short-Form Complaints

16   incorporate the allegations of the Master Complaint, but offer more individualized

17   information regarding their particular use of Defendants' platforms and the alleged

18   individual harms they each suffered as a result of that use.[1]

19        In the M.C. SFC, the minor M.C. brings claims against all Defendants for his

20   or her alleged use of Instagram, Snapchat, TikTok, and YouTube.  (M.C. SFC, ¶ 3.)

21   Plaintiff M.C. alleges that his or her harms include addiction/compulsive use,

22   anorexia, depression, suicidality, attempted suicide, and a "[r]educed inclination or

23   ability to sleep."  (M.C. SFC, ¶ 5.)  Plaintiff M.C. seeks to recover pursuant to the

24   First through Tenth Causes of Action (i.e., Plaintiff M.C. does not allege a cause of

25   action for wrongful death, a survival cause of action, or a cause of action for loss of

26

27   [1] Although the Master Complaint refers to injuries allegedly caused by child predators, by child
     sexual abuse material, and by dangerous "challenges" found on social media (see, e.g., Mast.
28   Compl., ¶¶ 137, 613), none of the Short-Form Complaints that are at issue in the current
     Motion alleges that a Plaintiff suffered injury from such causes.

1   consortium).

2        In the J.P. SFC, the minor M.P. brings claims against Meta and ByteDance

3   based on Plaintiff M.P.'s use of Instagram and TikTok.  (J.P. SFC, ¶¶ 3-4.)  Plaintiff

4   M.P. alleges that his or her harms include addiction/compulsive use, anorexia,

5   depression, and "[l]ong-term physical harms arising as foreseeable result of eating

6   disorder."  (J.P. SFC, ¶ 5.)  The J.P. SFC alleges the First through Tenth, and the

7   Thirteenth Causes of Action from the Master Complaint.  (J.P. SFC, ¶ 6.)

8        In the J.S. SFC, the minor L.J.S. brings claims against Meta for his or her use

9   of Facebook and Instagram.  (J.S. SFC, ¶¶ 3-4.)  Plaintiff L.J.S. also brings his or

10  her claims based on use of the Meta product "Oculus."  (J.S. SFC, ¶ 4.)  Plaintiff

11  L.J.S. alleges that his or her harms include addiction/compulsive use, bulimia,

12  binge-eating, depression, anxiety, suicidality, and "physical injuries suffered as a

13  result of use of the Oculus Virtual Reality headset."  (J.S. SFC, ¶ 5.)[2]  The J.S. SFC

14  alleges the First through Ninth, and Thirteenth Causes of Action from the Master

15  Complaint.

16       Defendants now demur to the Master Complaint and to the three Short-Form

17  Complaints with respect to the First through Tenth, and Thirteenth Causes of

18  Action, contending that Plaintiffs have failed to state facts sufficient to constitute a

19  cause of action against Defendants.  Plaintiffs alleging claims in the M.C. SFC and

20  the J.P. SFC have decided to withdraw their Tenth Cause of Action; similarly,

21  Plaintiffs from the J.P. SFC and the J.S. SFC have agreed to withdraw their

22  Thirteenth Cause of Action.  (Pls' Opp., at p. 75.)  Consequently, this ruling

23  addresses only the First through Ninth Causes of Action as alleged in the Master

24  Complaint and Short-Form Complaints.

25

26    —————————————

27  [2] Allegations regarding Plaintiff L.J.S.'s use of the Oculus virtual reality headset are not
    addressed in this ruling.  On June 16, 2023, by way of a post on the Case Anywhere message
    board, this court approved the parties' proposal "that any demurrer briefing addressing the

28  supplemental Oculus allegations be held in abeyance until after [this court] has ruled on the
    initial demurrers."

1    Snap has filed a supplemental brief in support of the Demurrer in an attempt

2    to demonstrate that Plaintiffs' claims are especially defective against Snap given the

3    way in which Snapchat functions.

4

5    **II.    Procedural Standard for Challenges to a Complaint by Demurrer**

6    Defendants' Demurrer is not an invitation for the court to determine the

7    veracity of any of the factual allegations in the Master Complaint.  Defendants'

8    Demurrer thus plays the rather "limited role" of testing the "legal sufficiency" of the

9    Master Complaint and the Short-Form Complaints.  (*Donabedian v. Mercury Ins.*

10   *Co.* (2004) 116 Cal.App.4th 968, 994.)  Here the court—as well as Defendants—

11   must treat all of the factual allegations in the Master Complaint as true.  "The sole

12   issue raised by a general demurrer is whether the facts pleaded state a valid cause

13   of action—not whether they are true. Thus, no matter how unlikely or improbable,

14   plaintiff's allegations must be accepted as true for the purpose of ruling on the

15   demurrer.  (Cal. Prac. Guide Civ. Pro. Before Trial (The Rutter Group) Ch. 7(I)-A ¶

16   7:44.)

17   It is important to stress that "a general demurrer may not be sustained ... as

18   to a portion of a cause of action." (*Daniels v. Select Portfolio Servicing, Inc.* (2016)

19   246 Cal.App.4th 1150, 1167, disapproved of on other grounds by *Sheen v. Wells*

20   *Fargo Bank, N.A.* (2022) 12 Cal.5th 905.)  This basic rule of California civil

21   procedure means that the court must limit its inquiry to the question whether there

22   are sufficient factual allegations in the Master Complaint upon which a particular

23   cause of action properly can be based; if such factual allegations exist, then the

24   court is not permitted to dismiss that cause of action based on some additional

25   factual allegations that, alone, would not properly support that cause of action.  As

26   the Third District Court of Appeal explained, if a "demurrer should [be] overruled

27   based on some of [the] factual allegations [found in the plaintiff's complaint], [the

28   court] need not address the sufficiency of the other factual allegations contained in

the complaint[]." (*Olson v. Hornbrook Community Services Dist.* (2019) 33 Cal.App.5th 502, 522, fn. 9.)  The proper way for a defendant to attack certain *portions* of a cause of action is by filing a motion to strike.  (*Id.*)

This basic character of demurrers was explained in *PH II, Inc. v. Superior Court* (1995) 33 Cal.App.4th 1680 (*PH II*).  There, the appellate court, without even reaching the "merits," reversed the trial court's decision to sustain the defendant's demurrer, given that the trial court had failed to follow the basic "rule that a party may not demur to a portion of a cause of action … ." (*Id.* at p. 1681.)  The plaintiff alleged two causes of action for legal malpractice that were based on "several distinct incidents of alleged malpractice." (*Id.*)  The defendants in *PH II* "demurred to one, identical portion of the two causes of action, which involved a single incident of alleged malpractice" which the plaintiff conceded was unmeritorious. (*Id.*)  But the plaintiff contended that its causes of action for malpractice could nonetheless rest on other, separate incidents of alleged malpractice by the defendants. (*Id.* at p. 1682.)  The trial court sustained the demurrer to the portions of the two causes of action based on the unmeritorious incident without leave to amend, "on the ground that failure to pursue a worthless claim is not actionable malpractice." (*Id.*)

The appellate court in *Ph II* reversed the trial court and found that the defendants' demurrer "was not procedurally proper." (*Id.*)  The court explained that, in such circumstances, the proper procedural vehicle is a motion to strike. (*Id.* at pp. 1682-1683.)

Because Defendants here have filed a demurrer, the foregoing principles of California civil procedure must govern this court's ruling.  If there are any allegations that would be sufficient to support a cause of action, then Defendants' Demurrer must be overruled as to that cause of action.

III.    **Nature of Defendants' Principal Legal Challenges**

Defendants argue that each of the causes of action alleged in the Master Complaint fails to state a claim.  In addition, Defendants argue that the entirety of Plaintiffs' case is barred by a federal statute—section 230 of the Communications Decency Act, 47 U.S.C. § 230 (Section 230)—and by the provisions of the United States and California Constitutions protecting freedom of speech (First Amendment).  Defendants, in their briefs and at oral argument, begin by analyzing caselaw interpreting Section 230 and the First Amendment.  However, as explained further below, in order to determine whether a state law cause of action is barred by either Section 230 or the First Amendment, the proper approach is to analyze the elements of a particular cause of action and then to determine whether the gravamen of the cause of action impermissibly imposes liability on a basis that is statutorily or constitutionally precluded.

Therefore, the court will first consider whether California law provides a basis for relief under each cause of action pleaded by Plaintiffs.  Then the court will consider the restrictions imposed by Section 230 and by the First Amendment, and whether either bars a particular cause of action.

Nevertheless, in order to provide a more thorough and cohesive analysis, the discussion below begins with some general principles that govern the immunity provided by Section 230 and the protections provided by the First Amendment when state courts seek to impose tort liability affecting speech.

A.  Section 230

Section 230 of the Communications Decency Act (CDA), titled "Protection for private blocking and screening of offensive material," was passed by Congress in 1996.  In part the statute was meant to overrule a decision of a New York state court that had held an internet service provider liable as a publisher of offensive content because it deleted some offensive message board posts and not others.

(See *Doe v. Internet Brands, Inc.* (9th Cir. 2016) 824 F.3d 846, 851-852 (*Internet Brands*); *Hassell v. Bird* (2018) 5 Cal.5th 522, 534 (*Hassell*).)  Congress sought to spare internet service providers the "grim choice" between doing nothing to remove offensive content and removing some but not all offensive content.  (*Internet Brands, supra,* at pp. 851-852.)

In a section entitled "Protection for 'Good Samaritan' blocking and screening of offensive material,"[3] Section 230 states that no provider of an interactive computer service may be held liable for either (a) a voluntary good faith action to restrict access to materials that the provider considers "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable," or (b) any action to enable information content providers or others the technical means to restrict access to such materials.  (47 U.S.C. § 230, subd. (c)(2)(A)-(B).)  Under that same heading, Congress provided additional protection for information service providers, which has proven more difficult to interpret:

> Treatment of publisher or speaker.  No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(*Id.* § 230, subd. (c)(1).)

Defendants seek protection from the claims asserted in this case based on this language of Section 230.  It is conceded by all parties that Defendants are "provider[s] … of an interactive computer service" within the meaning of subdivision (c)(1) of Section 230.[4]

---

[3] The court in *Internet Brands, supra,* 824 F.3d at p. 851, looked to the heading of subdivision (c) of Section 230 to guide its consideration of the purposes of Section 230.

[4] "The term 'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." (*Id.* § 230, subd. (f)(2).)

"The term 'access software provider' means a provider of software (including client or server software), or enabling tools that do any one or more of the following: (A) filter, screen, allow, or disallow content; (B) pick, choose, analyze, or digest content; or (C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content." (*Id.* § 230, subd. (f)(4).)

1    Congress expressly stated its policy goals in enacting Section 230.

2   Subdivision (b) of Section 230 states that "[i]t is the policy of the United States" to

3   promote continued development of the internet and interactive computer services

4   and to preserve "the vibrant and competitive free market" of these services

5   "unfettered by Federal or State regulation." (*Id.* § 230, subd. (b)(1)-(2).)

6   Congress equally desired "to encourage the development of technologies which

7   maximize user control over what information is received by individuals, families and

8   schools" using interactive computer services and to "remove disincentives for the

9   development and utilization of blocking and filtering technologies that empower

10  parents to restrict children's access to objectionable or inappropriate online

11  material." (*Id.* § 230, subd. (b)(3)-(4).)[5]

12    The California Supreme Court has quoted with approval Ninth Circuit

13  precedent recognizing that "there is an apparent tension between Congress's goals

14  of promoting free speech while at the same time giving parents the tools to limit

15  the material their children can access over the Internet … . The need to balance

16  competing values is a primary impetus for enacting legislation. Tension within

17  statutes is often not a defect but an indication that the legislature was doing its

18  job." (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 56 (*Barrett*), quoting *Batzel v.*

19  *Smith* (9th Cir. 2002) 333 F.3d 1018, 1028 (*Batzel*), reversed on other grounds by

20  subsequent statutory amendment as stated in *Breazeale v. Victim Servs.* (9th Cir.

21  2017) 878 F.3d 759, 766-767).

22    As to the preemptive effect of Section 230, the statute states:
        (e) Effect on other laws.

23

                                    •••

24      (3) State law.   Nothing in this section shall be construed to prevent any
        State from enforcing any State law that is consistent with this section.   No

25

26  _____

27  [5] Congress also expressed a policy "to ensure vigorous enforcement of Federal criminal laws
    to deter and punish trafficking in obscenity, stalking, and harassment by means of
    computer."  As stated in footnote 1, *supra*, none of the Short-Form Complaints at issue on

28  this demurrer allege any actions by Defendants that led to injury of a Plaintiff due to
    exposure to child sexual abuse material or due to stalking or sexual abuse by an adult.

cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

(47 U.S.C. § 230, subd. (e)(3).)

Several general principles can be derived from caselaw that has evolved since the enactment of subdivision (c)(1) of Section 230:

- A provider of interactive computer services (hereinafter sometimes referred to as "a provider") cannot be held liable as a publisher or speaker of content provided by a third party.  (*Barrett*, *supra*, 40 Cal.4th at p. 57 ["Congress intended to create a blanket immunity from tort liability for online republication of third party content"]; *Zeran v. America Online, Inc.* (4th Cir. 1997) 129 F.3d 327, 330 ["By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service. Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role"].)

- A provider also cannot be liable for incidental editorial functions because it is still acting as a publisher of third-party content.  (*Batzel*, *supra*, 333 F.3d at 1031 [provider who does no more than select and make minor edits to third-party content cannot be considered a content provider].)

- A provider can be liable for its own speech, subject to First Amendment restrictions.  (*Fair Housing Council v. Roommates.com, LLC* (9th Cir. 2008) 521 F.3d 1157, 1169 (*en banc*) (*Roommates*) [Section 230 did not bar liability where provider "designed its search and email systems to limit the listings available to subscribers based on sex, sexual orientation and presence of children" and thereby allegedly engaged in unlawful discriminatory conduct]; *Liapes v. Facebook, Inc.* (Sept. 21, 2023) ___ Cal.App.5th ___, 2023 WL 20680402 [Facebook acted as a "content developer" and therefore section 230 did not bar a claim against Facebook for unlawful discrimination under California law.  Facebook allegedly required

1    users to disclose age and gender and then relied on those "unlawful criteria"

2    to develop an advertising targeting and delivery system making it difficult

3    for individuals with protected characteristics (women and older people) to

4    find or access insurance ads on Facebook].)

5    • It is important to consider the gravamen of the cause of action brought

6    against the provider.  Section 230 bars liability only if the cause of action

7    seeks to impose liability for the provider's *publication* decisions regarding

8    third party content—for example, whether or not to publish and whether or

9    not to depublish.  (See, e.g., *Barnes v. Yahoo!, Inc.* (9th Cir. 2009) 570 F.3d

10   1096, (*Barnes*) [Although taking down third-party content from its website

11   "is quintessential publisher conduct" by a provider, Section 230 did not bar

12   an action for promissory estoppel based on the provider's failure to remove

13   a posting after it had agreed to do so. "Contract liability here would come

14   not from Yahoo's publishing conduct, but from Yahoo's manifest intention to

15   be legally obligated to do something, which happens to be removal of

16   material from publication"]; *Hassell*, *supra*, 5 Cal.5th at pp. 542-543 ["we

17   recognize that not all legal duties owed by Internet intermediaries

18   necessarily treat them as publishers of third party content, even when these

19   obligations are in some way associated with their publication of this

20   material"]; *Bolger v. Amazon.com, LLC* (2020) 53 Cal.App.5th 431, 464-465

21   (*Bolger*) [Provider was liable in strict product liability as a seller in the chain

22   of distribution for a defective product.  That cause of action targeted the

23   provider's role in the distribution of consumer goods, not the third-party

24   content in the product listing published by the provider].)

25   • Even if third-party content is a "but-for" cause of the harm suffered by a

26   plaintiff, the action is not barred by Section 230 if the cause of action does

27   not seek to hold the provider liable as a publisher.  (*Internet Brands*, *supra*,

28   824 F.3d at p. 853 [Provider acted as a publisher of third-party content by

hosting Jane Doe's user profile on a website, but the provider could be held liable for failure to warn Jane Doe based on its independent knowledge that the website was used to identify rape victims.  Section 230 "does not provide a general immunity against all claims derived from third-party content" even if the third-party content was a but-for cause of plaintiff's injuries.]; *HomeAway.com v. City of Santa Monica* (9th Cir. 2018) 918 F.3d 676, 682 (*HomeAway*) [Provider that hosted postings by persons offering Airbnb rentals was required to comply with an ordinance prohibiting short-term home rentals unless licensed as "home-sharing."  The court rejected "use of a 'but-for' test that would provide immunity under [section 230] solely because a cause of action would not otherwise have accrued but for the third-party content," rather looking to "whether the duty would necessarily require an internet company to monitor third-party content"]; *Lee v. Amazon.com, Inc.* (2022) 76 Cal.App.5th 200, 256 (*Lee*) [Quoting *HomeAway* and holding that a provider was required to post a warning under California's "Proposition 65" where the product offered for sale by a third party on defendant's website exposed consumers to mercury].)

The effect of Section 230 on a cause of action will be discussed below in the context of an enumeration of the elements of the claims that have been pleaded by Plaintiffs in the Master Complaint and in the three Short-Form Complaints for those causes of action that survive this Demurrer.

B. First Amendment

Both the United States Supreme Court and the California Supreme Court have been guided by the importance of protecting free expression and have declined to permit theories of liability based on speech content (except in narrowly defined categories such as obscenity and fighting words).  Where liability is imposed on the basis of some other wrongful act, however, a more nuanced

approach is required when the liability might have a chilling effect on speech.  And, in some instances, the United States Supreme Court has allowed restrictions on speech when the unwilling target of the speech is effectively unable to avoid it.

"The most basic of [the] principles [underlying the First Amendment] is this: '[A]s a general matter, … government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" (*Brown v. Entm't Merchs. Ass'n* (2011) 564 U.S. 786, 790-791 (*Brown*), citation and internal quotation marks omitted.)  In *Brown*, the United States Supreme Court struck down a California law placing restrictions on sale of violent computer games to minors, holding that the restriction banned speech that was in a category of protected expression and that the regulation did not meet the requirements of strict scrutiny applicable to regulations that censor speech on the basis of content.  (*Id.* at p. 799.)  Regarding the State's desire to protect children, the Court acknowledged that "a State possesses legitimate power to protect children from harm … but that does not include a free-floating power to restrict the ideas to which children may be exposed."  (*Id.* at pp. 794-795, citations omitted.)  " 'Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.' "  (*Id.* at p. 795, quoting *Erznoznik v. Jacksonville* (1975) 422 U.S. 205, 213-214 (*Erznoznik*).)

California courts also have been faithful to the First Amendment's protection of expression.  In *McCollum v. CBS* (1988) 202 Cal.App.3d 989 (*McCollum*), the Court of Appeal barred an action for wrongful death brought on the ground that the decedent had been incited to commit suicide by the lyrics of a song.  The court characterized the action as a "novel attempt to seek postpublication damages for the general public dissemination of recorded music and lyrics … ."  (*Id.* at p. 998.)  The court held that the plaintiff's claim was barred by the First Amendment because the plaintiff could not show that the generally distributed music was "directed and

intended toward the goal of bringing about the imminent suicide of listeners *and* …
that it was likely to produce such a result." (*Id.* at pp. 1000-1001, emphasis in
original; see also, *Olivia N.* v. *National Broadcasting Co*. (1981) 126 Cal.App.3d 488
(*Olivia N.*) [television network that broadcast a film in which an act of sexual
violence was depicted could not be held liable to plaintiff who suffered a "copycat"
assault by a person who had viewed the film].)

In *Bill v. Superior Court* (1982) 137 Cal.App.3d 1002 (*Bill*), the Court of
Appeal considered whether the director and producers of a violent film could be
held liable for injuries to the plaintiff caused by the actions of a third party who shot
the plaintiff outside the movie theater where the film was shown.  The plaintiff
contended that she did not seek to impose liability based on the content of the film,
but rather alleged that the defendants knew or should have known that the violent
movie would attract members of the public "who were prone to violence and who
carried weapons" and were likely to cause injury to members of the public at or
near the showing of the movie.  (*Id.* at pp. 1005, 1007.)  The court recognized that
imposing a duty to warn or imposing liability for the actions of third parties in these
circumstances would predictably have "a chilling effect upon the selection of subject
matter for movies … ."  (*Id.* at p. 1008.)  Nevertheless, the court "refrain[ed] from
deciding this case on First Amendment grounds alone, for there may well be
circumstances in which the state could hold a party responsible for warning, or
taking protective action, against the foreseeable reaction of persons to protected
speech without violating the First Amendment."  (*Id.* at p. 1009.)  Instead, the
court examined common law principles informing when a defendant will be held
liable for the wrongful actions of third parties and held that there was no duty to
warn.  (*Id.* at pp. 1011-1014.)  As relevant to the protected nature of the speech,
the court concluded that liability could not be imposed for the content of the film
itself, and that defendants were not accused of any additional act that increased the
risk of harm from the content.  "It is not claimed, for example, that petitioners are

1   responsible for any conduct which increased the risk of violence on the part of

2   persons in the vicinity of the theater, in order to obtain some commercial rewards."

3   (*Id.* at p. 1011.)

4          Courts recognize that when a party commits a wrongful act, the party can be

5   held liable even though the wrongful act involves speech.  In *Weirun v. RKO*

6   *General, Inc.* (1975) 15 Cal.3d 40 (*Weirun*), the California Supreme Court found, in

7   a decision by Justice Stanley Mosk, that a radio broadcast had created an

8   unreasonable risk of harm to its listeners by encouraging their participation in a

9   contest involving a race on city streets to obtain case prizes.  (*Id.* at p. 47.)  The

10  Supreme Court found the radio station liable to a listener that was killed in a car

11  crash while pursuing the contest prize money.  The court rejected the defendant's

12  claim of First Amendment immunity, stating that "[t]he First Amendment does not

13  sanction the infliction of physical injury merely because achieved by word, rather

14  than act."  (*Id.* at p. 48.)

15         Some civil wrongs involve speech in addition to conduct, but a remedy

16  nevertheless is not barred by the First Amendment.  "A statute that is otherwise

17  valid, and is not aimed at protected expression, does not conflict with the First

18  Amendment simply because the statute can be violated by the use of spoken words

19  or other expressive activity."  (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21

20  Cal.4th 121, 134 (*Avis Rent A Car*), citing *Roberts v. United States Jaycees* (1984)

21  468 U.S. 609, 628.)  "Since words can in some circumstances violate laws directed

22  not against speech but against conduct (a law against treason, for example, is

23  violated by telling the enemy the Nation's defense secrets) speech can be swept up

24  incidentally within the reach of a statute directed at conduct rather than

25  speech. ...Thus, for example, sexually derogatory fighting words, among other

26  words, may produce a violation of Title VII's general prohibition against sexual

27  discrimination in employment practices ... ."  (*Id.* at p. 135, internal quotation

28  marks, brackets, and ellipses omitted, quoting *R.A.V. v. St. Paul* (1992) 505 U.S.

377, 389 (*R.A.V.*).)

Moreover, when a speaker invades the privacy interests of another "in an essentially intolerable manner," the involuntary hearer may have a right to avoid the speech.  (See *Erznoznik*, *supra*, 422 U.S. at p. 210.)  In *Rowan v. U.S. Post Office Dept.* (1970) 397 U.S. 728 (*Rowan*), a unanimous Supreme Court rejected a First Amendment challenge to a federal statute that allowed a postal recipient to "insulate himself from advertisements that offer for sale 'matter which the addressee in his sole discretion believes to be erotically arousing or sexually provocative.' " (*Id.* at p. 730, quoting 39 U. S. C. § 4009, subd. (a) (1964 ed., Supp. IV).)  Despite the fact that the ban on delivery of speech indisputably allowed the postal customer to discriminate on the basis of content, the Court nevertheless allowed the federal government to enforce the postal customer's content preferences.  The Supreme Court noted that "[t]he legislative history, including testimony of child psychology specialists and psychiatrists before the House Committee on the Post Office and the Civil Service, reflected concern over the impact of the materials on the development of children. A declared objective of Congress was to protect minors and the privacy of homes from such material and to place the judgment of what constitutes an offensive invasion of those interests in the hands of the addressee." (*Id.* at p. 732.)  The Court acknowledged that "[t]o make the householder the exclusive and final judge of what will cross his threshold undoubtedly has the effect of impeding the flow of ideas, information, and arguments that, ideally, he should receive and consider." (*Id.* at p. 736.)  But the Court tolerated the restriction on the free flow of ideas in order to affirm the right of a recipient to regulate what comes into his home:

> We therefore categorically reject the argument that a vendor has a right under the Constitution or otherwise to send unwanted material into the home of another. If this prohibition operates to impede the flow of even valid ideas, the answer is that no one has a right to press even "good" ideas on an unwilling recipient. That we are often "captives" outside the sanctuary of the home and subject to objectionable speech and other sound does not mean we must be captives everywhere. [Citation.]   The

1    asserted right of a mailer, we repeat, stops at the outer boundary of every
person's domain.

2    (*Id.* at p. 738, citations omitted.)

3        In *Erznoznik,* the Supreme Court struck down a law forbidding drive-in

4    theaters to show films that displayed nudity when the movie screen could be

5    viewed from a public street or place.  The Court found that the law "seeks only to

6    keep these films from being seen from public streets and places where the offended

7    viewer readily can avert his eyes.  In short, the screen of a drive-in theater is not

8    'so obtrusive as to make it impossible for an unwilling individual to avoid exposure

9    to it.' " (*Erznoznik*, *supra*, 422 U.S. at p. 212, quoting *Redrup v. New York* (1967)

10   386 U.S. 767, 769 [striking down state attempts to ban "gentlemen's magazines" in

11   a context where the statutes did not "reflect[ ] a specific and limited state concern

12   for juveniles" and display of publications was not "so obtrusive as to make it

13   impossible for an unwilling individual to avoid exposure to it"].)  Nevertheless the

14   Court acknowledged that speech could be limited where "the degree of captivity

15   makes it impractical for the unwilling viewer or auditor to avoid exposure," quoting

16   Justice John Marshall Harlan's statement in *Cohen v. California* (1971) 403 U.S. 15,

17   21, that "[t]he ability of government, consonant with the Constitution, to shut off

18   discourse solely to protect others from hearing it is … dependent upon a showing

19   that substantial privacy interests are being invaded in an essentially intolerable

20   manner.  Any broader view of this authority would effectively empower a majority

21   to silence dissidents simply as a matter of personal predilections." (*Erznoznik*,

22   *supra,* 422 U.S. at pp. 209-210.)

23       Finally, First Amendment protections permit reasonable time, place and

24   manner regulations that are not related to the content of the speech, that are

25   narrowly tailored to serve a significant governmental interest and that "leave open

26   ample alternative channels for communication of the information." (*Ward v. Rock*

27   *Against Racism* (1989) 491 U.S. 781, 791 (*Rock Against Racism*), internal citations

28   and quotation marks omitted.)  Thus, the government may "proscribe particular

1  speech on the basis of a noncontent element (*e. g.*, noise) ... ." (*R.A.V.*, *supra*, 505

2  U.S. at p. 386.)

3

4  **IV.    First through Fourth Causes of Action – Product Liability**

5         Plaintiffs allege four causes of action based on the doctrine of product

6  liability: strict liability for design defect (First Cause of Action), strict liability for

7  failure to warn (Second Cause of Action), product liability for negligent design

8  (Third Cause of Action), and negligent failure to warn (Fourth Cause of Action).  The

9  parties strenuously debate whether the social media sites created by Defendants

10  can be considered to be "products" for purposes of applying doctrines of product

11  liability.  The court determines, as discussed below, that the concept of product

12  liability as a remedy for injuries due to defective products was created in a different

13  era to solve different problems experienced by consumers.  The more flexible

14  principles of common law negligence are more appropriate to address what is better

15  characterized as an alleged intentional or negligent course of conduct by

16  Defendants toward Plaintiffs, foreseeably resulting in their injuries.

17         Plaintiffs allege that Defendants' social media applications are products.

18  Plaintiffs allege that the social media sites are mass marketed and distributed to the

19  public through retail channels and are marketed and advertised for the personal use

20  of the consumer.  (Mast. Compl., ¶¶ 828-829.)  "The software and architecture of

21  each social media product is the same for every user that logs on or signs up for an

22  account."  (Mast. Compl., ¶ 827.)  Plaintiffs allege that "[e]ach of the Defendants

23  defectively designed its respective products to addict minors and young adults, who

24  were particularly unable to appreciate the risks posed by the products, and

25  particularly susceptive to harms from those products."  (Mast. Compl., ¶ 830.)

26         In paragraph 838 of the Master Complaint, Plaintiffs enumerate 22 "cost-

27  effective, reasonably feasible alternative designs" that Defendants could have

28  utilized to minimize the harms to minors.  These include (by way of example)

proposed "[r]obust age verification;" "[e]ffective parental controls ... and notifications;" "[o]pt-in restrictions to the length and frequency of sessions" and "self-limiting tools;" blocks during certain times of day or night; "[b]eginning and end to a user's 'Feed;' " redesigning algorithms to limit "addictive engagement" and to limit "strategic timing and clustering of notifications to lure back users;" and "[d]esigning products that did not include the defective features listed in this Complaint while still fulfilling the social networking purposes of a social media product."  Plaintiffs do not specifically define the purposes or function that the social media sites are properly designed to serve.

Product liability doctrine is inappropriate for analyzing Defendants' responsibility for Plaintiffs' injuries for three reasons.  First, Defendants' platforms are not tangible products and are not analogous to tangible products within the framework of product liability.[6]  Second, the "risk-benefit" analysis at the heart of determining whether liability for a product defect can be imposed is illusive in the context of a social media site because the necessary functionality of the product is not easily defined.  Third, the interaction between Defendants and their customers is better conceptualized as a course of conduct implemented by Defendants through computer algorithms.

A.  Defendants' Platforms Are Not Analogous to Tangible Products for Purposes of Product Liability Analysis

The Restatement (Third) of Torts: Product Liability defines a "product" as:

> [T]angible personal property distributed commercially for use or consumption.  Other items, such as real property and electricity, are products when the context of their distribution and use is sufficiently analogous to the distribution and use of tangible personal property that it is appropriate to apply the rules [for product liability]. ... Services, even when provided commercially, are not products.

(Rest.3d Torts, Prod. Liab., § 19, subds. (a)-(b).)  Defendants' platforms are not

---

[6] Whether or not something is a product for the purposes of strict product liability is a question of law for the court.  (*Sharufa v. Festival Fun Parks, LLC* (2020) 49 Cal.App.5th 493, 502.)

1  tangible; one cannot reach out and touch them.

2       Nor are Defendants' platforms analogous to tangible personal property in the

3  context of the purposes behind the creation of product liability.  The doctrines of

4  product liability are creations of the common law intended to address the

5  challenges posed by mass manufacture and marketing of products that injure

6  consumers in ways that are not able to be anticipated by the user.  (See, e.g.,

7  *Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63 (*Greenman*); *Daly*

8  *v. General Motors Corp.* (1978) 20 Cal.3d 725, 733 (*Daly*).)  Courts that framed the

9  product liability doctrine noted that the industrial economy no longer allowed a

10  relationship between the craftsman of a product and the user that would provide

11  the consumer an opportunity to trust and evaluate the product purchased.  (*Escola*

12  *v. Coca Cola Bottling Co. of Fresno* (1944) 24 Cal.2d 453, 467 (conc. op. of

13  Traynor, J.).)  In addition, manufacturing processes placed into general circulation

14  products that had predictable, uniform characteristics from the standpoint of the

15  manufacturer (that is, products were not hand-crafted); but from the standpoint of

16  the consumer, the mass-produced products could have unanticipated harmful

17  characteristics.  (*Id.* at p. 462; see also Rest.3d Torts: Prod. Liab., § 19, reporter's

18  note, cmt. a [noting caselaw stating that one policy goal of product liability is to

19  spread costs in the case of mass-marketed products].)

20       Product liability, as a creation of the common law, was designed to overcome

21  two limiting doctrines.  The first limiting doctrine was privity.  Because consumers

22  frequently did not purchase a product directly from its manufacturer, the absence of

23  privity often barred recovery from the responsible actor.  Product liability overcame

24  the limitations of privity and reached back to the source of the injurious product

25  and its defective characteristic.  (*Daly*, *supra*, 20 Cal.3d at p. 732; Rest.3d Torts:

26  Prod. Liab., § 1, cmt (a).)  Second, product liability reduced the difficulty of

27  demonstrating negligence.  (Rest.2d Torts, § 402A, cmt. b.)  Product defects could

28  arise from aspects of product design that the manufacturer had not analyzed or

from manufacturing defects of which the manufacturer was unaware.  (Rest.2d Torts, § 402A.)  As the Restatement (Third) of Torts puts it, "[s]trict liability in tort for defectively manufactured products merges the concept of implied warranty, in which negligence is not required, with the tort concept of negligence, in which contractual privity is not required."  (Rest.3d Torts: Prod. Liab., § 1, cmt. (a).)  Product liability doctrine intentionally puts aside the question of whether the manufacturer can be understood to bear moral responsibility for the product defect, and instead imposes liability based on (1) the fact that, as between the manufacturer and the consumer, the manufacturer is in the better position to avoid harm than the consumer, and (2) the economic concept that, as between the manufacturer and the consumer, the cost of the harms caused by the product should be borne by the product manufacturer who is in a better position to insure for those risks.  (*Greenman*, *supra*, 59 Cal.2d at p. 63; see also Rest.3d Torts: Prod. Liab., § 2 cmt. (a).)

Services were not made subject to the doctrine of product liability because they ordinarily did not present the same barriers to recovery.  (Rest.3d Torts: Prod. Liab., § 19, reporter's note, cmt. (f) ["[c]ourts are unanimous in refusing to categorize commercially-provided services as products for the purposes of strict products liability in tort"].)  Services usually involve a direct relationship between the service provider and the customer; privity therefore is not a bar to recovery. Services are also typically shaped to the needs of the customer rather than being delivered through mass production.  Therefore, negligence is a more appropriate gauge for whether the seller performed to the standards of reasonable care that society imposes and that reasonable consumers would expect.  (*Pierson v. Sharp Memorial Hospital, Inc.* (1989) 216 Cal.App.3d 340, 345.)

The interactions between Defendants and Plaintiffs on Defendants' platforms are different from typical product sales.  There is a direct relationship between Defendants and Plaintiffs; therefore, privity is not a bar to recovery.  Moreover,

1    Defendants do not sell Plaintiffs a static product.  Plaintiffs argue that Defendants'

2    platforms apply a common algorithm to all user interactions.  (Mast. Compl., ¶

3    827.)  The court accepts that allegation as true, but the facts alleged in the Master

4    Complaint do not describe a product that all consumers *experience* in a uniform

5    manner.  Rather, the Master Complaint alleges that Defendants' algorithms

6    individually analyze a user's interactions with the platform and, based on those

7    interactions, formulate responses that are intended to and do tailor the user's

8    experience to the individual consumer so as to maximize the amount of time the

9    user spends on Defendants' platforms.  (See, e.g., Mast. Compl., ¶¶ 80, 241, 661,

10   689.)  Plaintiffs allege that Defendants knowingly and intentionally seek to

11   maximize advertising revenue by maximizing the time minors spend on Defendants'

12   platforms, and that Defendants knew or should have known that this maximization

13   of use by minors would cause them harm by addicting them to the use of

14   Defendants' platforms.  (See, e.g., Mast. Compl., ¶ 80-96.)

15       There is no moral ambiguity in these allegations.  There is no need to turn to

16   an economic analysis of who better can bear the cost of an unanticipated harmful

17   product defect.  According to Plaintiffs' allegations, the defects of which they

18   complain are not unanticipated.  Stated another way, the ways in which the social

19   media sites are alleged to interact with minors are not "bugs;" they are "features"

20   built into the social media experience by Defendants.

21       The interactions between Defendants and Plaintiffs by way of the Defendants'

22   platforms are not "analogous to the distribution and use of tangible personal

23   property."[7]  They do not present challenges that the common law overcame by

24

25   ─────────────────
     [7] Plaintiffs allege that Defendants themselves have referred to their platforms outside of
26   litigation as "products."  (See Mast. Compl., ¶¶ 144-153.)  And Plaintiffs have thus suggested
     that Defendants' social media sites should be considered to be "products" for purposes of
27   product liability analysis because Defendants referred to the social media sites as "products"
     in a variety of commercial settings.  (Pls' Opp., at p. 40, fn. 32.)  This argument is not
28   persuasive.  The caselaw does not determine whether an alleged instrumentality of harm is or
     is not a "product" based on the terminology used by the creator of the instrumentality.  The

1  creating product liability doctrine.  Rather, they present new challenges for the

2  common law.

3      Plaintiffs cite California and federal cases, arguing they support the position

4  that that Defendants' platforms are "products."  (Pls' Opp., at pp. 37-43.)  None of

5  the cases, properly construed, holds that computer software is a "product" for

6  purposes of product liability law, much less that computer software of every sort

7  should be considered to be a "product."  In *Hardin v. PDX, Inc.* (2014) 227

8  Cal.App.4th 159 (*Hardin*), the plaintiffs sued a software provider for retail

9  pharmacies for negligence and product liability when one of the plaintiffs suffered

10  blindness after taking a drug where the patient warning information omitted a

11  "Black Box" warning by the manufacturer.  The defendant's software had been

12  intentionally modified to allow the retail pharmacy to truncate the manufacturer's

13  full list of warnings to a short-form version, and the Black Box warning was omitted

14  through the workings of the software.

15      The defendant in *Hardin* had advanced a protected speech argument under

16  Section 230.  The plaintiffs opposed on the basis that it was the truncating feature

17  of the defendant's software that they were citing as the cause of their harm, not

18  the republication of portions of the manufacturer's product information.  The court

19  held that Section 230 did not bar the plaintiff's claim.  (*Hardin,* at pp. 168-69.)  The

20  balance of the opinion in *Hardin* followed a statement that defendant's "remaining

21  arguments merit only brief attention."  (*Id.* at p. 169.)  The court made an

22  inconclusive observation as to the possibility that product liability might apply to

23  these claims:

24      [The defendant] also asserts that [the plaintiff] cannot prevail on her
    products liability theory as a matter of law because [the defendant]
25      distributes drug information, and "'information' is not a 'product' for
    purposes of product liability claims." But [the plaintiff's] theory is that
26      [the defendant']s software program, not the information it produces, is

27

28  definition of "product" in the caselaw and the rationale for subjecting product manufacturers
    to product liability are *determinative.*

the defective product. *[The defendant] has not argued, let alone shown, that [the plaintiff] cannot prevail under that theory. Maybe so, but at this early juncture we cannot so conclude.*

(*Id.* at 170, emphasis added.)  The challenged truncating feature of the defendant's software appeared to be simple, treated all users in the same way, and did not involve an interactive relationship or course of dealing between the defendant and the plaintiff.  In that regard, it was perhaps amenable to treatment under product liability doctrine, although the court in *Hardin* never held as much.  Here, the fluid applications of Defendants' algorithms do not present such a simple issue.

*Lemmon v. Snap, Inc.* (9th Cir. 2021) 995 F.3d 1085 (*Lemmon*), also relied on by Plaintiffs, considered whether Section 230 immunized defendant Snap from liability for the allegedly dangerous conditions created by its Speed Filter, which plaintiff parents alleged was the cause of their two sons' deaths.  While the court did characterize Snapchat generally as a "product" with a "defect (the interplay between Snapchat's reward system and the Speed Filter)," the Ninth Circuit panel was not called upon to address whether the doctrine of product liability was applicable to Snap's social media platform.  That issue simply was not presented on appeal.  *Lemmon* is not a precedent for an issue not decided and not necessary to the decision that was rendered.

Plaintiffs cite *Winter v. G.P. Putnam* (9th Cir. 1991) 938 F.2d 1033 (*Winter*) for the inconclusive statement that "computer software may be a product." (Pls' Opp., at p. 38.)  Plaintiffs in *Winter* had purchased a physical book published by defendant and, in reliance on its contents, harvested wild mushrooms and became sick.  They sued for product liability and other theories.  Dismissal of the suit on summary judgment was affirmed.  As to the product liability theory, the appellate court held that although the paper in the physical book may be a product, the information contained therein (the alleged source of liability) was not.  (*Id.*, at p. 1034.)  The snippet that Plaintiffs chose to cite from this case in their Opposition Brief came after a discussion about why a navigational chart could support a

product liability claim but a book about mushrooms could not.  The portion quoted by the Plaintiffs says simply: "Computer software that fails to yield the result for which it was designed may be another" circumstance comparable to a defective navigation chart.  (*Id.,* at p. 1036.)  This is not a holding and is obiter dicta because no computer software was involved in the case.

The final authority cited by Plaintiffs regarding whether software can be considered to be a "product" is *In re MyFord Touch Litigation* (N.D.Cal. 2016) 2016 WL 7734558.  Plaintiffs assert it stands for the proposition: "certifying products liability class alleging defect in Ford's 'infotainment' software that caused driver distraction and raised safety concerns."  A review of the lengthy procedural history of that case reveals that no such product liability class was certified for California plaintiffs; instead claims for breach of express and implied warranty, Song-Beverly, and Unfair Competition Law violations were.  (*In re MyFord Touch Litigation* (N.D.Cal. 2018) 291 F.Supp.3d 936, 943.)  The certified product liability claims of Colorado consumers (the only subclass for which this theory was certified) were thereafter dismissed as contrary to Colorado's economic loss rule, meaning those claims were without legal merit.  (*Id.,* at pp. 954-956.)

Plaintiffs rely on two California Court of Appeal cases in support of their argument that a product need not be tangible in order for product liability to apply.  One case involved defective aeronautical navigation charts (then sold in physical form) and the other involved the delivery of electricity by a public utility to a customer's home.  Neither case supports the conclusion that Defendants' platforms are products for purposes of product liability law.

The case involving mass-produced navigation charts provided to pilots is *Flour Corp. v. Jeppesen & Co.* (1985) 170 Cal.App.3d 468.  The plaintiff aircraft owner sued the chart's publisher for strict liability (plus negligence and breach of warranty) because the chart sold by the defendant at the time of the crash omitted the highest landmass in close proximity to the airport, showing a lesser, alternative

promontory instead.  The trial court had refused to submit the product liability count to the jury because the trial court believed the challenged product had to be innately dangerous by its composition, e.g., explosive, combustible or flammable material.  (*Id.* at p. 475.)  The court of appeal reversed, holding that the inaccurate contents of the defendant's mass-produced air navigation charts were properly subjected to product liability exposure: "[A]lthough a sheet of paper might not be dangerous, per se, it would be difficult indeed to conceive of a salable commodity with more inherent lethal potential than an aid to aircraft navigation that, contrary to its own design standards, fails to list the highest land mass immediately surrounding a landing site." (*Id.* at 476.)

Thus, strict products liability applied to the information on the printed navigation charts sold by defendant for the very reason that the information itself was indisputably incomplete and thus inaccurate.  Here, by comparison, Plaintiffs necessarily abjure any assertion that the contents of the information provided via Defendants' platforms is inaccurate, because to do so would invite preemptive application of Section 230.  Instead, liability is premised on how Defendants' respective algorithms allegedly work to extend customer viewing time and to potentially addict minors to constant usage.  This is materially different from how a given pilot would use a mass-produced, printed chart for instrument-landing approach to a given airport when such chart was materially inaccurate.  All pilots would suffer from the same defect.[8]

The California electricity case imposing strict product liability on utility providers is consistent with a specialized line of cases in many jurisdictions which the Restatement Reporters find to be "[t]he weight of authority" that supports the extension of strict liability to electrical utilities.  (Rest.3d Torts: Prod. Liab., § 19,

---

[8] The Restatement (Third) of Torts criticizes the line of cases holding that navigation charts are subject to strict liability principles.  "[T]he better view is that false information in such documents constitutes a misrepresentation that the user may properly rely upon." (Rest.3d Torts: Prod. Liab., § 19, cmt. d.)

reporter's note, cmt. d.)  The California case is *Pierce v. Pacific Gas & Electric Co.* (1985) 166 Cal.App.3d 68 (*Pierce*).  The plaintiff suffered a severe shock from a 7,000-volt surge of electricity into her home after she tried to close a propane gas valve.  The source of the high voltage was equipment repair by the utility's linemen during a lightning storm.  When the case was tried, the utility had evidence that the connection of the household ground wiring to the propane tank was unlawful and that the household wiring had poor insulation.  The replacement transformer that malfunctioned had not been known to have any problems, but the crew working on emergency repairs during a storm had not tested it before installation.

The plaintiffs' second cause of action for product liability had alleged defective electrical equipment, not defective electricity.  (*Id.* at 78.)  The court non-suited the plaintiffs' strict product liability theory at the close of evidence on the theory that the malfunctioning transformer was made by Federal Pacific, not the defendant utility.  The jury ruled for the defendant on the remaining claim of negligence.

During trial, the plaintiffs had urged a factual argument that the 7,000-volt surge, i.e., the electricity itself, was the defective product, and the appellate court that held it was adequately disclosed to the defendant, even though the plaintiffs had not formally tried to amend their complaint, such that "Plaintiffs' failure to amend does not bar their pursuit of liability on a theory that electricity is a defective product." (*Id.* at 81.)  In reversing on the merits, the court held that it advanced useful social policies to relieve plaintiffs in these circumstance from having to show negligence, that imposing this legal duty would enhance public safety, and, finally, that the utility was in a suitable position to spread the costs among all customers.  (*Id.* at p. 83.)

While some of those considerations arguably support Plaintiffs' efforts to

treat Defendants' platforms as the equivalent of electricity,[9] if considerations of ease of proof for plaintiffs, imposition of additional legal risk on defendants to induce safer behavior, and the virtues of cost-shifting were the controlling determinates of the availability of strict liability for any and all tort claims, then virtually all torts would be treated as product liability claims regardless of whether there was anything conceivably considered a "product" in the calculus.   Although Defendants' social media platforms are not tangible, they are not otherwise analogous to electricity within the context of the purposes of product liability doctrine.

The common law's ability to adapt basic negligence concepts to new social problems appears better suited to providing legal regulation of this new technology. To treat the multi-faceted ways in which Defendants' platforms interact with their various customers as if they were merely providing some consistent form of service delivery, like the provision of properly regulated electric service to households and businesses, overlooks the factual complexities presented by the pleadings before this court.  As noted below, the particularized legal concepts that flow from the application of product liability doctrine to a given "product" do not provide a useful construct for a jury to assess the culpability of these Defendants' conduct in the creation and operation of their interactive social media platforms.

B.   The "Risk-Benefit" and "Consumer Expectation" Analyses that Are at the Heart of Determining When a Manufacturer Should Be Liable for a Product Defect Are Not Suitable for Analyzing Liability Under the Facts Alleged

California recognizes two tests for whether a manufacturer is liable for a design defect under principles of product liability.  These tests are referred to as the "consumer expectations" test and the "risk-benefit" test.  They may be presented to

---

[9] Notably, product liability applies to utilities only for injurious events which occur after electricity has been sold to a consumer by delivery across the meter which measures the cost owed for the service delivered.  (*Pierce, supra*, 166 Cal.App.3d at 84; see also Rest.3d Torts: Prod. Liab., § 19, reporter's note, cmt. d.)    Thus, even this application of strict liability to an intangible "product" has its limits.

1   the trier of fact as alternative theories of liability.  (*Demara v. The Raymond Corp.*

2   (2017) 13 Cal.App.5th 545, 553-554 (*Demara*).)  Plaintiffs' First and Second Causes

3   of Action can fairly be read to plead both theories.

4        Both theories of product liability for design defect focus on the product

5   without reference to the actions or intent of the product manufacturer.  The

6   "consumer expectation" test asks the fact-finder to determine whether the product

7   in question "perform[ed] as safely as an ordinary consumer would have expected it

8   to perform when used or misused in an intended or reasonably foreseeable way …

9   ."  (Judicial Council of California Civil Jury Instructions (2023 ed.) (CACI) 1203;

10  *Demara*, *supra*, 13 Cal.App.5th at p. 557.)  The "risk-benefit" test asks the fact-

11  finder to judge whether "the benefits of the [product]'s design outweigh the risks of

12  the design" and in making that determination to consider, *inter alia*, the feasibility,

13  cost and disadvantages of an "alternative design."  (CACI 1204; *Barker v. Lull*

14  *Engineering Co.* (1978) 20 Cal.3d 413, 431.)

15       Both of these tests proceed from the premise that a product is a static thing.

16  In order for a factfinder to determine what an "ordinary consumer" would expect

17  when using a product, and in order to discern the benefits of the product's design,

18  the fact-finder must be able to anticipate how the ordinary consumer would use the

19  product, and what benefits a user would be seeking when purchasing the product.

20  Consumers expect a gas-powered lawn mower to cut grass; they likely do not

21  expect it to emit hazardous fumes or to cut their feet or hands.  Consumers expect

22  a kitchen blender to chop or puree food; they likely do not expect it to overheat

23  and explode.  Consumers who purchase sewing shears value the benefit that they

24  are sharp enough to cut fabric; they likely view this benefit as outweighing the risk

25  that a child could be injured if the shears were left in a place where an

26  unsupervised child could reach it.

27       Defendants' platforms are not static things; they are programs that facilitate

28  an interactive experience.  Moreover, according to the allegations of the Master

Complaint, the interactive experience of a user evolves over time as the social media algorithm responds to the user's inputs.  The problem with applying the consumer expectation or the risk-benefit test to an algorithm that is designed to produce an interactive experience is that users may have a multiplicity of consumer expectations and may seek very different benefits.  A grandmother might expect the social media site to do no more than allow her to see the latest pictures of her grandchildren.  A business might expect a social media site to help it find customers or to help customers find the business.  A person might expect to find news stories in which he is interested.  A young man might expect to be able to send intimate photographs to his girlfriend that are not retained on the social media site.  A child might expect to be able to watch videos of cute puppies.  A teen might expect the social media site to facilitate comments on her posted photographs.

In short, there is not one type of anticipated "product" functionality for Defendants' platforms.  They are not tangible products with a well-defined, anticipated function.  Without the foundational element of a static product from which ordinary consumer expectations or benefits from use of the product can be discerned, there is no reasonable basis for applying the tests for whether a product is defective.  Like services, Defendants' platforms involve a direct relationship between the seller and the customer and, at least to some extent, can be shaped by the apparent customer needs or preferences.

The product liability test does not address the allegedly harmful conduct of Defendants, which here is alleged to be intentional manipulation of expected features in order to maximize use time to the benefit of Defendants and to the detriment of minor users.   Defendants' platforms may "perform" as some consumers expected and desired when used in a foreseeable way, but the features that are desirable to some nevertheless may cause harm to some minors by virtue of Defendants' unseen actions to maximize use time.

### C. Whether or Not Defendants are Liable Should Be Determined by Focusing on Defendants' Conduct

The Master Complaint alleges that Defendants crafted the algorithms that determine a user's interactive experience on a social media site to favor their own interests. It has become a meme of the internet culture that "[i]f you are not paying for it, you're not the customer; you're the product being sold."[10] Plaintiffs are clear that they seek to prove Defendants intended to maximize engagement by users to produce advertising revenue and that Defendants were on notice of foreseeable injury to minors from the features that Defendants intentionally chose in order to affect minors' use of their platforms. (See, e.g., Mast. Compl., ¶ 2.)

There is a "functional similarity between negligence theory and strict products liability insofar as duty and breach is concerned … ." (*Milwaukee Electric Tool Corp. v. Superior Court* (1993) 15 Cal.App.4th 547, 559.) The focus in this case is more appropriately on the alleged conduct of Defendants, and on whether common law negligence provides a basis for imposing a duty to avoid the harm for which Plaintiffs seek recovery. As discussed below, the common law has shaped negligence as a nuanced doctrine, not one of unlimited liability. Plaintiffs' allegations are more appropriately conceptualized as contending Defendants engaged in a course of conduct intended to shape the user experience for these Plaintiffs, and that this course of conduct foreseeably caused personal injury to Plaintiffs. Allowing this case to go forward on theories of product liability would be like trying to fit a four-dimensional peg into a three-dimensional hole.

Plaintiffs and Defendants briefed the first four cause of action as a unit. Their primary arguments concerned whether Defendants' social media platforms are "products." Very little attention was given to the failure to warn causes of action (the Second and Fourth Causes of Action) as such. Because Plaintiffs pled failure to

---

[10] This quotation has been attributed to Andrew Lewis (aka blue beetle), in a comment on MetaFilter.com on Aug. 26, 2010. (https://www.metafilter.com/95152/Userdriven-discontent#3256046.)

1  warn by invoking product liability principles, those causes of action cannot proceed.

2  Plaintiffs' Fifth Cause of Action based on Negligence does not allege facts

3  concerning any alleged failure to warn.  In the briefing on the Demurrer, neither

4  side addressed whether a claim for negligent failure to warn could be pled outside

5  of the product liability context, and the court does not address that issue.

6         The Demurrer to the First, Second, Third and Fourth Causes of Action is

7  sustained.

8

9  **V.     Fifth Cause of Action – Negligence**

10       A. Plaintiffs' Allegations Supporting a Cause of Action for Negligence

11           Plaintiffs' Fifth Cause of Action is grounded in common law negligence.

12  Plaintiffs allege that Defendants failed to use reasonable care in designing their

13  social media platforms and that they knew the design and interactive operational

14  features of the applications were likely to cause harm to minor users of the social

15  media sites.  Plaintiffs allege that:

16           Each Defendant owed Plaintiffs a duty to exercise reasonable care in the
             development, setup, management, maintenance, operation, marketing,
17           advertising, promotion, supervision, and control of its respective platforms
             not to create an unreasonable risk of harm from and in the use of its
18           platforms (including an unreasonable risk of addiction, compulsive use,
             sleep deprivation, anxiety, depression, or other physical or mental
19           injuries); to protect Plaintiffs from unreasonable risk of injury from and in
             the use of its platforms; and not to invite, encourage, or facilitate youth,
20           such as Plaintiffs, to foreseeably engage in dangerous or risky behavior
             through, on, or as a reasonably foreseeable result of using its platforms.
21           These duties govern Defendants' own specific actions and are based on
             direct actions Defendants took in developing their respective Products and
22           features.

23  (Mast. Compl., ¶ 914.)  In addition to maintaining "unreasonably dangerous

24  features and algorithms", Defendants are alleged to have facilitated use of their

25  platforms by youth under the age of 13 by adopting protocols that do not verify the

26  age of users, and "facilitate[ed] unsupervised and/or hidden use of their respective

27  platforms by youth" by allowing "youth users to create multiple and private

28

accounts and by offering features that allow youth users to delete, hide, or mask their usage."  (Mast. Compl., ¶ 929(d), (e), (f).)

Plaintiffs allege that Defendants are liable "for injuries occasioned to Plaintiffs by Defendant[s'] want of ordinary care and/or skill in the management of their property.  (Mast. Compl., ¶ 916.)  "Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its respective platforms (as developed, set up, managed, maintained, supervised, and operated by that Defendant) was dangerous, harmful, and injurious when used by youth such as Plaintiffs in a reasonably foreseeable manner." (Mast. Compl., ¶ 920.)  "Each Defendant could have avoided Plaintiffs' injuries with minimal cost, including, for example, by not including certain features and algorithms in its respective platforms which harmed Plaintiffs." (Mast. Compl., ¶ 924.)

For example, minor Plaintiff M.P. alleges that use of Instagram from 2018 to the present, and use of TikTok from 2019 to the present have caused this Plaintiff to develop addiction/compulsive use, anorexia, depression, and anxiety, as well as long-term physical harms arising as a foreseeable result of the eating disorder. (See J.P. SFC.)  In the Master Complaint, Plaintiffs allege that all Defendants— including Meta and ByteDance—breached their duties to the minor users of their platforms by, among other things, using features and algorithms that unreasonably create or increase foreseeable risk of addiction or compulsive use by youths and by structuring and operating their platforms in a manner that "unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users."  (Mast. Compl., ¶ 929.)  As to the platforms used by M.P., the Master Complaint alleges that TikTok is designed with "continuous scrolling," a feature of the platform that "makes it hard for users to disengage from the app," (Mast. Compl., ¶ 567) and that minor users cannot disable the "auto-play function" so that a "flow-state" is induced in the minds of the minor users (Mast. Compl., ¶ 590).  Plaintiffs allege that "ByteDance uses a series of interrelated design features

1    that exploit known mental processes to induce TikTok's users to use the product

2    more frequently, for more extended periods, and with more intensity (i.e.,

3    providing more comments and 'likes')." (Mast. Compl., ¶ 589.) TikTok "also

4    leverages principles of IVR to encourage compulsive usage, in the same fashion as

5    Instagram Reels." (Mast. Compl., ¶ 592.)

6

7    B. Plaintiffs Have Adequately Alleged a Basis for Defendants' Duty

8        "Duty, under the common law, is essentially an expression of policy that the

9    plaintiff's interests are entitled to legal protection against the defendant's conduct."

10    (*Kuciemba v. Victory Woodworks, Inc.* (2023) 14 Cal.5th 993, 1016 (*Kuciemba*),

11    internal citations and quotation marks omitted.) The general framework for

12    defining duty in California is set forth in California Civil Code section 1714. (*Id.*)

13    Civil Code section 1714, subdivision (a), provides that "[e]veryone is responsible,

14    not only for the result of his or her willful acts, but also for an injury occasioned to

15    another by his or her want of ordinary care or skill in the management of his or her

16    property or person, except so far as the latter has, willfully or by want of ordinary

17    care, brought the injury upon himself or herself." "This statute establishes the

18    default rule that each person has a duty 'to exercise, in his or her activities,

19    reasonable care for the safety of others.' " (*Brown v. USA Taekwondo* (2021) 11

20    Cal.5th 204, 214 (*USA Taekwondo*), internal citations omitted).

21        "To establish a cause of action for negligence, the plaintiff must show that

22    the defendant had a duty to use due care, that he breached that duty, and that the

23    breach was the proximate or legal cause of the resulting injury." (*Hacala v. Bird

24    Rides, Inc.* (2023) 90 Cal.App.5th 292, 310 (*Hacala*), internal citations and

25    quotation marks omitted.) "While the question whether one owes a duty to another

26    must be decided on a case-by-case basis, *every case* is governed by the rule of

27    general application that all persons are required to use ordinary care to prevent

28    others from being injured as the result of their conduct. [Citation.] As our

[California] Supreme Court has repeatedly emphasized, in the absence of a statutory provision establishing an exception to the general rule of Civil Code section 1714, courts should create one only where clearly supported by public policy." (*Id.*, internal citations and quotation marks omitted; emphasis in original.)

In *Hacala*, the Court of Appeal held that defendant had a duty to use care when it made its products available for public use and one of those products harmed the plaintiff.  The defendant provided electric motorized scooters that could be rented through a "downloadable app." (*Id.* at p. 311.)  The app allowed the defendant "to monitor and locate its scooters and to determine if its scooters were properly parked and out of the pedestrian right-of-way." (*Id.*, internal quotation marks and brackets omitted.)  The defendant failed to locate and remove scooters that were parked in violation of the requirements set forth in the defendant's city permit, including those parked within 25 feet of a single pedestrian ramp. (*Id.*)  The defendant also knew that, because the defendant had failed to place proper lighting on the scooters, the scooters would not be visible to pedestrians at night. (*Id.* at p. 312.)  The court found that these allegations were a sufficient basis on which to find that the defendant owed a duty to members of the public like the plaintiff, who tripped on the back wheel of one of the defendant's scooters when walking "just after twilight." (*Id.* at p. 300.)

Here, Plaintiffs seek to hold Defendants liable for the way that Defendants manage their property, that is, for the way in which Defendants designed and operated their platforms for users like Plaintiffs.  Plaintiffs allege that they were directly injured by Defendants' conduct in providing Plaintiffs with the use of Defendants' platforms.  Because all persons are required to use ordinary care to prevent others from being injured as the result of their conduct, Defendants had a duty not to harm the users of Defendants' platforms through the design and/or operation of those platforms.

Defendants argue that Plaintiffs do not have a "heightened duty of care"

1  because they are not in a "special relationship" with Plaintiffs.  Plaintiff's negligence

2  cause of action is based, in part, on allegations that Defendants owed a

3  "heightened duty of care to youth users of their respective platforms because the

4  child brain is not fully developed, meaning young people are more neurologically

5  vulnerable than adults to the addictive and other harmful aspects of Defendants'

6  respective platforms" and have a diminished capacity to make responsible

7  decisions.  (Mast. Compl., ¶ 928.)  When an actor is in a "special relationship" with

8  another, the actor has an affirmative duty to prevent harm to the other within the

9  scope of the relationship.  (6 Witkin, Summary of Cal. Law (11th ed. 2023) Torts, §

10  961 (Witkin Torts); Rest.3d Torts, Phys. & Emot. Harm, § 40.)

11  However, separate from the "special relationship" allegations, the Master

12  Complaint also alleges that Defendants are liable based on failure to exercise

13  reasonable care in their own activities thereby creating a risk of harm to Plaintiffs

14  that reasonably could be anticipated.  (See Witkin Torts, § 961; Rest.3d Torts,

15  Phys. & Emot. Harm, § 7.)  Plaintiffs allege a duty of ordinary care arising from the

16  fact that Defendants knew that Plaintiffs were using Defendants' interactive social

17  media applications, that Defendants had a duty to exercise ordinary care to prevent

18  Plaintiffs from being harmed by that use, that Defendants breached that duty by

19  developing and using algorithms and operational features of the platforms that

20  sought to unreasonably maximize the minors' use of the platforms, that it was

21  foreseeable Plaintiffs would be harmed by becoming addicted, and that Plaintiffs

22  were in fact harmed.

23  As discussed further below, Plaintiffs have adequately stated a claim of

24  negligence based on lack of reasonable care in the Defendants' own conduct from

25  which harm might reasonably be anticipated.  Because the cause of action for

26  negligence may proceed on that basis, the court does not reach the issue of

27  whether Defendants also had an affirmative duty to act to protect Plaintiffs based

28

1  on a special relationship.[11]

2

3     C.  <u>Public Policy Does Not Require a Limitation on Defendants' General Duty of Ordinary Care – The <i>Rowland</i> Factors</u>

4        The California courts make exceptions to Civil Code section 1714's general

5  duty of ordinary care "only when foreseeability and policy considerations justify a

6  categorical no-duty rule." (*Cabral v. Ralphs Grocery Co.,* (2011) 51 Cal.4th 764,

7  772 (*Cabral*).)  Those foreseeability and policy considerations are examined through

8  the so-called *Rowland* analysis, based on *Rowland v. Christian* (1968) 69 Cal.2d

9  108 (*Rowland*).  (*Kuciemba, supra,* 14 Cal.5th at p. 1021.)  The multifactor

10  *Rowland* test is not a means of establishing duty, but rather a means to decide

11  whether the scope of the general rule of section 1714 should be limited.  (*Id.*)  The

12  *Rowland* factors are:

> "[T]he foreseeability of harm to the plaintiff, the degree of certainty that
> the plaintiff suffered injury, the closeness of the connection between the
> defendant's conduct and the injury suffered, the moral blame attached to
> the defendant's conduct, the policy of preventing future harm, the extent
> of the burden to the defendant and consequences to the community of
> imposing a duty to exercise care with resulting liability for breach, and the
> availability, cost, and prevalence of insurance for the risk involved."

13

14

15

16

17  (*Id.,* quoting *Rowland, supra,* 69 Cal.2d at p. 113.)  Generally, California authorities

18  divide the *Rowland* factors into two categories, the first addressing foreseeability

19  and related concepts and the second addressing public policy considerations.

20  (*Kuciemba,* at pp. 1021-1022.)

21     *1. Foreseeability Factors*

22        The trilogy of foreseeability factors are foreseeability, certainty, and the

23  connection between the plaintiff and the defendant.

24        "The most important factor to consider in determining whether to create an

25  exception to the general duty to exercise ordinary care articulated by section 1714

26

27  _____

28  [11] The court is not now called upon to decide whether in this case it would be appropriate to instruct the jury that "[a]n adult must anticipate the ordinary behavior of children.  An adult must be more careful when dealing with children than with other adults." (CACI 412.)

is whether it was foreseeable." (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1145 (*Kesner*).) "[A]s to foreseeability, we have explained that the court's task in determining duty is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed." (*Cabral*, *supra*, 51 Cal.4th at p. 772, internal citations, quotation marks, and ellipses omitted; emphasis in original.)

In *Kuciemba* and in *Kesner,* the California Supreme Court looked to whether the defendants in those cases had information that would allow them to anticipate the risks those defendants' conduct allegedly posed to the respective plaintiffs in those cases.  In *Kesner,* the Court found that the employer should have been aware from OSHA standards that an employee exposed to asbestos at work could carry asbestos fibers home, causing risk to the plaintiff in that case, who was the wife of an employee.  (*Kesner*, *supra,* 1 Cal.5th at pp. 1146-1148.)  In *Kuciemba*, the Court held that government health orders made employers such as the defendant aware "that COVID-19 could be transmitted not only within the workplace but also to individuals [such as the plaintiff] who came into contact with infected employees." (*Kuciemba*, *supra*, 14 Cal.5th at p. 1023.)

Under the allegations in the Master Complaint, foreseeability weighs heavily in favor of finding that Defendants owe a general duty to the users of Defendants' platforms.  The Master Complaint is replete with allegations that Defendants were well aware of the harms that could result to Plaintiffs by their use of Defendants' platforms.  For example, Plaintiffs allege:

> Recognizing the power of engaging young users, Defendants deliberately tweaked the design and operation of their apps to exploit the psychology and neurophysiology of kids. Because children's and adolescents' brains are not fully developed, they lack the same emotional maturity, impulse control, and psychological resiliency as adults. As a result, they are uniquely susceptible to addictive features in digital products and highly vulnerable to the consequent harms. Knowing this, Defendants wrote code

designed to manipulate dopamine release in children's developing brains and, in doing so, create compulsive use of their apps.

(Mast. Compl., ¶ 12.)  Plaintiffs further allege:

Over a decade of scientific and medical studies demonstrate that dangerous features engineered into Defendants' platforms—particularly when used multiple hours a day—can have a "detrimental effect on the psychological health of their users," including compulsive use, addiction, body dissatisfaction, anxiety, depression, and self-harming behaviors such as eating disorders.

(Mast. Compl., ¶ 102, internal brackets and footnotes omitted.)

In short, Plaintiffs here allege that the effect of Defendants' algorithms and operational features on Plaintiffs' frequency and intensity of use of the social media sites was not only foreseeable, but was in fact intended.  And Plaintiffs allege that Defendants were on notice through their own research as well as through independent medical studies that this intended frequency and intensity of use of Defendants' platforms risked adverse health effects for the minor users.

"The second *Rowland* factor, the degree of certainty that the plaintiff suffered injury, has been noted primarily, if not exclusively, when the only claimed injury is an intangible harm such as emotional distress. [Citation.] Courts have occasionally included under this factor concerns about the existence of a remedy." (*Kesner*, *supra*, 1 Cal.5th at p. 1148, internal citations and quotation marks omitted.)

This factor primarily has influenced decisions about the existence of duty in situations where the wrongful conduct by the defendant was directed toward a person other than the plaintiff or where the plaintiff suffers emotional distress as a bystander.  For example, in *Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1080, the California Supreme Court applied the *Rowland* factors when a mother sought to recover for emotional distress when her infant was harmed during the process of childbirth.  Although the mother suffered emotional distress rather than physical injury, the court noted that the "close bond" between the mother and the baby during labor and delivery made the mother's emotional distress foreseeable. In *Quesada v. Oak Hill Improvement Co.* (1989) 213 Cal.App.3d 596, 608-609, the

court held that it was "appropriate to limit the class of potential plaintiffs to close family members in order to avoid expansive liability and to be assured that those claiming damages by way of the negligent handling of a corpse truly suffered serious emotional distress."

Here, Plaintiffs are the persons who were directly affected by Defendants' conduct; they are not mere bystanders. The nature of the harm suffered is not a reason to deny them recovery. Although Defendants designed social media platforms that interacted with Plaintiffs' minds rather than products that injured Plaintiffs' bodies, the allegations of the Master Complaint (if proved) demonstrate that the adverse effect on Plaintiffs was foreseeable and substantial. Moreover, Plaintiffs also allege they suffered physical harms such as anorexia, long-term physical injury resulting from an eating disorder, self-harm (attempted suicide), inability to sleep, and addictive or compulsive behavior—Plaintiffs do not merely allege that they were emotionally upset. It is sufficiently certain, based on the allegations of the Master Complaint, that Plaintiffs suffered injury.

"The third *Rowland* factor, the closeness of the connection between the defendant's conduct and the injury suffered, … is strongly related to the question of foreseeability itself." (*Kesner, supra,* 1 Cal.5th at p. 1148, internal citations, quotation marks, and brackets omitted.) This factor is relevant when a court is called upon to determine whether the defendant owes "a duty to prevent injury that is the result of third party conduct," and in those circumstances "the touchstone of the analysis is the foreseeability of that intervening conduct." (*Id.*) For example, in *Hacala,* the Court held that a scooter rental company had a duty to a pedestrian who was injured when she tripped on a scooter that a third-party user of the scooter left in a dangerous location. The court stated that "a fair reading of the complaint confirms it alleges sufficient facts, that, if proven, would support a finding that [the scooter rental company's] conduct—specifically, [the company's] 'management of its property' (§ 1714, subd. (a))—*contributed* to the risk of harm

1    that resulted in plaintiffs' injuries." (*Halcala*, *supra*, 90 Cal.App.5th at p. 311,

2    internal brackets omitted; emphasis in original.)

3          Defendants argue that "the harms alleged by Plaintiffs are several steps

4    removed from the recommendations or other varied features that Plaintiffs

5    challenge." (Defs' Dem., at p. 71.)  But here, as in *Halcala,* Defendants' argument

6    is not supported by the allegations in the Master Complaint.  As noted with respect

7    to the first *Rowland* factor, the harms to Plaintiffs are alleged to be caused by the

8    operation of the social media platforms that maximize engagement of minor users

9    through continuous scrolls, IVF notification, and other features.  The extent to

10   which the harm suffered by a Plaintiff was contributed to by being pulled into a

11   "flow-state" by continuous scrolling, or by extensive notifications and reminders at

12   all hours of the day and night, or by a compulsion to use the platform in a way that

13   would gain an in-app "reward," or by the inability of a parent to monitor the

14   Plaintiff's use of the social media site due to actions of a Defendant, will be an issue

15   for the jury.

16         Once it is determined that a Defendant owes a duty of care to a Plaintiff, it is

17   for the jury to determine whether the defendant breached that duty, whether the

18   defendant's breach caused harm to the plaintiff and whether the conduct of some

19   third party also contributed to the harm.  (*Cabral*, *supra*, 51 Cal.4th at p. 769.)  At

20   this point in the litigation, the closeness of the connection between Defendants'

21   conduct and Plaintiffs' harm must be determined on the basis of the allegations of

22   the operative pleadings; Plaintiffs have alleged that Defendants' conduct directly

23   harmed Plaintiffs.

24   *2. Policy Factors*

25         "A duty of care will not be held to exist even as to foreseeable injuries …

26   where the social utility of the activity concerned is so great, and avoidance of the

27   injuries so burdensome to society, as to outweigh the compensatory and cost-

28   internalization values of negligence liability." (*Merrill v. Navegar, Inc.* (2001) 26

Cal.4th 465, 502 (Werdegar, J., dissenting).)  As set forth in *Rowland*, the policy

factors bearing on this determination are the moral blame attached to the

defendant's conduct, the policy of preventing future harm, the extent of the burden

to the defendant and consequences to the community of imposing a duty

to exercise care with resulting liability for breach, and the availability, cost, and

prevalence of insurance for the risk involved.

Moral blame attaches to a party's conduct when there are ameliorative steps

the party could have taken to avert foreseeable harm and the party failed to take

those steps.  (*Kuciemba, supra,* 14 Cal.5th at p. 1025.)  "Relative inequality

between the parties may also bear upon moral blame. 'We have previously

assigned moral blame, and we have relied in part on that blame in finding a duty, in

instances where the plaintiffs are particularly powerless or unsophisticated

compared to the defendants or where the defendants exercised greater control over

the risks at issue.' " (*Id.* at p. 1026, citing *Kesner, supra*, 1 Cal.5th at p. 1151.)

Defendants offer no argument in their Demurrer as to this *Rowland* factor.

Plaintiffs have alleged specific facts which, if true, tend to show that Defendants

anticipated the very harm allegedly suffered by Plaintiffs and intentionally failed to

make changes to ameliorate that potential harm.  And there is an obvious

inequality between the unsophisticated minors and Defendants who exercised total

control over how their platforms functioned.

The *Rowland* factor that considers a policy of preventing future harm

ordinarily is served by imposing the costs of negligent conduct on the negligent

party.  (*Kuciemba, supra*, 14 Cal.5th at p. 1026.)  Here, (particularly where the

issue is presented in a mass-tort context), if liability is imposed, it is likely to induce

a change of conduct by the allegedly negligent party.  Defendants offer no

argument as to this *Rowland* factor.  And, as Plaintiffs point out, protecting minors

is an important public policy goal.  (See, e.g., *Juarez v. Boy Scouts of America, Inc.*

(2000) 81 Cal.App.4th 377, 407 disapproved of on other grounds by *USA*

1   *Taekwondo*, *supra*, 11 Cal.5th 204.)

2   The third policy factor looks both to the extent of the burden of imposing

3   liability on a defendant and to the consequences to the community of imposing a

4   duty to exercise care with resulting liability for breach.  Defendants make two

5   arguments that are relevant to this *Rowland* factor.  First, they argue that courts

6   have declined to impose a duty to prevent addiction to online services out of

7   concern that there would be no limiting principle to that liability.  Second, they

8   argue that courts have declined to impose duties on disseminators of expressive

9   conduct.  (Defs' Dem., at pp. 69-70.)

10   For their first argument concerning liability for addiction without a limiting

11   principle, Defendants cite the California Supreme Court's *Kesner* decision in a very

12   misleading sentence purporting to quote from that decision.  (Defs' Dem., at p. 70.)

13   The actual quotation from that case says only that "courts invoke the concept of

14   duty to limit generally the otherwise potentially infinite liability which would follow

15   from every negligent act." (*Kesner*, *supra*, 1 Cal.5th at p. 1143, internal citations,

16   quotation marks, brackets, and ellipses omitted.)  That case says nothing about

17   addiction.

18   Defendants also cite a federal case decided under Indiana law holding that a

19   casino had no tort liability for "fail[ing] to evict a gambler who requests his own

20   exclusion" and discussing dram shop liability under Indiana law.  (*Merrill v. Trump

21   Ind., Inc.* (7th Cir. 2003) 320 F.3d 729, 732-733.)  The case is inapposite for the

22   reason (among others) that there were no allegations that the defendant engaged

23   in manipulative conduct toward the (adult) plaintiff in order to retain the plaintiff's

24   engagement in the services offered by the casino.

25   In the final case cited by Defendants, parents and their son sued three major

26   television networks, alleging that violent programming watched by the son from

27   age 5 to age 15 had made him a sociopath.  Unsurprisingly, the court found that it

28   "lack[ed] the legal and institutional capacity to identify isolated depictions of

violence, let alone the ability to set the standard for media dissemination of items containing 'violence' in one form or the other," and that suit was barred by the First Amendment.  (*Zamora v. Columbia Broadcasting System* (S.D.Fla. 1979) 480 F.Supp. 199, 203.)  Again, Plaintiffs here challenge Defendants' manipulation of their engagement with Defendants' platforms, and, as discussed below, the First Amendment does not bar Plaintiffs' negligence claims.

Defendants also cannot support their contention that the California courts have declined to impose duties on disseminators of expressive content.  (Defs' Dem., at p. 69.)  As discussed above in the section on First Amendment principles, in *Weirun*, the California Supreme Court held that a radio broadcast had created an unreasonable risk of harm to listeners who were encouraged to participate in a race on city streets to obtain cash prizes.  The court declined to bar negligence liability solely on the ground that physical injury was induced by speech rather than conduct.  (*Weirun*, *supra*, 15 Cal.3d at p. 48.)  Defendants instead cite *McCollum*, but there the Court of Appeal found that the plaintiff had not shown that the music he listened to before committing suicide was directed and intended toward the goal of urging listeners to commit suicide, and that it was likely to produce such a result. (*McCollum*, *supra*, 202 Cal.App.3d at pp. 1000-1001.)  Thus, in addition to holding that suit was barred by the First Amendment, the court found that the plaintiff had not established the elements of negligence (in particular, foreseeability of harm). Similarly, in another case cited by Defendants, *Watters v. TSR, Inc.* (6th Cir. 1990) 904 F.2d 378, 382, the Court of Appeals (referencing other similar cases cited by Defendants) held that "without actual incitement" First Amendment considerations argue against liability for a reader's reaction to a publication.

As discussed below, the First Amendment does not bar Plaintiffs' negligence claim.  Unlike in the cases cited by Defendants, here Plaintiffs seek to hold Defendants liable for their conduct in manipulating Plaintiffs' engagement with social media platforms separate from the content of those platforms.  Moreover, the

1   cases cited by Defendants also failed to find a duty based on a lack of foreseeability

2   of harm to a person who chose to watch or read the expressive content.  Here, as

3   discussed above, Defendants allegedly knew the likely effect of their conduct on

4   Plaintiffs.  To be sure, Plaintiffs seek to limit the conduct of social media sites in

5   crafting mechanisms for interactions with minors.  But those limits do not implicate

6   the duties of content publishers who have no intention of inciting harmful behavior

7   in consumers of the content.  Neither the extent of the burden of imposing liability

8   on Defendants in this case, nor the consequences to the community of imposing a

9   duty on Defendants to exercise care toward these minor Plaintiffs, suggests that the

10  duty imposed by negligence principles should not apply here.

11          Finally, as to whether Defendants might be able to insure for the risk

12  involved by recognizing a duty to Plaintiffs, Defendants fail to argue—much less

13  show—that it would be impossible or difficult for Defendants to insure against the

14  risks related to operating their platforms.  This *Rowland* factor thus does not weigh

15  in favor of sustaining the Demurrer as to the negligence-based claims.

16          In summary, the court finds that there is no basis for deviating from general

17  principles of negligence requiring Defendants to exercise due care in the

18  management of their property for the safety of their customers.

19

20      D. Plaintiffs Have Adequately Alleged Proximate Causation

21          Defendants argue that all of the claims alleged by Plaintiffs—including the

22  negligence claims—fail due to Plaintiffs' failure to adequately allege that

23  Defendants' platforms were the proximate cause of Plaintiffs' alleged injuries.

24  Defendants claim it is unclear which Plaintiffs used which features of Defendants'

25  platforms.  Defendants state:

26          Plaintiffs' allegations are akin to those of a teenager who, having attended
            multiple high schools, sues each of the schools together, claiming that a
27          variety of issues that can possibly occur in educational settings—from
            abusive teachers, to inadequate special education services, to unsafe bus
28          drivers, to insufficient protection from bullies, to nutritionally deficient

> food—are all theoretically capable of causing harm, but declining to specify which high school, let alone which aspect of their school experience at a particular school, actually caused their injuries.

(Defs' Dem., at p. 75.)

"In the usual negligence case, the elements of due care and proximate cause present questions of fact for the jury." (Witkin Torts, § 996.) "Traditionally, the law has asked whether defendant's conduct was the proximate cause of injury. [Citation.] Ordinarily, proximate cause is a question of fact which cannot be decided as a matter of law from the allegations of a complaint. Nevertheless, where the facts are such that the only reasonable conclusion is an absence of causation, the question is one of law, not of fact." (*Modisette v. Apple Inc.* (2018) 30 Cal.App.5th 136, 152 (*Modisette*), internal citations, quotation marks, and ellipses omitted.)

"Proximate cause has two aspects. One is cause in fact. An act is a cause in fact if it is a necessary antecedent of an event. This is sometimes referred to as but-for causation. [Citation.] To establish but-for causation, the plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of plaintiff's harm." (*Id.* at p. 153, internal citations, quotation marks, and brackets omitted.)

"As with the test for duty in negligence actions, the second aspect of proximate cause focuses on public policy considerations. Because the purported factual causes of an event may be traced back to the dawn of humanity, the law has imposed additional limitations on liability other than simple causality. These additional limitations are related not only to the degree of connection between the conduct and the injury, but also with public policy." (*Id.*, internal citations, quotation marks, and brackets omitted.) As for this second aspect of proximate cause, "legal responsibility must be limited to those causes which are so close to the result, or of such significance as causes, that the law is justified in making the defendant pay." (*Id.* at p. 154.) For example, in *Modisette*, the court held that the

law was not justified in making Apple, Inc. (Apple) pay for injuries resulting from a third-party driver who crashed into the plaintiffs' vehicle because the third-party driver was using Apple's vide chat application while driving.  (*Id.*)  The court found that, under the specific facts there, no reasonable person could conclude that Apple was responsible for the car crash.  (*Id.* at p. 155.)

Here, as previously discussed, there is a close connection between Defendants' management of their platforms and Plaintiffs' injuries.  The Master Complaint is clear in stating that the use of each of Defendants' platforms leads to minors' addiction to those products, which, in turn, leads to mental and physical harms.  (See, e.g., Mast. Compl., ¶¶ 80-95.)  These design features themselves are alleged to "cause or contribute to (and, with respect to Plaintiffs, have caused and contributed to) [specified] injuries in young people … ."  (Mast. Compl., ¶ 96, internal footnotes omitted; see also Mast. Compl., ¶ 102 [alleging that Defendants' platforms "can have a detrimental effect on the psychological health of their users, including compulsive use, addiction, body dissatisfaction, anxiety, depression, and self-harming behaviors such as eating disorders"], internal quotation marks, brackets, and footnotes omitted.)  Plaintiffs allege that the design features of each of the platforms at issue here cause these types of harms.  (See, e.g., Mast. Compl., ¶¶ 268-337 (Meta); ¶¶ 484-487, 489-490 (Snap); ¶¶ 589-598 (ByteDance); ¶¶ 713-773, 803 (Google).)  These allegations are sufficient under California's liberal pleading standard to adequately plead causation.

When the Short-Form Complaints are read in conjunction with the Master Complaint, the three individual Plaintiffs at issue here also have adequately alleged causation in the Short-Form Complaints.  Plaintiff M.C. allegedly used the following platforms: Instagram, Snapchat, TikTok, and YouTube.  (M.C. SFC, ¶ 4.)  Plaintiff M.C. has accordingly brought claims against Meta, Snap, ByteDance, and Google.  (M.C. SFC, ¶ 3.)  Plaintiff M.P. allegedly used Instagram and TikTok.  (J.P. SFC, ¶ 4.)  Plaintiff M.P. has accordingly brought claims against Meta and ByteDance.  (J.P.

SFC, ¶ 3.)  Plaintiff L.J.S. allegedly used Facebook and Instagram.  (J.S. SFC, ¶ 4.)

Plaintiff L.J.S. has accordingly brought claims against Meta.  (J.S. SFC, ¶ 3.)  The

parents of L.J.S. allege that L.J.S was able to secretly use Facebook and Instagram

because of Defendants' practices allowing youth users to create accounts without

age verification and to create multiple private accounts, that they would not have

allowed L.J.S. to use those social media sites, and that L.J.S. developed an

addiction to the sites.  (J.S. SFC ¶¶ 7-8; Mast. Compl. ¶ 929.)  All three of these

individual Plaintiffs allege that they suffered specified harm as a result of using

Defendants' platforms.  (M.C. SFC, ¶ 5; J.P. SFC, ¶ 5; J.S. SFC, ¶ 5.)

To the extent that Defendants can be understood to make the argument that

it is unclear from these factual allegations *to what extent* each platform caused the

specific harm suffered by one of the individual Plaintiffs, Defendants raise a factual

argument that must be addressed at a later stage of the litigation.  Here, Plaintiffs

have alleged that their use of each of Defendants' platforms causes harm; and each

of the three individual Plaintiffs has alleged that his or her use of particular

platforms caused his or her individual harm.  This coordinated proceeding thus is

not analogous to "alternative liability" cases like *Setliff v. E. I. Du Pont de Nemours

& Co.* (1995) 32 Cal.App.4th 1525 (*Setliff*), where the plaintiff was unable to

determine *which* product caused the plaintiff harm.  Here, for example, Plaintiff

M.P. has alleged use of both Instagram and TikTok, and that both Instagram and

TikTok caused his or her harm; Plaintiff M.P. has not alleged that he or she is not

sure whether he or she used *either* Instagram *or* TikTok.  Defendants' reliance on

*Setliff*, where the plaintiff was unable to determine which manufacturer had

manufactured a product to which he was exposed and by which he was harmed, is

thus misplaced.

Moreover, as discussed above, because the Master Complaint can be read to

state that Defendants' design features themselves—rather than the actions of third

parties using Defendants' platforms—caused Plaintiffs' harms, the Demurrer cannot

1  be sustained based on Defendants' secondary argument that Defendants cannot be

2  made to pay for the actions of third parties using Defendants' platforms.

3

4      E.  <u>Section 230 Does Not Bar Plaintiffs' Negligence Claim</u>

5      Section 230 states that "[n]o provider … of an interactive computer service

6  shall be treated as the publisher or speaker of any information provided by another

7  information content provider."  (47 U.S.C. § 230(c)(1).)  Through this statute,

8  "Congress intended to create a blanket immunity from tort liability for online

9  republication of third party content."  (*Barrett, supra,* 40 Cal.4th 57.)

10      Plaintiffs do not dispute the fact that Defendants are providers of an

11  interactive computer service within the meaning of Section 230.  The question for

12  the court is thus whether the Fifth Cause of Action must be read as seeking to hold

13  Defendants liable as the publishers of third-party information.  Put slightly

14  differently, the court must determine "whether the duty that [Plaintiffs allege

15  Defendants] violated derives from [Defendants'] status or conduct as a publisher…

16  ."  (*Lee, supra*, 76 Cal.App.5th at p. 256, internal citations and quotation marks

17  omitted.)

18      As discussed above, under California procedural law, if any allegations are

19  sufficient to support a viable cause of action, the Demurrer to that cause of action

20  must be overruled.  Thus, if any facts sufficient to state a claim for negligence

21  support a theory of liability that is not preempted by Section 230, the court must

22  overrule the Demurrer as to the Fifth Cause of Action.  If some allegations state a

23  claim that is not barred by Section 230, the court is not required at this stage of the

24  litigation to determine whether or not there are other particular allegations of the

25  Master Complaint and Short-Form Complaints that are barred by Section 230.  For

26  the reasons that follow, this court concludes that there are several theories of

27  breach of duty set forth in the Fifth Cause of Action that are not barred by Section

28  230.

1    Plaintiffs allege they were injured by features of Defendants' platforms that

2  were designed to, and did in fact, maximize use of the platforms in ways leading to

3  minors' addiction and resulting health consequences.  The Ninth Circuit has held

4  that Section 230 does not bar a claim based on features of a social media site that

5  have an adverse effect on users apart from the content of material published on the

6  site.

7    In *Lemmon, supra,* the plaintiffs were parents of two deceased boys who

8  sued Snap, "alleging that it encouraged their sons to drive at dangerous speeds and

9  thus caused the boys' deaths through its negligent design of its smartphone

10 application Snapchat." (955 F.3d at p. 1087.)  At issue was Snap's app called the

11 "Speed Filter." "The app … permits its users to superimpose a filter over the photos

12 or videos that they capture through Snapchat at the moment they take that photo

13 or video. [One of the deceased boys] used one of these filters—the Speed Filter—

14 minutes before the fatal accident on May 28, 2017. The Speed Filter enables

15 Snapchat users to record their real-life speed." (*Id.* at p. 1088, internal quotation

16 marks omitted.)  "Many of Snapchat's users suspect, if not actually believe, that

17 Snapchat will reward them for recording a 100-MPH or faster snap using the Speed

18 Filter. According to plaintiffs, this is a game for Snap and many of its users with the

19 goal being to reach 100 MPH, take a photo or video with the Speed Filter, and then

20 share the 100-MPH-Snap on Snapchat." (*Id.* at p. 1089, internal quotation marks

21 and brackets omitted.)

22    The Ninth Circuit reversed the district court's dismissal of the plaintiffs' action

23 under Section 230, concluding "that, because the [plaintiffs'] claim neither treats

24 Snap as a publisher or speaker nor relies on information provided by another

25 information content provider, Snap does not enjoy immunity from this suit under §

26 230(c)(1)." (*Id.* at p. 1087, internal quotation marks omitted.)  The court noted

27 that the plaintiffs in *Lemmon* alleged a cause of action that "rests on the premise

28 that manufacturers have a duty to exercise due care in supplying products that do

1    not present an unreasonable risk of injury or harm to the public." (*Id.* at p. 1092.)

2    The court then concluded that the claims were not barred by Section 230:

3           The duty underlying such a claim differs markedly from the duties of
            publishers as defined in [Section 230]. Manufacturers have a specific duty

4           to refrain from designing a product that poses an unreasonable risk of
            injury or harm to consumers. [Citation.] Meanwhile, entities acting solely

5           as publishers—*i.e.*, those that "review material submitted for publication,
            perhaps edit it for style or technical fluency, and then decide whether to

6           publish it," [citation]—generally have no similar duty. [Citation.]
                  It is thus apparent that the [plaintiffs'] amended complaint does not

7           seek to hold Snap liable for its conduct as a publisher or speaker. . . .
            [T]he duty that Snap allegedly violated "springs from" its distinct capacity

8           as a product designer. [Citation.] This is further evidenced by the fact that
            Snap could have satisfied its "alleged obligation"—to take reasonable

9           measures to design a product more useful than it was foreseeably
            dangerous—without altering the content that Snapchat's users generate.

10          [Citation.] Snap's alleged duty in this case thus "has nothing to do with"
            its editing, monitoring, or removing of the content that its users generate

11          through Snapchat. [Citation.]

12

13   (*Lemmon v. Snap, Inc.* (9th Cir. 2021) 995 F.3d 1085, 1092, internal citations and

14   brackets omitted; italics in original.)

15          As in *Lemmon,* Plaintiffs' claims based on the interactive operational features

16   of Defendants' platforms do not seek to require that Defendants publish or de-

17   publish third-party content that is posted on those platforms. The features

18   themselves allegedly operate to addict and harm minor users of the platforms

19   regardless of the particular third-party content viewed by the minor user. (See,

20   e.g., Mast. Compl., ¶¶ 81, 84.) For example, the Master Complaint alleges that

21   TikTok is designed with "continuous scrolling," a feature of the platform that

22   "makes it hard for users to disengage from the app," (Mast. Compl., ¶ 567) and

23   that minor users cannot disable the "auto-play function" so that a "flow-state" is

24   induced in the minds of the minor users (Mast. Compl., ¶ 590). The Master

25   Complaint also alleges that some Plaintiffs suffer sleep disturbances because

26   "Defendants' products, driven by IVR algorithms, deprive users of sleep by sending

27   push notifications and emails at night, prompting children to re-engage with the

28   apps when they should be sleeping." (Mast. Comp., ¶ 107 [also noting that

disturbed sleep increases the risk of major depression and is associated with "future suicidal behavior in adolescents"].)

Also similar to the allegations in *Lemmon,* the Master Complaint alleges harm from "filters" and "rewards" offered by Defendants.  Plaintiffs allege, for example, that Defendants encourage minor users to create and post their own content using appearance-altering tools provided by Defendants that promote unhealthy "body image issues." (Mast. Compl., ¶ 94).  The Master Complaint alleges that some minors spend hours editing photographs they have taken of themselves using Defendants' tools.  (See, e.g., Mast. Compl., ¶ 318.)  The Master Complaint also alleges that Defendants use "rewards" to keep users checking the social media sites in ways that contribute to feelings of social pressure and anxiety.  (See, e.g., Mast. Compl., ¶ 257 [social pressure not to lose or break a "Snap Streak"].)

Another aspect of Defendants' alleged lack of due care in the operation of their platforms is their facilitation of unsupervised or secret use by allowing minor users to create multiple and private accounts and allowing minor users to mask their usage.  (Mast. Compl., ¶ 929(d), (e), (f).)  Plaintiffs J.S. and D.S., the parents of minor Plaintiff L.J.S., allege that L.J.S. was able to secretly use Facebook and Instagram, that they would not have allowed use of those sites, and that L.J.S. developed an addiction to those social media sites which led to "a steady decline in his mental health, including sleep deprivation, anxiety, depression, and related mental and physical health harms." (J.S. SFC ¶¶ 7-8.)

Insofar as the Fifth Cause of Action is based on these and similar features allegedly negligently crafted or implemented by Defendants, Plaintiffs' claims are not barred by Section 230 because the alleged wrongdoing does not "treat[ ] [the provider] as the publisher or speaker of any information provided by another information content provider." (47 U.S.C. § 230, subd. (c)(1).)  Plaintiffs' contentions based on the allegedly addictive qualities of the interactive features of Defendants' social media sites do not fall within the "blanket immunity from tort

1    liability for online republication of third party content." (*Barrett, supra*, 40 Cal.4th

2    at p. 57.)  Defendants are allegedly liable for their own actions, not for the content

3    of third-party postings.  (See, e.g., *Barnes, supra*, 570 F.3d 1096 [provider's

4    liability for a promise to remove third-party content was not barred by Section

5    230]; *Bolger, supra*, 53 Cal.App.5th at pp. 464-465 [provider's liability as a seller in

6    the chain of distribution for a defective product listed on its website was not barred

7    by Section 230].)  Where a provider manipulates third party content in a manner

8    that injures a user, Section 230 does not provide immunity.  (*Hardin, supra*, 227

9    Cal.App.4th at p. 171 [no Section 230 immunity where the provider edited product

10   warnings before publishing them and the liability allegedly arose from the omitted

11   portions].)

12          Courts are to attempt to construe statutes to effectuate the intent of the

13   legislative body.  (*People v. Johnson* (2002) 28 Cal.4th 240, 244.)  Section 230

14   states an express congressional policy to "encourage the development of

15   technologies which *maximize user control* over what information is *received* by

16   individuals, families and schools who use the Internet and other interactive

17   computer services ... ."  (47 U.S.C. § 230, subd. (b)(3), emphasis added.)

18   Congress did not decide to support this congressional policy by enacting into

19   positive law a requirement that a provider act so as to maximize user control.

20   When the immunity granted by subdivision (c) of Section 230 is applied according

21   to its terms, providers are shielded from being held liable for content others have

22   posted on their platforms.  Thus, for example, users cannot maximize their control

23   over the content they receive by holding a provider liable if the user receives

24   content he has asked not to see.  (Cf., *Barnes, supra*, 570 F.3d 1096.)  But the

25   congressional policy of encouraging technologies that maximize user control should

26   caution a court not to stretch the immunity provision of Section 230 beyond its

27   plain meaning in a manner that diminishes users' control over content they receive.

28   So long as providers are not punished for publishing third-party content, it is

1  consistent with the purposes of Section 230 to recognize a common law duty that

2  providers refrain from actions that injure minor users by inducing frequency and

3  length of use of a social media platform to the point where a minor is addicted and

4  can no longer control the information they receive from that platform.

5      Similarly, Congress made no secret of its intent regarding parental

6  supervision of minors' social media use.  By enacting Section 230, Congress

7  expressly sought "to remove disincentives for the development and utilization of

8  blocking and filtering technologies that empower parents to restrict children's

9  access to objectionable or inappropriate online material."  (47 U.S.C. § 230, subd.

10  (b)(4).)  While in some instances there may be an "apparent tension between

11  Congress's goals of promoting free speech while at the same time giving parents

12  the tools to limit the material their children can access over the Internet" (*Barrett*,

13  *supra*, 40 Cal.4th at p. 56), where a plaintiff seeks to impose liability for a

14  provider's acts that diminish the effectiveness of parental supervision, and where

15  the plaintiff does not challenge any act of the provider in publishing particular

16  content, there is no tension between Congress's goals.

17      Further, subdivision (e)(3) of Section 230 provides that "[n]othing in this

18  section shall be construed to prevent any State from enforcing State law that is

19  consistent with this section."  (47 U.S.C. § 230, subd. (e)(3).)  Application of

20  negligence principles in the manner permitted by state common law as described

21  above is consonant with, not inconsistent with, both subdivision (c) of Section 230

22  and the intent expressed by Congress in enacting Section 230.

23      Although Defendants argue they cannot be liable for their design features'

24  ability to addict minor users and cause near constant engagement with Defendants'

25  platforms because Defendants create such "engagement" "with user-generated

26  content" (Defs' Dem., at p. 42, internal italics omitted), this argument is best

27  understood as taking issue with the facts as pleaded in the Master Complaint.  It

28  may very well be that a jury would find that Plaintiffs were addicted to Defendants'

1  platforms because of the third-party content posted thereon.  But the Master

2  Complaint nonetheless can be read to state the contrary—that is, that it was the

3  design of Defendants' platforms themselves that caused minor users to become

4  addicted.  To take another example, even though L.J.S. was viewing content of

5  some kind on Facebook and Instagram, if he became addicted and lost sleep due to

6  constant unsupervised use of the social media sites, and if Defendants facilitated

7  L.J.S.'s addictive behavior and unsupervised use of their social media platforms

8  (i.e., acted so as to maximize engagement to the point of addiction and to deter

9  parental supervision), the negligence cause of action does not seek to impose

10  liability for Defendants' publication decisions, but rather for their conduct that was

11  intended to achieve this frequency of use and deter parental supervision.  Section

12  230 does not shield Defendants from liability for the way in which their platforms

13  actually operated.

14  Moreover, courts have repeatedly "rejected use of a 'but-for' test that would

15  provide immunity under [Section 230] solely because a cause of action would not

16  otherwise have accrued but for the third-party content." (*Lee*, *supra*, 76

17  Cal.App.5th at p. 256, internal citations and quotation marks omitted.)  "[N]ot all

18  legal duties owed by Internet intermediaries necessarily treat them as the

19  publishers of third party content, even when these obligations are in some way

20  associated with their publication of this material." (*Hassell*, *supra*, 5 Cal.5th at pp.

21  542-543.)  As the Ninth Circuit found in *Lemmon*:

22  > Snap "is an internet publishing business. Without publishing user content,
> it would not exist." *Id.* But though publishing content is "a but-for cause of

23  > just about everything" Snap is involved in, that does not mean that the
> [plaintiffs'] claim, specifically, seeks to hold Snap responsible in its

24  > capacity as a "publisher or speaker." *Id.* The duty to design a reasonably
> safe product is fully independent of Snap's role in monitoring or publishing

25  > third-party content.

26  (*Lemmon*, *supra*, 995 F.3d at pp. 1092-1093, internal brackets omitted; see also

27  *Internet Brands*, *supra*, 824 F.3d at p. 853; *HomeAway*, *supra*, 918 F.3d at p. 682.)

28  Thus, the fact that Plaintiffs' harmful addiction to Defendants' platforms would not

have arisen *without* the presence of third-party content does not, without more, bar the Fifth Cause of Action under Section 230.

In arguing that Section 230 bars liability for negligently creating the platform features that Plaintiffs contend cause addiction and resulting harm, Defendants rely on cases that are distinguishable because they concern circumstances where an internet service provider failed to protect a user from harm caused by third-party content.  Plaintiffs' allegations on the basis of which this court is sustaining the Demurrer to the negligence claim do not seek to hold Defendants liable for injury caused by third-party content.

In *Dyroff v. Ultimate Software Group, Inc.* (9th Cir. 2019) 934 F.3d 1093 (*Dyroff*), for example, the plaintiff's son used a social networking website to connect with a drug dealer and purchase heroin that caused death from fentanyl toxicity.  The plaintiff alleged that defendant allowed illegal drug trafficking on the website, steered users to groups dedicated to the sale and use of narcotics, and permitted users to remain active accountholders despite evidence that they openly engaged in drug trafficking.  (*Id.*)  The Ninth Circuit rejected the plaintiff's argument that the social networking website could be held liable for "features and functions, including algorithms, to analyze user posts on [the site] and recommend[ ] other user groups."  (*Id.* at p. 1098.)  The court held that "what matters [for purposes of Section 230] is whether the claims 'inherently require[ ] the court to treat the defendant as the 'publisher or speaker' of content provided by another.' "  (*Id.*, quoting *Barnes*, *supra*, 570 F.3d at p. 1102.)  The plaintiff in *Dyroff* also was unable to allege that the defendant "materially contributed to the content posted … that led to [the plaintiff's death]."  (*Id.* at p. 1099.)  Thus, in *Dyroff*, liability was premised on the website's publication and recommendation of third-party content and injury flowing from that content, not from the provider's own actions.

Similarly, in *Doe II v. MySpace, Inc.*, (2009) 175 Cal.App.4th 561 (*MySpace*), the plaintiffs sought to hold the provider liable for injuries from sexual

assault by men the minor plaintiffs met through the social networking site.  The

Court of Appeal held that even though the plaintiffs "seek to hold [the provider]

responsible for the communications between the [plaintiffs] and their assailants[,]

… [a]t its core, [the plaintiffs] want [the provider] to regulate what appears on its

Web site. … [T]hey want [the provider] to ensure that sexual predators do not gain

access to (i.e., communicate with) minors on its Web site.  That type of activity—to

restrict or make available certain material—is expressly covered by section 230."

(*Id.* at p. 573.)  Again, as in *Dyroff*, it was clear to the appellate court in *MySpace*

that the gravamen of the cause of action was for injury caused by content on the

social media service.  Here, the injuries to Plaintiffs that are the basis for overruling

the Demurrer to the Fifth Cause of Action are not alleged to be caused by content

on Defendants' website, but rather by features created by Defendants to keep the

minor user on the platform and to decrease the potential for parental supervision.

Defendants also argue that *Prager University v. Google LLC* (2022) 85

Cal.App.5th 1022 (*Prager*) rejects the argument that algorithmic features can be a

basis for liability that is not barred by Section 230.  That case has little relevance

here.  The plaintiffs in *Prager* sought to hold the defendant provider liable for

restricting access to the plaintiff's video content and for limiting third-party

advertising based on those videos.  (*Id.* at p. 1028.)  The plaintiffs alleged that the

defendant's algorithms used in determining what content to publish should be

considered to be the provider's own speech.  The court rejected that argument,

finding that the defendant's act of deciding what to allow on its website was indeed

a decision to publish third party content and that liability was barred by Section

230.  (*Id.* at p. 1034-1035.)  Again, here Plaintiffs' contentions concerning features

that maximize minors' engagement do not challenge algorithms that decide what

content to publish.

Despite the fact that the allegations of the Master Complaint are sufficient to

allege a negligence claim based on tools and features of engagement created by

Defendants that operate regardless of third-party content, there also are allegations

that can be read to seek to hold Defendants liable for publishing third-party

content.  For example, Plaintiffs allege that "thinspiration" and "fitspiration" content

lowers minors' self-esteem and that content viewed by minors on Defendants'

platforms promotes anorexia.  (See, e.g., Mast. Compl. ¶¶ 118, 359.)

While the Master Complaint can be read to allege that the amount of time

spent on social media can cause disordered eating behaviors (Mast. Compl. ¶ 116),

other allegations suggest alternative causes based on content.  Nevertheless, the

Demurrer to the Fifth Cause of Action must be overruled based on the existence of

allegations that Plaintiffs' harms were caused directly by Defendants' negligent

failure to properly design and operate their platforms.

At oral argument, Defendants suggested that, contrary to California

procedural law, this court can sustain the Demurrer on the ground that some but

not all of the allegations can be read to state that Plaintiffs seek to hold Defendants

liable in negligence in their role as publishers of third-party content.  Defendants

have presented no authority—and this court is aware of none—suggesting that the

most basic rules of California procedure are somehow preempted by Section 230.

The court thus declines to sustain a demurrer to a portion of a cause of action.


F.  The First Amendment Does Not Bar Plaintiffs' Negligence Claim

Defendants argue that the First Amendment bars all Plaintiffs' claims,

including the Fifth Cause of Action.  Defendants claim that they should be viewed as

"publishers of material alleged to have harmed those exposed to it."  (Defs' Dem.,

at p. 52.)  Defendants argue that they cannot be liable for "disseminating speech,"

and contend that Plaintiffs seek to hold Defendants liable for disseminating speech.

According to Defendants, "Plaintiffs cannot evade the First Amendment by directing

attention toward allegedly defective 'features' of Defendants' services."  (Defs'

Dem., at p. 54.)

"First Amendment rights are accorded a preferred place in our democratic society. [Citation.] First Amendment protection extends to a communication, to its source and to its recipients. [Citation.] Above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." (*McCollum*, *supra*, 202 Cal.App.3d at pp. 998-999, internal citations, quotation marks, and brackets omitted.) "First Amendment guaranties of freedom of speech and expression extend to all artistic and literary expression, whether in music, concerts, plays, pictures or books." (*Id.* at p. 999; see *Brown, supra,* 564 U.S. 786 [striking down a law restricting violent video games as a category of protected expression].)

Defendants cite frequently to *McCollum* in support of their Demurrer, but that case did not deal primarily with the question of whether the relevant bad acts by the defendant constitute speech or expression.  In *McCollum,* the act for which the plaintiff sought to hold the defendant liable was publication of a song with lyrics about suicide, which clearly was expressive activity.  There, the issue was whether the defendant's speech was directed to inciting or producing imminent lawless action, and thus excepted from the normal protections of the First Amendment. (*McCollum*, *supra*, 202 Cal.App.3d at p. 1000.)  Here, by contrast, the main issue before the court is whether the design features of Defendants' platforms that allegedly harmed Plaintiffs must be viewed as speech protected under the First Amendment.

Defendants would have this court treat Defendants as mere "publishers" of information, and treat Plaintiffs as individuals who were exposed to that information when using Defendants' platforms.  Defendants thus seek to analogize the allegations in the Master Complaint to cases where the defendant distributed recorded music or violent movies.  (See Defs' Dem., at p. 54, citing *McCollum* and *Olivia N.*, *supra*, 126 Cal.App.3d 488.)

Plaintiffs here were exposed to speech when using Defendants' platforms.

1   But the mere fact that the conduct at issue involves or includes speech does not

2   necessarily shield a defendant from liability.  (See *Avis Rent A Car, supra,* 21

3   Cal.4th at p. 134 [spoken words, alone or in conjunction with conduct, can amount

4   to unlawful employment discrimination].)  For example, even where some speech

5   by a defendant is alleged, the First Amendment does not bar a claim for liability

6   based on manufacture and distribution of a defective product.  (See *Martinez v.*

7   *Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188.)  And in *Weirun, supra,*

8   15 Cal.3d at pp. 47-48, the California Supreme Court allowed a tort claim to be

9   pursued based on a radio broadcast that created an unreasonable risk of harm by

10  encouraging participation in a race on city streets for cash prizes.  Moreover, while

11  conduct that is "sufficiently imbued with elements of communication" is protected

12  by the First Amendment, the Supreme Court of the United States has rejected "the

13  view that an apparently limitless variety of conduct can be labeled speech whenever

14  the person engaging in the conduct intends thereby to express an idea." (*Edge v.*

15  *City of Everett* (9th Cir. 2019) 929 F.3d 657, 668, internal citations and quotation

16  marks omitted.)

17          A case cited by Defendants in support of their arguments regarding Plaintiffs'

18  strict liability claims serves to highlight the difference between, on the one hand,

19  content offered by a defendant's product, and, on the other, the product itself.  In

20  *Winter, supra,* 938 F.2d 1033, the Ninth Circuit, concerned with First Amendment

21  protections, held that informational content in a book is not a "product" for the

22  purposes of strict products liability.  The court began by stating:

23          A book containing Shakespeare's sonnets consists of two parts, the
        material and print therein, and the ideas and expression thereof. The first
24      may be a product, but the second is not. The latter, were Shakespeare
        alive, would be governed by copyright laws; the laws of libel, to the extent
25      consistent with the First Amendment; and the laws of misrepresentation,
        negligent misrepresentation, negligence, and mistake. These doctrines
26      applicable to the second part are aimed at the delicate issues that arise
        with respect to intangibles such as ideas and expression. Products liability
27      law is geared to the tangible world.

28  (*Id.*)  The court determined that the purposes served by products liability law "do

1  not take into consideration the unique characteristics of ideas and expression."

2  (*Id.*)

3       Because the allegations in the Master Complaint can be read to state that

4  Defendants' liability grows from the way their platforms functioned, the Demurrer

5  cannot be sustained pursuant to the protections of the First Amendment.  As

6  Plaintiffs argue in their Opposition, the allegations can be read to state that

7  Plaintiffs' harms were caused by their addiction to Defendants' platforms

8  themselves, not simply to exposure to any particular content visible on those

9  platforms.  Therefore, Defendants here cannot be analogized to mere publishers of

10  information.  To put it another way, the design features of Defendants' platforms

11  can best be analogized to the physical material of a book containing Shakespeare's

12  sonnets, rather than to the sonnets themselves.

13       Defendants fail to demonstrate that the design features of Defendants'

14  applications must be understood at the pleadings stage to be protected speech or

15  expression.  Indeed, throughout their Demurrer, Defendants make clear their

16  position that Plaintiffs' claims are based on content created by third parties that

17  was merely posted on Defendants' platforms.  (See, e.g., Defs' Dem., at p. 49.)  As

18  discussed above, a trier of fact might find that Plaintiffs' harms resulted from the

19  content to which they were exposed, but Plaintiffs' allegations to the contrary

20  control at the pleading stage.

21       Defendants nonetheless argue that "Plaintiffs cannot evade the First

22  Amendment by directing attention toward allegedly defective 'features' of

23  Defendants' services."  (Defs' Dem., at p. 54.)  According to Defendants, third-

24  party speech disseminated by Defendants is a necessary part of Plaintiffs' claims,

25  and Defendants argue that "without reference to the speech generated or made

26  available through those features, Plaintiffs' alleged harms are inexplicable."  (Defs'

27  Dem., at p. 55.)  In arguing that the presence of third-party speech on Defendants'

28  platforms renders all of Plaintiffs' claims barred under the First Amendment,

Defendants cite to the following two cases: *Bill*, *supra*, 137 Cal.App.3d 1002; and

*Estate of B.H. v. Netflix, Inc.* (N.D. Cal., Jan. 12, 2022, No. 4:21-CV-06561-YGR)

2022 WL 551701 (*Netflix*).  (See Defs' Dem., at p. 54.)

In *Bill*, *supra,* 137 Cal.App.3d 1002, plaintiff contended that the director and

producers of a violent film could be held liable when a third party shot the plaintiff

outside the movie theater that showed the film.  Although the court expressed

concern that such tort liability could have "a chilling effect" on speech (*id.* at p.

1008), the court in fact "refrain[ed] from deciding the case on First Amendment

grounds alone" because there could be appropriate circumstances to "hold a party

responsible for warning, or taking protective action, against the foreseeable

reaction of persons to protected speech without violating the First Amendment" (*id.*

at p. 1009).  The Plaintiff in *Bill* argued that she was not seeking to impose liability

on the basis of the content of the movie.  (*Id.* at p. 1007.)  But the court effectively

found there were no other wrongful actions by the defendant on which liability

could be premised.  "It is not claimed, for example, that petitioners are responsible

for any conduct [other than distributing the film] which *increased the risk of*

*violence* on the part of persons in the vicinity of the theater, in order to obtain

some commercial rewards." (*Id.* at p. 1011, emphasis added.)

The holding in *Bill* cannot be analogized to the allegations of the Master

Complaint regarding Defendants' alleged negligence in the design and operation of

their platforms.  As the court in *Bill* stressed, it was the content of the movie that

attracted violent third parties to the movie theater, and it was thus the content of

the movie that allegedly led to the plaintiff's harm.  In contrast, the allegations of

the Master Complaint can be read to state that it is the way in which the platforms

function that renders them addictive and thus harmful to minor Plaintiffs, or that

certain design features (such as filters) directly led to Plaintiffs' harm.  In contrast

to the facts in *Bill*, here there is no single type of content viewed by all Plaintiffs;

rather, the particular content viewed depends on each user.  The allegedly addictive

1    and harmful features of Defendants' platforms are alleged to work *regardless* of the

2    third-party content viewed by the users.  (See, e.g., Mast. Compl., ¶ 93.)

3    Moreover, Defendants fail to explain how a requirement that Defendants change the

4    design features of their platforms would have a chilling effect on third-party speech

5    or the distribution of such speech.

6         Nor does *Netflix* support Defendants' position.  *Netflix*, like *Bill*, concerned

7    content, not the design features of a website or application.  The plaintiffs in *Netflix*

8    alleged that the defendant, which operated a streaming platform, released a show

9    that dealt with suicide, and that the defendant knew that "certain impressionable

10   youths" would be harmed if they *watched* the show.  (See Amended Complaint in

11   *Netflix*, 2021 WL 8821883 (N.D.Cal.).)  The plaintiffs alleged that the defendant

12   "used its sophisticated, targeted recommendation systems to push the Show on

13   unsuspecting and vulnerable children, using its cutting-edge technology," but the

14   harm alleged by the plaintiffs was clearly caused by the content of the show.  (*Id.*

15   ¶¶ 6, 26.)  In dismissing the action on First Amendment grounds, the court thus

16   determined that the plaintiffs' "efforts to oppose the anti-SLAPP motion on the

17   grounds that the complaint [did] not concern the content or dissemination of the

18   show [did] not persuade and [were] inconsistent with the allegations." (*Netflix*,

19   *supra*, 2022 WL 551701, at *2.)

20        The reasoning in *Netflix* would apply here to the extent Plaintiffs' claims are

21   based on allegations that Defendants directed them to watch harmful third-party

22   content.  But, as repeatedly stated in this order, Plaintiffs' claims can be interpreted

23   as being based on harm arising from the design features of Defendants' platforms.

24   When Plaintiffs' claims are so framed, cases like *Netflix* are inapposite.

25        Despite Defendants' suggestions to the contrary, this litigation cannot be

26   analogized to *NetChoice, LLC v. Attorney General, Florida* (11th Cir. 2022) 34 F.4th

27   1196 (*NetChoice*), which dealt directly with the content posted on social-media

28   platforms.  In *NetChoice*, the state of Florida sought to control the political content

found on social-media platforms.  For example, Florida state law would have

prevented social-media platforms from willfully deleting or banning a candidate for

office from a social-media platform for more than 14 days.  (*Id.* at p. 1206.)  The

Eleventh Circuit determined that "when a platform removes or deprioritizes a user

or post, it makes a judgment about whether and to what extent it will publish

information to its users—a judgment rooted in the platform's own views about the

sorts of content and viewpoints that are valuable and appropriate for dissemination

on its site." (*Id.* at p. 1210.)  "When a platform selectively removes what it

perceives to be incendiary political rhetoric, pornographic content, or public-health

misinformation, it conveys a message and thereby engages in 'speech' within the

meaning of the First Amendment." (*Id.*)  The court in *NetChoice* thus reached the

conclusion that "[l]aws that restrict platforms' ability to speak through content

moderation therefore trigger First Amendment scrutiny." (*Id.*)  Here, the design

features of Defendants' platforms are not an instance of "content moderation" as

discussed in *NetChoice*.

Defendants are also incorrect in suggesting that First Amendment protections

apply here because the addictive features of Defendants' platforms (such as

"endless scroll") can be analogized to how a publisher chooses to make a

compilation of information.  (See Defs' Dem., at p. 55.)  It is undisputed that the

First Amendment generally protects a publisher from liability where that publisher

organized, compiled, and disseminated information that then harmed the plaintiff.

(See, e.g., *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 266.)  Moreover, a

plaintiff cannot properly force a publisher to disseminate certain information.

(*Miami Herald Pub. Co. v. Tornillo* (1974) 418 U.S. 241 [political candidate could

not sue to require a newspaper to publish his reply to the newspaper's editorials].)

But Defendants fail to cite to a case in which the plaintiff's claims against a

publisher of information were based on harm caused by the way in which the

publisher provided third-party content, rather than being based on the content

itself.  Design features of the platforms (such as endless scroll or filters) cannot readily be analogized to mere editorial decisions made by a publisher.  Here, the design features of Defendants' platforms affect how Plaintiffs interact with the platforms regardless of the nature of the third-party content viewed by Plaintiffs.

In addition, the allegations of the Master Complaint are analogous to facts alleged in a line of United States Supreme Court cases that allow a person to avoid speech that invades privacy interests "in an essentially intolerable manner." (*Erznoznik*, *supra*, 422 U.S. at p. 210.)  In *Rowan,* the Supreme Court turned aside a First Amendment challenge to a federal statute that allowed a postal recipient to insulate himself from home delivery of matter he believed to be "sexually provocative."  (*Rowan*, *supra*, 397 U.S. at p. 730.)  Although the court acknowledged that the regulation impeded the free flow of ideas and to that extent chilled expression, the court protected minors and the privacy of homes from receiving speech that could not be avoided.  "The asserted right of a mailer, we repeat, stops at the outer boundary of every person's domain." (*Id.* at p. 738.) Similarly, in dicta, the Supreme Court recognized in *Erznoznik* a right to avoid speech when "the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure."  (*Erznoznik*, *supra*, 422 U.S. at p. 209.)

If Plaintiffs' allegations can be proved, minors were subject to endless scrolls of videos and notifications at all hours of the day and night.  Having become addicted to Defendants' platforms as a result of these features, the minors were unable to control exposure to the content that was communicated to them in this manner.  Holding Defendants responsible in tort for these addictive features does not violate the First Amendment even if less content is delivered as a result.  The right of Defendants to send content that the minors could not avoid stops at the boundary of their domain." (*Rowan*, *supra*, 397 U.S. at p. 738; see also *Rock Against Racism*, *supra*, 491 U.S. at p. 803 [city's sound-amplification guideline for use of a public bandshell so as to preserve quiet space was narrowly tailored to

serve a substantial, content-neutral governmental interest and the guideline left open ample channels of communication].)

As discussed above, Defendants are correct that there are allegations in the Master Complaint that could be read to state that Plaintiffs were also harmed by *content* found on Defendants' platforms.  But the Master Complaint can be read to state that Plaintiffs' claims are based on the fact that the design features of the platforms—and not the specific content viewed by Plaintiffs—caused Plaintiffs' harms.  The Fifth Cause of Action is not barred by the First Amendment.

## VI.       Sixth Cause of Action – Negligent Undertaking

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise reasonable care *increases the risk of such harm*, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered *because of reliance of the other or the third person upon the undertaking*." (*Paz v. State of California* (2000) 22 Cal.4th 550, 558 (*Paz*), internal citations, quotation marks, brackets, and footnotes omitted; emphasis added.) "The general rule is that a person who has not created a peril is not liable in tort for failing to take affirmative action to protect another unless they have some relationship that gives rise to a duty to act. [Citation.] However, one who undertakes to aid another is under a duty to exercise due care in acting and is liable if the failure to do so increases the risk of harm or if the harm is suffered because the other relied on the undertaking." (*Id.* at pp. 558-559, internal citations omitted.)

The Sixth Cause of Action concerns Defendants' alleged decision to provide users with "age verification services." (Mast. Compl., ¶ 940.)  Plaintiffs do not

1   contend that Defendants, by creating the age verification services, have undertaken

2   to perform a duty owed by another person to Plaintiffs.  (See Pls' Opp., at pp. 58-

3   60.)  Plaintiffs must therefore allege *either* that the provision of the age verification

4   services increased the risk of harm to Plaintiffs *or* that the harm was caused by

5   reliance on the age verification services.  Because Plaintiffs fail to allege either of

6   these alternative elements of their Sixth Cause of Action, the negligent undertaking

7   claim fails.

8          There are no factual allegations stating that the provision of age verification

9   services actually increased any likelihood of harm to Plaintiffs.  Here, because the

10  "undertaking" is the provision of age verification services, the increase of risk must

11  be compared with a situation in which *no such services* are provided.  But Plaintiffs

12  fail to provide any allegations demonstrating that the risk of harm to Plaintiffs

13  *increased* with the provision of age verification services.  Given the allegations in

14  the Master Complaint, the risk of harm to Plaintiffs would have been the same if

15  Defendants had instead failed to provide *any* age verification services for the use of

16  their platforms.

17         For example, in their Opposition, Plaintiffs cite to paragraph 717 of the

18  Master Complaint in arguing that Google's age verification services increased the

19  risk to Plaintiffs.  That paragraph states: "YouTube's defective age verification

20  feature means that Google fails to protect children from other product features

21  discussed below that Google knows to be harmful to kids."  (Mast. Compl., ¶ 717.)

22  This paragraph fails to allege any increased risk caused by the provision of age

23  verification services: if there were no age verification services provided by Google,

24  then Plaintiffs would still have been exposed to Google's product features that are

25  harmful to kids.  The same conclusion must be reached with respect to ByteDance

26  and Snap.  (See Mast. Compl., ¶¶ 434-436, 540-547.)

27         With respect to Meta, Plaintiffs cite to the following paragraph of the Master

28  Complaint:

Meta imposes unnecessary barriers to the removal of accounts created by children under 13. Since at least April 2018, Instagram and Facebook both accept reports of accounts created by children under 13. However, before an Instagram or Facebook account is deleted, Meta requires verification that the child is under the age of 13. For example, Instagram's reporting page states:

If you're reporting a child's account that was made with a false date of birth, and the child's age can be reasonably verified as under 13, we'll delete the account. You will not get confirmation that the account has been deleted, but you should no longer be able to view it on Instagram. Keep in mind that complete and detailed reports (example: providing the username of the account you're reporting) help us take appropriate action. If the reported child's age can't reasonably be verified as under 13, then we may not be able to take action on the account.

Facebook's reporting page contains almost identical language. By choosing to implement age verification only before deleting accounts of users suspected to be children, but not when those accounts are first created, Meta makes it more difficult to prove a user is under age 13 than it does for a minor to pretend to be over 13.

(Mast. Compl., ¶ 249, internal footnotes omitted.)  Plaintiffs then opine in their Opposition that preteen users *might* continue to be harmed by Meta's products even when their parents try to delete their accounts.  (See Pls' Opp., at pp. 59-60.) The problem with this argument, however, is that Plaintiffs fail to point to any factual allegations in the Master Complaint stating that any Plaintiffs suffered harm that they would otherwise not have suffered because Meta required some age verification before a minor's account was deleted.  The absence of these allegations comes as no surprise, given the nature of Plaintiffs' claim: Plaintiffs' Sixth Cause of Action is based on the allegation that Meta's age verification services were inadequate *at the point minor users signed up for accounts*—not at the point any parent hypothetically had difficulty in requesting that his or her minor child's account be deleted.

Plaintiffs also argue that ByteDance's and Snap's inadequate age verification features allowed adult users to pose as children, thereby "increasing the dangers to children on these youth-only products."  (Pls' Opp., at p. 60.)  But again, the decision to provide age verification services for "youth-only products" could not

have increased the risk of adults posing as children, given that the failure to provide any age verification services would have made it just as easy for adults to pose as children.  And there are no allegations in the Master Complaint suggesting any increased risk.

Plaintiffs have also failed to allege any facts demonstrating that any harm suffered by minor Plaintiffs was caused by their or their parents' *reliance* on the provision of age verification services.  Plaintiffs' only argument on this issue is limited to the following sentence in the Opposition: "Given the potential harms to Plaintiffs, it is reasonable to infer that the parents of Plaintiffs would rely on Defendants to act with ordinary care in providing age verification measures."  (Pls' Opp., at p. 60.)  But Plaintiffs fail to cite to any allegations in the Master Complaint from which the court could properly infer that any Plaintiff in this coordinated proceeding actually suffered any harm that was caused by his/her parent relying on the provision of age verification services.

## VII.　　Seventh and Eighth Causes of Action – Misrepresentation and Concealment

The Seventh and Eighth Causes of Action are brought solely against Meta for its allegedly fraudulent and negligent misrepresentations and concealment of information regarding its platforms.  The Seventh Cause of Action is for fraudulent conduct in *either* making affirmative misrepresentations *or* concealing information. The Seventh Cause of Action is thus based on two different theories of relief.  The Eighth Cause of Action sounds in negligence rather than fraud and, like the Seventh Cause of Action, is based on two types of conduct: Meta's affirmative misrepresentations and Meta's alleged negligent concealment of information.

Below, this court addresses both the Seventh and Eighth Causes of Action by first finding that neither cause of action, as alleged, properly states a claim based on a misrepresentation made by Meta.  The court then addresses whether Plaintiffs can base a claim in either fraud (Seventh Cause of Action) or negligence (Eighth

Cause of Action) based on Meta's "concealment" of information.

      A.  <u>Plaintiffs Fail to Allege a Claim Based on a Misrepresentation by Meta</u>

"To establish a claim for fraudulent misrepresentation, the plaintiff must prove: (1) the defendant represented to the plaintiff that an important fact was true; (2) that representation was false; (3) the defendant knew that the representation was false when the defendant made it, or the defendant made the representation recklessly and without regard for its truth; (4) the defendant intended that the plaintiff rely on the representation; (5) the plaintiff *reasonably relied on the representation;* (6) the plaintiff was harmed; and, (7) the plaintiff's reliance on the defendant's representation was a substantial factor in causing that harm to the plaintiff. … [Citation.] Each element in a cause of action for fraud must be factually and specifically alleged." (*Perlas v. GMAC Mortgage, LLC* (2010) 187 Cal.App.4th 429, 434, internal citations, quotation marks, and ellipses omitted; emphasis in original.)  As for negligent misrepresentation, a plaintiff must prove the following in order to recover: "Misrepresentation of a past or existing material fact, without reasonable ground for believing it to be true, and with intent to induce another's reliance on the fact misrepresented; ignorance of the truth and justifiable reliance on the misrepresentation by the party to whom it was directed; and resulting damage." (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 983, internal citations, quotation marks, and brackets omitted.)

      Plaintiffs' misrepresentation claims are based on Meta's representations that its platforms are safe.  Plaintiffs cite to the fact that Mark Zuckerberg stated, in a discussion at a university with a United States Senator and in a separate "forum" discussion, that Meta was "focused" on safety, that Meta plans on "try[ing] to build a safe environment" in the future, and that making Meta's platforms potentially safe in the future for minors is "extremely important."  (See Pls' Opp., at p. 62, citing Mast. Compl., ¶ 343; see also Mast. Compl., ¶¶ 344 [Zuckerberg stated Meta's

intent to make its platforms safe for children].)  Elsewhere in the Master Complaint, Plaintiffs allege:

> Meta made numerous partial material representations downplaying any potential harm associated with Instagram and Facebook and reassuring the public, Congress, and parents, including Plaintiffs and Consortium Plaintiffs, that its products, Instagram and Facebook, were safe, including but not limited to:
>
> (a) public statements regarding product development that assured users of the products safety, such as its announcement of a Youth Portal, which it purported helped teens "stay[ ] safe."
>
> (b) statements in congressional hearing asserting that Facebook had adequate safeguards to protect youth online, such as Mark Zuckerberg's statements that "A.I. tools [ ] can proactively police and enforce safety across the community. . . . I think Facebook is safe. I use it, my family uses it, and all the people I love and care about use it all the time. These controls are not just to make people feel safe; it's actually what people want in the product."
>
> (c) statements in conversations with public officials asserting the products were safe:
>
> i. Zuckerberg (3/25/2011): "So, we're really focused on, on safety, especially children's safety. So we're having folks under the age of 18, um we, we just take a lot of extra precautions for it, to make sure that it's just a safe environment for them um, to use this service that you know, the default for, for people sharing things isn't that they're sharing with everyone but that they're sharing with a smaller community … But I think, I think that's a lot of it. We really try to build a safe environment. Um, and um, that's gonna be the key long term."
>
> ii. Zuckerberg (3/25/2011): "Right, and they, they feel like Facebook is this really secure place and that it's a hundred percent safe, and um, we're always thinking about little and big things like that that we can do to keep it safe for, for the people who use our service."
>
> iii. Zuckerberg (5/25/2011): "I mean, we do not allow people under the age of 13 to sign up and I think if we ever were, we would need to try to figure out a lot of ways to make sure that they were safe, right, because that's just extremely important and that's just not the top of the list in terms of things for us to figure out right now."
>
> (d) statements that the core mission and impact of Meta's products on users is to "Giv[e] people the power to build community and bring the world closer together[.]"

(Mast. Compl., ¶ 961, internal footnotes omitted; brackets and ellipses in original.)

Plaintiffs do not plead that any Plaintiff actually relied upon Meta's alleged promises of safety.  There is no allegation in the Master Complaint or in the Short-Form Complaints at issue on this Demurrer that any Plaintiff (1) was exposed to

any of the above-cited statements, and (2) relied on those statements in either becoming a user of Meta's platforms or allowing his or her child to become a user of Meta's platforms.  For example, Plaintiff J.P. alleges in the J.P. SFC that, "[p]rior to M.P. opening an Instagram account, J.P. researched Instagram, including materials and representations Meta published about its Instagram product."  (J.P. SFC, Add'l Allegs., ¶ 2.)  "Relying on that information, J.P. believed that Instagram was safe and age-appropriate for her child."  (J.P. SFC, Add'l Allegs., ¶ 2.)  But J.P. fails to allege that he or she was exposed to or otherwise relied upon the statements that are actually included in the Master Complaint.  This failure to allege actual exposure and reliance is fatal to J.P.'s misrepresentation claim.

Plaintiffs argue that they need not allege they relied on any of the above-cited statements from the Master Complaint.  In support of this argument, Plaintiffs cite *In re Tobacco II Cases* (2009) 46 Cal.4th 298 (*Tobacco II*) and *Morgan v. AT&T Wireless Services, Inc.* (2009) 177 Cal.App.4th 1235 (*Morgan*), for the proposition that, where "a fraud claim is based upon numerous misrepresentations, such as an advertising campaign that is alleged to be misleading, plaintiffs need not allege the specific advertisements or misrepresentations the individual plaintiffs relied upon; it is sufficient for the plaintiff to provide a representative selection of the advertisements or other statements to indicate the language upon which the implied misrepresentations are based."  (Pls' Opp., at p. 65, internal citations, quotation marks, and brackets omitted.)  However, unlike in the cases cited by Plaintiffs, the above-cited statements by Meta "were [not] part of an extensive and long-term advertising campaign."  (*Tobacco II*, *supra,* 46 Cal.4th at p. 328.)  Moreover, the cases cited by Plaintiffs make clear that a plaintiff must actually have been exposed to and must have relied upon the defendants' advertising campaigns.  (See *id.* at p. 328 [plaintiff alleged he was exposed to the advertising campaign]; see also *Morgan*, *supra,* 177 Cal.App.4th at p. 1257 [plaintiffs alleged they encountered the defendant's misleading advertisements].)  But here, Plaintiffs do

not allege that they were exposed to a widespread misleading advertising campaign.

Plaintiffs also argue that they may base their claims on a false statement made to a third party.  (Pls' Opp., at pp. 65-66.)  Plaintiffs' argument is based on "the principle of indirect deception described in section 533 of the Restatement Second of Torts." (*Shapiro v. Sutherland* (1998) 64 Cal.App.4th 1534, 1548.)  But this principle does not free Plaintiffs from the requirement of pleading that the messages relayed to a third party actually came to Plaintiffs' attention.  (See, e.g., *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1095.)  Here, there are no allegations that some third party ever communicated the above-cited statements of Mark Zuckerberg to Plaintiffs.

Accordingly, if the Seventh or Eighth Causes of Action are to survive the instant pleadings challenge, they must be based on fraudulent or negligent *concealment* of information; they cannot survive the Demurrer insofar as they plead alleged misstatements of fact.

### B. Plaintiffs Have Properly Alleged Fraudulent Concealment, But Cannot State a Claim for Negligent Concealment

The Eighth Cause of Action pleads negligent misrepresentation and negligent concealment.  As explained above, Plaintiffs have failed to allege any actionable misrepresentation, and the Eighth Cause of Action is thus necessarily limited to a cause of action for negligent concealment.

However, California law does not recognize a cause of action for negligent concealment.  "Negligent misrepresentation is a species of fraud or deceit specifically requiring a 'positive assertion' [citation] or 'assertion' [citation] of fact. [Citation.] An 'implied' assertion or representation is not enough." (*Wilson v. Century 21 Great Western Realty* (1993) 15 Cal.App.4th 298, 306, internal citations omitted; see also *Huber, Hunt & Nichols, Inc. v. Moore* (1977) 67 Cal.App.3d 278, 304.)  The court in *Byrum v. Brand* (1990) 219 Cal.App.3d 926, 942 explained this

point as follows:

> Witkin has explained that an actual representation is not a required element of a cause of action for breach of fiduciary duty or constructive fraud. However, for a cause of action for negligent misrepresentation, clearly a representation is an essential element. The alleged representation by omission claimed by [the plaintiff] seems to us to be too remote to fit this requirement. While [the defendant] may not have uncovered or investigated certain material facts about the investment—i.e., its timing, cost, scope, or necessity for third-party contribution, as the material facts were defined for the jury—the record does not show he positively asserted any facts about these factors that were not true, nor actively concealed or suppressed any such facts.

Plaintiffs therefore cannot bring a claim for negligent concealment.  For that reason, and because Plaintiffs cannot state any claim against Meta based on a misrepresentation, the Demurrer is sustained as to the Eighth Cause of Action. However, this analysis does not apply to a claim based on fraudulent concealment (Seventh Cause of Action).

"A failure to disclose a fact can constitute actionable fraud or deceit in four circumstances: (1) when the defendant is the plaintiff's fiduciary; (2) when the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations that are misleading because some other material fact has not been disclosed." (*Collins v. eMachines, Inc.* (2011) 202 Cal.App.4th 249, 255 (*Collins*).)  "The elements of an action for fraud and deceit based on a concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 665–666 (*Roddenberry*), internal citations, quotation marks, and brackets omitted;

see also CACI 1901.)

In *Collins*, the court held that failure to tell consumers that a product is defective is an actionable omission for a fraud cause of action.  Similarly, in *Khan v. Shiley Inc.* (1990) 217 Cal.App.3d 848, 858, the court held that the manufacturer's failure to disclose facts "showing the product had a history of … failure" could support the plaintiffs' cause of action for fraud.  But a duty not to conceal information can also arise outside of the product liability context.  For example, in *Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 315-318, the court found that a claim could proceed against a provider of medical services for its alleged failure to warn the patient of risks associated with the use of a medical device.  And in *Roddenberry*, the duty to disclose a fact arose because the defendant had business dealings with the plaintiff, even though the defendant was not in a fiduciary relationship with the plaintiff.  (*Roddenberry*, *supra*, 44 Cal.App.4th at p. 666.)  The principles underlying these decisions were expressed as follows by the Sixth District Court of Appeal:

> Where material facts are known to one party and not to the other, failure to disclose them is not actionable fraud unless there is *some relationship* between the parties which gives rise to a duty to disclose such known facts. … [Citation.] A relationship between the parties is present if there is some sort of *transaction* between the parties. … Thus, a duty to disclose may arise from the relationship between seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual agreement.

(*Hoffman v. 162 North Wolfe LLC* (2014) 228 Cal.App.4th 1178, 1187, internal citations, quotation marks, and brackets omitted; emphasis in original.)

Here, Plaintiffs have adequately alleged facts to survive a pleading challenge to their fraudulent concealment claim.  Plaintiffs allege that Meta knew of its platforms' defects, but that Meta nonetheless failed to share this information with its potential customers.  Plaintiffs allege that Meta "could have but failed to disclose information it knew concerning the significant risks associated with its products, even though it knew that the public lacked access to this information."  (Mast.

Compl., ¶ 345.)  Plaintiffs allege that Meta has failed to reveal the results of "the internal research it had conducted demonstrating the negative impact Instagram can have on kids' mental health." (Mast. Compl., ¶ 347.)  Plaintiffs allege that Meta failed to disclose:

> its detailed research regarding addiction to its products, which the company terms problematic usage; its assessment that "[t]he best external research indicates that Facebook's impact on people's well-being is negative"; its identification of "Problematic Use," loneliness, and social comparison as the three drivers of this negative impact; its finding that up to 25% of people on Facebook experience so-called problematic use; its data showing that "high time spent users do tend to be disproportionately younger users"; its conclusion that so-called problematic use causes profound harms, including loss of productivity, sleep disruption, relationship impacts, and safety risks; its identification of multiple Meta product features that act as triggers for so-called problematic use; its knowledge that teens who feel addicted to a Meta app "know that what they're seeing is bad for their mental health but feel unable to stop themselves"; its studies regarding body image and social comparison; its knowledge that Instagram makes body image issues worse "for one in three teen girls"; its analysis showing that topics eliciting appearance comparison comprise one third of what teen girls see on Instagram; its research concluding that negative social comparison on Instagram gets worse for users over time; its awareness that teens report Instagram as a source of increased anxiety and depression; its finding that Instagram has a "consistent bias in favor of harmful content"; its knowledge that Meta's recommendation algorithms "create an echo chamber" of suicide and self-harm content; its researchers' conclusion that teens "[h]ave an addict's narrative about their use" of Instagram; and its survey finding that "[o]ver one third of teens felt they have only a little control of or no control at all over how Instagram makes them feel"—in addition to the other findings described in this Complaint.

(Mast. Compl., ¶ 350, internal footnotes omitted; brackets in original.)

Plaintiffs allege that the users of Meta's platforms—including Plaintiffs—"could not have discovered such serious safety risks." (Mast. Compl., ¶ 963.)  And Plaintiffs allege that Plaintiffs' parents relied on this omission in deciding whether to allow their minor children to use Meta's platforms.  "As a direct and proximate result of Meta's material omissions, misrepresentations, and concealment of material information, Plaintiffs and Consortium Plaintiffs were not aware and could not have been aware of the facts that Meta concealed or misstated, and therefore

justifiably and reasonably believed that Instagram and Facebook were safe for children to use." (Mast. Compl., ¶ 971; see also J.P. SFC, Add'l Alleg., ¶ 2 [alleging that a Plaintiff's parent relied upon information made available by Meta when deciding whether to allow her child to use Instagram].)

Defendants' reliance on cases like *Daugherty v. American Honda Motor Co., Inc.* (2006) 144 Cal.App.4th 824, 836 (*Daugherty*) is misplaced, given that, here, Plaintiffs clearly allege that the defects in Meta's platforms were known to cause harm to Plaintiffs.  In *Daughtery*, the complaint was "devoid of factual allegations showing any instance of physical injury or any safety concerns posed by the defect." (*Id.*)  As Defendants' cited caselaw makes clear, "California federal courts have generally interpreted *Daugherty* as holding that a manufacturer's duty to consumers is limited to its warranty obligations absent either an affirmative misrepresentation or a safety issue." (*Wilson v. Hewlett-Packard Co.* (9th Cir. 2012) 668 F.3d 1136, 1141, internal citations, quotation marks, and brackets omitted.)  Here, Plaintiffs have alleged that Meta's omission concerned the safety of Meta's platforms.

The fact that the three minor Plaintiffs allege in the Short-Form Complaints that they continue to use Meta's platforms does not mean that Plaintiffs have failed to allege reliance on Meta's omissions.  The important fact for the purposes of the Seventh Cause of Action is the initial decision by a minor to become a user of one of Meta's platforms or the initial decision by a parent to first allow a minor child to become a user of one of Meta's platforms.  Moreover, despite Defendants' arguments to the contrary, the Master Complaint cannot be read to assert facts leading to the conclusion that the allegedly omitted information could have been properly released by Meta to the public no earlier than 2021.[12]  Accordingly, the

---

[12] For example, Plaintiffs allege that an internal document regarding "problematic usage" dates from March 9, 2020.  (See Mast. Compl., ¶ 498.)  This court cannot determine based on the allegations of the Plaintiffs that Meta had no knowledge of "problematic usage" prior to March 9, 2020, when the internal document was allegedly created.

1    fact that the three individual Plaintiffs at issue here began using Meta's platforms

2    before 2021 does not defeat the element of reliance.

3

4          C.   <u>Plaintiffs' Claim for Fraudulent Concealment is Not Barred by Section 230 or the First Amendment</u>

5          The court already has determined that Section 230 does not bar a negligence

6    claim based on a provider's use of features and interactive platform operations that

7    induce minor users' engagement with social media platforms in ways that

8    foreseeably cause addiction.  As discussed above, insofar as tort liability turns on

9    these design features, Section 230 immunity for claims based on third-party

10   content is not implicated.

11         Holding Meta responsible for a failure to warn of the potentially harmful

12   effects of such design features likewise does not fall within the scope of Section 230

13   immunity.  Insofar as Plaintiffs contend that Meta fraudulently concealed from users

14   Meta's research regarding addiction to its products, its data showing that "high time

15   spent users" are disproportionately young, its awareness that teens report

16   Instagram as a source of increased anxiety and depression, and other research

17   findings of potential harm that do not pertain to harm from specific third-party

18   content, warnings Plaintiffs contend should have been provided do not seek to hold

19   Meta liable for third-party content.  Meta is not protected from tort liability for its

20   own failure to warn because these adverse effects that allegedly should have been

21   disclosed result from Meta' own conduct, not from any particular content displayed.

22   Meta could have fulfilled its duty to warn of these potential harms without

23   referencing or deleting any content—the duty springs from its capacity as a creator

24   of features designed to maximize engagement for minors, not from its role as

25   publisher.  (See *Lemmon, supra,* 995 F.3d at p. 1092; *Roommates, supra,* 521 F.3d

26   at p. 1164 [Section 230 did not bar liability where provider designed its search and

27   email systems to limit listings to subscribers based on sex and other impermissible

28   categories].)

1      Some of the warnings contemplated by Plaintiffs do appear to be based on

2  content; for example, a warning about "suicide and self-harm content." (Mast.

3  Compl. ¶ 350.)  Liability for failure to warn about specific third-party content could

4  be interpreted as premised on Meta's role as publisher in violation of both Section

5  230 and the First Amendment.  (See, e.g., *L.W. through Doe v. Snap Inc.* (S.D.

6  Cal., June 5, 2023, No. 22CV619-LAB-MDD) 2023 WL 3830365, at *8 [failure to

7  warn claim based on harm caused by third-party content is barred by Section 230];

8  see also *Netflix, supra*, 2022 WL 551701, at *2 [claim based on failing to warn

9  about the content of a television show is barred by the First Amendment].)

10  However, in *Internet Brands*, the Ninth Circuit held that where a provider has

11  information from "an outside source about how third parties targeted and lured

12  victims" through a website the provider hosted, "[t]he duty to warn imposed by

13  California law would not require [the defendant] to remove any user content or

14  otherwise affect how it publishes or monitors such content," and the claim was not

15  barred by Section 230.  (*Internet Brands, supra*, 824 F.3d at p. 851.)

16      The court does not have to resolve the issue of the scope of Section 230 with

17  respect to a provider's duty to warn based on content on a provider's social media

18  platform.  Some of the warnings Plaintiffs contend should have been given concern

19  social media platform design.  Duty to warn of harm allegedly flowing from

20  interactive features allegedly known to risk harm to minors is not barred by Section

21  230 and the Demurrer is overruled on that basis.

22      Similarly, the First Amendment does not bar a claim of failure to warn of

23  potential injuries from Meta's social media platform design.  If a potential user were

24  deterred from consuming content on Meta's platforms due to a warning about

25  possible addiction, the deterrence would not be based on a government sanction of

26  the content on the platforms.  Therefore, the First Amendment is not implicated by

27  failure to provide warnings concerning potential harms from features created by

28  Defendants to maximize minors' usage.

1    Accordingly, the Demurrer to the Seventh Cause of Action is overruled.

2

3    **VIII.    Ninth Cause of Action – Negligence per se**

4    " 'Negligence per se' is an evidentiary doctrine codified at Evidence Code

5    section 669. Under subdivision (a) of this section, the doctrine creates a

6    presumption of negligence if four elements are established: (1) the defendant

7    violated a statute, ordinance, or regulation of a public entity; (2) the violation

8    proximately caused death or injury to person or property; (3) the death or injury

9    resulted from an occurrence the nature of which the statute, ordinance, or

10   regulation was designed to prevent; and (4) the person suffering the death or the

11   injury to his person or property was one of the class of persons for whose

12   protection the statute, ordinance, or regulation was adopted." (*Quiroz v. Seventh*

13   *Ave. Center* (2006) 140 Cal.App.4th 1256, 1285.)

14   Plaintiffs' Ninth Cause of Action for Negligence per se is based on alleged

15   violations of the California Consumer Privacy Act of 2018 (CCPA).  (See Cal. Civ.

16   Code §§ 1798.100 *et seq.*)  The CCPA gives consumers certain rights over their

17   personal information that is collected by online businesses.  Specifically, Plaintiffs

18   base their claim on alleged violations of California Civil Code section 1798.120,

19   subdivision (c), which states:

20   > … a business shall not sell or share the personal information of consumers
>    if the business has actual knowledge that the consumer is less than 16

21   > years of age, unless the consumer, in the case of consumers at least 13
>    years of age and less than 16 years of age, or the consumer's parent or

22   > guardian, in the case of consumers who are less than 13 years of age, has
>    affirmatively authorized the sale or sharing of the consumer's personal

23   > information. A business that willfully disregards the consumer's age shall

24   > be deemed to have had actual knowledge of the consumer's age.

25   (Cal. Civ. Code, § 1798.120, subd. (c).)  Plaintiffs allege that each Defendant "has

26   collected and shared and/or sold personal information from children younger than

27   age 16 without obtaining prior affirmative authorization from minor users or their

28   parents (for minor users under 13) … ." (Mast. Compl., ¶ 1000.)

Plaintiffs' Ninth Cause of Action cannot proceed.  The CCPA itself precludes Plaintiffs from basing a cause of action on a violation of Civil Code section 1798.120.  The CCPA provides that "[n]othing in [the CCPA] shall be interpreted to serve as the basis for a private right of action under any other law."  (Cal. Civ. Code, § 1798.150, subd. (c).)  The only reasonable reading of this language is that section 1798.120 cannot serve as the basis for Plaintiffs' cause of action based on negligence law.  The Ninth Cause of Action, which is based on negligence and on the effect of the Evidence Code creating a presumption of negligence, is barred by subdivision (c) of section 1798.150.

Accordingly, the Demurrer must be sustained as to the Ninth Cause of Action.

**ORDER**:

The Demurrer is sustained as to the First, Second, Third, Fourth, Sixth, Eighth and Ninth Causes of Action.  The Demurrer is overruled as to the Fifth and Seventh Causes of Action.

Dated:   OCT 1 3 2023

_____
Carolyn B. Kuhl / Judge
Honorable Carolyn B. Kuhl
Judge of the Superior Court