# Exhibit 4

AMENDED TRANSCRIPT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, District Judge

KADREY, et al.,                    )  No. C 23-03417-VC
                                   )
          Plaintiffs,              )
                                   )
vs.                                )
                                   )
META PLATFORMS, INC.,              )
                                   )
          Defendant.               )
_____)

                                   San Francisco, California
                                   Thursday, November 9, 2023

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
            RECORDING 10:00 - 10:59 = 59 MINUTES

APPEARANCES:

For Plaintiffs:            Joseph R. Saveri Law Firm, LLP
                           601 California Street
                           Suite 1000
                           San Francisco, California
                            94108
                       BY: JOSEPH R. SAVERI, ESQ.
                           KATHLEEN MCMAHON, ESQ.

                           1920 Hillhurst Avenue
                           Suite 406
                           Los Angeles, California 90027
                       BY: MATTHEW BUTTERICK, ESQ.

For Defendants:            Cooley, LLP
                           1333 2nd Street, Suite 400
                           Santa Monica, California 90401
                       BY: BOBBY A. GHAJAR, ESQ.

*Echo Reporting, Inc.*

2

```
 1   APPEARANCES:  (cont'd.)

 2   For Defendants:            Cooley, LLP
                                3 Embarcadero Center
 3                              20th Floor
                                San Francisco, California
 4                                94111
                            BY:  KATHLEEN HARTNETT, ESQ.
 5
                                Cooley, LLP
 6                              3175 Hanover Street
                                Palo Alto, California 94304
 7                          BY:  JUDD LAUTER, ESQ.

 8   Transcribed by:            Echo Reporting, Inc.
                                Contracted Court Reporter/
 9                              Transcriber
                                echoreporting@yahoo.com
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1   <u>Thursday, November 9, 2023</u>                    <u>10:00 a.m.</u>

2                        P-R-O-C-E-E-D-I-N-G-S

3                             --oOo--

4           THE CLERK:  Now calling Civil Case 23-3417, Kadrey

5   et al vs. Meta Platforms, Inc.

6       Will counsel please step forward and state your

7   appearances for the record, starting with the Plaintiff.

8           MR. SAVERI:  Good morning, your Honor.  Joseph

9   Saveri on behalf of the Plaintiffs.

10          THE COURT:  Morning.

11          MR. BUTTERICK:  Good morning, your Honor.  Matthew

12  Butterick on behalf of Plaintiffs.

13          THE COURT:  Morning.

14          MS. MCMAHON:  Good morning, your Honor.  Kathleen

15  McMahon on behalf of Plaintiffs.

16          THE COURT:  All right.

17          MR. BENNETT:  Good morning, your Honor.  Holden

18  Bennett on behalf of the Plaintiffs.

19          THE COURT:  Hi.

20          MR. GHAJAR:  Good morning, your Honor.  Bobby

21  Ghajar from Cooley on behalf of Meta Platforms.

22          THE COURT:  Hi.

23          MS. HARTNETT:  Good morning, your Honor.  Kathleen

24  Hartnett, also for Meta.

25          THE COURT:  Hi.

4

1        MR. WEINSTEIN:  Good morning, your Honor.  Clark
2   Weinstein, also for Meta.

3        THE COURT:  Hi.

4        MR. LAUTER:  Good morning, your Honor.  Judd
5   Lauter also for Meta.

6        THE COURT:  Hi.

7     Okay.  Let me start with the Plaintiffs.  Feel free to
8   have a seat if you like.  So I understand your core theory
9   of copyright infringement.  The book -- you know, Meta took
10  the books, copied the books, used the books to train the
11  program.  I get that.

12    I don't -- you know, obviously we haven't had a chance
13  to explore whether that would give rise to liability.  That
14  would be for later in the case, but at least I understand
15  that theory.

16      Your remaining theories of liability I don't understand
17  even a little bit.

18        MR. SAVERI:  Okay.

19        THE COURT:  So why don't you take one last crack
20  at explaining them to me.

21        MR. SAVERI:  Okay.  So, so we have a number of
22  theories.  One is the direct copyright claim, which I -- we
23  just covered.  So we have a vicarious liability claim, which
24  is another version of a copyright claim, which involves --
25  involves the use and the output of the product.  And that

5

1  theory basically says that when that happens, there is a

2  copyright violation.  There is copying of protected work

3  without permission.

4          THE COURT:  Let me put a -- but vicarious -- so

5  you're talking about your theory --

6          MR. SAVERI:  The second cause of action.

7          THE COURT:  -- which asserts that copyright

8  infringement occurs when a user of the AI product make a

9  query for something?

10          MR. SAVERI:  Correct.

11          THE COURT:  And the product produces something in

12  response to that query?

13          MR. SAVERI:  Yes.

14          THE COURT:  And you believe that that is copyright

15  infringement by the user of the AI product?

16          MR. SAVERI:  We are not suing the user.  What

17  we're saying --

18          THE COURT:  I know, but you're saying vicarious --

19  vicarious infringement, right?  You're saying that -- I know

20  that you're not suing the user, but you're -- it seems like

21  that claim is based on an assertion that the user is

22  committing copyright infringement --

23          MR. SAVERI:  Correct.

24          THE COURT:  -- when they make a query to the -- is

25  it -- do you pronounce it "Llama"?

6

1          MR. SAVERI:  I believe so.

2          THE COURT:  Okay.

3          MR. SAVERI:  I believe so.

4          THE COURT:  So, how could the user of the AI

5   product possibly be committing copyright infringement when

6   they're making a query of the software?

7          MR. SAVERI:  Because the theory is that the query

8   is eliciting a copy.

9          THE COURT:  But it's not.  I mean, how -- I mean,

10   that's just -- that's just not true.

11          MR. SAVERI:  Well --

12          THE COURT:  I'm not -- when I make a -- when I

13   make a query of Llama, I'm not asking for a copy of Sarah

14   Silverman's book.  I'm not even asking for an excerpt from

15   Sarah Silverman's book.  How could -- how can you -- how can

16   you possibly be asserting that I'm -- that the user is

17   acquiring a copy of the book?

18          MR. SAVERI:  Well, the theory is that the -- that

19   the purpose and effect of the product is to generate in

20   response to the query something, a work, which reproduces as

21   closely as possible, given the technology of the -- of the

22   underlying protected work.

23      And so --

24          THE COURT:  I don't understand that.  I mean,

25   you're -- I could make a query of Llama and get something

7

1  that looks nothing like Sarah Silverman's book.  How could

2  that be -- how could I be committing copyright infringement?

3          MR. SAVERI:  Well, if the query is some version of

4  Silverman, that's the query --

5          THE COURT:  Who is Sarah Silverman?

6          MR. SAVERI:  Well, or the instruction, right, to

7  -- and ask the model to produce --

8          THE COURT:  Write an essay on Sarah Silverman's

9  career.

10          MR. SAVERI:  No, it's more than that.  A printout

11  text in the style of Sarah Silverman or --

12          THE COURT:  But that's not what your complaint

13  alleges.  Your complaint alleges at any time anybody makes a

14  query of Llama about anything, that that is copyright

15  infringement.

16          MR. SAVERI:  If --

17          THE COURT:  I don't understand how you could --

18  how you could base a claim on that.

19          MR. SAVERI:  Well, our claim is on behalf of the

20  -- of the authors, the --

21          THE COURT:  I mean, I understand if I'm a user,

22  right, and I say -- I make a query and I say, I want to read

23  Sarah Silverman's book.  Can you give it to me?  And the,

24  you know, the AI produces the book for me to read, then

25  perhaps I'm committing copyright infringement in the same

8

1 way that I'm -- you know, if I download protected music, I'm

2 committing copyright infringement, but the rest of it I just

3 don't understand.

4        MR. SAVERI: Well, your Honor, I mean, for

5 example, it's not just someone who wants to read Sarah

6 Silverman's book. It would be, for example, if someone

7 wants to -- for commercial purposes or for some other

8 purposes, wants to obtain something from the model that

9 approximates the copyrighted work of Sarah Silverman, is a

10 near duplicate --

11        THE COURT: Right. So you're saying that if I --

12 it sounds like what you're saying now is different from what

13 you're saying in your complaint, because I -- and different

14 from what you're saying in your opposition brief. Because

15 what I understood you to be asserting in your complaint and

16 in your opposition brief, is that any query that any user

17 makes constitutes copyright infringement.

18    And now what you seem to be -- and you say, you argue

19 in your belief, it doesn't matter how similar or different

20 it is, right? It doesn't matter how similar the output or

21 different the output is from Sarah Silverman's book.

22    But now you -- what you seem to be saying is, if a user

23 makes a query of the AI software, and the AI software

24 produces something that is very similar to Sarah Silverman's

25 book, then there could be copyright infringement, but I

9

1    don't think you make that -- I don't think you assert that

2    anywhere in your complaint, and I don't think you assert

3    that anywhere in your opposition brief.

4         Are you abandoning the claim, the broader claim that

5    you make in your complaint?

6              MR. SAVERI:  Well, I guess that what I would say

7    is, when we allege that every output of the Llama language

8    model is an infringing derivative work, made without

9    permission and in violation of their exclusive rights under

10   the Copyright Act, which is what we said.  That that include

11   or described what I just provided in more detail.

12             THE COURT:  So do you want by that argument that

13   you just -- that allegation that you read to me, that every

14   output from Llama is a -- is a derivative work and is

15   infringing?  Is that the argument you're sticking it or are

16   you changing your argument?

17             MR. SAVERI:  Well, I guess we are only suing on

18   behalf of the -- of the authors, like Sarah Silverman, who

19   have copyrighted material.  Those are our clients that are

20   in the model.  So to the extent that there -- so, it's not

21   necessarily every output.  And so --

22             THE COURT:  But that's what -- you just read to me

23   something from your complaint that says you're alleging

24   every output is a violation of the copyright laws.

25             MR. SAVERI:  And what I -- what I'm saying, your

10

Honor, if I take your point, that the allegation is perhaps too general, overbroad, not specific enough with respect to the vicarious claim.

THE COURT:  Okay.  Do you have -- is there any allegation that any output from the model is so similar to Sarah Silverman's book that it constitutes copyright infringement?

MR. SAVERI:  Well, we would say --

THE COURT:  And, if not, don't I have to dismiss the remainder of your claims for that reason alone?

MR. SAVERI:  Well --

THE COURT:  At least the vicarious infringement claims for that reason alone?

MR. SAVERI:  Well, I would say a couple things about that, your Honor.  I don't think -- well, I do think our allegations are sufficient to describe the situation that the -- that we're talking about.  That in response to a query, a particular query that if the model -- or when the model does produce something that is a near duplicate or close enough, and we can have that discussion about --

THE COURT:  Can you show me where in your complaint you allege that?  Can you read me the language from your complaint that alleges that?

(Pause.)

MR. SAVERI:  Yeah, yeah.  We're just starting

1 | on --

2 |    THE COURT:  I mean, I wonder if you -- I wonder if

3 | it would worth -- be worth it for you to be a little more

4 | candid and just say, we've alleged a theory in our complaint

5 | that we are no longer pressing because it's not viable?  And

6 | now we want to assert a different, narrower theory of

7 | vicarious infringement.

8 |    MR. SAVERI:  Well, your Honor, I would push back

9 | and say that it's -- well, certainly.  I mean, I don't think

10 | we've been not candid, but I --

11 |    THE COURT:  Well, I'm asking you to be candid

12 | here.  I mean, you're making a completely different argument

13 | from the one you make in your complaint and the one you make

14 | in your opposition brief.  Isn't that true?

15 |    MR. SAVERI:  No, I don't believe it's completely

16 | different, but I take your point that --

17 |    THE COURT:  So show me the language in your

18 | complaint that supports the argument you're making right

19 | now.

20 |   I mean, I'm reading your count two, vicarious copyright

21 | infringement --

22 |    MR. SAVERI:  Yes.

23 |    THE COURT:  -- and it says, "therefore, every

24 | output from the Llama language models constitutes an act of

25 | vicarious copyright infringement."  And in your opposition

12

1 brief you spend the whole time arguing that it doesn't

2 matter how different or similar the output is.

3          MR. SAVERI:  Well --

4          THE COURT:  You don't need to -- you don't need to

5 allege or prove that the output is similar.

6          MR. SAVERI:  Well, what we say, your Honor, is

7 that --

8          THE COURT:  And I'm just asking you, are you

9 abandoning that argument now or are you pressing that

10 argument?

11          MR. SAVERI:  I'm abandoning this as it's alleged

12 right now and -- but we would maintain a version of

13 vicarious claim that I just described.

14          THE COURT:  Okay, but that's not in the complaint

15 and it's not --

16          MR. SAVERI:  That's fair --

17          THE COURT:  -- in your opposition brief.

18          MR. SAVERI:  Fair enough, your Honor.

19          THE COURT:  Okay.  In fact, you don't even allege

20 anything about the outputs at all, right?  You don't allege

21 anything about what the outputs from the Llama language

22 model look like?

23      And so, are you saying that you -- if I dismiss this

24 clearly meritless, vicarious copyright infringement claim,

25 that you would be able to amend it to allege something about

13

1    -- more narrowly about the outputs --

2            MR. SAVERI:  Yes.

3            THE COURT:  -- that would state a claim for --

4    state a claim based on substantial similarity?

5            MR. SAVERI:  With respect to the vicarious claim,

6    yes.

7            THE COURT:  Okay.

8            MR. SAVERI:  And -- but, you know, there is also

9    extensive briefing in the papers about whether in a direct

10   copying case proof of substantial similarity is required.

11   And that's something that is in it.  There's a lot of ink

12   spilled on that issue.

13       But with respect to the vicarious claim, which you were

14   asking me about count two, you know, now that the model has

15   been released, right, and it's commercially available, to

16   answer your question directly, yes, we believe and would

17   intend to do it if we were granted leave to amend --

18           THE COURT:  Okay.  So I need to dismiss the

19   vicarious copyright infringement claim based on the way

20   you've drafted it?

21           MR. SAVERI:  I think that's -- that's fine, your

22   Honor.  And we would be prepared -- if the Court were to

23   grant leave to amend, we would be prepared, and we would

24   endeavor to plead those facts with the specificity along the

25   lines of the theory we discuss.

14

1          THE COURT:  All right.  And the -- and for direct
2  copyright infringement, I -- it -- as I understand it, you
3  have two -- two different versions of direct copyright
4  infringement --
5          MR. SAVERI:  Well, that I --
6          THE COURT:  -- that you're alleging, is that
7  right?
8          MR. SAVERI:  I would say two alternative theories,
9  one of which the Defendants do not contest.
10          THE COURT:  Right.  The one they don't contest is
11  the allegation -- the sort of straightforward, very
12  straightforward and understandable allegation, right, that
13  you -- that you -- that Meta takes these protected works and
14  feeds them to the machine.  And part of feeding it to the
15  machine is copying the works, and that in itself constitutes
16  copyright infringement, and I get that.
17          MR. SAVERI:  Plus, without the consent, right?
18          THE COURT:  Without consent.
19          MR. SAVERI:  That's an important --
20          THE COURT:  Right.
21          MR. SAVERI:  That's the other piece.
22          THE COURT:  Got it.
23      And then the -- but the other direct copyright
24  infringement theory is that the Llama language model itself
25  is copyright infringement?  And so that whenever -- where

15

1  does that -- what does that mean?

2         MR. SAVERI:  Well, it has to do with the way the

3  model works, right.

4         THE COURT:  Okay.

5         MR. SAVERI:  And so, you describe kind of the

6  first step of the process, right --

7         THE COURT:  Okay.

8         MR. SAVERI:  -- which is the -- I don't know what

9  verb you want to use, ingestion, taking, copying of the

10  copyrighted material without permission from book three, as

11  we describe.

12         THE COURT:  Uh-huh.

13         MR. SAVERI:  That material, right, is then used in

14  creating the model, operating the model, right.  And so that

15  includes taking those copies and then copying them,

16  analyzing them, applying statistics, applying mathematics,

17  applying computer program and engineering.

18         THE COURT:  Right.

19         MR. SAVERI:  And those operations --

20         THE COURT:  Uh-huh.

21         MR. SAVERI:  -- right, are -- constitute copying.

22         THE COURT:  Those operations constitute copying.

23  You mean the process of -- let's say maybe we -- correct me

24  if I'm thinking about this incorrectly.  But it sounds like

25  what you're saying is, there's a process where the raw data

16

1 is copied, right and the raw data are the books and all the

2 works, right?  And that process of copying the raw data is

3 copyright infringement.

4      But then you're saying -- I think what you're saying is

5 that once the raw data is copied, then there's a further

6 process where the product produces outputs.  And in

7 producing those outputs, the product is going to its bank of

8 data and sort of analyzing that data, and the analysis

9 results in the output that is produced.  And you're saying

10 that that -- that process is also copyright infringement?

11           MR. SAVERI:  Yes.  I also think there's kind of an

12 intermediate step.  I think you actually describe kind of

13 the way we understand the kind of chain of events.

14           THE COURT:  Okay.

15           MR. SAVERI:  But the operation, right, internal to

16 the model, right, which involves -- it's before you actually

17 get to the output.  It's the actual, you know, the creation

18 of the model applying the artificial intelligence

19 technologies, which is some, as I said, some combination of

20 math and statistics and computing power and engineering,

21 that process, that operation involves copying.

22           THE COURT:  Okay.  Again, I don't see that in your

23 complaint, right, because you -- I'm looking back at your

24 complaint, count one, direct copyright infringement.  I

25 mean, first you allege that, you know, to train the language

17

1  models Meta copies the books, right?

2          MR. SAVERI:  Yes.

3          THE COURT:  And that's the --

4          MR. SAVERI:  That's paragraph 39.

5          THE COURT:  -- and that's the part that, you know,

6  they are not seeking to -- that's the claim they're not

7  seeking to dismiss right now?

8          MR. SAVERI:  Correct.

9          THE COURT:  But then you go on to say:

10              "Because the Llama language models

11          cannot function without the expressive

12          information extracted from Plaintiff's

13          infringed works and retained inside the

14          Llama language models is Llama language

15          models are themselves infringing

16          derivative works."

17      So the language model itself --

18          MR. SAVERI:  Yes.

19          THE COURT:  -- is an infringing work?

20          MR. SAVERI:  Yes.  Because it's -- because, as I

21  said and I tried to describe, maybe -- I'm certainly in

22  detail wasn't included in the complaint, that that operation

23  of the model, which includes retaining these copies inside

24  the model, is itself copying of work that's protected

25  without permission.

18

1          THE COURT:  Okay.  So --

2          MR. SAVERI:  And --

3          THE COURT:  -- it sounds like what you're -- what

4  you're saying to me now is that you're no longer alleging

5  that the analytical process of producing the output is

6  copyright infringement.  What you're alleging is that

7  somewhere during that process additional copying is

8  occurring, and that constitutes copyright infringement?

9          MR. SAVERI:  Direct copying.

10          THE COURT:  But that's different from saying that

11  the Llama language model itself is an infringing work,

12  right?  I mean, that's the part that I just don't

13  understand.

14          MR. SAVERI:  I don't --

15          THE COURT:  You're -- in your complaint you're

16  saying that the Llama language model itself is an infringing

17  work, which would have to mean that if you put the Llama

18  language model next to Sarah Silverman's book you would say

19  they're similar.  And I just don't --

20          MR. SAVERI:  No, no.  I --

21          THE COURT:  That makes my head explode when I try

22  to --

23          MR. SAVERI:  Well --

24          THE COURT:  -- try to understand that.

25          MR. SAVERI:  Excuse me.  I didn't mean to speak

19

1   over you.

2            THE COURT:  No, that's okay.

3            MR. SAVERI:  So, I think the discussion we're

4   having is about facts which are not in the complaint, right.

5   So we -- the --

6            THE COURT:  But you say the Llama language models

7   are themselves infringing derivative works.

8            MR. SAVERI:  And that --

9            THE COURT:  So that language is in the complaint.

10           MR. SAVERI:  But what I'm meant to say --

11           THE COURT:  And what I'm trying to -- what I'm

12  trying to understand is, how could that be, right?  I'm

13  stuck with your complaint, although you seem to be sort of,

14  again, moving away from the allegations and claims in your

15  complaint and wanting to assert something different, but

16  that is in the complaint, right?

17      These Llama language models are themselves infringing

18  derivative works, and I just don't -- I cannot wrap my brain

19  around that theory.

20           MR. SAVERI:  And I was trying to explain that when

21  we -- we describe that, that the infringing works are

22  retained inside the model.  The -- because of how the model

23  operates, which includes copying, that that itself is the

24  direct copyright infringement.

25      That's -- that's the theory.

20

1           THE COURT:  Okay.

2           MR. SAVERI:  Now, your Honor, if I might.  You

3  asked about the output.  The output we say is a -- gives

4  rise to the vicarious copyright claim.  The actual output

5  itself, right, the querying and what comes out.  We did not

6  include that, and we didn't mean to include it as part of

7  the direct copyright claim.

8      We meant to address that in the vicarious claim because

9  that's really activity by others.  And so -- and what we

10  allege and what we believe is, given the relationship of the

11  Defendant to that activity, the Defendant is vicariously

12  liable.  I --

13           THE COURT:  Right.  And but now --

14           MR. SAVERI:  And I hear you saying, stop there.

15           THE COURT:  Right.

16           MR. SAVERI:  And those aren't the facts that are

17  alleged, and we've had that dialogue.

18           THE COURT:  Okay.

19           MR. SAVERI:  And I accept that.  I just want to

20  explain kind of the theory of the pleading --

21           THE COURT:  Okay.

22           MR. SAVERI:  -- to the extent it wasn't clear.

23           THE COURT:  I appreciate that.  Thank you.

24  Anything else you want to add?

25           MR. SAVERI:  Well, you asked me about -- I think

21

1  you said -- and I don't want to put words in your mouth.  I

2  think I understand your first claim, but I don't understand

3  the rest.

4          THE COURT:  Right.

5          MR. SAVERI:  And, you know, I --

6          THE COURT:  Right.

7          MR. SAVERI:  And so why shouldn't I dump them or

8  get -- dismiss them.  Dump is not the word you used.

9      So, the third claim is a DCMA claim, which has to do

10 with the removal of the CMI.  These are copyrighted texts

11 which contain what people -- or at least I'm accustomed to

12 seeing at the very beginning of a book --

13         THE COURT:  Uh-huh.

14         MR. SAVERI:  -- that like describes the author --

15         THE COURT:  Well, I would think that the removal

16 of the CMI would, that would make sense in a situation where

17 you copied the book, right, and then somebody makes a query

18 for the book from -- from the AI model.  And the book is

19 reproduced to the person without th CGI (phonetic), right.

20 That sounds like that could state a -- if that happens --

21         MR. SAVERI:  Yes.

22         THE COURT:  -- right, that sounds like maybe you

23 could state a claim under that provision of the DCMA.

24     But beyond that, I just don't -- again, I just don't

25 understand the theory.

22

1           MR. SAVERI:  Well, the -- and what we say is that

2  that CMI is --

3           THE COURT:  CGI, sorry.  CMI.  I said, "CGI."

4           MR. SAVERI:  And I glossed over it because I knew

5  what you were talking about.  So, the -- the creation of the

6  model itself has, we allege, the CMI stripped and --

7           THE COURT:  Why would the CMI need to be on the

8  model?  Like I'm not going to -- I'm not going to a

9  bookstore and like taking the model and looking at the model

10 and confusing the model for a Sarah Silverman book.

11          MR. SAVERI:  Well, we think it's in both places.

12 And I just want to be clear that we -- it's our allegation

13 that the CMI is stripped within the model, and it's also

14 stripped --

15          THE COURT:  But why would it matter if it's

16 stripped within the model?

17          MR. SAVERI:  Well, there -- I think either --

18          THE COURT:  Would that be a -- why would that

19 possibly --

20          MR. SAVERI:  Matter?

21          THE COURT:  -- "matter" --

22          MR. SAVERI:  Well --

23          THE COURT:  -- or be a violation of the statute?

24          MR. SAVERI:  Because if it's copyright protected

25 information and attached to it is CMI, as required by the

23

1 DMCA, whenever it's stripped it's a violation of the DMCA.

2         THE COURT:  Okay.  So in other words, if I buy a

3 book and I take it home with me and I cross out the CMI,

4 black out the CMI, I've violated the DCMA?

5         MR. SAVERI:  Well, and if it's -- and it's

6 distributed, abused, yes.

7         THE COURT:  No, but -- it just sits in my -- it

8 sits on my bookshelf.

9         MR. SAVERI:  No, I don't -- I don't believe that

10 if it's just -- there has to be some other act --

11         THE COURT:  It has to be distributed -- it has to

12 be done knowingly, intentionally of course, and then it was

13 to be -- it has to be distributed, right?  So, but they're

14 not --

15         MR. SAVERI:  But -- and then there's the double --

16         THE COURT:  Right.  So -- but they're not --

17 right.  So that's why I said, I think that theory maybe

18 could be make sense if then they -- you know, a user made a

19 query for Sarah Silverman's book, and Sarah Silverman's book

20 was reproduced without the CMI.  But beyond that, I just

21 don't understand -- I mean, you're trying to fit a square

22 peg into a round hole with this claim.

23         MR. SAVERI:  And, your Honor, look.  I mean, the

24 core of that claim is what we allege in 50.  By distributing

25 these works without the CMI, Meta violated the DMCA.  That's

24

1  paragraph --

2        THE COURT:  Yeah.  But you say by distributing

3  "these works."  But when you use the phrase, "these works,"

4  you're not talking about a reproduction of the books, you're

5  talking about any output from -- from the Llama language

6  models, and, again, that just doesn't make any sense.

7        MR. SAVERI:  Well, your Honor, the -- we assert

8  that the output, which is a copy, virtual copy of the

9  copyrighted works, is a violation of the Copyright Act.

10        THE COURT:  Right -- I'm sorry, I'm confused.  Are

11  you going back to the assertion that any output is a

12  violation of the Copyright Act, or are you asserting that

13  the reproduction of the book as an output is the -- is a

14  violation of the copyright?

15        MR. SAVERI:  No, I'm not saying, "any," your

16  Honor.  I'm saying that if the request for the output is for

17  the work or something like -- I mean, Sarah Silverman, if

18  that is -- if that --

19        THE COURT:  Well, I think we need to be more

20  precise here.  I mean, if it -- if it's -- if the query is

21  for Sarah Silverman's book, and the product reproduces Sarah

22  Silverman's book, I understand the idea that that is a

23  copyright violation and maybe a violation of the DCMA.

24     If the query is for something like Sarah Silverman's

25  book, right, then I think there is a question of how similar

25

1 is it to Sarah Silverman's book, right?  And only if it is

2 similar enough to Sarah Silverman's book that, you know, you

3 can't meaningfully distinguish between the two where it

4 would be -- would be confused as Sarah Silverman's book.  I

5 don't know what the exact test is, but something along those

6 lines.

7          MR. SAVERI:  Yeah.  And there's this -- in the

8 Ninth Circuit, there's this combination of extrinsic and

9 intrinsic --

10          THE COURT:  Right.

11          MR. SAVERI:  -- tests for substantial

12 similarities.

13          THE COURT:  But I understand.

14          MR. SAVERI:  So I take your point.

15          THE COURT:  So, if it's substantially similar to

16 Sarah -- if the output is substantially similar to Sarah

17 Silverman's book, I understand that, the idea that that

18 would be copyright infringement.  But you seem to be saying

19 that something more than that is a copyright -- is copyright

20 infringement, and I don't understand that.

21          MR. SAVERI:  No.  I -- we were talking about the

22 DMCA and we were talking about --

23          THE COURT:  And I don't understand how it could --

24 something more than that could be a violation of the DMCA.

25

26

1          MR. SAVERI:  Well, if -- to fill the hypothetical

2  along, and the request is for something similar to -- I

3  mean, we're using that as the shorthand to Sarah Silverman's

4  work.  And the -- there is output of that, right?

5          THE COURT:  Okay.

6          MR. SAVERI:  And we say that -- the purpose and

7  effect of the application is to -- is basically to produce a

8  copy of that.  When that's done --

9          THE COURT:  Well, but you keep saying "copy," but

10 you can't make it a copy by calling it a copy.  I mean, you

11 -- it might -- if the query is, produce something similar to

12 Sarah Silverman's book, it may or may not be a copy within

13 the meaning of the copyright laws and in the -- within the

14 meaning of the DCMA, right?

15         MR. SAVERI:  That's absolutely true, your Honor.

16 And if it were, if it were within however the standards

17 apply to determine that it is substantially similar or a

18 copy, and assuming that to be true --

19         THE COURT:  Uh-huh.

20         MR. SAVERI:  -- and that that output doesn't

21 include the CMI, we say that's a violation of the DMCA.

22         THE COURT:  Okay.  That theory makes sense.

23 Again, it's -- that's just not what's in your complaint.  Or

24 I think that -- I shouldn't too definitive.  I think that

25 theory makes sense.  I haven't had a chance to think about

27

1  it --

2          MR. SAVERI:  Okay.  And I --

3          THE COURT:  -- because it's not in your complaint.

4  But, I mean, I think that what that means is I need to

5  dismiss this claim, also, because that's not the theory you

6  articulated in your complaint or your opposition brief,

7  right?

8          MR. SAVERI:  Well, no, I disagree that it's not

9  within the ambit of, for example, paragraph 50, but I take

10 your point, I mean, that it doesn't have the specificity

11 that we're describing.  I mean --

12         THE COURT:  Paragraph 50 doesn't say anything

13 remotely like what you're saying to me now.  I mean, it's --

14 you've -- paragraph 50 just adopts this -- uses this term

15 "derivative works," as broadly defined in the complaint, to

16 mean any output.  And then it says that it violates the --

17 it also violates the DMCA.

18     Okay.  So I --

19         MR. SAVERI:  Well, and it also includes, to be

20 fair, your Honor, it says, "by distributing any of these

21 works without the CMI," which is what -- what gives rise to

22 the DMCA.

23         THE COURT:  Right, but that it has to distribute

24 the works.  And you're alleging in the complaint that all of

25 the -- that any output is a distribution of the works.  It

28

1  just doesn't make any sense.

2       Let me just get some clarity from you on one other

3  thing.  The -- it seems like now you are conceding that for

4  the output to be a copyright violation, it needs to be

5  substantially similar to the -- to the work that is

6  infringed.  The work has been copied.  Do I -- am I

7  understanding you correctly?

8            MR. SAVERI:  Well, I -- not entirely.  And what I

9  would say is that we think that under the Ninth Circuit law

10 the substantial similarity is not required, but we can

11 plead --

12           THE COURT:  For a -- if you're alleging that a

13 derivative work is infringing -- if you're alleging that

14 there is a work that is a derivative work of the protected

15 work, that you can get liability even if the derivative work

16 is nothing like the --

17           MR. SAVERI:  No.  No.

18           THE COURT:  Okay.

19           MR. SAVERI:  Excuse me, your Honor.  What I was

20 suggesting, if the derivative work, if the offending work is

21 a copy, is a direct copy, we do not have to show substantial

22 similarity.

23           THE COURT:  But the output is not a direct copy.

24           MR. SAVERI:  Well, your Honor, I think that the

25 output -- the purpose and effect of these -- of this

29

1  software is to produce text which is a duplicate, near

2  duplicate of some or all of the copyrighted works.  And it

3  doesn't have to the work in the entirety, right, it can be

4  parts of it.

5      And so, in that case, to answer your question, where we

6  can show that it is a -- there's -- it's a direct copy, we

7  -- under the Ninth Circuit authority, we don't have to show

8  substantial similarity.

9          THE COURT:  It's direct copy but it's not similar?

10 I mean, that just doesn't make any sense.  If it's a direct

11 copy, it's a direct copy, which means it's similar --

12 identical to the original work.

13         MR. SAVERI:  No, your Honor.  I think there are

14 lots of cases where the Ninth Circuit, like the Range Road

15 case which we cite, which was a case in --

16         THE COURT:  The Range Road case is not about

17 derivative work.

18         MR. SAVERI:  Well, it's about copying.

19         THE COURT:  Yes, "it's about copying," right.

20         MR. SAVERI:  And --

21         THE COURT:  And it's a direct infringement case

22 where they're playing music in a bar that is the same as the

23 music that was -- the music that was recorded, and it's --

24         MR. SAVERI:  It's a cover band.

25         THE COURT:  What?

30

 1          MR. SAVERI:  It's a cover band.

 2          THE COURT:  Right.

 3          MR. SAVERI:  And so it's not -- they're not

 4   playing the digital music, right?

 5          THE COURT:  But it's -- but it's not that -- it's

 6   a copy.  They are actually copying the song.  The output --

 7   the <u>Range Road</u> case only shows why your theory makes no

 8   sense.  In the <u>Range Road</u> case they are copying the song.

 9   In the -- in this case, they are producing an output that

10   looks nothing like the book.

11          MR. SAVERI:  No, I just -- we are not saying that

12   -- that the output looks nothing like --

13          THE COURT:  The output must be substantially

14   similar to the book in order to give rise to a claim for

15   derivative copyright infringement, right?

16          MR. SAVERI:  Your Honor, we're going to be able to

17   show substantial similar -- you're asking me to concede as a

18   matter of law that -- and were we to show that the output is

19   a direct copy, that we do -- we also have to show

20   substantial similar.  I'm not prepared to concede that.

21       I am prepared to say that if we're --

22          THE COURT:  So you're going -- you're arguing --

23   or you're arguing that even if an output from the Llama

24   language model is not similar to a protected book, there is

25   still copyright infringement?

31

1          MR. SAVERI:  Well, what I'm saying, your Honor, is

2  that the Copyright Act requires -- protects against the

3  unlawful -- the unlawful reproduction.  And there's two ways

4  of showing, it seems to me, and I think the law -- the case

5  law supports that, two ways of showing the unlawful

6  reproduction.

7      One is, proof of direct copying.

8          THE COURT:  Like in Range Road?

9          MR. SAVERI:  Well -- but again, the Range Road is

10  a case involving compact discs, and it wasn't like they

11  played the compact discs at the -- at Roscoe's, right.  I

12  think it was Roscoe's.  They had a cover band play it, okay.

13      We don't know --

14          THE COURT:  I think it was both, if I remember

15  correctly.  It was both playing the recorded music and

16  cover --

17          MR. SAVERI:  Fair enough.

18          THE COURT:  -- cover band.

19          MR. SAVERI:  But I -- but, you know, a cover band

20  doesn't make an exact copy.  They may do their best to

21  reproduce it, but it is not -- it's a cover band, because

22  they're not playing the CD's.

23      So, they may be trying, but there's no requirement that

24  we have to show -- or in that case, have to show --

25          THE COURT:  I think you're just misunderstanding

32

1  that case.  I mean, there -- if in fact the song -- songs

2  that were played at the bar had not been substantially

3  similar to the protected songs, if there were a genuine

4  dispute of fact on whether the songs played at the bar were

5  substantially similar to the protected songs, then that

6  would have needed to go to a jury to decide similarity.

7       And you seem to be interpreting Range Road as not

8  requiring that, but that's just -- that's a

9  misinterpretation of that case.

10            MR. SAVERI:  And, your Honor, to finish my point.

11 So, in the event that there is not proof that the direct

12 copying -- we've had this discussion about that, we can

13 prove the copying in another light, which is, essentially,

14 circumstantial, right.  Which is some version of comparing

15 the output to the infringed work, and asking someone through

16 a combination of extrinsic and intrinsic evidence whether

17 they are substantially similar.  I think they're both ways

18 of proving the copying.

19            THE COURT:  Let me -- let me just put it this way

20 to you, okay.  As you can see, a number of these claims are

21 going to need to be dismissed.

22            MR. SAVERI:  I gather that.

23            THE COURT:  And if you come back and you allege

24 that an output that is not substantially similar to the

25 protected work is copyright infringement, that's also going

33

1 to be dismissed.  Yeah.

2          MR. SAVERI:  I understand that, your Honor.  And I

3 understand that what you are -- it seems to me requiring, is

4 factual allegations of substantial similarity along the

5 lines that you are --

6          THE COURT:  Absolutely.  It seems clear to me that

7 the law requires that.

8          MR. SAVERI:  Right.  And so what I'm trying to

9 tell you is --

10          THE COURT:  Unless you can show it's a direct

11 copy, but of course the output is not by definition not a

12 direct copy.  But the output by definition is, at best,

13 derivative.  And if it's derivative, you have to show that

14 it's substantially similar.

15          MR. SAVERI:  And, your Honor, we're prepared to

16 allege facts, and if we're granted leave to amend, to

17 address the substantial similarity part.

18          THE COURT:  Okay.  Anything else you want to --

19          MR. SAVERI:  Well, I could go through the rest of

20 the causes of action if you --

21          THE COURT:  I don't want to waste any time on the

22 negligence claim.

23          MR. SAVERI:  There's an unfair competition and

24 there's a negligence claim and unjust enrichment.

25          THE COURT:  I mean the unfair competition just

34

1  rises and falls with the other allegations, right?  I mean,

2  the unfair competition is also based in the same theories

3  that you have alleged in the complaint, which we've already

4  discussed, right?

5          MR. SAVERI:  In part.

6          THE COURT:  So to the extent that is an unfair

7  competition claim, it seems like it needs to be based on a

8  theory other than what you've articulated in the complaint.

9          MR. SAVERI:  Well, there are three -- there are

10 three prongs.  The unlawful prong under the UCL that we say

11 is the DMCA, and we've had that discussion.  But there's

12 also unfairness and fraudulent, right.  And so, for example,

13 with respect to the fraudulent prong, we say that

14 representing to customers that the output is not --

15 representing to customers that the output is not subject to

16 copyright protection satisfies the fraudulent prong.

17         THE COURT:  Can I ask you why -- I mean, you have

18 this claim that they're not moving to dismiss.  And as I

19 said at the outset, that's an understandable claim.  It

20 makes sense.  Whether it wins or loses at the end of the

21 day, I don't know.  I haven't dived into that yet.

22     But all of these other claims, why are you -- why are

23 you tacking them on?  I mean, they all seem very much like

24 square peg/round role.  What do they give you?  Like what --

25 I mean, you can go forward on this direct copyright

35

1  infringement claim.  Why should we be spending all this time

2  on multiple rounds of motions to dismiss on these other

3  claims that seem very much to be the square peg/round hole

4  situation?

5         MR. SAVERI:  Well, so, again, your Honor, this was

6  the first complaint, and it's not uncommon to have multiple

7  theories of liability that arise under both federal and

8  state law.  We think that --

9         THE COURT:  Yeah, I know, but we want them to make

10 sense, right?

11        MR. SAVERI:  And, your Honor, I mean we do.  And

12 we -- we believe, and I do think there are valid state law

13 claims that make sense.  We're entitled to proceed under

14 those alternative theory.

15    Now, if -- again, I take your point that in -- in a

16 case like this, it makes a lot of sense to focus on the most

17 important and strongest claims, and the most -- the most

18 comprehensible and simple and straightforward.  I mean, we

19 are masters of our complaint.

20    Certainly we have an interest when we get to the jury

21 of having a cogent theory that makes sense.  But this is --

22 we filed our -- we filed our complaint.  I mean, I can make

23 an argument that the unjust enrichment claim, right, because

24 of the nature of the relationship, that -- there's a reason

25 -- there's a reason for it, and there's a valid reason for

36

1  it.

2      Certainly, we're going to be thinking about narrowing

3  our claims based on today.  You know, some of these are

4  going to -- may end up on the cutting room floor.  We

5  understand that.  That happens all the time in cases.

6              THE COURT:  Okay.

7              MR. SAVERI:  And, look, your Honor, I would also

8  say that I've certainly seen complaints which have a laundry

9  list of 14, 15, 16, 20 state causes, you know, causes of

10 action.

11             THE COURT:  They're annoying, aren't they?

12             MR. SAVERI:  Yeah, they certainly are.  And so I

13 actually thought we were doing our level best not to do that

14 and to have a smaller subset.  I hear your Honor saying you

15 should have tried harder, but I take your point.

16     This is -- we tried to be disciplined about what causes

17 of action we're asserting.  And I hear you, that you think

18 that there are -- there are complaints which are more

19 towards the front of the complaint, which you find more

20 sensible.  And they haven't conceded -- they haven't fought.

21 And so, you know, that's really in large measure what the

22 case is going to -- is centered on.

23     To the extent we have claims that arise under state

24 law, it's entirely proper to plead them and to assert them.

25             THE COURT:  Okay.

37

1        Mr. Ghajar, is there anything you'd like to say?

2              MR. GHAJAR:  Good morning.  Briefly.

3              THE COURT:  By the way, I apologize.  Did I

4   pronounce your name right?

5              MR. GHAJAR:  It's getting closer.  It's Ghajar.

6   Ghajar.

7              THE COURT:  "Ghajar."  Sorry about that.

8              MR. GHAJAR:   Thank you.

9              THE COURT:  I of all people should know how to

10  pronounce your name.  Sorry about that.

11             MR. GHAJAR:  Good to see you again, your Honor.

12  Thank you for previewing your thinking.  I can't say that

13  I'm any less confused now than when we began the morning,

14  because much of the discussion today was about facts and

15  theories that are actually not in the complaint, and your

16  Honor pointed that out.

17        And so, I believe that I'd be playing a game of Whac-A-

18  Mole to preemptively deal with hypotheticals that they have

19  not pled.  Hypotheticals like there is an output that Llama

20  creates that is substantially similar in protected

21  expression to one of the Plaintiff's works.  They didn't

22  even begin to allege that.  In fact, they avoided alleging

23  that because they can't.  And I don't believe they should be

24  given leave to amend to plead that.  If they could have,

25  they would have.

38

1          THE COURT:  Really?  I mean you really think it
2 would be appropriate to dismiss all those claims without
3 leave to amend?
4          MR. GHAJAR:  Well, if they didn't allege it, your
5 Honor -- actually, let me jump to that.  I think that there
6 are parts of this complaint that are -- they were DOA and
7 they remain DOA.  The DMCA claims, I mean, you took the
8 words again out of my mouth, that it is a round peg/square
9 hold -- or square hole -- square peg/round hole situation.
10      But let's look at what they conceded, and there's no
11 reason for them to be able to revive those claims and go
12 back to the drawing board and come up with a completely
13 different theory.  The 1202(a)(1) claim, they threw it in
14 and then they didn't defend it.  That should be dismissed
15 with prejudice and it doesn't apply.
16      And if you're going to give them leave to amend the
17 DMCA while we're on it, counsel acknowledged the double
18 scienter requirement.  Your Honor acknowledged some of the
19 inconsistencies with the theory. They just recited the
20 elements of the DMCA.  They didn't even bother to put an
21 plausible facts to support the knowingly distributed --
22          THE COURT:  So, let me just say, Mr. Ghajar.  I'm
23 not going to dismiss any of these claims with -- without
24 leave to amend, other than maybe the negligence claim.  I am
25 quite skeptical of, you know, many of these claims.  Again,

39

1  I'm not talking about the claim that you didn't move to

2  dismiss.  I don't have any opinion on that yet --

3          MR. GHAJAR:  Okay.

4          THE COURT:  -- one way or the other.  But the

5  other claims I'm quite skeptical of, but I do not think it

6  would be appropriate for me to dismiss any of them with

7  leave to amend (sic).

8          MR. GHAJAR:  And we -- we understand.

9          THE COURT:  Or without leave to amend.

10         MR. GHAJAR:  It's in your discretion.  I guess I

11 would make an effort, at least on the 1202(a)(1) claim, that

12 they didn't defend, they shouldn't be able to revive it

13 because your Honor's being generous with leave.

14     I think that the state law claims in terms of what they

15 -- what -- how they pled them, they're preempted, and Ms.

16 Hartnett's prepared to address that.  I don't know how

17 they're going to shape shift --

18         THE COURT:  Yeah.

19         MR. GHAJAR:  -- the claims.

20         THE COURT:  I don't either, and I don't need to

21 hear argument on that right now.

22         MR. GHAJAR:  Okay.  I'm sorry.  We'll not.

23     I think given that we're talking about really another

24 complaint that they haven't yet drafted, what I want to

25 leave today with is an understanding, because I thought I

40

1  had one during the argument, but then it changed.

2      This theory that Llama is a derivative work and,

3  therefore, they don't have to prove substantial similarity.

4  Your Honor said it right.  That's not what Range Road says.

5  That's not what Rentmeester says.  And Plaintiff submitted a

6  declaration to your Honor two days -- two, three days ago,

7  the Hanagami, the Epic Games case.

8          THE COURT:  That was the Fortnite case?

9          MR. GHAJAR:  It was the Fornite dance case.  It's

10  a case that's important on the issue of choreography.  But

11  the reason I took interest in it, I was pleased that they

12  filed it with your Honor, is it actually walks through the

13  test for copyright infringement.  It makes it very clear

14  that copying is separate from unlawful appropriation.  And

15  if you're talking about unlawful appropriation, you actually

16  have to then demonstrate substantial similarity in protected

17  expression.  It has to be observed.

18      And, your Honor, we've had cases -- I've had cases

19  before your Honor where the plaintiff doesn't show what

20  exactly is infringing, what exactly is problematic.  There

21  are no examples, and this is one of them.  They don't even

22  describe anything that would violate the

23  Litchfield/Rentmeester test, and they have to.  They can't

24  ignore that going forward and cling to the theory that Llama

25  is a derivative work, so, therefore, we don't have to allege

41

1  substantial similarity.  And I think we made progress today,

2  and I hope that we -- if you allow them to amend, they will

3  heed that standard.

4      On vicarious infringement you honed in on the real

5  issue.  You -- it sounds like your Honor's going to allow

6  them to allow them to amend to point to output that is

7  substantially similar in protected expression to the

8  Plaintiff's works.

9      I would say that, again, we're talking about vicarious

10 infringement.  And I would urge your Honor to look at the

11 additional factors, and in particularly -- in particular,

12 the direct financial benefit factor.

13     And there's clear case law that my colleague did not

14 address, in the opposition, from the Schneider case, citing

15 to the VHT v. Zillow case that says that the draw of the

16 work, the draw of the allegedly vicariously infringing work,

17 has to be the infringement -- the infringing books, the

18 books that are in it.

19     They don't even plead how the draw of Llama is

20 Plaintiff's books.  It doesn't even make sense, given that

21 there are billions of parameters in it and --

22         THE COURT:  Well, we -- and we don't know because

23 we don't -- they haven't even tried to plead substantial

24 similarity, so I don't know what they're going to say about

25 that next time.  We'll find out I guess.

42

1          MR. GHAJAR:  Okay.  We don't think that they could

2   under Ninth Circuit law allege, a, the level of supervision

3   required to meet prong two, vicarious liability, and, three,

4   under the Zillow VHT case, the financial benefit prong.

5      Again, they didn't even try to, they didn't defend it

6   in opposition.  We're all skeptical of it, but if there's

7   any claim that should also fall by the wayside without

8   leave, it would be that, and I'd urge your Honor to just

9   take a look at those couple factors.

10     I don't know that there's any more that I need to

11  address.  If your Honor has any questions, I --

12         THE COURT:  I'll ask you a question since I have

13  you.  I'm not sure it's directly relevant to this motion.

14  But, you know, as often happens in these copyright cases,

15  you start thinking about analogies and hypotheticals and

16  your own experiences that you've had, and you wonder how it

17  relates to this case, right.

18     So, as I was reading the stuff, I was thinking back to

19  my recent trip to Nashville where --

20         MR. GHAJAR:  To Nashville?

21         THE COURT:  "To Nashville," where I was teaching a

22  short course at the law school, and of course every night

23  going out and seeing great, great music performed by these

24  singer songwriters, right.  And one of them said -- she was,

25  you know, introducing a song that she was going to sing, and

43

1   she said, I wrote this song for Luke Combs.

2       And what she meant by that, right, is, you know, I know

3   Luke Combs' music, and I'm a songwriter and I'm hoping that

4   Luke Combs will pick up my song.

5           MR. GHAJAR:  Right.

6           THE COURT:  Right.  And it's a song that sounds

7   like a Luke Combs song, right.  And hopefully he'll want to

8   pick it up, and I'll become rich and all that.

9       And so, you know, I was trying to draw an analogy

10  between that concept and this case.  And it strikes me that,

11  you know, you can imagine the songwriter downloading and

12  listening to all of Luke Combs' music and writing a song for

13  him that is -- that sounds like a Luke Combs song.

14      And she might -- let's say that she downloads his music

15  illegally, okay.  It seems to me that in the case perhaps

16  she could be liable for copyright infringement for

17  downloading his music illegally, but in the song she writes,

18  if it's not substantially similar to a Luke Combs song

19  within the meaning of the copyright laws, the song she

20  writes is not a copyright --

21          MR. GHAJAR:  Okay.

22          THE COURT:  -- violation.  Do you agree with

23  that --

24          MR. GHAJAR:  I do.

25          THE COURT:  -- analogy?

44

1          MR. GHAJAR:  I do.  I do.  On the first part --

2          THE COURT:  And so the -- as applied to this case,

3   it would mean that the output, right, even if the output of,

4   you know, the Llama language model, you know, is influenced

5   by, you know, protected works, right, it's not the -- the

6   output itself is not a copyright violation because there's

7   nothing wrong with writing music or creating an output that

8   is influenced by protected works.

9          MR. GHAJAR:  I would agree with that statement.

10  And I think, just to take the hypothetical further and we

11  haven't reached this yet, but just because a large language

12  model is able to tell you a little bit about your Honor,

13  about me, about my book, doesn't mean it's committing

14  copyright infringement.

15         THE COURT:  Right.

16         MR. GHAJAR:  In fact, I'm sure that we could all

17  go on the internet and learn about Sarah Silverman's book by

18  running a search on popular search engine --

19         THE COURT:  Right.

20         MR. GHAJAR:  -- and reading Wikipedia --

21         THE COURT:  Right.

22         MR. GHAJAR:  -- reading book reviews.  And to the

23  extent that a large language model has trained from those

24  sources, it's going to know a little bit about the books and

25  the works that are described therein.  It's --

45

```
 1          THE COURT:  But I assume you agree that if I went
 2  and asked the language model to reproduce her book, and her
 3  book is protected and it's been copied without permission,
 4  then the reproduction is copyright infringement?
 5          MR. GHAJAR:  It could be.  I'm not aware that --
 6  and they don't allege that the large language models are
 7  able to do that.
 8          THE COURT:  Right.
 9          MR. GHAJAR:  That's not really the way they work.
10  So, theoretically, perhaps, but that's not what's alleged,
11  and I'm not aware that --
12          THE COURT:  I assume they could do that, unless it
13  were programmed not to.  Unless it were told, you can't do
14  that --
15          MR. GHAJAR:  It could be both.
16          THE COURT:  -- because it's copyright
17  infringement.
18          MR. GHAJAR:  It could be both, but it's not -- in
19  my understanding, and we have experts in the audience, but
20  it's my understanding it's supposed to be -- it's supposed
21  to be learning syntax.  Like these -- what I -- I explained
22  it to my kids, for example.  It's just a turbocharged
23  autocorrect that is really good at predicting.  And how is
24  it good at predicting?  It's read a lot of stuff, and it
25  knows that when start a sentence with "good," there's a
```

46

1  pretty good chance the next word should be "good morning" --
2  or "morning," and so on.  And it has the statistical data in
3  it.
4       I don't know that it's supposed to be able to able to
5  -- any of the LLM's are supposed to be able to regurgitate
6  verbatim.
7            THE COURT:  I'd be pretty surprised if they
8  couldn't.  But anyway, it doesn't matter for these purposes.
9            MR. GHAJAR:  Right.
10            THE COURT:  But one more question about my
11  hypothetical.
12            MR. GHAJAR:  Sure.
13            THE COURT:  It sounded like you agreed that, you
14  know, she -- if the singer-songwriter illegally downloaded
15  Luke Combs' songs for the purpose of writing a song that was
16  influenced by Luke Combs' music, that the download -- you
17  know, that that -- she could be liable for illegally
18  downloading the songs.
19       Isn't -- taking the analogy to this case, isn't that
20  what they are alleging about Meta copying the books?  I
21  mean, isn't that -- isn't that the equivalent of the singer-
22  songwriter illegally downloading the songs and then creating
23  something from them?
24            MR. GHAJAR:  What you described is the songwriter
25  doing it herself.  It's not alleged that Meta went and

47

1 copied books individually, or that any of the other makers

2 of LLM's have done that.

3      What is alleged is that there are these preexisting

4 large data sets out there.

5           THE COURT:  Right.

6           MR. GHAJAR:  I've read about Books3 --

7           THE COURT:  Well, those -- right.  But what if she

8 gets -- what if the singer-songwriter got the Luke Combs

9 music from an unauthorized --

10          MR. GHAJAR:  So --

11          THE COURT:  -- library of music?

12          MR. GHAJAR:  So, the theory, the hypothetical is,

13 there's an unauthorized copying.  And then you have to ask,

14 well, is it -- we have to look at that copying.  And for

15 later in the case, there are cases that talk about whether

16 it's -- a permanent copy created, whether it's an ephemeral

17 copy, a transitory copy?  And we look at, okay, the copy for

18 what purpose?

19      And then of course there -- as your Honor's aware from

20 Google Books, then there are very strong principals of fair

21 use.

22          THE COURT:  Right.

23          MR. GHAJAR:  And in that case the copies --

24          THE COURT:  But in my -- in the case of my singer-

25 songwriter, is it fair use for her to legally -- to download

48

1  the protected -- yeah, that was a bad question.

2      Is it fair use for her to download the protected works

3  without authorization and then listen to them?  Is that fair

4  use?

5            MR. GHAJAR:  I'd want to think about -- I'd want

6  to chew on that.  I think the way you framed it, you know,

7  maybe, maybe not.  I mean, I -- we could probably together

8  come up with reasons why it would be fair use, but --

9            THE COURT:  I mean, isn't that like the <u>Napster</u>

10 case?  I don't remember.  It was so long ago.

11           MR. GHAJAR:  <u>Napster</u>, you remember -- <u>Napster</u> was

12 a website that allowed for infringement of millions of

13 songs, and people were sharing songs.  They were copying the

14 songs themselves and then sharing them with others.  That's

15 what made that -- yeah.  That's what made that platform

16 problematic.  So it was the copying for themselves, and then

17 sharing it with their friends, and then with people in other

18 countries that they didn't know.

19           THE COURT:  Uh-huh.  Okay.  All right.  Thanks.

20 Do you want a final word on anything, or you want me to wrap

21 up?

22           MR. GHAJAR:  No, your Honor.  I mean when those

23 hypotheticals comes up I'll have something to say about

24 them, but probably today's not the day.

25           THE COURT:  Okay.  All right.  Thank you.

49

1          I'll issue a ruling shortly.

2          MR. GHAJAR:  Thank you, your Honor.

3          THE COURT:  I forgot one last question.  Is there

4  any reason for discovery not to go forward on the claim that

5  Meta did not seek to dismiss?

6          MR. SAVERI:  I'm sure he has a different answer

7  than I.  I'll let him go first.

8          MR. GHAJAR:  We'd like the pleadings to be

9  resolved to understand the entire scope of the case before

10 we start getting into discovery.

11         THE COURT:  But there's this -- there's this claim

12 that survives.  You haven't moved to dismiss it.  Why

13 shouldn't we plow ahead?  Why -- I mean, litigation takes

14 long enough.  Why don't we get rolling?

15         MR. GHAJAR:  My reaction, your Honor, is that we

16 wanted the pleadings to be settled before we go forward with

17 any discovery.  We don't know whether their discovery can be

18 limited to just that one issue.  There's going to be

19 overlap.

20     So, it'd be my preference -- our preference -- I don't

21 know if any of my colleagues have meetings?  They -- I'm

22 going to -- for -- let's settle the pleadings.  Let's get

23 this -- get the complaint -- get to what the claims should

24 look like, and then discovery should begin.

25         THE COURT:  Okay.  Can go forward on that claim

50

1 immediately, and I'll issue a ruling on the -- on the claims

2 that are the subject of the motion to dismiss promptly.

3          MR. GHAJAR:  Thank you, your Honor.

4          MR. SAVERI:  Thank you, your Honor.

5          THE COURT:  Thank you.

6          THE CLERK:  Court is adjourned.

7      (Proceedings adjourned at 10:59 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

51

<u>CERTIFICATE OF TRANSCRIBER</u>

 1

 2

 3      I certify that the foregoing is a true and correct

 4 transcript, to the best of my ability, of the above pages of

 5 the official electronic sound recording provided to me by

 6 the U.S. District Court, Northern District of California, of

 7 the proceedings taken on the date and time previously stated

 8 in the above matter.

 9      I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14 

15

16      Echo Reporting, Inc., Transcriber

17        Wednesday, November 15, 2023

18

19

20

21

22

23

24

25