LATHAM & WATKINS LLP
Andrew M. Gass (SBN 259694)
 andrew.gass@lw.com
Michael H. Rubin (SBN 214636)
 michael.rubin@lw.com
Brittany N. Lovejoy (SBN 286813)
 brittany.lovejoy@lw.com
505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone:  415.391.0600

*Attorneys for Defendant DeviantArt, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SARAH ANDERSEN, et al., | CASE NO. 3:23-cv-00201-WHO |
| Individual and Representative Plaintiffs, | **DEFENDANT DEVIANTART, INC.'S NOTICE OF MOTION, MOTION TO DISMISS FIRST AMENDED COMPLAINT, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS** |
| v. | |
| STABILITY AI LTD., et al., | |
| Defendants. | Date:     May 8, 2024<br>Time:     2:00 p.m.<br>Place:    Courtroom 2 - 17th Floor<br>Before:   Hon. William H. Orrick |

1  **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2       **PLEASE TAKE NOTICE** that on May 8, 2024 at 2:00 p.m., or as soon thereafter as the

3  matter may be heard, in the United States District Court for the Northern District of California,

4  Courtroom 2, 17th Floor, located at 450 Golden Gate Ave., San Francisco, CA 94102, Defendant

5  DeviantArt, Inc. ("DeviantArt") through its undersigned counsel, will, and hereby does, move to

6  dismiss Counts 15, 16, and 17 of Plaintiffs' First Amended Class Action Complaint ("FAC")

7  pursuant to Federal Rule of Civil Procedure 12(b)(6).

8       DeviantArt's Motion to Dismiss ("Motion") is based on this Notice, the supporting

9  Memorandum of Points and Authorities ("Memorandum"), the complete files and records in this

10 action, and any additional material and arguments as may be considered in connection with the

11 hearing on the Motion.

12                       **STATEMENT OF RELIEF SOUGHT**

13      DeviantArt seeks an order pursuant to FRCP 12(b)(6) dismissing the claims against it for

14 failure to state a claim upon which relief can be granted.

15                       **ISSUES TO BE DECIDED**

16      The Motion presents the following issues to be decided: (1) whether Count 15 of the FAC

17 fails to state a claim for direct copyright infringement; (2) whether Count 16 of the FAC fails to

18 state a claim for breach of contract and breach of the implied covenant of good faith and fair

19 dealing; (3) whether Count 17 of the FAC fails to state a claim for unjust enrichment; and

20 (4) whether Plaintiffs' new claims and class representatives should be dismissed as beyond the

21 scope of permitted amendment.

22  Dated:  February 8, 2024               Respectfully submitted,

23                              LATHAM & WATKINS LLP

24                              By:   */s/ Andrew M. Gass*

25                              Andrew M. Gass (SBN 259694)
                              andrew.gass@lw.com

26                              Michael H. Rubin (SBN 214636)
                              michael.rubin@lw.com

27                              Brittany N. Lovejoy (SBN 286813)
                              brittany.lovejoy@lw.com

28                              505 Montgomery Street, Suite 2000

San Francisco, California  94111-6538
Telephone:  415.391.0600

*Attorneys for Defendant DeviantArt, Inc.*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................... 1

II.   BACKGROUND ............................................................................................................ 3

III.  LEGAL STANDARD..................................................................................................... 5

IV.   ARGUMENT ................................................................................................................. 5

    A.   Plaintiffs Fail To Allege A Copyright Claim Against DeviantArt ....................... 6

        1.   This Court's October 30 Order Resolves The Copyright Claim................ 6

        2.   The FAC's Allegations Do Not Plead A Copyright Violation ................. 8

            a.   Plaintiffs Reframed The Legal Basis of This Claim..................... 9

            b.   DreamUp Is Not A Copy ............................................................ 10

                i.    Plaintiffs Do Not Allege that DreamUp
                     Reproduces Images ......................................................... 11

                ii.   Plaintiffs Do Not Allege Stable Diffusion
                     1.4 Reproduces Images ................................................... 12

                iii.  Plaintiffs' Allegations As To Other Models
                     Do Not Suffice ............................................................... 14

            c.   DreamUp Is Not A Derivative Work ........................................... 16

        3.   DeviantArt's Creation of DreamUp Was Fair Use ............................... 17

    B.   Plaintiffs Fail To Allege A Breach of Contract Claim ...................................... 20

        1.   Plaintiffs Restate The Contract Claim This Court Dismissed ................ 20

        2.   The FAC Does Not State An Implied Covenant Claim .......................... 21

    C.   Plaintiffs Fail To Allege An Unjust Enrichment Claim...................................... 23

    D.   The Court Should Dismiss The Additional Named Plaintiffs ............................. 24

V.    CONCLUSION.............................................................................................................. 25

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

## CASES

4

*Airs Aromatics, LLV v. Victoria's Secret Stores Brand Mgmt., Inc.*,
5
    744 F.3d 595 (9th Cir. 2014) ...................................................................................13

6
*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
    143 S. Ct. 1258 (2023)...........................................................................................18
7

8
*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).........................................................................................5, 15

9
*Authors Guild v. Google, Inc.*,
10
    804 F.3d 202 (2d Cir. 2015)...............................................................16, 17, 18, 20

11
*Bill Graham Archives v. Dorling Kindersley Ltd.*,
    448 F.3d 605 (2d Cir. 2006)..................................................................................19
12

13
*Bittel Tech., Inc. v. Bittel USA, Inc.*,
    No. 10-cv-00719, 2010 WL 3221864 (N.D. Cal. Aug. 13, 2010) .........................24

14
*Carrasco v. HSBC Bank USA, N.A.*,
15
    No. 11-cv-2711, 2012 WL 685523 (N.D. Cal. Mar. 2, 2012) ...............................21

16
*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
    536 F.3d 121 (2d Cir. 2008)..................................................................................16
17

18
*DeLeon v. Wells Fargo Bank, N.A.*,
    No. 10-cv-01390, 2010 WL 4285006 (N.D. Cal. Oct. 22, 2010) .......................5, 23

19
*Doe 1. v. Github, Inc.*,
20
    No. 22-cv-06823, 2024 WL 235217 (N.D. Cal. Jan. 22, 2024)..............................23

21
*Durell v. Sharp Healthcare*,
    183 Cal. App. 4th 1350 (2010) ..............................................................................22
22

23
*ESG Cap. Partners, LP v. Stratos*,
    828 F.3d 1023 (9th Cir. 2016) ...............................................................................24

24
*Feist Publications Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991)...............................................................................................18
25

26
*Firoozye v. Earthlink Network*,
    153 F. Supp. 2d 1115 (N.D. Cal. 2001) .................................................................23

27
*Foley v. Interactive Data Corp.*,
28
    47 Cal.3d 654 (1988) .............................................................................................22

*Gallagher v. Chipotle Mexican Grill, Inc.*,
  No. 15-cv-03952, 2016 U.S. Dist. LEXIS 45501 (N.D. Cal. Apr. 4, 2016)...........................24

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ........................................................................................5, 11

*Google LLC v. Oracle Am., Inc.*,
  141 S. Ct. 1183 (2021).........................................................................................................18

*Greenspan v. Qazi*,
  No. 23-cv-03426, 2021 WL 2577526 (N.D. Cal. June 23, 2021)..........................................17

*Gulaid v. CH2M Hill, Inc.*,
  No. 15-cv-04824, 2016 WL 5673144 (N.D. Cal. Oct. 3, 2016) ............................................13

*Kadrey, et al. v. Meta Platforms, Inc.*,
  No. 23-cv-03417, 2023 WL 8039640 (N.D. Cal. Nov. 20, 2023) ...................................17, 23

*King v. Facebook, Inc.*,
  No. 19-cv-01987, 2019 WL 6493968 (N.D. Cal. Dec. 3, 2019).............................................21

*Litchfield v. Spielberg*,
  736 F.2d 1352 (9th Cir. 1984) ...........................................................................................17

*Lovesy v. Armed Forces Ben. Ass'n*,
  No. 07-cv-02745, 2009 WL 1574575 (N.D. Cal. June 3, 2009)..........................................4, 9

*Martinez v. Wells Fargo Bank, N.A.*,
  No. 13-cv-05597, 2014 WL 1572689 (N.D. Cal. Apr. 17, 2014).............................................4

*May v. Semblant, Inc.*,
  No. 13-cv-01576, 2013 WL 5423614 (N.D. Cal. Sept. 27, 2013).........................................21

*Pac. Recovery Sols. v. United Behav. Health*,
  508 F. Supp. 3d 606 (N.D. Cal. 2020) ...............................................................................5, 7

*Paracor Finance, Inc. v. General Elec. Capital Corp.*,
  96 F.3d 1151 (9th Cir. 1996) ...........................................................................................24

*Perfect 10, Inc. v. Giganews, Inc.*,
  847 F.3d 657 (9th Cir. 2017) ...........................................................................................16

*Peter Mayer Publishers Inc. v. Shilovskaya*,
  11 F. Supp. 3d 421 (S.D.N.Y. 2014)...................................................................................16

*Ringgold v. Black Entertainment Television, Inc.*,
  126 F.3d 70 (2d Cir. 1997)................................................................................................19

*Rockridge Trust v. Wells Fargo, N.A.*,
  985 F. Supp. 2d 1110 (N.D. Cal. 2013) .............................................................................22

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

DEVIANTART'S MOTION TO DISMISS FAC
CASE NO. 3:23-cv-00201-WHO

*Rosal v. First Fed. Bank of Cal.*,
  671 F. Supp. 2d 1111 (N.D. Cal. 2009) ...................................................................................24

*Sega Enterprises Ltd v. Accolade, Inc.*,
  977 F.2d 1510 (9th Cir. 1992) ................................................................................17, 18, 20

*Sony Computer Entm't, Inc. v. Connectix Corp.*,
  203 F.3d 596 (9th Cir. 2000) .............................................................................................18, 19

*Stewart v. Abend*,
  495 U.S. 207 (1990)...................................................................................................................18

*Thomson Reuters Enter. Centre GmbH v. Ross Intel. Inc.*,
  No. 20-cv-613, 2023 WL 6210901 (D. Del. Sept. 23, 2023)...................................................19

*Twentieth Century Music Corp. v. Aiken*,
  422 U.S. 151 (1975)...................................................................................................................18

*U.S. v. Ritchie*,
  342 F.3d 903 (9th Cir. 2003) ....................................................................................................12

*Vann v. Aurora Loan Servs. LLC*,
  No. 10-cv-04736, 2011 WL 2181861 (N.D. Cal. June 3, 2011)...............................................23

*Welgus v. TriNet Grp., Inc.*,
  No. 15-cv-03625, 2017 WL 6466264 (N.D. Cal. Dec. 18, 2017), *aff'd*, 765 Fed. App'x 239
  (9th Cir. 2019)........................................................................................................................5, 7

*Wilson v. Frito-Lay North Am., Inc.*,
  961 F. Supp. 2d 1134 (N.D. Cal. 2013) ...................................................................................14

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) .....................................................................................................5

**STATUTES**

17 U.S.C.
  § 101.............................................................................................................................. *passim*
  § 106.................................................................................................................9, 10, 16, 17
  § 107..................................................................................................................................18
  § 504(c) ...............................................................................................................................8

Cal. Bus. Prof. Code § 17200 .................................................................................2, 4, 23

**OTHER AUTHORITIES**

Joe Spisak & Sergey Edunov, The Llama Ecosystem: Past, Present, and Future, Meta Blog (Sept.
  27, 2023), https://ai.meta.com/blog/llama-2-updates-connect-2023/ .......................................8

1
2

Nicholas Carlini, et al., *Extracting Training Data from Diffusion Models,*
https://arxiv.org/pdf/2301.13188.pdf (Jan. 30, 2023) ............................................................12

Stable Diffusion XL 1.0 Model Card, Hugging Face, https://huggingface.co/stabilityai/stable-
diffusion-xl-base-1.0 ...................................................................................................................8

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEVIANTART'S MOTION TO DISMISS FAC
CASE NO. 3:23-cv-00201-WHO

## I.     INTRODUCTION

DeviantArt's inclusion as a defendant in this lawsuit has never made sense. The claims at issue raise a number of novel questions relating to the cutting-edge field of generative artificial intelligence, including whether copyright law prohibits AI models from learning basic patterns, styles, and concepts from images that are made available for public consumption on the Internet. But none of those questions implicates DeviantArt. Plaintiffs have now filed two complaints in this case, and neither of them makes any attempt to allege that DeviantArt has *ever* directly used Plaintiffs' images to train an AI model, to use an AI model to create images that look like Plaintiffs' images, to offer third parties an AI model that has ever been used to create images that look like Plaintiffs' images, or in any other conceivably relevant way.

Instead, Plaintiffs included DeviantArt in this suit because they believe that merely *implementing* an AI model created, trained, and distributed by others renders the *implementer* liable for infringement of each of the billions of copyrighted works used to train that model—even if the implementer was completely unaware of and uninvolved in the model's development. That theory of liability is not only wrong, it would yield absurd results. Endorsing it would mean that tens of millions of programmers, researchers, and businesses who have downloaded and implemented third-party "open-source" AI models are vulnerable to similar class action lawsuits demanding multiple billions of dollars in statutory damages. Put simply, if Plaintiffs can state a claim against DeviantArt, anyone whose work was used to train an AI model can state the same claim against millions of other innocent parties, any of whom might find themselves dragged into court simply because they used this pioneering technology to build a new product whose systems or outputs have nothing whatsoever to do with any given work used in the training process.

Of the eight claims Plaintiffs asserted against DeviantArt in the original complaint, only two remain. First, Plaintiffs with registered copyrights reassert a narrowed and reframed claim for copyright infringement, on the theory that DeviantArt directly infringed their reproduction and derivative-work rights by building a service "based on" Stability AI's Stable Diffusion model. But this Court already rejected Plaintiffs' attempt to state a copyright claim against DeviantArt for "simply provid[ing] its customers access to Stable Diffusion as a library." Dkt. 117 (Order) at 10.

1    And while Plaintiffs have changed their theory as to *why* implementing Stable Diffusion renders

2    DeviantArt a copyright infringer—now arguing that DreamUp itself is both a "copy" and a

3    "derivative work," *see* FAC ¶¶ 412–13—that theory is wholly unsupported by the facts alleged in

4    the FAC.  Because that pleading does not plausibly allege that DreamUp has replicated or can

5    replicate Plaintiffs' registered images, it does not plausibly allege that DreamUp is either a copy

6    or a derivative work.  And even if it did, DeviantArt's service—which, under the facts alleged

7    here, creates only *new*, non-infringing images—is a protected fair use under well-established Ninth

8    Circuit precedent.

9          Second, Plaintiffs who are DeviantArt users reallege the exact same breach of contract

10   claim that this Court dismissed in its October 30 Order.  Even after this Court held that Section 16

11   of DeviantArt's Terms of Service "does not clearly cover the conduct that plaintiffs accuse

12   DeviantArt of in this suit" and dismissed Plaintiffs' first breach claim, *see* Order at 26, Plaintiffs

13   now reassert precisely the same claim, based on the same contractual provision and an identical

14   set of supporting facts.  Plaintiffs also add a claim for breach of the implied covenant of good faith

15   and fair dealing, but support it only with general grievances which have no connection to the

16   contract at issue.  FAC ¶ 422(b).  Neither of these claims comes close to stating a claim for relief.

17         Finally, the same Plaintiffs add another claim for "unjust enrichment under Cal. Bus. Prof.

18   Code § 17200 and California Common Law."  FAC at 92.  This claim appears nowhere in the

19   original complaint and thus falls outside the scope of the amendment permitted by the Court.  But

20   it also fails on its face for several reasons—including because it is preempted by the Copyright

21   Act and because these Plaintiffs admit to having an enforceable contract with DeviantArt, which

22   precludes any quasi-contract claim.  And in any case, unjust enrichment is not a "catch-all" claim

23   for plaintiffs to throw at any perceived injustice.  It is a long-established doctrine with particular

24   elements that have no application to the facts alleged in the FAC.

25         Plaintiffs have now had two opportunities to advance a coherent legal theory for why

26   DeviantArt should be a defendant in this case, and have twice failed to do so.  This Court should

27   dismiss the claims against DeviantArt with prejudice and dismiss DeviantArt from this case.

28

## II.     BACKGROUND

Plaintiffs Sarah Andersen, Kelly McKernan, and Karla Ortiz commenced this putative class action on January 13, 2023 against Stability AI Ltd., Stability AI, Inc. (together, "Stability AI"), Midjourney, Inc. ("Midjourney"), and DeviantArt, Inc. (together, "Defendants").  *See* Dkt. 1.  The initial pleadings focused on Stability AI's alleged use of Plaintiffs' "copyrighted images without permission to create Stable Diffusion," a series of machine learning models allegedly capable of generating images "in the style" of individual artists.  *Id.* ¶¶ 2–5.  Plaintiffs included Midjourney and DeviantArt as defendants in the suit based on allegations that those entities created image generation services that "rel[y] on Stable Diffusion to produce images."  *Id.* ¶¶ 34–35.  The original complaint asserted seven causes of action against all Defendants: (1) direct copyright infringement, (2) vicarious copyright infringement, (3) violation of Section 1202 of the DMCA, (4) violation of the statutory right of publicity, (5) violation of the common law right of publicity, (6) violation of California's unfair competition law (UCL), and (7) declaratory relief.  *Id.* ¶¶ 153–239.  Plaintiffs also alleged a breach of contract claim against DeviantArt alone.  *Id.* ¶¶ 227–36.

On October 30, 2023, the Court granted Defendants' motions to dismiss as to all claims except the direct copyright infringement claim against Stability AI.  *See generally* Order.  The Court then granted Plaintiffs leave to amend to "cure the deficiencies identified" in the Court's Order.  *Id.* at 28.  On November 29, 2023, Plaintiffs filed a 96-page amended complaint with seventeen separate claims for relief, which went far beyond attempting to "cure the deficiencies identified" by the Court.  *See* FAC ¶¶ 214–439.  Instead, Plaintiffs added seven new named class representatives, *id.* ¶¶ 17–23, joined a number of new causes of action, *see, e.g.*, *id.* at Count 17 (alleging "unjust enrichment" against DeviantArt), and named a new defendant against whom Plaintiffs alleged four separate claims, *id.* ¶¶ 342–79 (claims against Runway AI, Inc.).

Only three of the FAC's claims implicate DeviantArt.  First, the Plaintiffs who registered copyrights in works allegedly included in one of the datasets used to train the models at issue— Sarah Andersen, along with newly-added Plaintiffs Zhang, Brom, Manchess, Kaye, and Ellis, *id.* ¶ 213 (defining "LAION-5B Registered Plaintiffs")—reassert direct copyright infringement claims targeted at DeviantArt's AI image generation service called "DreamUp."  *Id.* ¶¶ 411–16

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    (Count 15).  These Plaintiffs do not allege that DeviantArt created or trained the "diffusion" model

2    on which DreamUp allegedly relies, namely "Stable Diffusion version 1.4."  *Id.* ¶ 388.  Instead,

3    they contend that, by creating an AI service "based on" that model, DeviantArt must have created

4    a "Statutory Copy" and a "Statutory Derivative Work" of each of the billions of images used to

5    train it.  *Id.* ¶¶ 388, 412–13.  To be clear, Plaintiffs' only surviving copyright claim against

6    DeviantArt is one for *direct* infringement, *id.* ¶¶ 411–16; they have abandoned any claim under

7    the doctrine of secondary infringement, including their prior "vicarious" liability theory.

8         Second, the Plaintiffs who are allegedly DeviantArt users—McKernan, along with newly-

9    added plaintiffs Southworth, Zhang, and Rutkowski, *id.* ¶ 381 (defining "DeviantArt Plaintiffs")—

10   reallege a claim for breach of contract based on Section 16 of the DeviantArt Terms of Service.

11   FAC ¶¶ 417–31.  Ignoring the Court's prior holding that the operative provision "does not clearly

12   cover the conduct that plaintiffs accuse DeviantArt of in this suit," Order at 26, Plaintiffs again

13   insist that "by releasing DreamUp," DeviantArt "breached" the same provision, FAC ¶ 422(a).

14   Plaintiffs also add a new claim asserting that "DeviantArt breached the implied covenant of good

15   faith and fair dealing" by releasing an AI image generation service that allowed users to create

16   "AI-generated images" and "compet[e] with the DeviantArt Plaintiffs."  *Id.* ¶ 422(b).

17        Third, without seeking the Court's leave, the DeviantArt Plaintiffs add a new claim for

18   unjust enrichment.  FAC at Count 17.  In support, they nod to violations of unspecified "legal

19   rights."  FAC ¶¶ 433–39.  Plaintiffs do not explain the FAC's reference to California's unfair

20   competition statute, *see* FAC at 92 (referring to "Cal. Bus. & Prof. Code § 17200"), nor do they

21   plead the elements of a UCL claim, *see Martinez v. Wells Fargo Bank, N.A.*, No. 13-cv-05597,

22   2014 WL 1572689, at *1 n.3 (N.D. Cal. Apr. 17, 2014) (ignoring "reference[]" to UCL because

23   the complaint "does not actually assert a cause of action under that statute").

24        The FAC does not reallege claims against DeviantArt for vicarious copyright infringement,

25   *see* Dkt. 1 ¶¶ 169–77, violation of Section 1202 of the DMCA, *see id.* ¶¶ 178–200, violation of the

26   statutory or common law rights of publicity, *see id.* ¶¶ 201–22, unfair competition, *see id.* ¶¶ 223–

27   26, or declaratory relief, *see id.* ¶¶ 237–39.  Those claims are therefore waived.  *See, e.g.*, *Lovesy*

28   *v. Armed Forces Ben. Ass'n*, No. 07-cv-02745, 2009 WL 1574575, at *6 (N.D. Cal. June 3, 2009)

1    ("It has long been the rule in the Ninth Circuit that a plaintiff waives all causes of action alleged

2    in the original complaint which are not alleged in the amended complaint." (cleaned up)).

3    **III.    LEGAL STANDARD**

4          "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to

5    relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

6    Conclusory allegations, unreasonable inferences, and unwarranted factual deductions do not

7    suffice. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  Where a court grants

8    leave to amend for a specific purpose—*e.g.*, to "cure the deficiencies identified" in the court's

9    order, *see* Order at 28—a plaintiff may not add claims or parties absent leave of court.  *DeLeon v.*

10   *Wells Fargo Bank, N.A.*, No. 10-cv-01390, 2010 WL 4285006, at *7 (N.D. Cal. Oct. 22, 2010).

11   Reassertion of the "same theor[ies]" and allegations the court previously rejected will result in

12   dismissal with prejudice.  *Welgus v. TriNet Grp., Inc.*, No. 15-cv-03625, 2017 WL 6466264, at *6

13   (N.D. Cal. Dec. 18, 2017), *aff'd*, 765 Fed. App'x 239 (9th Cir. 2019); *see also Pac. Recovery Sols.*

14   *v. United Behav. Health,* 508 F. Supp. 3d 606, 622 (N.D. Cal. 2020).  And "where the plaintiff has

15   previously been granted leave to amend and has subsequently failed to add the requisite

16   particularity to its claims, the district court's discretion to deny [further] leave to amend is

17   particularly broad."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009).

18   **IV.    ARGUMENT**

19         The FAC does not state a claim for relief against DeviantArt.  Plaintiffs' realleged direct

20   copyright claim is foreclosed by this Court's Order, *infra* Section IV(A)(1), and in any case does

21   not allege that DeviantArt's DreamUp service or the model underlying it is a "copy" or a

22   "derivative work," *infra* Section IV(A)(2).  Even if it did, DeviantArt's creation of that "copy" or

23   "derivative work" would be a protected fair use.  *Infra* Section IV(A)(3).  Plaintiffs' breach of

24   contract claim is a carbon copy of the breach of contract claim this Court already dismissed, *infra*

25   Section IV(B)(1), and their new claim for breach of the implied covenant of good faith and fair

26   dealing is beyond the scope of the amendment permitted by the Court and fails separately on the

27   merits, *infra* Section IV(B)(2).  Plaintiffs' new claim for unjust enrichment is similarly beyond the

28   scope of the amendment permitted by the Court, preempted by the Copyright Act, and facially

insufficient as a matter of law.  *Infra* Section IV(C).  Finally, the Court should strike the new named Plaintiffs from the FAC as beyond the scope of permitted amendment.  *Infra* Section IV(D).

**A.**     **Plaintiffs Fail To Allege A Copyright Claim Against DeviantArt**

**1.**     **This Court's October 30 Order Resolves The Copyright Claim**

None of the facts alleged in Plaintiffs' first complaint suggested that DeviantArt itself had unlawfully copied or otherwise used their registered works, whether to train an AI model or otherwise.  Order at 7.  Rather, the factual basis underlying the copyright claim against DeviantArt was Plaintiffs' allegation that DeviantArt "download[ed]" Stable Diffusion and "incorporate[ed] it into [its] website via the DreamUp app."  Dkt. 1 ¶¶ 52, 123; *see also id.* ¶ 64 ("DreamUp relies on Stability's Stable Diffusion software as its underlying software engine.").  The Court rejected that expansive theory in its Order, questioning how DeviantArt could possibly be "liable for direct copyright infringement" when it "simply provides its customers access to Stable Diffusion as a library."  Order at 10.

The copyright claim against DeviantArt alleged in the FAC relies on the same core allegations.  Plaintiffs allege no new facts that, consistent with the Court's directive, "plausibly show" how DeviantArt's implementation of Stable Diffusion could support a claim for copyright infringement.  Order at 10.[1]  Plaintiffs *still* do not allege that DeviantArt directly copied or otherwise used their works, to train Stable Diffusion or otherwise.  Instead, Plaintiffs continue to claim that DeviantArt is a copyright infringer because it implemented an AI model that it had no role in creating, developing, or training.  *See, e.g.*, FAC ¶ 387 (DeviantArt "incorporates" and "relies on Stable Diffusion to produce images").

To be sure, Plaintiffs have now reframed the legal theory for their claim against DeviantArt—we address the futility of that reframing below, *see infra* Section IV(A)(2).  But while Plaintiffs have adorned the FAC with new ancillary factual allegations and citations, the overwhelming majority of those newly-asserted facts have nothing to do with DeviantArt.

---

[1] The Court suggested that Plaintiffs might bolster their claims by alleging that DreamUp "allows users to create new works by expressly referencing Anders[e]n's works by name," which might suggest that "Anders[e]n's protected content remains in Stable Diffusion."  Order at 10.  The FAC contains no allegations regarding the use of Plaintiffs' names in DreamUp.  *See* FAC ¶¶ 380–431.

Plaintiffs, for example, have supplemented their allegations regarding the sourcing and creation of the "LAION" datasets—which DeviantArt is not alleged to have ever used, and which DeviantArt is not alleged to have helped create. *See* FAC ¶¶ 57–80. Plaintiffs also amended their description of the technical process behind the creation and training of diffusion models—which DeviantArt is not alleged to have implemented. *See* FAC ¶¶ 82–150. And Plaintiffs added a number of examples of outputs generated by diffusion models, but none of the outputs is alleged to have been created by DeviantArt or DreamUp. FAC ¶¶ 151–200 (referencing example outputs from Stable Diffusion XL 1.0, Midjourney, and Runway's "AI Magic Tools" service).

Plaintiffs also now distinguish between the different models released under the "Stable Diffusion" name. FAC ¶ 388 (addressing "Stable Diffusion [] 1.4"); ¶ 342 (addressing "Stable Diffusion 1.5"); ¶ 139 (addressing "Stable Diffusion XL 1.0"). They allege that the "model inside DreamUp"—which they call the "DreamUp–CompVis Model"—is "based on" a model called "Stable Diffusion version 1.4." FAC ¶ 388. But Plaintiffs still do not allege that DeviantArt played any role in creating or training that model. Instead, they allege it was independently created by a group of researchers called "CompVis" with no alleged connection to DeviantArt. *Id.* ¶¶ 388–92. And they admit that "DeviantArt did not 'add' images to the training sets" or "do any fine-tuning of the weights included in the Stable Diffusion model." *Id.* ¶¶ 396–97; *see also id.* ¶ 395.

As such, the factual basis of Plaintiffs' claim of direct copyright infringement against DeviantArt remains unchanged: that DeviantArt violated the Copyright Act by creating an app "based on Stable Diffusion" that "relies on [that model] to produce images." *Id.* ¶¶ 387–88. The Court rightly rejected that theory in its October 30 Order and may thus dismiss Plaintiffs' claim with prejudice for the simple reason that it has already decided the issue. *Welgus*, 2017 WL 6466264, at *6 (dismissing with prejudice because plaintiff "trie[d] to reargue the same theory rejected in the Court's Prior Order"); *see also Pac. Recovery*, 508 F. Supp. 3d at 622 ("In any amended complaint, plaintiffs may not . . . assert theories that the Court has rejected.").

Any other result would have absurd consequences.[2] The models referenced in the FAC

---

[2] Of the numerous pending lawsuits challenging generative artificial intelligence services, this is the only one to suggest that a defendant might incur direct copyright liability merely by

have been downloaded and implemented by tens of millions of programmers, businesses, and researchers.[3]  So too for other popular "open source" AI models, which have already become the "foundation" for "[t]ens of thousands of startups," "[m]ajor hardware platforms," and development projects.[4]  Under Plaintiffs' theory, every single one of these businesses is liable for copyright infringement as to each and every one of the billions of individual works used to train the models— even if those businesses are completely unaware of how those models were created or what works were used to train them; and irrespective of whether anyone ever uses the model to generate a single infringing output.  *See* FAC ¶ 234 ("[A]nyone who in fact downloads, uses, or deploys Stable Diffusion 2.0 or Stable Diffusion XL 1.0 is engaged in infringing activity.").  That would leave millions of otherwise innocent parties not only vulnerable to copyright infringement claims, but to class action lawsuits demanding many billions of dollars in statutory damages under Section 504 of the Copyright Act.  *See* 17 U.S.C. § 504(c) (requiring for statutory damages "not less than $200" with respect to each work infringed, even if the infringer "was not aware and had no reason to believe that his or her acts constituted an infringement").  The aggregate liability could easily exceed the gross domestic product of the United States.

**2.      The FAC's Allegations Do Not Plead A Copyright Violation**

Even if the Court were to disregard its prior Order, it should nonetheless dismiss Plaintiffs'

---

implementing a third-party model it did not develop or train.  *See* Operative Complaints in *Getty Images (US), Inc. v. Stability AI, Inc.*, No. 23-cv-00135, Dkt. 13 (D. Del., filed Mar. 29, 2023); *Tremblay v. OpenAI, Inc.*, No. 23-cv-03223, Dkt. 1 (N.D. Cal., filed June 28, 2023); *Silverman v. OpenAI, Inc.*, No. 23-cv-03416, Dkt. 1 (N.D. Cal., filed July 7, 2023); *J.L. v. Alphabet Inc.*, No. 23-cv-03440, Dkt. 1 (N.D. Cal., filed July 11, 2023); *Doe 1 v. Github, Inc.*, No. 22-cv-06823, Dkt. 200 (N.D. Cal., filed Jan. 25, 2024); *Chabon v. OpenAI, Inc.*, No. 23-cv-04625, Dkt. 1 (N.D. Cal., filed Sept. 8, 2023); *Chabon v. Meta Platforms, Inc.*, No. 23-cv-04663, Dkt. 16 (N.D. Cal., filed Oct. 5, 2023); *Huckabee v. Meta Platforms, Inc.*, No. 23-cv-09152, Dkt. 74 (S.D.N.Y., filed Jan. 24, 2024); *Concord Music Group, Inc. v. Anthropic PBC*, No. 23-cv-01092, Dkt. 1 (M.D. Tenn., filed Oct. 18, 2023); *Authors Guild v. OpenAI, Inc.*, No. 23-cv-08292, Dkt. 69 (S.D.N.Y., filed Feb. 5, 2024); *Kadrey v. Meta Platforms, Inc.*, No. 23-cv-03417, Dkt. 69 (N.D. Cal., filed Dec. 22, 2023); *Alter v. OpenAI, Inc.*, No. 23-cv-10211, Dkt. 47 (S.D.N.Y., filed Feb. 6, 2024); *New York Times v. Microsoft Corp., et al.*, No. 23-cv-11195, Dkt. 1 (S.D.N.Y., filed Dec. 27, 2023).

[3] Stable Diffusion XL 1.0 Model Card, Hugging Face, https://huggingface.co/stabilityai/stable-diffusion-xl-base-1.0 (over 9 million downloads in November 2023 alone).

[4] *See, e.g.*, Joe Spisak & Sergey Edunov, The Llama Ecosystem: Past, Present, and Future, Meta Blog (Sept. 27, 2023), https://ai.meta.com/blog/llama-2-updates-connect-2023/ (reporting "more than 30 million downloads of Llama-based models through Hugging Face and over 10 million of these in the last 30 days alone").

direct copyright infringement claim against DeviantArt because that claim, as newly framed, is not supported by the facts alleged.  As described above, Plaintiffs assert no new facts concerning DreamUp or DeviantArt's relationship to DreamUp's development that cure the legal deficiencies identified in the Court's Order.  Instead, Plaintiffs have changed their *theory* as to *why* the underlying facts support a copyright claim against DeviantArt.  But that new theory—that the DreamUp service is itself both a "copy" and a "derivative work"—fails because Plaintiffs do not and cannot allege that DreamUp is capable of reproducing protected expression from their works.

### a.   Plaintiffs Reframed The Legal Basis of This Claim

Plaintiffs' initial copyright claim turned on the "assertions—made throughout the Complaint—that 'embedded and stored copies of the Training Images' are contained within Stable Diffusion."  Order at 8 (citing Dkt. 1 ¶¶ 3, 19, 58).  Plaintiffs, in other words, claimed that Stable Diffusion is little more than a "directory" of "JPEG image files," Dkt. 1 ¶ 75(c), and that because DreamUp "relies on [] Stable Diffusion [] as its underlying software engine," *id.* ¶ 64, DreamUp must also "contain compressed copies of the[ir] copyrighted works."  *Id.* ¶ 18; *see also id.* ¶ 166 (DreamUp "contain[s] copies of every image in the set of Training Images").

On that basis, Plaintiffs asserted a number of somewhat muddled theories of copyright infringement (albeit, for the first time, in their opposition papers).  Order at 8.  Plaintiffs, for example, argued that by making its DreamUp service available on the Internet, DeviantArt "distribut[ed] Stable Diffusion" and thereby violated Plaintiffs' rights under Section 106(3) of the Act.  Dkt. 65 at 12; 17 U.S.C. § 106(3) (securing the exclusive right to "distribute copies . . .to the public by sale or other transfer of ownership").[5]  The Court rejected each of these arguments, acknowledging doubt about the plausibility of Plaintiffs' "theory with respect to compressed copies," and instructing them to "clarify" it with plausible facts in support.  Order at 8–9 (doubt that "five billion images could [] be compressed into an active program").

---

[5] Plaintiffs also claimed that each of DreamUp's outputs "necessarily" constituted a derivative work that violated Plaintiffs' exclusive right under Section 106(2) of the Copyright Act.  *See* 17 U.S.C. § 106(2); Dkt. 1 ¶ 90; Dkt. 65 at 14.  In its October 30 Order, the Court rejected that theory, holding that "it is simply not plausible" that "*all* Output images are derivative images."  Order at 12.  Plaintiffs do not reallege this "output" theory against DeviantArt in the FAC, *see generally* FAC ¶¶ 380–439, and have therefore waived it, *Lovesy*, 2009 WL 1574575, at *6.

1    Rather than doing so, Plaintiffs abandoned the "compressed copies" theory in the FAC.[6]

2    The FAC includes extensive discussion about the concept of "compression" generally.  *See, e.g.*,

3    FAC ¶ 118 (explaining that "a machine-learning model[] [] treats its data as sitting on a continuous

4    geometric surface, called a *manifold*," and that by creating "representations of the training data on

5    the manifold," the models "essentially . . . accomplish compression").  But the initial complaint's

6    repeated assertions that each of the Defendants' services "contain[s] compressed copies of the

7    copyrighted works they were trained on," *see* Dkt. 1 ¶ 18; *see also id.* ¶¶ 3, 58–59, 164, 166, have

8    now been removed from the FAC—and, most notably, from the paragraphs laying out the basis of

9    the operative copyright claim, *see* FAC ¶¶ 412–16 (Count 15).

10    Now, Plaintiffs assert that the models violate the Copyright Act solely because they are

11    "*capable of reproducing protected expression* from each of the [works]" used to train them.  *See*

12    FAC ¶ 223 (emphasis added); *see also id.* ¶ 288 (same); ¶ 350 (same); ¶ 393 (same).  On that basis,

13    Plaintiffs assert two direct copyright claims against DeviantArt.  FAC ¶¶ 412–16 (alleging direct

14    copyright infringement).   First, they claim that the model underlying the DreamUp service

15    qualifies as a "cop[y]" of their images because the Copyright Act defines that term to include any

16    "material object . . . from which [a] work can be perceived, reproduced, or otherwise

17    communicated."  FAC ¶ 209; *see also* 17 U.S.C. § 101.  Second*,* Plaintiffs claim that because the

18    DreamUp service can reproduce "protected expression" from their images, it must "represent[] a

19    transformation" of those images "into an alternative form," *see* FAC ¶¶ 393–94, which supposedly

20    qualifies DreamUp as a "derivative work," *see id.* ¶ 413; *see also* 17 U.S.C. § 101 (defining

21    "derivative work").  Neither of these theories states a claim for relief, as explained below.

22    b.    <u>DreamUp Is Not A Copy</u>

23    To support their claim for violation of Section 106(1)'s reproduction right, Plaintiffs must

24    allege facts to support the conclusion that the DreamUp service—or some element of it—is a

25    "cop[y]" as defined by the Copyright Act.  FAC ¶ 412; 17 U.S.C. § 106(1) (securing the exclusive

26    right to "reproduce the copyrighted work in copies").  Plaintiffs, in other words, must *plausibly*

27

28
---
[6] Plaintiffs also abandoned any attempt to claim that DeviantArt infringed their exclusive right to "distribute copies . . . of the copyrighted work to the public."  17 U.S.C. § 106(3).

allege that DreamUp is a "material object . . . from which [Plaintiffs' images] can be perceived, reproduced, or otherwise communicated." 17 U.S.C. § 101 (defining "copies").

The FAC fails to do so on several counts. First, while Plaintiffs state that DreamUp is a copy because it can output "potentially infringing works," FAC ¶ 398, the FAC does not allege that DreamUp has ever been used to create any images that look anything like their artworks. *Infra* Section IV(A)(2)(b)(i). Second, Plaintiffs argue that DreamUp must be a copy because the model on which it is allegedly "based" (Stable Diffusion version 1.4) is capable of reproducing their works. But the sole basis of that contention is a study whose results suggest that Stable Diffusion version 1.4 is decidedly *not* capable of doing so. *Infra* Section IV(A)(2)(b)(ii). Third, Plaintiffs point to the fact that they were able to manipulate *other* diffusion models to create outputs that mimic their works. But those models have nothing to do with DreamUp, and the outputs Plaintiffs cite do not in any way suggest that these models are "copies." *Infra* Section IV(A)(2)(b)(iii).

### i. Plaintiffs Do Not Allege that DreamUp Reproduces Images

As noted above, Plaintiffs' claim of direct copyright infringement against DeviantArt hinges entirely on the assertion that DreamUp is "capable of reproducing protected expression" from Plaintiffs' works. FAC ¶ 393. But the FAC does not allege that DreamUp has *ever* displayed, reproduced, or otherwise communicated those works or anything that looks like them. *Id.* ¶¶ 380–410. Plaintiffs do not include any DreamUp outputs in the FAC or its exhibits.

Plaintiffs do state in their FAC that "DreamUp can be used . . . to create potentially infringing works based on artists' underlying work." FAC ¶ 398. But such "conclusory" assertions or "unwarranted deductions of fact" do not state a claim for relief. *Gilead*, 536 F.3d at 1055. They are particularly insufficient in light of this Court's instruction that Plaintiffs provide "specific plausible facts" in support of their claim, *see* Order at 7; *see also id.* at 10 (requiring "more facts that plausibly show how DeviantArt is liable for direct copyright infringement"), and Plaintiffs' prior admission that there are no visually apparent similarities between their works and any DreamUp outputs, Dkt. 1 ¶¶ 93, 192. Plaintiffs make no attempt to explain why they were unable to use DreamUp—a publicly available service, FAC ¶ 382—to investigate whether it can "create

1    potentially infringing works," as they allegedly attempted to do for the other services at issue here.[7]

2         *ii.*   *Plaintiffs Do Not Allege Stable Diffusion 1.4 Reproduces Images*

3      Instead, Plaintiffs ask the Court to assume that DreamUp is a "copy" based on their

4    assertion that the model on which it is "based"—which they allege is "Stable Diffusion version

5    1.4"—is "capable of reproducing protected expression from each of [their works]."  FAC ¶ 393;

6    *see also* ¶¶ 388, 396–97.  But that allegation is also entirely conclusory and insufficient to state a

7    claim.  Notably, there are no references to images generated by Stable Diffusion version 1.4 in

8    Plaintiffs' 96-page FAC or any of its fourteen exhibits.  FAC ¶ 176 (Exhibits D–F show outputs

9    from Stable Diffusion XL 1.0, Runway's "AI Magic Tools" service, and Midjourney); *see also id.*

10   ¶ 191 (same as to Exhibits G–I).  The only relevant allegation is a citation to a paper by a

11   "prominent machine-learning researcher" reporting on a test performed on the Stable Diffusion

12   version 1.4 model.  *Id.* ¶ 393(a); *see* Nicholas Carlini, et al., Extracting Training Data from

13   Diffusion Models, https://arxiv.org/pdf/2301.13188.pdf (Jan. 30, 2023) (the "Carlini Study").[8]

14     But the Carlini Study does not in any way suggest that Stable Diffusion version 1.4 is

15   "capable" of reproducing Plaintiffs' works.  That paper discussed a "data extraction attack"

16   conducted by nine computer scientists whose goal was to extract "near-identical replicas of

17   training images" from Stable Diffusion version 1.4.  Carlini Study at 1.  The attack focused on

18   "duplicated training examples"—*i.e.*, identical images that appear multiple times in the training

19   dataset—"because these are orders of magnitude more likely to be memorized than non-duplicated

20   examples."  *Id.* at 4; *see also id.* at 6 (Figure 5) (showing that many images were "duplicated at

21   least [] 100 times" in the dataset).  After choosing the "350,000 most-duplicated [images]," the

22   researchers chose "prompts" designed to coax replicas of each image from the model, and

23   "generate[d] 500 candidate images for each of these prompts."  *Id.* at 5.  Out of the "175 million

24

25                
---
[7] The only specific allegation as to DreamUp outputs is a citation to an FAQ page suggesting that DreamUp can create outputs "inspired by the style of [a] particular artist."  FAC ¶ 398.  But "art styles" are not protected by copyright.  *See* Dkt. 50 at 20–21.  So the allegation that DreamUp can mimic style is not sufficient to allege that DreamUp is a "material object . . . from which [Plaintiffs' images] can be perceived, reproduced, or otherwise communicated."  17 U.S.C. § 101.

26

27   [8] Plaintiffs rely extensively on the Carlini Study and therefore incorporate it by reference into the FAC.  *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (document is "incorporated by reference into a complaint if the plaintiff refers extensively to [it]"); *see* FAC ¶¶ 90, 130–37, 145.

28

generated images," only 109 were "near-copies of training examples"—representing a roughly one-in-a-million hit rate. *Id.* at 5–6.[9]  Moreover, the researchers reported that "[t]he majority" of these extracted images are "photographs [of] a recognizable person." *Id.* at 6; *see also* FAC ¶ 133 (Carlini's duplicated images include photographs of Daft Punk, Robin Williams in *Mrs. Doubtfire*, Aretha Franklin, the cast of *Its Always Sunny in Philadelphia,* George R.R. Martin, and Prince).

For that reason, the Carlini Study does not in any way support the proposition that Stable Diffusion version 1.4 is "capable of reproducing protected expression from" Plaintiffs' registered works. FAC ¶ 393.  Plaintiffs do not allege that any of their works appeared multiple times in the training dataset, which means that their works are "orders of magnitude [less] likely to be memorized." Carlini Study at 4.[10]  In fact, Plaintiffs' allegations suggest that each of their works appears (at best) once in the dataset. FAC ¶ 77 (Plaintiffs' works included because they "stored [their] images on DeviantArt").  And Plaintiffs' registered works are drawings or stylized illustrations, which are far afield from the category of works Carlini found most likely to be extracted from the model—*i.e.*, photographs of celebrities. *See* Carlini Study at 6; FAC Ex. A.

In any case, the Carlini Study demonstrates that even a team of expert researchers, focusing on highly duplicated training images, were unable to coax more than 109 duplicates out of the model, even after generating 175 million images.  Carlini Study at 5–6.  Contrary to Plaintiffs' suggestion, the Carlini Study demonstrates that Stable Diffusion version 1.4 is decidedly *not* "capable of reproducing" Plaintiffs' particular works.  That, in turn, suggests that Stable Diffusion version 1.4 and the models and services allegedly "based on" it are not "copies" within the meaning of the Copyright Act.  17 U.S.C. § 101.

Regardless, the allegation that Stable Diffusion version 1.4 is capable of reproducing Plaintiffs' images does not establish that DreamUp is capable of the same.  Notably, Plaintiffs do

---

[9] This confirms Plaintiffs' original allegation that "none of the Stable Diffusion output images provided in response to a particular Text Prompt is likely to be a close match for any specific image in the training data." Dkt. 1 ¶ 93.  To the extent that allegations in Plaintiffs' FAC contradict these concessions, those allegations are inoperative. *Airs Aromatics, LLV v. Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 600 (9th Cir. 2014) ("A party cannot amend pleadings to directly contradict an earlier assertion made in the same proceeding." (cleaned up)).

[10] *See Gulaid v. CH2M Hill, Inc.*, No. 15-cv-04824, 2016 WL 5673144, at *2 (N.D. Cal. Oct. 3, 2016) ("Where a document is incorporated by reference . . . the court [] assumes the truth of its contents for the purposes of ruling on a motion to dismiss." (cleaned up)).

not allege that DreamUp and Stable Diffusion version 1.4 are identical in their capabilities and features. Instead, they allege only that "DreamUp must be *based on* Stable Diffusion version 1.4," FAC ¶ 388 (emphasis added), and that DeviantArt altered the model with "additional guidance at generation time" through techniques "akin to prompt tuning," *id.* ¶ 397. That leaves the FAC devoid of allegations as to whether DreamUp can display, reproduce, or otherwise communicate any protected material from Plaintiffs' registered works—which, in turn, means that the FAC does not allege that DreamUp is a "copy" of Plaintiffs' works. *Cf. Wilson v. Frito-Lay North Am., Inc.*, 961 F. Supp. 2d 1134, 1142–43 (N.D. Cal. 2013) ("The Court will not assume that each of these subtly different Products is like all the others. To meet the plausibility standard of Rule 8, Plaintiffs have to say more . . . otherwise their pleadings amount to unacceptably bare legal conclusions.")

### iii.   Plaintiffs' Allegations As To Other Models Do Not Suffice

Plaintiffs also attempt to establish that DreamUp is "capable of reproducing" their images by pointing to two exhibits that (they claim) suggest that a *different* model—"Stable Diffusion 1.5"—is "capable of emitting stored copies of protected expression." FAC ¶ 393(b) (citing FAC Exs. E and H). But these allegations do not support their claim for two independent reasons.

First, Plaintiffs do not allege that Stable Diffusion 1.5 has anything to do with DreamUp, which (they allege) is "based on" an entirely different model. *Compare id.* ¶ 388 (model "inside" DreamUp was "trained by CompVis and released on August 22, 2022"), *with id.* ¶¶ 342, 352 (Stable Diffusion 1.5 "trained" by "Runway" and released in October 2022). In fact, Plaintiffs elsewhere suggest that Stable Diffusion 1.5 is unique in its ability to "mimic artists," implying that it is different from other versions of Stable Diffusion. *Id.* ¶ 343 (alleging that version 1.5 "is still sought out by many users" for this reason). That Plaintiffs may have manipulated Stable Diffusion 1.5 to generate outputs that are similar to their registered works does not mean that Plaintiffs could manipulate DreamUp to do the same. *Cf. Wilson*, 961 F. Supp. 2d at 1143.

Second*,* the cited exhibits (Exhibits E and H) do not actually demonstrate that the Stable Diffusion 1.5 model can "reproduce[] or otherwise communicate" protected material from its training data. 17 U.S.C. § 101. The first exhibit (Exhibit E) consists entirely of outputs from a service called "AI Magic Tools" provided by Defendant Runway AI, Inc. ("Runway"), which

Plaintiffs allege relies on "Stable Diffusion 1.5." FAC ¶ 163.[11]  Plaintiffs generated these outputs by combining simple prompts ("chef" and "teacher") with Plaintiffs' names. *Id.* ¶ 167–68.  The resulting images allegedly reflect those Plaintiffs' artistic styles, *e.g.*, Plaintiff Manchess's "calligraphic brushwork." *Id.* ¶ 167; *see also id.* Ex. E.  But these stylistic attributes are not "protected expression," *contra* FAC ¶ 393(b), because copyright does not protect art styles, *see* Dkt. 50 at 20–21; Order at 20 n.15 (suggesting that claims based on "artistic 'styles'" are impermissible).  Tellingly, Plaintiffs do not allege that these output images are "substantially similar" to their registered works. FAC ¶¶ 167–68; Order at 12 ("substantial similarity" required).  That Stable Diffusion 1.5 may be able to create images that are *stylistically* similar to Plaintiffs' registered works does not establish that the model is a "material object . . . from which [Plaintiffs' works] can be perceived, reproduced, or otherwise communicated." 17 U.S.C. § 101.

The second exhibit (Exhibit H) contains outputs from Runway's "Image Variation" service. FAC ¶ 185.  Plaintiffs created these images by uploading their own registered images into the "Image Variation" service as "image prompts." *Id.* ¶ 186.  Each page of Exhibit H shows (in the top left corner) the image that Plaintiffs uploaded into the "Image Variation" service, and (in the remaining places) the resulting outputs. *Id.* ¶ 187; *see also id.* Ex. H.  Unsurprisingly, the output images are "[v]ariation[s]" of the input images. *Id.* ¶¶ 185, 187.  But the only plausible inference to be drawn from Exhibit H is that Runway's "Image Variation" feature does exactly as its name suggests: it mimics the image that the user feeds into the model.  Plaintiffs' assertion that Exhibit H demonstrates that the underlying model *already* had "stored copies" of the images simply does not follow from the facts they have pleaded. *Iqbal*, 556 U.S. at 679 (courts should "draw on . . . common sense" when evaluating the sufficiency of complaints).

Put differently, the fact that Plaintiffs were able to generate "Image Variation[s]" from an "Image Variation" service does not prove that the underlying model is a "copy" of those images—any more than a photocopier's ability to duplicate a photograph proves that the photocopier itself is a "copy" of that photograph.  Instead, even assuming the images in Exhibit H are substantially

---

[11] Plaintiffs allege that "AI Magic Tools" "uses Stable Diffusion 1.5" on "information and belief," based on the fact that "Runway trained that version of Stable Diffusion."  FAC ¶ 163.

similar to Plaintiffs' works, Plaintiffs' creation of those images does not mean that the parties who implement the models Plaintiffs used are somehow directly liable for copyright infringement. *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131–32 (2d Cir. 2008) (provider of a "system[] which automatically obeys commands" cannot be held directly liable).  If anything, it suggests that *Plaintiffs* just "reproduce[d]" "copies" of their own works.  17 U.S.C. § 106(1); *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017) (direct infringement attaches only to party who is the "proximate caus[e]" of the challenged work's creation).

### c.    DreamUp Is Not A Derivative Work

Plaintiffs have similarly failed to allege that DreamUp is an "infringing Statutory Derivative Work."  FAC ¶¶ 388, 413.  The Copyright Act defines a "derivative work" as a work that "recast[s], transform[s], or adapt[s]" an original, "such as a translation, musical arrangement, dramatization, fictionalization, [etc.]."  17 U.S.C. § 101.  The statute's examples delineate the term's boundaries.  *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 215 (2d Cir. 2015) (Act "defines derivative works largely by example"); *Peter Mayer Publishers Inc. v. Shilovskaya*, 11 F. Supp. 3d 421, 426–27 (S.D.N.Y. 2014) (applying ejusdem generis to "derivative work" definition).

Consistent with those examples, courts have consistently held that to be a derivative work, a work must "re-present the protected aspects of the original work, *i.e.* its expressive content, converted into an altered form."  *Authors Guild,* 804 F.3d at 225; Order at 12 (same, quoting *Authors Guild*).  A derivative work, in other words, must somehow "recast, transform, or adapt" a work's "expressive content" into a new format that is nonetheless "substantially similar" to the original.  As this Court explained in its October 30 Order, "copyright claims based on a derivative theory" cannot survive "absent 'substantial similarity' type allegations.  Order at 12.

Attempts to stretch the term "derivative work" beyond these limitations have uniformly failed.  This Court, for example, rejected Plaintiffs' assertion that the term "derivative work" includes any follow-on work based on an original, even if the follow-on work does not re-present "protected elements of the original."  *Id.*  In *Authors Guild v. Google*, the Second Circuit held that a service that contained "digitized copies" of copyrighted books was not a "derivative work" because it "does not allow access in any substantial way to [the] book[s'] expressive content."  804

F.3d at 225–26.  And, most recently, in *Kadrey, et al. v. Meta Platforms, Inc.*, Judge Chhabria dismissed as "nonsensical" the notion that AI models "are themselves infringing derivative works" of the works on which they were trained.  No. 23-cv-03417, 2023 WL 8039640, at *1 (N.D. Cal. Nov. 20, 2023).  As Judge Chhabria explained: "[t]here is no way to understand the LLaMA models themselves as a recasting or adaptation of any of the plaintiffs' books."  *Id.*[12]

Plaintiffs' suggestion that DeviantArt violated the Section 106(2) derivative-work right by launching DreamUp fails for precisely the same reason.  Plaintiffs make no attempt to explain how DreamUp, a piece of software, could be "substantially similar" to their registered visual works. *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984) ("[T]o prove infringement [of the derivative-work right], one must show substantial similarity.").  Rather, the basis for Plaintiffs' Section 106(2) claim against DeviantArt is the conclusory assertion that the model on which DreamUp is allegedly "based"—*i.e.*, Stable Diffusion version 1.4—"represents a transformation of the LAION-5B Registered Works into an alternative form."  FAC ¶¶ 388, 394.  But even taking that statement as true, it fails to state a claim for relief absent plausible allegations that the service "allow[s] access in [a] substantial way" to the original images' "expressive content."  *Authors Guild,* 804 F.3d at 226.  As explained above, the FAC contains no such allegations.  *See supra* 10.

### 3.  DeviantArt's Creation of DreamUp Was Fair Use

Assuming that the Plaintiffs had alleged that DeviantArt's conduct implicates Sections 106(1) or 106(2) of the Copyright Act, DeviantArt's creation of DreamUp would be protected by the doctrine of fair use.  17 U.S.C. § 106 (fair use is "not an infringement of copyright"); *see Greenspan v. Qazi*, No. 23-cv-03426, 2021 WL 2577526, at *10–12 (N.D. Cal. June 23, 2021) (granting motion to dismiss copyright claim on the basis of fair use).

The Ninth Circuit has twice held that the use of a copyrighted work to create a new and non-infringing product is a protected fair use.  *See Sega Enterprises Ltd v. Accolade, Inc.*, 977 F.2d 1510, 1522–23 (9th Cir. 1992) (copying video game code to create new, console-compatible games

---

[12] The allegations supporting the derivative-work claim in *Kadrey* were materially identical to the allegations supporting the derivative-work claim in the FAC.  *See* Compl. ¶ 41, *Kadrey, et al. v. Meta Platforms, Inc.*, No. 23-cv-03417 (N.D. Cal., filed July 7, 2023) (alleging that "language models are themselves infringing derivative works" because they "retain[]" "expressive information extracted from Plaintiffs' [] Works").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEVIANTART'S MOTION TO DISMISS FAC
CASE NO. 3:23-cv-00201-WHO

1    was copying for a "legitimate, essentially non-exploitive purpose," *i.e.* to "produce a competing

2    product"); *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 603–08 (9th Cir. 2000)

3    (same, even though defendant's product would cause Sony to "lose console sales and profits").

4    The Supreme Court has since endorsed those holdings, *see Google LLC v. Oracle Am., Inc.*, 141

5    S. Ct. 1183, 1198–99 (2021) (citing *Accolade* and *Connectix* with approval), along with the Second

6    Circuit's holding that copying protected works to "derive information" and "patterns" for a new

7    service is fair use, as long as the service does not "reveal[] so much [of the work's content] as to

8    threaten the author's copyright interests." *Authors Guild*, 804 F.3d at 209, 218; *Andy Warhol*

9    *Found. for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258, 1284 (2023) (citing *Authors Guild*

10   with approval); *see also* Dkt. 1 ¶ 21 (diffusion models "find patterns" in "training data").

11           These cases reflect the principle that the Copyright Act "does not give a copyright holder

12   control over all uses of his copyrighted work." *See Twentieth Century Music Corp. v. Aiken*, 422

13   U.S. 151, 154–55 (1975). Instead, it confers a "statutory monopoly" of "limited scope," *id.* at 156,

14   which "assures authors the right to their original expression, but encourages others to build freely

15   upon the . . . information conveyed by a work," *Feist Publications Inc. v. Rural Tel. Serv. Co.*, 499

16   U.S. 340, 349–50 (1991). The role of fair use is to "keep [this] copyright monopoly within its

17   lawful bounds," *see Oracle*, 141 S. Ct. at 1198–99, including by "avoid[ing] rigid application[s]

18   of the copyright statute" that would "stifle the very creativity which that law is designed to foster,"

19   *Stewart v. Abend*, 495 U.S. 207, 236 (1990). For that reason, every court to consider the question

20   has held that copying a work for the purpose of "discover[ing]" or extracting unprotectable

21   information—like patterns and styles—is fair use because it does not "exploit[]" the expressive

22   subject matter covered by the owner's copyright monopoly. *Accolade*, 977 F.2d at 1522–23.

23           The Copyright Act provides four non-exclusive factors to consider when evaluating fair

24   use. 17 U.S.C. § 107. The first factor—"purpose and character of the use"—favors fair use

25   because, to the extent DeviantArt used Plaintiffs' images at all, that use was "for a legitimate,

26   essentially non-exploitative purpose," *Accolade,* 977 F.2d at 1522–23, *i.e.*, to create an "entirely

27   new" platform, *Connectix*, 203 F.3d at 606, that does not in any way "display to the user any

28   [protected expression] from the underlying [training images]," *Authors Guild*, 804 F.3d at 217.

The second and third factors—the "nature of the copyrighted work" and the "amount and substantiality of the portion used"—favor fair use for the same reason. *Id.* at 220–23 (factors favor fair use because Google Books does not "replicat[e] protected expression"). The fourth factor— the "effect of the use upon the potential market"—points in the same direction. Even if the Court were to assume the existence of a market for licensing works as training data, *see Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 81 (2d Cir. 1997) (market must be "traditional, reasonable, or likely to be developed"), a finding that the use was transformative forecloses any cognizable market harm, *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 615 (2d Cir. 2006) (copyright "may not preempt exploitation of transformative markets") (citation omitted).[13]

Judge Bibas (sitting by designation on the District of Delaware) recently applied these principles to a related case implicating similar technology. *See Thomson Reuters Enter. Centre GmbH v. Ross Intel. Inc.,* No. 20-cv-613, 2023 WL 6210901 (D. Del. Sept. 23, 2023). That case concerned a copyright claim brought by Thomson Reuters against Ross Intelligence—a "legal-research industry upstart"—who used copyrighted headnotes from Thomson Reuters' Westlaw platform to train an AI system for legal research. *Id.* at *1. After discussing the Ninth Circuit authorities cited above, Judge Bibas explained that the question whether Ross's copying of those headnotes was fair use depended on whether Ross's AI system simply "replicate[s] and reproduce[s] the creative drafting done by Westlaw's attorney-editors." *Id.* at *8. If the system did not, and merely used those "intermediate cop[ies]" to create "a wholly new, albeit competing, product," the copying would be "transformative" and protected by fair use. *Id.* (copying would be fair use if Ross's "AI studied the headnotes . . . only to analyze language patterns, not to replicate Westlaw's expression").

These authorities leave no room for doubt: Even if simply implementing an AI system trained on copyrighted material implicates the rights protected by Section 106 of the Act, that implementation is a fair use—particularly absent any allegation that that implementation

---

[13] That Plaintiffs may have to "compet[e]" with "AI-generated images," *see* FAC ¶ 422(b), is irrelevant here because "economic loss . . . as a result of [] competition" with non-infringing works "does not compel a finding of no fair use," *Connectix*, 203 F.3d at 607–08.

regurgitates protected expression from the training data.  Plaintiffs here have not alleged that DreamUp "replicate[s] [or] reproduce[s]" their expressive content.  *See supra* 10; *Thomson Reuters*, 2023 WL 6210901, at *8.[14]  That is because DreamUp's sole purpose is to create *new* images—not to replicate expression from pre-existing ones.  Indeed, Plaintiffs themselves admitted in their original pleadings that the relationship between any individual output and any individual training image is *unrecognizable*, even to the creators of the training images.  *See, e.g.,* Dkt. 1 ¶ 192 (conceding that, without copyright management information, creators of training images cannot "know[] or learn[] that the Ouptut is based upon one or more of their works").  Accordingly, to the extent DeviantArt's creation of DreamUp implicated Plaintiffs' reproduction or derivative-work rights, that creation was a protected fair use because it was "essentially non-exploitive," *Accolade*, 977 F.2d at 1522–23, and in no way "threaten[ed] the [Plaintiffs'] copyright interests" by republishing their protected expression, *Authors Guild*, 804 F.3d at 218.

**B.   Plaintiffs Fail To Allege A Breach of Contract Claim**

Plaintiffs also fail to state a claim for breach of contract.  First, Plaintiffs simply restate the breach claim based on Section 16 of DeviantArt's Terms of Service (the "Terms") that this Court already dismissed.  Second, Plaintiffs' new claim for breach of the implied covenant is beyond the scope of the Court's permitted amendment, and in any case fails on the merits.

**1.   Plaintiffs Restate The Contract Claim This Court Dismissed**

Plaintiffs' original breach claim "focus[ed] on § 16 of the [DeviantArt Terms of Service]," under which DeviantArt's users "grant to DeviantArt a non-exclusive, royalty-free license to reproduce, distribute, re-format, store, prepare derivative works based on, and publicly display and perform [their] Content" "[f]or the sole purpose of enabling [DeviantArt] to make [that] Content available through the Service."  Order at 26; *see also* Dkt. 65 at 28.  Plaintiffs asserted that DeviantArt breached that provision by "incorporat[ing] Stable Diffusion into" DreamUp.  Dkt. 65 at 28.  The Court dismissed the claim, noting that Section 16's sole function is to license DeviantArt to make certain uses of its users' content and to "warn[] [users] that third parties may

---

[14] Indeed, Plaintiffs have now abandoned their claim that DreamUp's "output images are infringing derivative works under the Copyright Act."  Dkt. 65 at 14; *see also supra* 3.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  be able to copy and violate content-owners' rights." Order at 26. As the Court explained, Section

2  16 does not prohibit DeviantArt from "offering for use a product [*i.e.*, Stable Diffusion] that a third

3  party may have created in part by using material posted on DeviantArt's own site." *Id.*

4      Plaintiffs make no attempt to cure these problems. Instead, Plaintiffs simply allege the

5  same claim again. FAC ¶¶ 418–22(a). The sole basis for their realleged claim is that "by releasing

6  DreamUp . . . [DeviantArt] breached its explicit Terms of Service." FAC ¶ 422(a) (citing Section

7  16 of the Terms). That is indistinguishable from the asserted grounds for Plaintiffs' now-dismissed

8  breach claim. *See* Dkt. 65 at 22 ("DeviantArt [] breached the [Section 16 of] the contract between

9  Plaintiffs and DeviantArt by creating DreamUp."). The Court need look no further than its October

10  30 Order for grounds to dismiss this claim with prejudice. Order at 25–27; *see also Carrasco v.*

11  *HSBC Bank USA, N.A.*, No. 11-cv-2711, 2012 WL 685523, at *4 (N.D. Cal. Mar. 2, 2012)

12  (dismissing claims with prejudice where the plaintiffs had "repeat[ed] the same allegations from

13  the original Complaint, without any new factual or legal basis").

14      **2.**    **The FAC Does Not State An Implied Covenant Claim**

15      In addition to their breach-of-contract claim, Plaintiffs now add a new claim against

16  DeviantArt for "breach[] [of] the implied covenant of good faith and fair dealing." FAC ¶ 422(b).

17  The factual basis of this claim is difficult to discern: Plaintiffs allege that DeviantArt "unleashed

18  a flood of AI-generated images" that "drown[ed] out the work of human artists" and "put itself

19  into competition with the DeviantArt Plaintiffs." FAC ¶ 422(b). Plaintiffs then claim that

20  DeviantArt acted in "bad faith" by amending its Terms to add a new provision addressing

21  "Machine Learning Activities." *Id.* This claim fails for two reasons.

22      First, this claim appears nowhere in the original Complaint. *See generally* Dkt. 1.

23  "[B]reach of contract and breach of the implied covenant of good faith and fair dealing are two

24  distinct claims" under California law. *May v. Semblant, Inc.*, No. 13-cv-01576, 2013 WL

25  5423614, at *6 (N.D. Cal. Sept. 27, 2013). Because Plaintiffs' original complaint did not include

26  an implied covenant claim, Plaintiffs inclusion of that "distinct" claim in the FAC falls beyond the

27  scope of the amendment permitted by the Court. Order at 28 (granting leave to amend "to cure

28  the deficiencies identified above"). The claim should be dismissed for that reason alone. *See King*

1  *v. Facebook, Inc.*, No. 19-cv-01987, 2019 WL 6493968, at *1–2 (N.D. Cal. Dec. 3, 2019) (where

2  court granted "leave to amend" a claim for "breach of contract," finding that plaintiff "was not

3  given leave to plead a claim based on the implied covenant," and dismissing claim with prejudice).

4        Second, Plaintiffs' implied covenant claim does not state a claim for relief under California

5  law.  The implied covenant does not "protect some general public policy interest not directly tied

6  to the contract's purposes," *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 690 (1988), nor does

7  it "impose substantive duties or limits . . . beyond those incorporated in the specific terms of the[]

8  [parties'] agreement," *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1369 (2010).  Instead,

9  its purpose is to "prevent a contracting party from . . . frustrat[ing] the other party's rights to the

10  benefits of the agreement."  *Id.*  As such, "to state a claim for breach of the implied covenant of

11  good faith and fair dealing, a plaintiff must identify the specific contractual provision that was

12  frustrated."  *Rockridge Trust v. Wells Fargo, N.A.*, 985 F. Supp. 2d 1110, 1156 (N.D. Cal. 2013).

13        Plaintiffs identify no provision that implies that DeviantArt would protect Plaintiffs from

14  "competition" or refrain from offering tools to help others create new works.  FAC ¶ 422(b).  And

15  this Court already held that the Terms do not preclude DeviantArt from "offering" an image-

16  generation service.  Order at 26.  Nor do Plaintiffs explain why the inclusion of the new "Machine

17  Learning" provision—which implemented a mechanism that "prohibit[s]" the use of uploaded

18  images for AI training "unless you actively give your consent," *see id.* Ex. M at 13—somehow

19  "frustrates" their ability to enjoy the benefit of DeviantArt's service or the Terms, *Durell*, 183 Cal.

20  App. 4th at 1369.[15]  And DeviantArt "reserve[d] the right to amend the[] Terms from time to time

21  in our sole discretion."  FAC Ex. L at 6 (users' "sole remedy shall be to discontinue using the

22  Service"); *cf. Rockridge*, 985 F. Supp. 2d at 1156 ("An implied covenant . . . cannot contradict the

---

[15] Plaintiffs wholly misconstrue the newly-added "Machine Learning" provision DeviantArt added to its Terms in January 2023.  FAC ¶ 422(b) (alleging that this provision "exemplifie[s]" "bad faith").  That provision (1) informs users that, "[u]nless [they] actively give [] consent" to the use of their images for AI training, DeviantArt will include a "noai" metatag on all content to *prevent* the use of uploaded images for such training, *id.* Ex. M at 13; (2) "prohibit[s]" other users from using images so-tagged for AI training, *id.*; (3) warns that "third-parties may [nonetheless] scrape or otherwise use their works without permission," including for AI training, *id.* at 14; and (4) clarifies that "DeviantArt provides no guarantees" that third parties will not do so, *id.* Plaintiffs' allegation that this new provision "explicitly permits" the use of uploaded content for AI training "so that Stable Diffusion and future generative AI services can continue to scrape DeviantArt for images" is simply wrong.  FAC ¶ 404.

1   express terms of a contract.").  Because Plaintiffs have not "point[ed] to an express contractual

2   provision and plead[ed] facts plausibly showing that Defendant injured or frustrated [their] right

3   to receive the benefits of that provision," their implied covenant claim fails.  *Vann v. Aurora Loan*

4   *Servs. LLC*, No. 10-cv-04736, 2011 WL 2181861, at *5 (N.D. Cal. June 3, 2011).

5   **C.     Plaintiffs Fail To Allege An Unjust Enrichment Claim**

6         Plaintiffs also add to their FAC a wholly new claim for "unjust enrichment under Cal. Bus.

7   & Prof. Code § 17200 and California Common Law."  FAC ¶¶ 432–39.[16]  The alleged factual basis

8   for the claim is DeviantArt's alleged "us[e] [of] the works hosted on DeviantArt to develop and

9   promoted DreamUp," which (Plaintiffs say) "violate[s]" their unspecified "legal rights."  *Id.* ¶ 433.

10        As a preliminary matter, this claim appears nowhere in the original pleading and thus falls

11  outside the scope of the amendment permitted by the Court.  Order at 28 (granting leave to amend

12  "to cure the deficiencies identified above"); *DeLeon*, 2010 WL 4285006, at *3 ("[W]here leave to

13  amend is given to cure deficiencies in certain specified claims, courts have agreed that new claims

14  alleged for the first time in the amended pleading should be dismissed or stricken.").

15        Moreover, Plaintiffs' unjust enrichment claim fails three times over on the merits.  First, it

16  is preempted because it is based on precisely the same allegations as Plaintiffs' claim for copyright

17  infringement.  *Compare* FAC ¶ 415 ("[T]he DreamUp app infringes copyrights owned by the

18  LAION-5B Registered Plaintiffs"), *with id.* ¶ 433 (unjust enrichment claim based on DeviantArt's

19  "develop[ment] and promot[ion] [of] DreamUp").  As this Court already explained, state law

20  claims "tie[d]" to "purported copyright violations" are "preempted."  Order at 23; *see also Kadrey*,

21  2023 WL 8039640, at *2 (Chhabria, J.) (unjust enrichment claim based on "use of the plaintiffs'

22  [works] to train [an AI model]" preempted because it "relies on the same rights contained in the

23  Copyright Act"); *Doe 1. v. Github, Inc.*, No. 22-cv-06823, 2024 WL 235217, at *7 (N.D. Cal. Jan.

24  22, 2024) (Tigar, J.) (unjust enrichment claim based on use of materials to "train [AI models]"

25  preempted); *Firoozye v. Earthlink Network*, 153 F. Supp. 2d 1115, 1128 (N.D. Cal. 2001) (unjust

26  enrichment claim, which "at its core alleges that the defendants unfairly benefitted from their

27  unauthorized use" of plaintiff's work, was "equivalent" to copyright claim and preempted).

28  ――――――――――――――――
[16] As noted, Plaintiffs do not explain their reference to the UCL, which appears to be a typo.

1    Second, "unjust enrichment is an action in quasi-contract, which does not lie when an

2    enforceable, binding agreement exists defining the rights of the parties." *Paracor Finance, Inc. v.*

3    *General Elec. Capital Corp*., 96 F.3d 1151, 1167 (9th Cir. 1996).  The FAC's unjust enrichment

4    claim against DeviantArt is brought on behalf of the "DeviantArt Plaintiffs," FAC at 92, each of

5    whom are "DeviantArt users," *id.* ¶ 381, and each of whom concede that DeviantArt's Terms are

6    an "enforceable, binding agreement" that "defin[es] the rights of the parties," *Paracor*, 96 F.3d at

7    1167; FAC ¶¶ 418 ("[T]he DeviantArt Plaintiffs have formed a contract with DeviantArt.").  The

8    claims for that reason alone.

9    Third, Plaintiffs fail to allege facts to support a claim for unjust enrichment.  To plead this

10   claim, Plaintiffs must allege that DeviantArt "received and unjustly retained a benefit at plaintiff's

11   expense," *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016), and that the

12   benefit was voluntarily "conferred on the defendant through mistake, fraud, or coercion," *Bittel*

13   *Tech., Inc. v. Bittel USA, Inc*., No. 10-cv-00719, 2010 WL 3221864, at *5 (N.D. Cal. Aug. 13,

14   2010) (citation omitted).  Well-pleaded unjust enrichment claims allege that the plaintiffs have

15   been misled or coerced into conferring some benefit, which the defendant unjustly retained.  *See*

16   *Stratos*, 828 F.3d at 1029–31, 1039 (discussing allegation that firm owners "paid themselves" with

17   funds that plaintiffs voluntarily conferred into a "client trust account").  Plaintiffs allege no such

18   facts here, which is an independent reason to dismiss the claim.  *See Rosal v. First Fed. Bank of*

19   *Cal.*, 671 F. Supp. 2d 1111, 1122, 1133 (N.D. Cal. 2009) ("conclusory allegation" that defendants

20   "retain[ed] profits, income and ill-gotten gains at the expense of plaintiff" was "insufficient").

21   **D.    The Court Should Dismiss The Additional Named Plaintiffs**

22   As noted above, this Court's October 30 Order granted Plaintiffs leave to amend only to

23   "cure the deficiencies identified" in that Order.  Order at 28.  Plaintiffs' addition of seven additional

24   class representatives does not in any way address the pleading issues the Court identified or affect

25   the claims or legal theories asserted in the FAC.  For that reason, the Court should strike these

26   Plaintiffs—*i.e.* Southworth, Rutkowski, Manchess, Brom, Zhang, Kaye, and Ellis—from the FAC.

27   *See Gallagher v. Chipotle Mexican Grill, Inc.*, No. 15-cv-03952, 2016 U.S. Dist. LEXIS 45501,

28   at *1 (N.D. Cal. Apr. 4, 2016) (striking "the additional class representatives . . . from the FAC"

because those parties were added "beyond the scope of the Court's leave" to amend).

**V.      CONCLUSION**

For these reasons, the Court should strike the additional class representatives from the FAC; dismiss Counts 15–17 of the FAC with prejudice; and dismiss DeviantArt from this case.

Dated:  February 8, 2024

Respectfully submitted,

LATHAM & WATKINS LLP

By:  */s/ Andrew M. Gass*

Andrew M. Gass (SBN 259694)
  andrew.gass@lw.com
Michael H. Rubin (SBN 214636)
  michael.rubin@lw.com
Brittany N. Lovejoy (SBN 286813)
  brittany.lovejoy@lw.com
505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone:  415.391.0600

*Attorneys for Defendant DeviantArt, Inc.*