# EXHIBIT A

COOLEY LLP
BOBBY GHAJAR (198719)
(bghajar@cooley.com)
COLETTE GHAZARIAN (322235)
(cghazarian@cooley.com)
1333 2nd Street, Suite 400
Santa Monica, California 90401
Telephone:     (310) 883-6400
Facsimile:     (310) 883-6500

ANGELA L. DUNNING (212047)
(adunning@cooley.com)
MARK WEINSTEIN (193043)
(mweinstein@cooley.com)
JUDD LAUTER (290945)
(jlauter@cooley.com)
3175 Hanover Street
Palo Alto, CA  94304-1130
Telephone:     (650) 843-5000
Facsimile:     (650) 849-7400

LEX LUMINA PLLC
MARK A. LEMLEY (155830)
(mlemley@lex-lumina.com)
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone: (646) 898-2055
Facsimile: (646) 906-8657

*Counsel for Defendant Meta Platforms, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD KADREY, an individual; SARAH SILVERMAN, an individual; CHRISTOPHER GOLDEN, an individual,<br><br>    Individual and Representative Plaintiffs,<br><br>        v.<br><br>META PLATFORMS, INC., a Delaware corporation;<br><br>                Defendant. | Case No. 3:23-cv-03417-VC<br><br>**DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT**<br><br>Date:      November 16, 2023<br>Time:      10:00 a.m.<br>Dept:      Courtroom 4 – 17th Floor<br>Judge:     Vince Chhabria<br><br>Trial Date: None<br>Date Action Filed: July 7, 2023 |

# TABLE OF CONTENTS

**Page**

I.     Introduction ......................................................................................................... 1

II.    Summary of Relevant Facts and Allegations ............................................ 4

      A.     The Parties ................................................................................................. 4

      B.     Plaintiffs' Allegations of Purported Wrongdoing .................................. 4

III.   Legal Standards ............................................................................................... 6

IV.   Argument ........................................................................................................... 6

      A.     Plaintiffs Fail to Plead that LLaMA Is an Infringing Derivative Work (Claim 1) .............................................................. 6

      B.     Plaintiffs Fail to State a Claim for Vicarious Infringement (Claim 2).................... 9

           1.     Plaintiffs fail to allege direct infringement ............................... 10

           2.     Plaintiffs fail to plead the requisite control ............................... 11

           3.     Plaintiffs fail to plead the requisite financial interest.............................. 11

      C.     Plaintiffs Fail to State a Claim for Violation of the DMCA (Claim 3)................ 12

           1.     Plaintiffs fail to state a claim under Section 1202(a)(1) .......................... 12

           2.     Plaintiffs fail to state a claim under Section 1202(b)(1) .......................... 14

           3.     Plaintiffs fail to state a claim under Section 1202(b)(3) .......................... 16

      D.     Plaintiffs Fail to State a Claim for Unfair Competition (Claim 4)....................... 17

      E.     Plaintiffs Fail to State a Claim for Unjust Enrichment (Claim 5)........................ 19

      F.     Plaintiffs Fail to State a Claim for Negligence (Claim 6)................................... 19

V.     Conclusion ......................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .................................................................................... *passim*

*Authors Guild v. Google, Inc.,*
804 F.3d 202 (2d Cir. 2015) ................................................................... 2, 7, 9

*Becton, Dickinson & Co. v. Cytek Biosciences Inc.,*
2020 WL 1877707 (N.D. Cal. Apr. 15, 2020) ......................................... 10

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ...................................................................................... 6

*Berk v. Coinbase, Inc.,*
2019 WL 3561926 (N.D. Cal. Aug. 6, 2019) (Chhabria, J.), *rev'd and
remanded on other grounds*, 840 F. App'x 914 (9th Cir. 2020) ............... 17

*Berkic v. Crichton,*
761 F.2d 1289 (9th Cir. 1985) ...................................................................... 8

*Blizzard Ent., Inc. v. Lilith Games (Shanghai) Co.,*
149 F. Supp. 3d 1167 (N.D. Cal. 2015) .................................................... 10

*Cavalier v. Random House, Inc.,*
297 F.3d 815 (9th Cir. 2002) ........................................................................ 8

*Cromwell v. Certified Forensic Loan Auditors,*
2019 WL 1095837 (N.D. Cal. Jan. 10, 2019) .......................................... 19

*Crowley v. Jones,*
608 F. Supp. 3d 78 (S.D.N.Y. 2022) ......................................................... 13

*Dahlia v. Rodriguez,*
735 F.3d 1060 (9th Cir. 2013) ...................................................................... 6

*Daniels-Hall v. Nat'l Educ. Ass'n,*
629 F.3d 992 (9th Cir. 2010) ........................................................................ 6

*Del Madera Props. v. Rhodes & Gardner, Inc.,*
820 F.2d 973 (9th Cir.1987), *overruled on other grounds, Fogerty v. Fantasy,
Inc.*, 510 U.S. 517 (1994) ..................................................................... 18, 19

*Dielsi v. Falk,*
916 F. Supp. 985 (C.D. Cal. 1996) ............................................................ 19

*Dolls Kill, Inc. v. Zoetop Bus. Co.*,
2022 WL 16961477 (C.D. Cal. Aug. 25, 2022) ........................................................ 15

*Eldred v. Ashcroft*,
537 U.S. 186 (2003) ...................................................................................................... 7

*Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc.*,
2018 WL 659105 (N.D. Cal. Feb. 1, 2018) ............................................................... 17

*Falkner v. General Motors LLC*,
393 F. Supp. 3d 927 (C.D. Cal. 2018) ...................................................................... 15

*Feist Publ'n Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) ...................................................................................................... 7

*Hadley v. Kellogg Sales Co.*,
243 F. Supp. 3d 1074 (N.D. Cal. 2017) .................................................................... 17

*Park v. Skidmore, Owings & Merrill LLP*,
2019 WL 9228987 (S.D.N.Y. Sept. 30, 2019) .......................................................... 13

*Kalitta Air, LLC v. Cent. Tex. Airborne Sys., Inc.*,
315 App'x 603 (9th Cir. 2008) .................................................................................. 20

*Kelly v. Arriba Soft Corp.*,
77 F. Supp. 2d 1116 (C.D. Cal. 1999), *aff'd in part, rev'd in part*, 280 F.3d 934
(9th Cir. 2002) ........................................................................................................... 15

*Kilina Am., Inc. v. Bonded Apparel, Inc.*,
2019 WL 8065854 ...................................................................................................... 11

*Kirk Kara Corp. v. W. Stone & Metal Corp.*,
2020 WL 5991503 (C.D. Cal. Aug. 14, 2020) .......................................................... 13

*Kodadek v. MTV Networks, Inc.*,
152 F.3d 1209 (9th Cir. 1998) .................................................................................. 18

*Krechmer v. Tantaros*,
747 Fed. App'x. 6 (2d Cir. 2018) .............................................................................. 14

*Laws v. Sony Music Entm't, Inc.*,
448 F.3d 1134 (9th Cir. 2006) .................................................................................. 18

*Litchfield v. Spielberg*,
736 F.2d 1352 (9th Cir. 1984) .................................................................................... 8

*Locklin v. StriVectin Operating Co., Inc.*,
2022 WL 867248 (N.D. Cal. Mar. 23, 2022) (Chhabria, J.) .................................... 19

*Low v. LinkedIn Corp.*,
    900 F. Supp. 2d 1010 (N.D. Cal. 2012) .................................................................. 20

*Maloney v. T3Media, Inc.*,
    853 F.3d 1004 (9th Cir. 2017) ............................................................................... 18

*Mayall ex rel. H.C. v. USA Water Polo, Inc.*,
    909 F.3d 1055 (9th Cir. 2018) ............................................................................... 20

*Michael Grecco Prods., Inc. v. Time USA, LLC*,
    2021 WL 3192543 (S.D.N.Y. July 27, 2021) .......................................................... 13

*Mills v. Netflix, Inc.*,
    2020 WL 548558 (C.D. Cal. Feb. 3, 2020) ............................................................ 16

*Mohanna v. Carrington Mortg. Servs. LLC*,
    2018 WL 3730419 (N.D. Cal. Aug. 6, 2018) .......................................................... 17

*MultiCraft Imports, Inc. v. Mariposa USA, Inc.*,
    2017 WL 5664996 (C.D. Cal. Sept. 14, 2017) ....................................................... 10

*Nash v. CBS, Inc.*,
    899 F.2d 1537 (7th Cir. 1990) ............................................................................. 7, 9

*O'Neal v. Sideshow, Inc.*,
    583 F. Supp. 3d 1282 (C.D. Cal. 2022) .................................................... 13, 16, 17

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
    823 F. App'x 516 (9th Cir. 2020) .......................................................................... 18

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) .................................................................. 10, 11, 12

*Perfect 10 v. Giganews, Inc.*,
    847 F.3d 657, 673 (9th Cir. 2017) ........................................................................ 11

*Rabin v. Google LLC*,
    2023 WL 4053804 (N.D. Cal. June 15, 2023) ....................................................... 19

*Roth Greeting Cards v. United Card Co.*,
    429 F.2d 1106 (9th Cir. 1970) ................................................................................. 8

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) ................................................................................... 6

*Stevens v. Corelogic, Inc.*,
    899 F.3d 666 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1222 (2019) ...................... 15

*Strumlauf v. Starbucks Corp.*,
    192 F. Supp. 3d 1025 (N.D. Cal. 2016) ................................................................. 20

*Sugarfina, Inc. v. Sweet Pete's LLC*,
    2017 WL 4271133 (C.D. Cal. Sept. 25, 2017) ............................................................. 19

*Sybersound Records, Inc. v. UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008) .................................................................................... 18

*Textile Secrets Int'l, Inc. v. Ya-Ya Brand Inc.*,
    524 F. Supp. 2d 1184 (C.D. Cal. 2007) ...................................................................... 13

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) .................................................................................... 17

**Statutes**

17 U.S.C.
    § 102 ................................................................................................................................ 7
    § 103 .............................................................................................................................. 18
    § 106 ................................................................................................................. 5, 7, 8, 18
    § 201 .............................................................................................................................. 14
    § 301 ........................................................................................................................ 18, 19
    § 512 .............................................................................................................................. 14
    § 1202 ..................................................................................................................... *passim*

Cal. Bus. & Prof. Code § 17200 ......................................................................... 3, 5, 17, 18, 19

**Other Authorities**

Fed. R. Civ. P.
    8 ............................................................................................................................. 16, 17
    9 .................................................................................................................................... 16
    12(b)(6) ........................................................................................................................ 1, 6

4 Patry on Copyright § 12:13 .................................................................................................. 8

U.S. Const., Art. I, § 8, cl. 8 .................................................................................................... 7

S. Rept. 105-190 (1998) ........................................................................................................ 13

Please take notice that, on November 16, 2023 at 10:00 a.m., Defendant Meta Platforms, Inc. ("Meta") will and hereby moves, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss Claim 1 (in part) and Claims 2–6 (in full) with prejudice for failure to state a claim on which relief may be granted. This motion is accompanied by a Request for Consideration of Documents Incorporated by Reference and Judicial Notice ("RJN"), Declaration of Judd Lauter ("Lauter") and exhibits thereto; all papers on file in this action; and such other matters as may be presented at the hearing.

## I.    INTRODUCTION

In February 2023, Meta announced its release of a family of state-of-the-art foundational large language models called LLaMA. A large language model ("LLM") is an AI software program designed to generate coherent text responses to user queries or "prompts." Just as a child learns language (words, grammar, syntax, sentence structure) by hearing everyday speech, bedtime stories, songs on the radio, and so on, LLaMA "learned" language by being exposed—through "training"—to "massive amounts of text from various sources," such as code, webpages, and books, in 20 languages. (¶¶ 2, 18.)[1] This process involved dissecting text into *trillions* of word snippets or letter combinations (called "tokens") and extracting a vast, complex set of statistical correlations as to how tokens are most likely to be arranged coherently. Once trained on sufficiently large volumes of data, LLMs, like LLaMA, develop emergent capabilities to use the building blocks of language in extra-ordinary ways, including to "generate creative text, solve mathematical theorems, predict protein structures, answer reading comprehension questions, and more. They are one of the clearest cases of the substantial potential benefits AI can offer at scale to billions of people." (Lauter Ex. 1.)

As part of its commitment to open science, Meta released LLaMA on a noncommercial basis to academic researchers, members of governmental organizations, and industry research laboratories around the world. (¶ 31 (quoting Lauter Ex. 1).) In doing so, Meta sought to democratize access to state-of-the-art LLMs, and thereby accelerate the development of better models and a broader and more innovative set of use-cases. (Lauter Ex. 1.)

---

[1] Unless otherwise stated, citations to "¶_" and "Ex. " are to the Complaint's paragraphs and exhibits, all emphases are added, and internal citations and quotation marks are omitted. Because Plaintiffs erred by including two instances of paragraphs numbered 1–23, Meta includes a page number with any citation to the second instance of those paragraphs (*e.g.*, ¶ 1 at 9).

Named Plaintiffs are authors of copyrighted books comprising a miniscule fraction (less than a millionth) of the material allegedly used to train LLaMA. Unlike in a traditional copyright case, Plaintiffs do *not* allege that LLaMA or any text generated by its users in response to prompts (called "output") is substantially similar in protectable expression to their books. They do not identify *any* output that has ever been created using LLaMA. Instead, they primarily object that Meta did not obtain their consent before extracting "information" from their texts as part of training LLaMA.

Copyright law does not protect facts or the syntactical, structural, and linguistic information that may have been extracted from books like Plaintiffs' during training. Use of texts to train LLaMA to statistically model language and generate original expression is transformative by nature and quintessential fair use—much like Google's wholesale copying of books to create an internet search tool was found to be fair use in *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015). That core issue, however, will be for another day, on a more fulsome record. For now, Meta moves to dismiss the remainder of the Complaint for failure to state a claim.

**Claim 1 (Direct Copyright Infringement):** Plaintiffs' claim for direct infringement must be dismissed with prejudice to the extent it is premised on a theory that LLaMA is *itself* an infringing "derivative" work. This theory is supported by a single allegation: that LLaMA "cannot function without the expressive information extracted from Plaintiffs' Works and retained inside [it]." (¶ 41.) Plaintiffs do not explain what "information" this refers to, but use of "information" from a copyrighted text is not the standard for infringement. Under well-settled Ninth Circuit law, the only pertinent question is whether the software comprising LLaMA is, itself, substantially similar in protected expression to Plaintiffs' books. Because Plaintiffs do not and cannot plausibly allege substantial similarity of protected expression, this legal theory fails as a matter of law.

**Claim 2 (Vicarious Copyright Infringement):** Plaintiffs seek to hold Meta vicariously liable for purportedly infringing outputs generated by others using LLaMA. But they do not identify a single output ever generated by *anyone* that supposedly infringes their books. Instead, Plaintiffs advance the fallacy that *every* output generated using LLaMA is "based on expressive information extracted from" Plaintiffs' books and, therefore an "infringing derivative work" of *each* of those books. (¶ 44.) The Ninth Circuit has rejected this argument as "frivolous," and it

1    makes no sense.   The test for infringement is "substantial similarity."   The solution to a

2    mathematical theorem, line of code, or language translation—all outputs LLaMA is capable of

3    generating—are not "substantially" or even remotely similar to *any* of Plaintiffs' books.   Nor is,

4    say, an original poem a user creates with LLaMA.   Plaintiffs cannot plead this most basic element

5    (or any of the others) necessary to state a claim for vicarious copyright infringement.

6        **Claim 3 (Digital Millennium Copyright Act ("DMCA")):**   Plaintiffs' DMCA claims are

7    divorced from the language and purpose of the law.   They allege that Meta provided false copyright

8    management information ("CMI") in violation of 17 U.S.C. § 1202(a)(1) by asserting copyright in

9    the LLaMA models.   However, such claims are only actionable where the allegedly false CMI is

10   included in an exact copy of a work, which is not the case here.   Nor can Plaintiffs plausibly plead

11   that Meta's claim of copyright in LLaMA was false or knowingly made with intent to cause or

12   conceal infringement.   Plaintiffs' Section 1202(b)(1) claim fails because they do not and cannot

13   allege "removal" of their CMI in training, much less that Meta intentionally removed it to cause or

14   conceal allegedly infringing outputs, particularly where Plaintiffs have yet to identify any.   And the

15   Section 1202(b)(3) claim—premised on removal of CMI from the LLaMA models, themselves—

16   fails because Plaintiffs are not the authors of LLaMA, they own (and claim) no copyright in it, and

17   their CMI was never included to begin with, much less intentionally removed by Meta with

18   wrongful intent.   As to each theory, Plaintiffs' allegations fail to state a claim under the DMCA.

19       **Claims 4–6 (Unfair Competition, Unjust Enrichment, Negligence):**   Plaintiffs' UCL

20   claim is based on two alleged predicate violations:  (1) violation of the DMCA, which Plaintiffs

21   cannot establish, and (2) unauthorized use of Plaintiffs works to train LLaMA, which is just a

22   repackaged copyright claim and, thus, expressly preempted by the Copyright Act.   Absent a viable

23   predicate violation, this claim must be dismissed.   So, too, must the unjust enrichment claim, which

24   is likewise preempted, and would require a quasi-contractual relationship between the parties,

25   which has not been pleaded and does not exist.   Finally, Plaintiffs' negligence claim—which is

26   based on a purported duty not to train LLaMA on their copyrighted works—is likewise preempted

27   and barred by the economic loss doctrine in any event.   Each of these claims should be dismissed

28   with prejudice.

COOLEY LLP
ATTORNEYS AT LAW

META'S MOTION TO DISMISS
3:23-CV-03417-VC

**II.     SUMMARY OF RELEVANT FACTS AND ALLEGATIONS**

**A.     The Parties**

**Named Plaintiffs:**  Named plaintiffs are book authors Richard Kadrey, Sarah Silverman, and Christopher Golden.  (¶¶ 4, 9–12 & Exs. A, B.)  They allegedly own registered copyrights in, respectively, *Sandman Slim*, *The Bedwetter*, and *Ararat* (referred to by Plaintiffs as "Infringed Works"), each of which contains CMI "customarily included in published books, including the name of the author and the year of publication."  (¶¶ 9–11.)  Plaintiffs allege that Meta used each of these books, along with others by Kadrey and Golden, to train LLaMA.  (¶¶ 23–30 & Ex. B.)

**Meta and Its LLaMA Models:**  Meta is a technology company that offers popular social media services Facebook and Instagram.  It also has a team called Meta AI that "creates and distributes artificial-intelligence software products" that "algorithmically simulate human reasoning." (¶¶ 16–17.)  In February 2023, Meta released LLaMA, a "set of large language models … designed to parse and emit natural language." (¶ 18.)  Meta announced that LLaMA would be made available on a limited basis to "academic researchers; those affiliated with organizations in government, civil society, and academia; and industry research laboratories around the world" for purposes of study, research and development.  (¶ 31 (quoting Lauter Ex. 1).)  Meta further announced that those seeking access could apply at a web link provided in a research paper describing how LLaMA was created and trained.  (*Id.*)  Plaintiffs allege "on information and belief" that Meta has "benefited financially" from this noncommercial release of LLaMA (¶ 32), but do not describe how.

In March 2023, the "model weights" for LLaMA—the statistical parameters derived from its training—were posted to popular code-sharing platform, GitHub, without Meta's authorization. (¶¶ 33–34.)  Meta promptly submitted a DMCA takedown notice to GitHub, asserting its copyright in LLaMA and requesting removal of a tool posted there by a programmer to help users download the LLaMA models outside of Meta's application process and without Meta's consent.  (¶ 34.)  Despite these efforts, unidentified third parties have "continued to circulate" LLaMA.  (¶ 33.)

**B.     Plaintiffs' Allegations of Purported Wrongdoing**

According to Plaintiffs, LLMs like LLaMA are "'trained' by copying massive amounts of text from various sources and feeding these copies into the model." (¶ 18.)  During training, an

LLM "copies each piece of text in the training dataset and extracts expressive information from it," which then enables the model "to emit convincing simulations of natural written language as it appears in the training dataset." (*Id.*)  Plaintiffs further allege that the output of an LLM is "entirely and uniquely reliant on the material in its training dataset.  Every time it assembles a text output, the model relies on the information it extracted from its training dataset."  (¶ 3.)

Plaintiffs infer that the allegedly Infringed Works were among the many materials on which LLaMA was trained from the research paper Meta published in connection with LLaMA's release, "LLaMA: Open and Efficient Foundation Language Models" ("Research Paper"), which described the models and their training sources.  (¶¶ 21, 23–30; *see* Lauter Ex. 2.)  According to Plaintiffs, *one* such source is "the Books3 section of ThePile," a corpus of 196,000 books, which was assembled by the research organization EleutherAI for training LLMs and includes the Infringed Works. (¶¶ 23–25.)  On that basis, Plaintiffs allege that their books must have been "copied and ingested" by Meta in training LLaMA. (¶¶ 5, 19.)  Notably, as detailed in the Research Paper, Books3 comprises an astonishingly small portion of the total text used to train LLaMA.  All books from Books3, together with the roughly 70,000 books collected from Project Gutenberg, an "archive of [] books that are out of copyright" (¶ 23), accounted for only 4.5% of training text.  (Lauter Ex. 2; ¶ 23.)  Even accepting Plaintiffs' allegations, their books comprised less than a millionth of the training data.

Plaintiffs filed this suit on July 7, 2023, asserting claims for:  (1, 2) direct and vicarious copyright infringement (17 U.S.C. § 106); (3) removal of CMI and false assertion of copyright in violation of the DMCA (17 U.S.C. §§ 1202(a)(1) and 1202(b)); (4) unfair competition (Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL")); (5) unjust enrichment; and (6) negligence.  Plaintiffs seek to represent a putative class of "all persons or entities domiciled in the United States that own a [U.S.] copyright in any work that was used as training data" for LLaMA.  (¶ 15 at 10.)

Plaintiffs assert that any copies of the allegedly Infringed Works made in the process of training LLaMA infringe the copyrights in those Works (¶ 40), and, further, because LLaMA relies on unspecified "expressive information extracted from" those Works, the LLaMA model, itself— and "every output" therefrom—are infringing derivatives.  (¶¶ 41, 44.)  Plaintiffs further claim that, "by design," the process of training LLaMA does not preserve CMI, and Meta thereby intentionally

COOLEY LLP
ATTORNEYS AT LAW

1  removed CMI from their works, distributed unauthorized derivative works without their CMI, and

2  provided false CMI by claiming "sole copyright" in LLaMA. (¶¶ 49-51.)  These purported acts also

3  form the basis of Plaintiffs' state and common law claims. (¶¶ 54–58; ¶¶ 1–14 at 9–10.)

## III.   LEGAL STANDARDS

5  "Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable

6  legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v.*

7  *Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013).  To avoid dismissal, a complaint must plead "enough

8  facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

9  544, 570 (2007).  The court need not "accept as true allegations that contradict … matters properly

10  subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact,

11  or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010);

12  *Dahlia v. Rodriguez*, 735 F.3d 1060, 1076 (9th Cir. 2013) (same); *Twombly*, 550 U.S. at 555 (courts

13  need not "accept as true a legal conclusion couched as a factual allegation").  "Where a complaint

14  pleads facts that are merely consistent with a defendant's liability, it stops short of the line between

15  possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV.   ARGUMENT

17  Plaintiffs' claims for direct and vicarious copyright infringement rest on legal theories that

18  are incompatible with the Copyright Act and contravene the binding law in this Circuit.  The state

19  law claims, in turn, all improperly invade on the exclusive domain of federal copyright law and

20  must be dismissed with prejudice as preempted, and because they fail to state a claim in any event.

### A.   Plaintiffs Fail to Plead that LLaMA Is an Infringing Derivative Work (Claim 1)

22  Plaintiffs' claim for direct copyright infringement is based on two theories:  (1) Meta created

23  unauthorized copies of Plaintiffs' books in the process of training LLaMA (¶ 40); and

24  (2) "[b]ecause the LLaMA language models cannot function without the expressive information

25  extracted from Plaintiffs' Infringed Works and retained inside [LLaMA]," the models "are

26  themselves infringing derivative works" (¶ 41).  Both theories are without merit, but this Motion

27  addresses only the latter theory, which rests on a fundamental misunderstanding of copyright law.

28

The Copyright Act secures to authors six "exclusive" rights enumerated in 17 U.S.C. § 106. These include the right to "reproduce" the copyrighted work in copies," 17 U.S.C. § 106(1), and the right to "prepare derivative works," *id.* § 106(2).

A "fundamental axiom of copyright law is that no author may copyright his ideas or the facts he narrates." *Feist Publ'n Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 344–45 (1991). Even ideas originally conceived by an author cannot be the proper subject of an infringement claim, because copyright does not extend to facts, ideas, or other foundational elements of creativity—it protects only the specific manner in which information is expressed. *Id.*; 17 U.S.C. § 102(b).

"This principle, known as the idea/expression or fact/expression dichotomy, applies to all works of authorship." *Id.* at 350. It dictates that "every idea, theory, and fact in a copyrighted work becomes instantly available for public exploitation at the moment of publication." *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003). Only by excluding facts and ideas from copyright protection can the Copyright Act advance the Constitutional imperative of promoting "the Progress of Science and useful Arts." U.S. CONST. Art. 1, § 8, cl. 8. After all, "[e]very work uses scraps of thought from thousands of predecessors"; "Intellectual (and artistic) progress is possible only if each author [is free to] build[] on the work of others." *Nash v. CBS, Inc.*, 899 F.2d 1537, 1540, 1543 (7th Cir. 1990) (affirming summary judgment that defendants "did not appropriate any of the material protected by Nash's copyrights" because they used his work solely "as a source of facts and ideas" and took his "analysis of history but none of his expression").

The fact/expression dichotomy was further elucidated in *Authors Guild*, in which the Second Circuit rejected an argument that the Google Books project—for which Google made digital copies of millions of books without permission to create a tool allowing Internet users to search for certain words or terms within them—constituted an infringing derivative work. 804 F.3d at 227. The court reasoned that plaintiffs had no "supposed derivative right to supply information about their books," such as "word frequencies, syntactic patterns, and thematic markers." *Id.* at 209, 227. This "statistical information," the court found, does not constitute "copyrighted expression," and its use by Google did "not support Plaintiffs' derivative works argument." *Id.*

With these bedrock principles in mind, the argument Plaintiffs seek to advance here—that Meta's LLaMA models must be infringing derivatives of each of Plaintiffs' copyrighted books merely because they were trained on their works (¶ 41)—is legally untenable for multiple reasons.

*First*, as the Ninth Circuit has definitively held, a derivative work must be *substantially similar* in protected expression to the copyrighted work to be infringing. In *Litchfield v. Spielberg*, the Ninth Circuit rejected as "frivolous" the exact argument Plaintiffs seek to advance here, namely, that a "derivative work" encompasses "any work based on a copyrighted work," irrespective of substantial similarity. 736 F.2d 1352, 1357 (9th Cir. 1984). Rather, "[t]o prove infringement, one must show substantial similarity." *Id.*; *see also Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1110 (9th Cir. 1970) ("[I]nfringement [requires] substantial similarity…."); 4 Patry on Copyright § 12:13 (collecting cases) ("In order to infringe the derivative right, *there must be substantial similarity in protectible expression between the parties' works*.").

To assess substantial similarity, the Ninth Circuit applies a two-part test. *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002). The first part—the "extrinsic test"—is an "objective comparison of specific expressive elements"; the court "disregard[s] the non-protectible elements" like "stock scenes and themes" and "plot ideas" and determines whether the remaining "protectible elements, standing alone, are substantially similar." *Id.* at 822–23; *see also Berkic v. Crichton*, 761 F.2d 1289, 1293–94 (9th Cir. 1985) (excluding ideas and scenes-a-faire). The second part—the "intrinsic test"—is a subjective comparison focused on "whether the ordinary, reasonable audience would find the works substantially similar" in "total concept and feel." *Id.* at 822. If, under these tests, the accused work is not "substantially similar" to plaintiff's copyrighted work, it is neither a "copy" nor a "derivative work" for purposes of Section 106. 17 U.S.C. § 106(1)–(3).

Here, Plaintiffs make no attempt to plead substantial similarity as between the LLaMA models and any of their books, and such an allegation would be implausible on its face. Software code for a neural network is not similar to Plaintiffs' novels and essay collection, and Plaintiffs do not and cannot claim that it is. Under *Litchfield*, that should end the analysis. 736 F.2d at 1357.

*Second*, rather than attempt to plead substantial similarity, Plaintiffs allege that "expressive information extracted from Plaintiffs' Infringed Works" is "retained inside the LLaMA language

1  models," and that they "cannot function without [it]." (¶ 41.)  This does not help their cause.  The

2  test of infringement is not whether one work can "function" without another.  In *Authors Guild*, for

3  instance, wholesale copying of books was necessary to enable the search function at issue, but the

4  court still rejected a claim that the search tool was an infringing derivative work.  804 F.3d at 209,

5  227.  Equally fatal, Plaintiffs do not identify any "expressive information" LLaMA is supposed to

6  contain, or what it consists of.  They do not claim, for instance, that text from their books appears

7  in LLaMA's codebase.  Such an allegation would be nonsensical and contrary to the way LLMs

8  function.  Instead, the most plausible read of Plaintiffs' allegations is that tokenized, statistical

9  "information" about the words, sentences, and paragraphs in their books has been extracted and

10  analyzed in training LLaMA and developing its code.  As amply demonstrated by *Authors Guild*,

11  *Nash* and the other authorities cited above, such information falls outside the scope of copyright

12  protected expression and its use (even if it were alleged) could not support a claim for infringement.

13      <u>Third</u>, even if the Court were to look past the total absence of allegations (plausible or

14  otherwise) of substantial similarity between Plaintiffs' books and the LLaMA language models,

15  *Authors Guild* provides yet another, independent basis for dismissing Plaintiffs' second theory of

16  direct copyright infringement.  In *Authors Guild*, it was undisputed that the Google search feature

17  at issue relied on digital scans of plaintiffs' entire books to generate snippets and data about the

18  books as search outputs.  804 F.3d at 225.  Nevertheless, because the digital copies created by

19  Google were hidden from view by the public and the tool did not permit access "in any substantial

20  way to a book's expressive content" apart from the snippets, the search tool was beyond the

21  "statutory definition of a derivative work, or of the logic that underlies it."  *Id*. at 226–27.

22      Here, Plaintiffs claim that LLaMA "ingested" copies of their books as training material.

23  (¶ 5.)  However, they do not allege that those copies are viewable or otherwise accessible to users

24  of LLaMA, and do not point to a single output that substantially reveals or borrows from the

25  protected expression of those works.  Accordingly, as in *Authors Guild*, Plaintiff's theory that the

26  LLaMA language model is itself an infringing derivative work fails as a matter of law.

27      **B.**    **Plaintiffs Fail to State a Claim for Vicarious Infringement (Claim 2)**

28      By their claim for vicarious copyright infringement, Plaintiffs seek to hold Meta secondarily

liable for allegedly infringing outputs generated by others using the LLaMA language models.  To state a claim for vicarious infringement, Plaintiffs must allege facts plausibly establishing:  (1) an act of direct infringement undertaken by another party; (2) that Meta exercises control over (i.e., has the "right and ability to supervise") that infringing conduct; and (3) that Meta has a direct financial interest in the infringing activity.  *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007).  Plaintiffs' factual allegations fail to satisfy any of these elements.

### 1.      Plaintiffs fail to allege direct infringement

The first, most basic element of any claim for secondary copyright liability is an act of direct infringement by another.  Plaintiffs do not identify any such act.  Indeed, the Complaint is devoid of a single example of any use of LLaMA to generate output that Plaintiffs might plausibly contend infringes any of their works.  This, alone, is fatal.

To state a claim, Plaintiffs were required to identify specific examples of directly infringing works so that, among other things, they may be compared against the original copyrighted works for purposes of assessing substantial similarity.  *See Becton, Dickinson & Co. v. Cytek Biosciences Inc.*, 2020 WL 1877707, at *6–7 (N.D. Cal. Apr. 15, 2020) (dismissing copyright claim for failure to plead representative acts of infringement).  Plaintiffs "need not specify each and every instance of infringement at the pleadings stage, but [they] must submit at least a representative sampling of infringed content," including what parts of their works were copied and how and where such copying is manifest.  *Id.* at *6.  Here, Plaintiffs do not allege *any* example of output of the LLaMA language models, what parts (if any) of their books were allegedly reproduced in any output, or any specific act of infringement.  Dismissal is thus required.  *See MultiCraft Imports, Inc. v. Mariposa USA, Inc.*, 2017 WL 5664996, at *3 (C.D. Cal. Sept. 14, 2017) (dismissing claim and reasoning:  "Absent any allegations of even representative infringements, the FAC fails to provide notice as a matter of law."); *Blizzard Ent., Inc. v. Lilith Games (Shanghai) Co.*, 149 F. Supp. 3d 1167, 1175 (N.D. Cal. 2015) (same, dismissing claim).

Rather than satisfy this pleading burden, Plaintiffs seek to circumvent it, asserting: "Because the output of the LLaMA language models is *based on* expressive information extracted from Plaintiffs' Infringed Works, *every* output of the [models] is an infringing derivative work."  (¶ 44.)

META'S MOTION TO DISMISS
3:23-CV-03417-VC

This is wrong as a matter of both well-settled law and common sense, as shown in Section IV.A. above.

Plaintiffs make no attempt to plead substantial similarity of the (unspecified) outputs of the models, just as they make no effort to show substantial similarity of the models themselves. The only description of potential outputs of the LLaMA models is that they are "able to emit convincing simulations of natural written language" (¶ 18), which could theoretically include outputs ranging from a sample cover letter for a job application, to a list of U.S. state capitols, to a dissertation on the Newtonian laws of motion. Any suggestion that such outputs would be substantially similar to *any* of named Plaintiffs' books is not only implausible, but absurd—which is presumably why Plaintiffs tried to avoid the essential issue of substantial similarity altogether.

### 2. Plaintiffs fail to plead the requisite control

To plead the second element of vicarious copyright infringement, Plaintiffs were required to allege facts showing that Meta had the "right and ability to supervise" the supposed infringement of their books in output generated by others. *Perfect 10 v. Giganews, Inc.*, 847 F.3d 657, 673 (9th Cir. 2017). Instead, the Complaint simply recites this element in conclusory fashion without any supporting facts. (¶ 45.) This is insufficient. Under *Iqbal*, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. 556 U.S. at 678; *Kilina Am., Inc. v. Bonded Apparel, Inc.*, 2019 WL 8065854, at *2 (C.D. Cal. Nov. 19, 2019 ("Merely alleging that the Defendants had the 'right and ability to supervise the infringing conduct' lacks the requisite detail to sustain a claim...").[2]

### 3. Plaintiffs fail to plead the requisite financial interest

Plaintiffs also fail to adequately plead the third element for vicarious liability—that Meta has a "direct financial interest" in the supposed infringement. *Perfect 10*, 847 F.3d at 673. Once again, the Complaint includes only the conclusory allegation that "Meta has benefited financially from the infringing output of the LLaMA language models" (¶ 45), which falls short. *Iqbal*, 556

---

[2] In light of Plaintiffs' allegation that unauthorized versions of LLaMA have "continued to circulate" on GitHub despite Meta's takedown efforts (¶¶ 33–34), it is unclear how Plaintiffs could ever plausibly plead that Meta has the ability to supervise uses of LLaMA of which it is not aware and which it has tried to prevent.

U.S. at 678.  At the same time, Plaintiffs acknowledge and affirmatively plead that LLaMA was released on a limited *noncommercial* basis to academic researchers free of charge.  (¶ 31.)

Moreover, Plaintiffs fail to allege any causal link between the allegedly infringing activities and a financial benefit to Meta, as the law requires.  *Perfect 10*, 847 F.3d at 673.  To satisfy the "direct financial interest" element of vicarious copyright infringement, Plaintiffs must show that LLaMA users were "drawn" to the program *because of* the copying of *Plaintiffs' works*.  *Id.* at 674.  This is not alleged in the Complaint, nor can it plausibly be.  According to the Complaint, Plaintiffs' books are among hundreds of thousands of books included in LLaMA's training data.  (¶¶ 23, 28.)  All 266,000+ books, in turn, comprise only 4.5% of the data used to train LLaMA, and a significant portion of that subset consists of books in the public domain.  (Lauter ¶ 3 & Ex. 2; ¶ 23.)  To claim that the statistical data extracted from any particular work in the dataset acts as a "draw" for users of the models—particularly where Meta is not alleged to have ever identified Plaintiffs' works as among LLaMA's training material (*see* ¶¶ 21–30)—is factually unsupported and untenable.

## C. Plaintiffs Fail to State a Claim for Violation of the DMCA (Claim 3)

As <u>relevant</u> here, the copyright management provisions of the Digital Millennium Copyright Act ("DCMA") prohibit the knowing dissemination of false CMI "with the intent to induce, enable, facilitate, or conceal infringement" (17 U.S.C. § 1202(a)(1)), and the intentional removal of CMI or knowing distribution of copies of works with CMI removed, with knowledge or "reasonable grounds to know, that it will induce, enable, facilitate, or conceal" infringement (*id.* §§ 1202(b)(1), (3)).  Plaintiffs purport to plead violations of each of these provisions (¶¶ 49–51), but their allegations are untethered from both the language of Section 1202 and its purpose.  As discussed in further detail below, each claim warrants dismissal with prejudice.

### 1. Plaintiffs fail to state a claim under Section 1202(a)(1)

Plaintiffs allege that Meta knowingly conveyed false CMI with the intent to cause or conceal copyright infringement, in violation of 17 U.S.C. § 1202(a)(1).  Their theory is that because Meta's LLaMA models are infringing derivative works (¶ 41), Meta provides false CMI by asserting copyright ownership in LLaMA. (¶ 51.)  This claim is meritless for multiple reasons.

<u>First</u>, even if the Court were to accept Plaintiffs' allegations as true, provision of false CMI

COOLEY LLP
ATTORNEYS AT LAW

must occur in connection with an *original* or otherwise *identical copy* of a work to be actionable. *O'Neal v. Sideshow, Inc.*, 583 F. Supp. 3d 1282, 1287 (C.D. Cal. 2022) (dismissing DMCA claim because works were not identical); *Kirk Kara Corp. v. W. Stone & Metal Corp.*, 2020 WL 5991503, at *6 (C.D. Cal. Aug. 14, 2020) (dismissing DMCA claim because "Defendant did not make *identical* copies of Plaintiff's works and then remove the [] CMI"). This is in keeping with the purpose of the DMCA, which was enacted to help address the "ease with which digital works can be copied and distributed worldwide virtually instantaneously" over the Internet. S. Rep. 105-190, at 8 (1998). CMI was envisioned as "a kind of license plate for a work on the information superhighway," from which the authorship and/or ownership of the work could be readily determined by internet users. *Textile Secrets Int'l, Inc. v. Ya-Ya Brand Inc.*, 524 F. Supp. 2d 1184, 1196 (C.D. Cal. 2007) (citation omitted) (discussing legislative history of Section 1202).

Courts interpreting Section 1202 of the DMCA have repeatedly held that it does not apply to CMI attached to a work other than that of the copyright owner, even if it is an unauthorized derivative. *See, e.g.*, *Michael Grecco Prods., Inc. v. Time USA*, *LLC*, 2021 WL 3192543, at *5 (S.D.N.Y. July 27, 2021) ("A party that puts its own CMI on work distinct from work owned by a copyright holder is not liable under Section 1202(a) even if the party's work incorporates the copyright holder's work."); *Park v. Skidmore, Owings & Merrill LLP*, 2019 WL 9228987, at *11 (S.D.N.Y. Sept. 30, 2019) ("[Defendant] has not violated [1202(a)] by claiming authorship over 1 WTC, even if it is improperly derivative of Cityfront '99."). For example, in *Crowley v. Jones*, the district court dismissed a 1202(a) claim in which the defendant had allegedly used a cropped version of the plaintiffs' photograph in the cover of a hip-hop album, explaining that "a defendant cannot violate the DMCA by associating its name with a derivative work that is unquestionably a distinct work, even if the derivative work infringes a copyright." 608 F. Supp. 3d 78, 90 (S.D.N.Y. 2022). This makes sense, because otherwise virtually every claim of copyright infringement would necessarily be a claim for violation of the DMCA. That is not the law.

Second, the Complaint does not explain exactly how Meta conveyed "false" CMI. Beyond a passing insinuation (¶ 51), there are no allegations that Meta's assertion of copyright ownership in LLaMA is false. Plaintiffs *acknowledge* that Meta created LLaMA (¶ 50), from which it follows

that Meta could rightfully claim copyright ownership in it. 17 U.S.C. § 201. Further, as explained above, Plaintiffs do not (and cannot) plausibly allege that LLaMA is an infringing derivative work.

<u>Third</u>, the claim fails because Plaintiffs do not and cannot plausibly plead that Meta acted with the requisite scienter. There is no allegation at all that Meta knowingly provided false CMI "*with the intent* to induce, enable, facilitate, or conceal infringement." 17 U.S.C. § 1202(a)(1) (emphasis added). The bald allegation that Meta "knew or had reasonable grounds to know" that "removal of CMI would facilitate copyright infringement" (¶ 52) is insufficient. Further, any contention that Meta "knew" its claim of rights in LLaMA was false is defeated by the lone allegation Plaintiffs plead to support it, *i.e.*, that Meta submitted a takedown notice to GitHub in which it asserted copyright ownership in LLaMA. Under 17 U.S.C. § 512(c)(3)(A), a DMCA takedown notice requires, among other things, statements that "the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner … or the law," and "under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed." Plaintiffs plead no facts from which one could reasonably infer that Meta made these representations knowing that they were false. *See Krechmer v. Tantaros*, 747 Fed. App'x 6, 9 (2d Cir. 2018) (upholding dismissal of 1202(a)(1) claim because plaintiff did not plausibly allege knowledge or intent). To the contrary, the only plausible inference to be drawn from Plaintiffs' allegations is that Meta actually believes itself to be the copyright owner of the LLaMA models, and for good reason.

### 2. Plaintiffs fail to state a claim under Section 1202(b)(1)

Plaintiffs' 1202(b)(1) claim is equally defective. They allege that Meta violated that section by "cop[ying]" Plaintiffs' works and "us[ing] them as training data for the LLaMA language models," a process which, "[b]y design … does not preserve any CMI." (¶ 49.) What this means is difficult to discern, but Plaintiffs appear to posit that because training LLaMA purportedly "extracted" "expressive information" (¶¶ 41, 44) from their books without preserving or including CMI (¶ 49), this somehow constitutes "removal" of CMI under Section 1202(b)(1). It does not.

<u>First</u>, the process that Plaintiffs describe in the Complaint would, if anything, constitute an omission of CMI, not a "removal." Merriam-Webster defines "removal" as occurring when

something is separated or moved from its original position; "omission" occurs when something is excluded or unacknowledged. (Lauter Exs. 3, 4.) Thus, as noted above, courts interpret Section 1202(b)(1) to apply only to "removal" of CMI from original, otherwise identical, works. *See, e.g.*, *Kelly v. Arriba Soft Corp.*, 77 F. Supp. 2d 1116, 1122 (C.D. Cal. 1999), *aff'd in part, rev'd in part*, 280 F.3d 934 (9th Cir. 2002); *Dolls Kill, Inc. v. Zoetop Bus. Co.*, 2022 WL 16961477, at *3–4 (C.D. Cal. Aug. 25, 2022). For example, in *Falkner v. General Motors LLC*, the court rejected a Section 1202(b)(1) claim brought by a mural artist, in which he alleged that a photographer removed CMI from one of his murals by photographing it at an angle from which his signature was not visible. 393 F. Supp. 3d 927, 938 (C.D. Cal. 2018). The court reasoned that the defendant's "failure to include" CMI could not be regarded as a "removal" under any ordinary definition of that term. *Id.*

Here, Plaintiffs do not allege that Meta removed CMI from their books by, for example, deleting the author's names or copyright notices from the text files that contain them. Rather, Plaintiffs contend that Meta designed the LLaMA training process to exclude CMI from the "expressive information" extracted from their books, i.e., not to extract it in the first place. That is, by definition, an alleged omission akin to the *Falkner* defendant's photo framing, and not a cognizable removal under Section 1202(b). Dismissal with prejudice is appropriate on this basis.

Second, even if Plaintiffs had pleaded that Meta removed CMI from their books, they have not adequately pleaded that Meta did so intentionally, with knowledge or reason to know that it would cause or facilitate infringement. "[T]he mental state requirement in Section 1202(b)" has "a more specific application than the universal possibility of encouraging infringement; *specific allegations as to how identifiable infringements 'will' be affected are necessary*." *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 674 (9th Cir. 2018) (affirming grant of summary judgment to defendant on § 1202(b) claim). Accordingly, a "plaintiff must provide evidence from which one can infer that future infringement is likely, albeit not certain, to occur as a result of the removal or alteration of CMI." *Id.* at 675.

Although *Stevens* addressed scienter at the summary judgment stage, pleading a claim under 1202(b) still requires "specific allegations as to how identifiable infringements will be affected by [d]efendants' alleged removing or altering of CMI," a "pattern of conduct demonstrating [that]

[d]efendants knew or had reason to know that their actions would cause future infringement," and "non-conclusory" facts demonstrating the requisite scienter. *Mills v. Netflix, Inc.*, 2020 WL 548558, at *3 (C.D. Cal. Feb. 3, 2020) (dismissing DMCA claim because scienter was inadequately pleaded); *O'Neal*, 583 F. Supp. 3d at 1287 (same). Scienter need not be pleaded with particularity, but it still must be plausibly alleged. *Iqbal*, 556 U.S. at 686-87 ("Rule 9 merely excuses a party from pleading [knowledge] under an elevated pleading standard. It does not give him license to evade the less rigid - though still operative - strictures of Rule 8").

Here, Plaintiffs allege that "Meta knew or had reasonable grounds to know" that removing CMI (or, more accurately, failing to "preserve" it) "would facilitate copyright infringement by concealing the fact that every output from the LLaMA language models is an infringing derivative work." (¶¶ 49, 52.) This fails for the simple reason that, as explained above, Plaintiffs have not plausibly alleged that *any* LLaMA outputs are infringing. Meta could not have "removed" CMI intending to conceal infringement of which it was not allegedly aware and which Plaintiffs never identify.

### 3. Plaintiffs fail to state a claim under Section 1202(b)(3)

Plaintiffs also allege that Meta violated Section 1202(b)(3) by "creat[ing] derivative works based on Plaintiffs' Infringed Works" and "distributing [them] without [Plaintiffs'] CMI." (¶ 50.) Since the only "derivative work" Meta is accused of creating is LLaMA, itself (¶ 41), this allegation distills to a charge that Meta somehow unlawfully removed CMI *from LLaMA*. This claim is fundamentally incompatible with the language of Section 1202(b)(3), which prohibits distribution of copies of works with CMI removed "without the authority of the copyright owner" of that work. 17 U.S.C. § 1202(b). As Plaintiffs acknowledge, Meta "created" LLaMA. (¶ 50.) Thus, Meta is the author of LLaMA and the sole party in whom copyright ownership and authority over LLaMA vests. 17 U.S.C. § 201(a). By the same token, none of the *Plaintiffs* could legitimately claim to be the author or copyright owner of the LLaMA language models. Their attempt to hold Meta liable for not including all *Plaintiffs'* CMI on LLaMA—even though Plaintiffs are not LLaMA's authors or copyright owners and such CMI would, by definition, be false—finds no basis in the DMCA.

And if the foregoing was somehow insufficient to justify dismissal with prejudice, Plaintiffs *also* do not allege what CMI was removed from LLaMA or how, let alone how such removal could

conceivably conceal that "every *output* from the LLaMA language models is an infringing derivative work." (¶ 52 (emphasis added).)  Nor could they.  Perhaps Plaintiffs mean to suggest that Meta was obligated to identify Plaintiffs' CMI in connection with distribution of LLaMA.  That is a different claim from the one pleaded, namely, that Meta *removed* CMI *from LLaMA*, and distributed copies of LLaMA with CMI having been removed.  (*See* ¶ 50.)  In any case, such claim would be subject to dismissal on the grounds that (1) it does not describe a "removal" of CMI, and (2) Section 1202(b)(3) applies only to distribution of exact copies of a party's works with CMI removed (*see O'Neal*, 583 F. Supp. 3d at 1287).  Here, Plaintiffs allege that both LLaMA and its outputs are "infringing derivative works"; not identical copies.  (¶¶ 41, 44.)  This claim fails.

### D.     Plaintiffs Fail to State a Claim for Unfair Competition (Claim 4)

Plaintiff's UCL claim also fails as a matter of law.  The UCL prohibits business practices that are (1) unlawful, (2) fraudulent, or (3) unfair.  *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1105 (N.D. Cal. 2017).  Plaintiffs plead violation of the "unlawful" prong based on two alleged predicate acts: (1) "violating Plaintiffs' rights under the DMCA"; and (2) "using Plaintiffs' Infringed Works to train LLaMA" without authorization.[3]  (¶ 55.)  Neither supports a claim.

The first basis fails because, as discussed above, Plaintiffs fail to state a DMCA violation.  The UCL unlawful prong "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Id.* (quoting *Alvarez v. Chevron Corp.*, 656 F.3d 925, 933 n.8 (9th Cir. 2011)).  A UCL unlawful claim "cannot survive" where, as here, it is predicated on a defective claim.  *Mohanna v. Carrington Mortg. Servs. LLC*, 2018 WL 3730419, at *8 (N.D. Cal. Aug. 6, 2018) (dismissing UCL claim for lack of predicate violation).

---

[3] Plaintiffs also include an off-hand reference to alleged "fraudulent" conduct.  (¶ 58 (alleging "consumers are likely to be deceived" because unidentified output from LLaMA has been "emitted without any credit to Plaintiffs … whose Infringed Works comprise LLaMA's training dataset").)  A UCL fraud claim requires Plaintiffs to allege *they* were deceived, which Plaintiffs cannot do here.  *See Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc.*, 2018 WL 659105, at *13 (N.D. Cal. Feb. 1, 2018); *Berk v. Coinbase, Inc.*, 2019 WL 3561926, at *4 (N.D. Cal. Aug. 6, 2019) (Chhabria, J.) (dismissing UCL fraud claim for failure to "particularly plead reliance" by plaintiffs), *rev'd and remanded on other grounds*, 840 F. App'x 914 (9th Cir. 2020).  Further, absent identification of specific "deceptive" outputs, this claim fails even to satisfy Rule 8, much less Rule 9's heightened pleading standard.  *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) ("fraud must be accompanied by the 'who, what, when, where, and how'").

The second basis, which concerns Meta's use of Plaintiffs' copyrighted works to train LLaMA, is merely a recasting of its claim for copyright infringement and, therefore, preempted by the Copyright Act. Under the Copyright Act, "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 … are governed exclusively by this title," and no person "is entitled to any such right or equivalent right in any such work under the common law or statutes of any State." 17 U.S.C. § 301(a).

The Ninth Circuit uses a two-part test to assess whether a state law claim is preempted by the Copyright Act. *Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1010 (9th Cir. 2017)). First, it asks whether the "subject matter" of the claim falls within the subject matter of copyright described in 17 U.S.C. §§ 102, 103. If so, the court must "determine whether the rights asserted under state law are equivalent to the rights contained in" Section 106. *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1138 (9th Cir. 2006). "[T]he state cause of action must protect rights which are qualitatively different from the copyright rights. The state claim must have an extra element which changes the nature of the action." *Del Madera Props. v. Rhodes & Gardner, Inc.*, 820 F.2d 973 (9th Cir. 1987), *overruled on other grounds, Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994).

Here, the subject matter of Plaintiffs' UCL claim is their copyrighted books, which plainly falls within the subject matter of copyright. *See Maloney*, 853 F.3d at 1011. Further, the purported violation is Meta's unauthorized "use[]" of those books "to train LLaMA." (¶ 57.) Although Plaintiffs artfully direct their UCL claim to improper "use" as opposed to "copying" (*id.*), the only unauthorized "use" of Plaintiffs works Meta is alleged to have made was to copy them in training LLaMA (*see* ¶ 40), which likewise falls squarely within the ambit of 17 U.S.C. § 106(1) (granting the copyright owner the exclusive right to "reproduce the copyrighted work in copies"). To the extent Plaintiffs' UCL claim is premised on unauthorized use or copying of their books, it must be dismissed with prejudice as preempted. *See Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1152 (9th Cir. 2008) (affirming dismissal of UCL claim with prejudice as preempted); *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 823 F. App'x 516, 519 (9th Cir. 2020) (affirming summary judgment on preemption grounds); *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1213 (9th Cir. 1998) (same).

**E. Plaintiffs Fail to State a Claim for Unjust Enrichment (Claim 5)**

Like their UCL claim, Plaintiffs' claim for "unjust enrichment" under California common law is coextensive with their copyright claim and, thus, preempted under Section 301. Specifically, Plaintiffs allege that Meta "unjustly utilized access to the Infringed Works to train LLaMA." (¶ 3 at 9.) That is identical to, not "qualitatively different from," Plaintiffs' copyright rights. *Del Madera Props.*, 820 F.2d at 977 (dismissing unjust enrichment claim based on an implied promise not to use copyrighted work). The unjust enrichment claim should be dismissed with prejudice.

Even if Plaintiffs' unjust enrichment claim were not preempted (it is), dismissal would still be warranted. Courts in this Circuit interpret a standalone claim for "unjust enrichment" as a "quasi-contract claim seeking restitution." *Rabin v. Google LLC*, 2023 WL 4053804, at *12 (N.D. Cal. June 15, 2023) (quoting *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015)); *see also Locklin v. StriVectin Operating Co.*, 2022 WL 867248, at *3 (N.D. Cal. Mar. 23, 2022) (Chhabria, J.). Because Plaintiffs do not and cannot allege the required "affiliation or connection [with Meta] to invoke a quasi-contract theory of liability," Claim 5 should be dismissed with prejudice for this additional reason. *Sugarfina, Inc. v. Sweet Pete's LLC*, 2017 WL 4271133, at *8 (C.D. Cal. Sept. 25, 2017) (dismissing unjust enrichment claim in trademark dispute with prejudice).

**F. Plaintiffs Fail to State a Claim for Negligence (Claim 6)**

Plaintiffs theorize that Meta owed them and breached a general duty of care by negligently (1) "collecting, maintaining and controlling Plaintiffs' and Class members' Infringed Works"; and (2) "engineering, designing, maintaining and controlling systems—including LLaMA—which are trained on Plaintiffs' and Class members' Infringed Works without their authorization." (¶ 11 at 10.) In other words: Meta allegedly copied Plaintiffs' books in the process of training LLaMA without their consent. This claim is preempted and fails to state a claim in any event.

<u>First</u>, as to preemption, the "duty" to which Plaintiffs obliquely refer is, in effect, an obligation not to copy their copyrighted books without permission. Plainly, Plaintiffs have "merely recharacterize[d] a copyright infringement claim as one for negligence." *See Dielsi v. Falk*, 916 F. Supp. 985, 992 (C.D. Cal. 1996) (dismissing claim as preempted); *Cromwell v. Certified Forensic Loan Auditors*, 2019 WL 1095837, at *11 (N.D. Cal. Jan. 10, 2019) (rejecting as preempted a

1  negligence claim premised on defendant's unauthorized publication of a book online).  Whether

2  cast as an issue of unfair competition, unjust enrichment, or negligence, Plaintiffs' claim that Meta

3  made unauthorized copies of Plaintiffs' books in the process of training LLaMA is a paradigmatic

4  copyright claim governed exclusively by the Copyright Act.  The negligence claim cannot stand.

5  Second, Plaintiffs plead the elements of negligence in only a threadbare and conclusory

6  manner, which does not suffice.  *Iqbal*, 556 U.S. at 678.  In addition to the "existence of a duty,

7  [and] a breach of that duty," they were also required to allege "damages proximately caused by the

8  breach."  *Mayall ex rel. H.C. v. USA Water Polo, Inc*., 909 F.3d 1055, 1060 (9th Cir. 2018).

9  Plaintiffs make no attempt to do so.  They do not even allege *that* they suffered damages, let alone

10  what those damages consist of and how Meta supposedly caused them.  (*See* ¶¶ 9–14 at 9–10.)

11  Dismissal is required.  *See Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1031–32 (N.D. Cal. 2012)

12  (dismissing negligence claim for failure to allege an "appreciable, nonspeculative, present injury").

13  Third, even if Plaintiffs had pleaded that they were injured by Meta's alleged "use" of the

14  Infringed Works (they have not), the claim is barred by the "economic loss doctrine."  In actions

15  for negligence in California, recovery of purely economic loss is foreclosed in the absence of

16  "(1) personal injury, (2) physical damage to property, (3) a 'special relationship' existing between

17  the parties, or (4) some other common law exception to the rule."  *Kalitta Air, LLC v. Cent. Tex.

18  Airborne Sys., Inc.*, 315 App'x 603, 605 (9th Cir. 2008) (quoting *J'Aire Corp. v. Gregory*, 24 Cal.

19  3d 799, 804 (1979)); *see also Strumlauf v. Starbucks Corp.*, 192 F. Supp. 3d 1025, 1035 (N.D. Cal.

20  2016) (granting motion to dismiss on ground that economic loss doctrine barred plaintiff's claim).

21  To the extent that the Complaint includes any vague suggestion of injury, that injury is purely

22  economic in nature.  Plaintiffs were therefore required to also plead an exception to the economic

23  loss rule, which they have not attempted to do, warranting dismissal.

24  **V.  CONCLUSION**

25  Plaintiffs' efforts to contort copyright law to manufacture infringement claims against Meta

26  are as unavailing as their efforts to recast those defective claims under California statutory and

27  common law.  For all of the foregoing reasons, Claim 1, in part, and Claims 2 through 6 should be

28  dismissed with prejudice.

Dated: September 18, 2023

COOLEY LLP

By: _____
Bobby Ghajar
Angela L. Dunning
Mark Weinstein
Judd Lauter
Colette Ghazarian

LEX LUMINA PLLC
Mark A. Lemley

Attorneys for Defendant
META PLATFORMS, INC.

# EXHIBIT  B

Joseph R. Saveri (State Bar No. 130064)
Cadio Zirpoli (State Bar No. 179108)
Christopher K.L. Young (State Bar No. 318371)
Holden Benon (State Bar No. 325847)
Kathleen J. McMahon (State Bar No. 340007)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:    (415) 500-6800
Facsimile:    (415) 395-9940
Email:        jsaveri@saverilawfirm.com
              czirpoli@saverilawfirm.com
              cyoung@saverilawfirm.com
              hbenon@saverilawfirm.com
              kmcmahon@saverilawfirm.com

Matthew Butterick (State Bar No. 250953)
1920 Hillhurst Avenue, #406
Los Angeles, CA 90027
Telephone: (323) 968-2632
Facsimile:  (415) 395-9940
Email:      mb@butericklaw.com

Bryan L. Clobes (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
205 N. Monroe Street
Media, PA 19063
Telephone: (215) 864-2800
Email:      bclobes@caffertyclobes.com

*Counsel for Individual and Representative
Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| Richard Kadrey, Sarah Silverman, Christopher Golden, Michael Chabon, Ta-Nehisi Coates, Junot Díaz, Andrew Sean Greer, David Henry Hwang, Matthew Klam, Laura Lippman, Rachel Louise Snyder, Ayelet Waldman, and Jacqueline Woodson, <br><br> *Individual and Representative Plaintiffs*, <br><br> v. <br><br> Meta Platforms, Inc., a Delaware corporation; <br><br> *Defendant.* | Case No. 3:23-cv-03417-VC <br><br> **FIRST CONSOLIDATED AMENDED COMPLAINT** <br><br> **Class Action** <br><br> **Demand for Jury Trial** |

Plaintiffs Richard Kadrey, Sarah Silverman, Christopher Golden, Michael Chabon, Ta-Nehisi Coates, Junot Díaz, Andrew Sean Greer, David Henry Hwang, Matthew Klam, Laura Lippman, Rachel Louise Snyder, Ayelet Waldman, and Jacqueline Woodson ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint (the "Complaint") against Defendant Meta Platforms, Inc. ("Meta").

## I.      OVERVIEW

1.      "Llama" is the name given to a series of large language models created and maintained by Meta. A *large language model* is an AI software program designed to emit convincingly naturalistic text outputs in response to user prompts.

2.      Rather than being programmed in the traditional way, a large language model is "trained" by copying massive amounts of text and extracting expressive information from it. This body of text is called the *training dataset*.

3.      A large language model's output is therefore entirely and uniquely reliant on the material in its training dataset. Every time it assembles a text output, the model relies on the information it extracted from its training dataset. Thus, the decisions about what textual information to include in the training dataset are deliberate and important choices.

4.      Plaintiffs and Class members are authors of books. Plaintiffs and Class members have copyrights in the books they published. Plaintiffs and Class members did not consent to the use of their copyrighted books as training material for Llama 1 and Llama 2.

5.      Nonetheless, their copyrighted materials were copied and ingested as part of training Llama 1 and Llama 2. Many of Plaintiffs' copyrighted books appear in the dataset that Meta has admitted to using to train Llama 1. On information and belief, Plaintiffs' copyrighted books also appear in the dataset that Meta used to train Llama 2.

## II.     JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case arises under the Copyright Act (17 U.S.C. § 101 *et seq.*).

7.      Jurisdiction and venue is proper in this judicial district under 28 U.S.C. § 1391(c)(2) because Defendant Meta Platforms, Inc. ("Meta") is headquartered in this district, and thus a substantial part of the events giving rise to the claim occurred in this district; and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and a substantial portion of the affected interstate trade and commerce was carried out in this District. Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. Defendant's conduct has had the intended and foreseeable effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

8.      Under Civil Local Rule 3.2(d), assignment of this case to the San Francisco Division is proper because Meta is headquartered in San Mateo County, where a substantial part of the events giving rise to the claim occurred, a substantial amount part of the events giving rise to Plaintiffs' claims and the interstate trade and commerce involved and affected by Defendant's conduct giving rise to the claims herein occurred in this Division.

## III.     PARTIES

### A.     Plaintiffs

9.      Plaintiff Richard Kadrey is a writer who lives in Pennsylvania and owns registered copyrights in multiple works, including *Sandman Slim*.

10.     Plaintiff Sarah Silverman is a writer and performer who lives in California and owns a registered copyright in one work, called *The Bedwetter*.

11.     Plaintiff Christopher Golden is a writer who lives in Massachusetts and owns registered copyrights in multiple works, including *Ararat*.

12.     Plaintiff Michael Chabon is an author who lives in California and owns registered copyrights in multiple works, including *The Amazing Adventures of Kavalier & Clay*.

13.     Plaintiff Ta-Nehisi Coates is an author who lives in New York and owns registered copyrights in multiple works, including *The Beautiful Struggle*.

14.     Plaintiff Junot Díaz is an author who lives in Massachusetts and owns registered copyrights in multiple works, including *Drown*.

15.     Plaintiff Andrew Sean Greer is an author who lives in California and owns registered copyrights in multiple works, including *The Confessions of Max Tivoli.*

16.     Plaintiff David Henry Hwang is a playwright and screenwriter who lives in New York and owns registered copyrights in multiple works, including *M. Butterfly.*

17.     Plaintiff Matthew Klam is an author who lives in Washington, D.C. and owns registered copyrights in multiple works, including *Who is Rich?*

18.     Plaintiff Laura Lippman is an author who lives in Maryland and owns registered copyrights in multiple works, including *After I'm Gone.*

19.     Plaintiff Rachel Louise Snyder is an author who lives in Washington, D.C. and owns registered copyrights in multiple works, including *No Visible Bruises: What We Don't Know About Domestic Violence Can Kill Us.*

20.     Plaintiff Ayelet Waldman is an author and screen and television writer who lives in California and owns registered copyrights in multiple works, including *Love and Other Impossible Pursuits*.

21.     Plaintiff Jacqueline Woodson is an author who lives in New York and owns registered copyrights in multiple works, including *Brown Girl Dreaming*.

22.     A nonexhaustive list of registered copyrights owned by Plaintiffs is included as **Exhibit A**.

**B.      Defendant**

23.      Defendant Meta is a Delaware corporation with its principal place of business at 1601 Willow Road, Menlo Park, California 94025.

## IV.      AGENTS AND CO-CONSPIRATORS

24.      The unlawful acts alleged against the Defendant in this class action complaint were authorized, ordered, or performed by the Defendant's respective officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction, or control of the Defendant's businesses or affairs. The Defendant's agents operated under the explicit and apparent authority of their principals. Each Defendant, and its subsidiaries, affiliates, and agents operated as a single unified entity.

25.      Various persons and/or firms not named as Defendants may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. Each acted as the principal, agent, or joint venture of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

## V.      FACTUAL ALLEGATIONS

26.      Meta is a diversified internet company that creates, markets, and sells software and hardware technology products, including Facebook, Instagram, and Horizon Worlds. Meta also has a large artificial-intelligence group called Meta AI that creates and distributes artificial-intelligence software products.

27.      *Artificial intelligence* is commonly abbreviated "AI." AI software is designed to algorithmically simulate human reasoning or inference, often using statistical methods.

28.      In February 2023, Meta released the initial version of an AI product called LLaMA, though Meta has since revised its spelling to "Llama." Llama is a series of *large language models.* A large language model (or "LLM" for short) is AI software designed to parse and emit natural language. Though a large language model is a software program, it is not created the way most software

programs are—that is, by human software engineers writing code. Rather, a large language model is "trained" by copying massive amounts of text from various sources and feeding these copies into the model. This corpus of input material is called the *training dataset*. During training, the large language model copies each piece of text in the training dataset and extracts expressive information from it. The large language model progressively adjusts its output to more closely resemble the sequences of words copied from the training dataset. Once the large language model has copied and ingested all this text, it is able to emit convincing simulations of natural written language as it appears in the training dataset.

29.     Much of the material in Meta's training dataset, however, comes from copyrighted works—including books written by Plaintiffs—that were copied by Meta without consent, without credit, and without compensation.

30.     The first version of Llama, called Llama 1, was trained between December 2022 and February 2023.

31.     In February 2023, Meta introduced Llama 1 in a paper called "[Llama 1]: Open and Efficient Foundation Language Models"[1] (the "Llama 1 Paper"). In the Llama 1 Paper, Meta describes the Llama 1 training dataset as "a large quantity of textual data" that was chosen because it was "publicly available, and compatible with open sourcing."

32.     *Open sourcing* refers to putting data under a permissive style of copyright license called an *open-source license*. Copyrighted materials, however, are not ordinarily "compatible with open sourcing" unless and until the copyright owner first places the material under an open-source license, thereby enabling others to do so later.

33.     In the Llama 1 Paper, in a table describing the composition of the Llama 1 training dataset, Meta notes that 85 gigabytes of the training data comes from a category called "Books." Meta further elaborates that "Books" comprises the text of books from two internet sources: (1) Project

---

[1] https://arxiv.org/pdf/2302.13971.pdf

Gutenberg, an online archive of approximately 70,000 books that are out of copyright, and (2) "the

Books3 section of ThePile . . . a publicly available dataset for training large language models." The

Llama 1 Paper does not further describe the contents of Books3 or The Pile.

34.     But that information is available elsewhere. The Pile is a dataset assembled by a

research organization called EleutherAI. In December 2020, EleutherAI discussed this dataset in a

paper called "The Pile: An 800GB Dataset of Diverse Text for Language Modeling"[2] (The "EleutherAI

Paper").

35.     The EleutherAI Paper reveals that the Books3 dataset comprises 108 gigabytes of data,

or approximately 12% of the dataset, making it the third largest component of The Pile by size.

36.     The EleutherAI Paper describes the contents of Books3:

> Books3 is a dataset of books derived from a copy of the contents of the
> Bibliotik private tracker … Bibliotik consists of a mix of fiction and
> nonfiction books and is almost an order of magnitude larger than our
> next largest book dataset (BookCorpus2). We included Bibliotik because
> books are invaluable for long-range context modeling research and
> coherent storytelling.

37.     Bibliotik is one of a number of notorious "shadow library" websites that also includes

Library Genesis (aka LibGen), Z-Library (aka B-ok), Sci-Hub, and Anna's Archive. The books and

other materials aggregated by these websites have also been available in bulk via torrent systems.

These shadow libraries have long been of interest to the AI-training community because of the large

quantity of copyrighted material they host. For that reason, these shadow libraries are also flagrantly

illegal.

38.     The person who assembled the Books3 dataset, Shawn Presser, has confirmed in public

statements that it represents "all of Bibliotik"[3] and contains 196,640 books.

---

[2] https://arxiv.org/pdf/2101.00027.pdf

[3] https://twitter.com/theshawwn/status/1320282149329784833

39.     Many of Plaintiffs' books appear in the Books3 dataset. A list of Plaintiffs' books currently known to exist in the Books3 dataset is attached as Exhibit B. Together, these books are referred to as the **Infringed Works**.

40.     Shawn Presser posts comments on the website Hacker News (https://news.ycombinator.com) under the name "sillysaurusx." In response to another commenter asking about the origin of Books3 in 2020, Presser said, "It was bibliotik. . . . The llama folks [meaning Meta] had to [remove duplicates from] the books themselves. . . . Basically, the-eye.eu was at one point hosting all of bibliotik, so I downloaded all the epubs [the native format for electronic books] and converted them to text. I still have those epubs (incidentally thanks to Carmack, who through a convoluted process managed to save the them and send them to me via snail mail)."[4] On information and belief, the only "Carmack" who could be identified mononymously on Hacker News is prominent software engineer John Carmack, who was employed by Meta during the events described by Presser.

41.     Until August 2023, EleutherAI facilitated the download of copies of Books3 through its website (https://pile.eleuther.ai/) by linking to a second site called The Eye (the-eye.eu). In August 2023, the Books3 dataset was removed from The Eye in response to a takedown notice by the Danish Rights Alliance.

42.     Until October 2023, the Books3 dataset was also available from a popular AI project hosting service called Hugging Face (https://huggingface.co/datasets/the_pile_books3). In October 2023, the Books3 dataset was removed from Hugging Face, with a message that it "is defunct and no longer accessible due to reported copyright infringement."

43.     On information and belief, the Books3 dataset is still circulating on the public internet and can be downloaded by those sufficiently motivated.

---

[4] https://news.ycombinator.com/item?id=36197731

44.     In the Llama 1 Paper, Meta says it copied material for the Llama 1 training dataset that was "publicly available." Importantly, however, "publicly available" does not mean "public domain." A work in the public domain is not protected by copyright. A work that is publicly available, on the other hand, may still be protected by copyright and other intellectual-property laws.

45.     Meta is well aware of this distinction. In the Llama 1 Paper, Meta describes Project Gutenberg as comprising "books that are in the *public domain*," whereas it acknowledges Books3 was merely "a *publicly available* dataset" (emphases added).

46.     Still, even "publicly available" is a misleading description of Books3. The books in Books3 were not put there by the copyright owners, including Plaintiffs. Rather, their books became "publicly available" via Books3 only because of the willful efforts of John Carmack, Shawn Presser, and EleutherAI to copy and distribute them for free without the authorization of Plaintiffs.

47.     Before Meta used Books3 for training its language models, it had already publicly acknowledged the legal problems with Books3.

48.     In November 2020, Meta AI researcher Tim Dettmers initiated a conversation on the EleutherAI public Discord server about Meta's interest in using The Pile as training data.

49.     Dettmers said, "It is really great work that you are doing with The Pile. Having a large public dataset that is easily accessible was long overdue!" A couple minutes later, Dettmers added, "A colleague of mine and I wanted to use [The Pile] dataset in our research and wondering what would be the best way to build on your research efforts."

50.     Leo Gao, an AI researcher affiliated with EleutherAI, exchanged a number of messages with Dettmers, and then said, "any downstream use of the data can begin right away."

51.     Dettmers asked, "in other words you would be happy if we are already using the data?"

52.     Gao responded, "yup, you can start now."

53.     Dettmers asked, "It is okay to download [The Pile] from the server that you linked?"

54.     Gao responded, "yeah, go right ahead."

FIRST CONSOLIDATED AMENDED COMPLAINT

55.     Dettmers then asked, ███████████████████████████████████████
████████████████████████████████████████████ Do you have a sense if there
would be any legal concerns with parts of the data?"

56.     Gao responded, "[I] believe that merely training on it should fall under fair use
… Stella Biderman [another AI researcher affiliated with EleutherAI] might have a bit more to say
[with respect to] legality."

57.     Dettmers said, "Sounds good! ████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████

58.     Responding to Dettmers, Gao said "[I]'m so glad that you like [The Pile] and are
interested in using it in your work and [I]'d definitely be down to talk about any potential legal
problems in the future."

59.     Responding to Dettmers, Stella Biderman said, "Happy to chat about legal questions
you have. tl;dr your legal dept is most likely to be worried about books3 which contains the text of
books with active copyrights. . . . In the US this is all a legal grey area because of a lack of court
rulings, but there's a very strong case for free use, even with books3."

60.     In December 2020, Dettmers posted on the EleutherAI Discord server: ████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████

61.     In January 2021, Dettmers posted on the EleutherAI Discord server: "At Facebook [since renamed Meta] there are a lot of people interested in working with [T]he [P]ile, including myself, ██████████████████████████████████ Would there be interest in working on this together, █████████████████████████████████████████████ ████████████████████████████████████

62.     Later that day, Dettmers added, ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████

63.     ████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████   Nevertheless, between December 2022 and February 2023, Meta still included Books3 in the training dataset for Llama 1, causing the books in Books3 to be copied and ingested during the training process, and published Llama 1.

64.     In August 2023, EleutherAI removed from public view these conversations between Tim Dettmers, Stella Biderman, and Leo Gao concerning The Pile and Books3.

65.     At the launch of the Llama 1 language models in February 2023, Meta made those models selectively available to organizations that requested access, saying:

> To maintain integrity and prevent misuse, we are releasing our model under a noncommercial license focused on research use cases. Access to the model will be granted on a case-by-case basis to academic researchers; those affiliated with organizations in government, civil society, and academia; and industry research laboratories around the world. People interested in applying for access can find the link to the application in our research paper.

66.     Meta has not disclosed what criteria it used to decide who was eligible to receive the Llama 1 language models, nor who actually received them, nor whether Meta in fact adhered to its stated criteria. On information and belief, Meta has in fact distributed the Llama 1 models to certain people and entities, continues to do so, and has benefited financially from these acts. Meta would later say that it "received unprecedented interest in the Llama 1 model we released for the research community—more than 100,000 individuals and organizations have applied for access to Llama 1 and tens of thousands are now using it to innovate." This implies that Meta's original suggestion that Llama 1 was focused on research was pretextual. Rather, Llama 1 was always intended to either become commercially available and lucrative, or as a precursor to another product that would be commercially available and lucrative.

67.     In March 2023, the Llama 1 language models were leaked to a public internet site and have continued to circulate. Meta has not disclosed what role it had, if any, in the leak.

68.     Later in March 2023, Meta issued a DMCA takedown notice to a programmer on GitHub who had released a tool that helped users download the leaked Llama 1 language models. In the notice, Meta asserted copyright over the Llama 1 language models.

69.     Between January and July 2023, Meta trained the successor to the Llama 1 language models, called Llama 2. On information and belief, Llama 2 was also trained on Books3, because the training period for Llama 2 (January–July 2023) overlapped with the training for Llama 1 (December 2022–February 2023), and took place before the initial complaint in this action was filed.

70.     Meta released the Llama 2 models in July 2023, after the initial complaint in this action was filed. Information about Llama 2 is available in a research paper released on July 19, 2023 called "Llama 2: Open Foundation and Fine-Tuned Chat Models"[5] (the "Llama 2 Paper").

---

[5] https://arxiv.org/pdf/2307.09288.pdf

71.     With Llama 2, Meta abandoned all pretext of non-commercial purpose. According to the FAQ for Llama 2,[6] "Llama 2 is . . . available under a permissive commercial license, whereas Llama 1 was limited to non-commercial use."

72.     In contrast to Llama 1, Meta chose not to reveal the training datasets for Llama 2. According to the FAQ for Llama 2, "[Q:] Where did the data come from to train the models? . . . [A:] A combination of sources are used for training. These sources include information that is publicly available online and annotated data to train our models. . . . [Q:] Why are you not sharing the training datasets for Llama 2? . . . [A:] data mixes are intentionally withheld for competitive reasons."

73.     This explanation, however, is likely pretextual. As explained in the Llama 2 Paper, Llama 2—like Llama 1—was also trained on a "mix of publicly available data." A more plausible explanation for Meta's decision to conceal its training data is to avoid scrutiny by those whose copyrighted works were copied and ingested during the training process for Llama 2.

74.     On information and belief, a key reason Meta chose not to share the training dataset for Llama 2 was to avoid litigation from using copyrighted materials for training that Meta had previously determined to be legally problematic. Indeed, as Meta acknowledged in its Form 10-Q filing on October 26, 2023, Meta is the subject of lawsuits which are challenging the "alleged use of copyright-protected content to train our [Meta's] AI models" and "any negative outcome from any such lawsuits could result in payments of substantial monetary damages or fines, or undesirable changes to our products or business practices, and accordingly our business, financial condition, or results of operations could be materially and adversely affected."

75.     The Llama 2 Paper warns that the "Llama 2 models should be used carefully and deployed only after significant safety tuning is applied" because "Llama 2 does not outperform other models on toxicity metrics." The term *toxicity metrics* refers to measurements of a language model's

---

[6] https://ai.meta.com/llama/faq/

propensity to emit output that is offensive, dangerous, or harmful. Meta "speculate[s] that [Llama's comparatively poor performance on toxicity metrics] may be because we refrained from aggressively filtering the [training] data. … We reiterate that this … choice does imply that additional safety mitigations should be applied before deployment."

76.     Despite these severe warnings, Meta still made the Llama 2 models available for free, to anyone, for commercial or noncommercial purposes.

## VI.     CLAIM FOR RELIEF

### Direct Copyright Infringement
### 17 U.S.C. § 101 et seq.

77.     Plaintiffs incorporate by reference the preceding factual allegations.

78.     As the owners of the registered copyrights in the Infringed Works, Plaintiffs hold the exclusive rights to those books under 17 U.S.C. § 106.

79.     To train the Llama 1 and Llama 2 language models, Meta copied the Books3 dataset, which includes the Infringed Works.

80.     Plaintiffs never authorized Meta to make copies of their Infringed Works, make derivative works, publicly display copies (or derivative works), or distribute copies (or derivative works). All those rights belong exclusively to Plaintiffs under copyright law.

81.     Meta made copies of the Infringed Works during the training process of the Llama 1 and Llama 2 language models without Plaintiffs' permission.

82.     Plaintiffs have been injured by Meta's acts of direct copyright infringement. Plaintiffs are entitled to statutory damages, actual damages, restitution of profits, and other remedies provided law.

# VII.   CLASS ALLEGATIONS

**A.     Class Definition**

83.     Plaintiffs bring this action for damages and injunctive relief as a class action under

Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of the following Class:

> **All persons or entities domiciled in the United States that own a
> United States copyright in any work that was used as training data
> for any version of the Llama language models between July 7, 2020
> and the present (the "Class Period").**

84.     This Class definition excludes:

a.     Defendant named herein;

b.     any of the Defendant's co-conspirators;

c.     any of Defendant's parent companies, subsidiaries, and affiliates;

d.     any of Defendant's officers, directors, management, employees, subsidiaries,

affiliates, or agents;

e.     all governmental entities; and

f.     the judges and chambers staff in this case, as well as any members of their

immediate families.

**B.     Numerosity**

85.     Plaintiffs do not know the exact number of members in the Class. This information is in

the exclusive control of Defendant. On information and belief, there are at least thousands of members

in the Class geographically dispersed throughout the United States. Therefore, joinder of all members

of the Class in the prosecution of this action is impracticable.

**C.     Typicality**

86.     Plaintiffs' claims are typical of the claims of other members of the Class because

Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendant as

alleged herein, and the relief sought herein is common to all members of the Class.

## D.     Adequacy

87.     Plaintiffs will fairly and adequately represent the interests of the members of the Class because the Plaintiffs have experienced the same harms as the members of the Class and have no conflicts with any other members of the Class. Furthermore, Plaintiffs have retained sophisticated and competent counsel who are experienced in prosecuting federal and state class actions, as well as other complex litigation.

## E.     Commonality and Predominance

88.     This action is appropriate as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law predominate over individual questions including:

a.  Whether Defendants' copying and downloading of the Class's copyrighted works and using them to train the Llama 1 and Llama 2 language models constitute copyright infringement;

b.  Whether any statutes of limitation limits Plaintiffs' and the Class's potential for recovery;

c.  Whether Defendants' copying and downloading of the Class's copyrighted works was fair use;

d.  Whether Class members were harmed by Meta's copying and downloading of the Class's Works to train the Llama 1 and Llama 2 language models, and whether Class members are entitled to damages, including statutory damage and the amount of such damages.

89.     These and other questions of law and fact are common to the Class predominate over any questions affecting the members of the Class individually.

## F.     Other Class Considerations

90.     Defendants have acted on grounds generally applicable to the Class. This class action is superior to alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecuting

the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

91. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VIII.   DEMAND FOR JUDGMENT

Wherefore, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class defined herein, by ordering:

a) This action may proceed as a class action, with Plaintiffs serving as Class Representatives, and with Plaintiffs' counsel as Class Counsel.Judgment in favor of Plaintiffs and the Class and against Defendant.

b) A declaration that Meta has infringed Plaintiffs and the Class' exclusive copyrights in the Infringed Works under the Copyright Act.

c) A declaration that such infringement is willful.

d) An award of Plaintiffs' and the Class' actual damages and profits under 17 U.S.C. § 504(b) as shall be determined at trial, or at their election, an award of statutory damages in an amount to be determined at trial, as provided in 17 U.S.C. § 504(c), resulting from Meta's willful infringement of Plaintiffs' and the Class' exclusive copyrights in the Infringed Works.

e) An order of costs and allowable attorneys' fees under 17 U.S.C. § 505.

a) Pre- and post-judgment interest on the damages awarded to Plaintiffs and the Class, and that such interest be awarded at the highest legal rate from and after the date this class action complaint is first served on Defendant.

b)  Defendants are to be jointly and severally responsible financially for the costs and
    expenses of a Court approved notice program through post and media designed to give
    immediate notification to the Class.

c)  Further relief for Plaintiffs and the Class as may be just and proper.

## IX.    JURY TRIAL DEMANDED

Under Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

Dated: December 11, 2023

By:     */s/ Joseph R. Saveri*
       Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Cadio Zirpoli (State Bar No. 179108)
Christopher K.L. Young (State Bar No. 318371)
Holden Benon (State Bar No. 325847)
Kathleen J. McMahon (State Bar No. 340007)
JOSEPH SAVERI LAW FIRM, LLP
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:   (415) 500-6800
Facsimile:   (415) 395-9940
Email:      jsaveri@saverilawfirm.com
          czirpoli@saverilawfirm.com
          cyoung@saverilawfirm.com
          hbenon@saverilawfirm.com
          kmcmahon@saverilawfirm.com

Matthew Butterick (State Bar No. 250953)
1920 Hillhurst Avenue, #406
Los Angeles, CA 90027
Telephone:   (323) 968-2632
Facsimile:   (415) 395-9940
Email:      mb@butericklaw.com

Bryan L. Clobes (*pro hac vice*)
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
205 N. Monroe Street
Media, PA 19063
Telephone:   (215) 864-2800
Email:      bclobes@caffertyclobes.com

Alexander J. Sweatman (*pro hac vice forthcoming*)
**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
135 South LaSalle Street, Suite 3210
Chicago, IL 60603
Telephone:   (312) 782-4880
Email:      asweatman@caffertyclobes.com

Daniel J. Muller (State Bar No. 193396)
**VENTURA HERSEY & MULLER, LLP**
1506 Hamilton Avenue
San Jose, California 95125
Telephone: (408) 512-3022
Facsimile: (408) 512-3023
Email:     dmuller@venturahersey.com


*Counsel for Individual and Representative*
*Plaintiffs and the Proposed Class*

FIRST CONSOLIDATED AMENDED COMPLAINT

# EXHIBIT C

# Extracting Training Data from Diffusion Models

*Nicholas Carlini*[*1]  *Jamie Hayes*[*2]  *Milad Nasr*[*1]

*Matthew Jagielski*[+1]  *Vikash Sehwag*[+4]  *Florian Tramèr*[+3]

*Borja Balle*[†2]  *Daphne Ippolito*[†1]  *Eric Wallace*[†5]

[1]Google  [2]DeepMind  [3]ETHZ  [4]Princeton  [5]UC Berkeley

[*]Equal contribution  [+]Equal contribution  [†]Equal contribution

## Abstract

Image diffusion models such as DALL-E 2, Imagen, and Stable Diffusion have attracted significant attention due to their ability to generate high-quality synthetic images. In this work, we show that diffusion models memorize individual images from their training data and emit them at generation time. With a generate-and-filter pipeline, we extract over a thousand training examples from state-of-the-art models, ranging from photographs of individual people to trademarked company logos. We also train hundreds of diffusion models in various settings to analyze how different modeling and data decisions affect privacy. Overall, our results show that diffusion models are much less private than prior generative models such as GANs, and that mitigating these vulnerabilities may require new advances in privacy-preserving training.

## 1 Introduction

Denoising diffusion models are an emerging class of generative neural networks that produce images from a training distribution via an iterative denoising process [64, 66, 33]. Compared to prior approaches such as GANs [30] or VAEs [46], diffusion models produce higher-quality samples [18] and are easier to scale [56] and control [51]. Consequently, they have rapidly become the de-facto method for generating high-resolution images, and large-scale models such as DALL-E 2 [56] have attracted significant public interest.

The appeal of generative diffusion models is rooted in their ability to synthesize novel images that are ostensibly unlike anything in the training set. Indeed, past large-scale training efforts "do not find overfitting to be an issue", [60] and researchers in privacy-sensitive domains have even suggested that diffusion models could "protect[] the privacy [...] of real images" [37] by generating synthetic examples [13, 14, 59, 2, 53]. This line of work relies on the assumption that diffusion models do not memorize and regenerate their training data. If they did, it would violate all privacy guarantees and raise numerous questions regarding model generalization and "digital forgery" [65].

**Training Set** | **Generated Image**

 

*Caption: Living in the light with Ann Graham Lotz*

*Prompt: Ann Graham Lotz*

Figure 1: Diffusion models memorize individual training examples and generate them at test time. **Left:** an image from Stable Diffusion's training set (licensed CC BY-SA 3.0, see [49]). **Right:** a Stable Diffusion generation when prompted with "Ann Graham Lotz". The reconstruction is nearly identical ($\ell_2$ distance = 0.031).

In this work, we demonstrate that state-of-the-art diffusion models *do* memorize and regenerate individual training examples. To begin, we propose and implement new definitions for "memorization" in image models. We then devise a two-stage data extraction attack that generates images using standard approaches, and flags those that exceed certain membership inference scoring criteria. Applying this method to Stable Diffusion [58] and Imagen [60], we extract over a hundred near-identical replicas of training images that range from personally identifiable photos to trademarked logos (e.g., Figure 1).

To better understand how and why memorization occurs, we train hundreds of diffusion models on CIFAR-10 to analyze the impact of model accuracy, hyperparameters, augmentation, and deduplication on privacy. Diffusion models are the least private form of image models that we evaluate—for example, they leak more than twice as much training data as GANs. Unfortunately, we also find that existing privacy-enhancing techniques do not provide an acceptable privacy-utility tradeoff. Overall, our paper highlights the tension between increasingly powerful generative models and data privacy, and raises questions on how diffusion models work and how they should be responsibly deployed.

arXiv:2301.13188v1 [cs.CR] 30 Jan 2023

## 2   Background

**Diffusion models.** Generative image models have a long history (see [29, Chapter 20]). Generative Adversarial Networks (GANs) [30] were the breakthrough that first enabled the generation of high-fidelity images at scale [6, 44]. But over the last two years, diffusion models [64] have largely displaced GANs: they achieve state-of-the-art results on academic benchmarks [18] and form the basis of all recently popularized image generators such as Stable Diffusion [58], DALL-E 2 [57, 56], Runway [58], Midjourney [67] and Imagen [60].

*Denoising Diffusion Probabilistic Models* [33][1] are conceptually simple: they are nothing more than image *denoisers*. During training, given a clean image $x$, we sample a time-step $t \in [0, T]$ and a Gaussian noise vector $\varepsilon \sim \mathcal{N}(0, I)$, to produce a noised image $x' \leftarrow \sqrt{a_t} x + \sqrt{1 - a_t} \varepsilon$, for some decaying parameter $a_t \in [0, 1]$ where $a_0 = 1$ and $a_T = 0$. A diffusion model $f_\theta$ removes the noise $\varepsilon$ to recover the original image $x$ by predicting the noise that was added by stochastically minimizing the objective $\frac{1}{N} \sum_i \mathbb{E}_{t, \varepsilon} \mathscr{L}(x_i, t, \varepsilon; f_\theta)$, where

$$\mathscr{L}(x_i, t, \varepsilon; f_\theta) = \| \varepsilon - f_\theta(\sqrt{a_t} x_i + \sqrt{1 - a_t} \varepsilon, t) \|_2^2 \ . \quad (1)$$

Despite being trained with this simple denoising objective, diffusion models can *generate* high-quality images by first sampling a random vector $z_T \sim \mathcal{N}(0, I)$ and then applying the diffusion model $f_\theta$ to remove the noise from this random "image". To make the denoising process easier, we do not remove all of the noise at once—we instead iteratively apply the model to slowly remove noise. Formally, the final image $z_0$ is obtained from $z_T$ by iterating the rule $z_{t-1} = f_\theta(z_t, t) + \sigma_t \mathcal{N}(0, I)$ for a noise schedule $\sigma_t$ (dependent on $a_t$) with $\sigma_1 = 0$. This process relies on the fact that the model $f_\theta$ was trained to denoise images with varying degrees of noise. Overall, running this iterative generation process (which we will denote by Gen) with large-scale diffusion models produces results that resemble natural images.

Some diffusion models are further *conditioned* to generate a particular type of image. Class-conditional diffusion models take as input a class-label (e.g., "dog" or "cat") alongside the noised image to produce a particular class of image. Text-conditioned models take this one step further and take as input the text embedding of some *prompt* (e.g., "a photograph of a horse on the moon") using a pre-trained language encoder (e.g., CLIP [54]).

---

[1]Our description of diffusion models below omits a number of significant details. However, these details are orthogonal to the results of our attacks and we omit them for simplicity.

**Training data privacy attacks.** Neural networks often leak details of their training datasets. Membership inference attacks [62, 80, 8] answer the question "was this example in the training set?" and present a mild privacy breach. Neural networks are also vulnerable to more powerful attacks such as inversion attacks [27, 81] that extract representative examples from a target class, attribute inference attacks [28] that reconstruct subsets of attributes of training examples, and extraction attacks [10, 11, 5] that completely recover training examples. In this paper, we focus on each of these three attacks when applied to diffusion models.

Concurrent work explores the privacy of diffusion models. Wu *et al.* [78] and Hu *et al.* [34] perform membership inference attacks on diffusion models; our results use more sophisticated attack methods and study stronger privacy risks such as data extraction. Somepalli *et al.* [65] show several cases where (non-adversarially) sampling from a diffusion model can produce memorized training examples. However, they focus mainly on comparing the semantic similarity of generated images to the training set, i.e., "style copying". In contrast, we focus on worst-case privacy under a much more restrictive notion of memorization, and perform our attacks on a wider range of models.

## 3   Motivation and Threat Model

There are two distinct motivations for understanding how diffusion models memorize and regenerate training data.

**Understanding privacy risks.** Diffusion models that regenerate data scraped from the Internet can pose similar privacy and copyright risks as language models [11, 7, 31]. For example, memorizing and regenerating copyrighted text [11] and source code [35] has been pointed to as indicators of potential copyright infringement [76]. Similarly, copying images from professional artists has been called "digital forgery" [65] and has spurred debate in the art community.

Future diffusion models might also be trained on more sensitive private data. Indeed, GANs have already been applied to medical imagery [73, 20, 45], which underlines the importance of understanding the risks of generative models *before* we apply them to private domains.

Worse, a growing literature suggests that diffusion models could create synthetic training data to "protect the privacy and usage rights of real images" [37], and production tools already claim to use diffusion models to protect data privacy [71, 17, 12]. Our work shows diffusion models may be unfit for this purpose.

**Understanding generalization.** Beyond data privacy, understanding how and why diffusion models memorize training data may help us understand their generalization capabilities. For instance, a common question for large-scale generative models is whether their impressive results arise from truly novel generations, or are instead the result of direct copying and remixing of their training data. By studying memorization, we can provide a concrete empirical characterization of the rates at which generative models perform such data copying.

In their diffusion model, Saharia *et al.* "do not find over-fitting to be an issue, and believe further training might improve overall performance" [60], and yet we will show that this model memorizes individual examples. It may thus be necessary to broaden our definitions of overfitting to include memorization and related privacy metrics. Our results also suggest that Feldman's theory that memorization is *necessary* for generalization in classifiers [24] may extend to generative models, raising the question of whether the improved performance of diffusion models compared to prior approaches is precisely *because* diffusion models memorize more.

## 3.1   Threat Model

Our threat model considers an adversary $\mathcal{A}$ that interacts with a diffusion model Gen (backed by a neural network $f_\theta$) to extract images from the model's training set $D$.

**Image-generation systems.** Unconditional diffusion models are trained on a dataset $D = \{x_1, x_2, \ldots, x_n\}$. When queried, the system outputs a generated image $x_{\text{gen}} \leftarrow \text{Gen}(r)$ using a fresh random noise $r$ as input. Conditional models are trained on annotated images (e.g., labeled or captioned) $D = \{(x_1, c_1), \ldots, (x_n, c_n)\}$ and when queried with a *prompt* $p$, the system outputs $x_{\text{gen}} \leftarrow \text{Gen}(p; r)$ using the prompt $p$ and noise $r$.

**Adversary capabilities.** We consider two adversaries:

- A *black-box* adversary can query Gen to generate images. If Gen is a conditional generator, the adversary can provide arbitrary prompts $p$. The adversary cannot control the system's internal randomness $r$.

- A *white-box* adversary gets full access to the system Gen and its internal diffusion model $f_\theta$. They can control the model's randomness and can thus use the model to denoise arbitrary input images.

In both cases, we assume that an adversary who attacks a conditional image generator knows the captions for some images in the training set—thus allowing us to study the *worst-case* privacy risk in diffusion models.

**Adversary goals.** We consider three broad types of adversarial goals, from strongest to weakest attacks:

1. *Data extraction*: The adversary aims to recover an image from the training set $x \in D$. The attack is successful if the adversary extracts an image $\hat{x}$ that is almost identical (see Section 4.1) to *some* $x \in D$.

2. *Data reconstruction*: The adversary has partial knowledge of a training image $x \in D$ (e.g., a subset of the image) and aims to recover the full image. This is an image-analog of an *attribute inference attack* [80], which aims to recover unknown features from partial knowledge of an input.

3. *Membership inference*: Given an image $x$, the adversary aims to infer whether $x$ is in the training set.

## 3.2   Ethics and Broader Impact

Training data extraction attacks can present a threat to user privacy. We take numerous steps to mitigate any possible harms from our paper. First, we study models that are trained on publicly-available images (e.g., LAION and CIFAR-10) and therefore do not expose any data that was not already available online.

Nevertheless, data that is available online may not have been intended to be available online. LAION, for example, contains unintentionally released medical images of several patients [23]. We also therefore ensure that all images shown in our paper are of public figures (e.g., politicians, musicians, actors, or authors) who knowingly chose to place their images online. As a result, inserting these images in our paper is unlikely to cause any unintended privacy violation. For example, Figure 1 comes from Ann Graham Lotz's Wikipedia profile picture and is licensed under Creative Commons, which allows us to "redistribute the material in any medium" and "remix, transform, and build upon the material for any purpose, even commercially".

Third, we shared an advance copy of this paper with the authors of each of the large-scale diffusion models that we study. This gave the authors and their corresponding organizations the ability to consider possible safeguards and software changes ahead of time.

In total, we believe that publishing our paper and publicly disclosing these privacy vulnerabilities is both ethical and responsible. Indeed, at the moment, no one appears to be immediately harmed by the (lack of) privacy of diffusion models; our goal with this work is thus to make sure to preempt these harms and encourage responsible training of diffusion models in the future.

# 4 Extracting Training Data from State-of-the-art Diffusion Models

We begin our paper by extracting training images from large, pre-trained, high-resolution diffusion models.

## 4.1 Defining Image Memorization

Most existing literature on training data extraction focuses on text language models, where a sequence is said to be "extracted" and "memorized" if an adversary can prompt the model to recover a *verbatim* sequence from the training set [11, 41]. Because we work with high-resolution images, verbatim definitions of memorization are not suitable. Instead, we define a notion of approximate memorization based on image similarity metrics.

**Definition 1 ($(\ell, \delta)$-Diffusion Extraction)** [adapted from [11]]. *We say that an example $x$ is extractable from a diffusion model $f_\theta$ if there exists an efficient algorithm $\mathscr{A}$ (that does not receive $x$ as input) such that $\hat{x} = \mathscr{A}(f_\theta)$ has the property that $\ell(x, \hat{x}) \le \delta$.*

Here, $\ell$ is a distance function and $\delta$ is a threshold that determines whether we count two images as being identical. In this paper, unless otherwise noted we follow Balle *et al.* [5] and use the Euclidean 2-norm distance $\ell_2(a, b) = \sqrt{\sum_i (a_i - b_i)^2 / d}$ where $d$ is the dimension of the inputs to normalize $\ell \in [0, 1]$. Given this definition of extractability, we can now define *memorization*.

**Definition 2 ($(k, \ell, \delta)$-Eidetic Memorization)** [adapted from [11]]. *We say that an example $x$ is $(k, \ell, \delta)$-Eidetic memorized [2] by a diffusion model $f_\theta$ if $x$ is extractable from the diffusion model, and there are at most $k$ training examples $\hat{x} \in X$ where $\ell(x, \hat{x}) \le \delta$.*

Again, $\ell$ is a distance function and $\delta$ is its corresponding threshold. The constant $k$ quantifies the number of near-duplicates of $x$ in the dataset. If $k$ is a small fraction of the data, then memorization is likely problematic. When $k$ is a larger fraction of data, memorization might be expected—but it could still be problematic, e.g., if the duplicated data is copyrighted.

---

[2] This paper covers a very restricted definition of "memorization": whether diffusion models can be induced to generate near-copies of some training examples when prompted with appropriate instructions. We will describe an approach that can generate images that are close approximations of some training images (especially images that are frequently represented in the training dataset through duplication or other means). There is active discussion within the technical and legal communities about whether the presence of this type of "memorization" suggests that generative neural networks "contain" their training data.



Figure 2: We do not count the generated image of Obama (at left) as memorized because it has a high $\ell_2$ distance to every training image. The four nearest training images are shown at right, each has a distance above 0.3.

**Restrictions of our definition.** Our definition of extraction is intentionally conservative as compared to what privacy concerns one might ultimately have. For example, if we prompt Stable Diffusion to generate "A Photograph of Barack Obama," it produces an entirely recognizable photograph of Barack Obama but not an *near-identical reconstruction* of any particular training image. Figure 2 compares the generated image (left) to the 4 nearest training images under the Euclidean 2-norm (right). Under our memorization definition, this image would not count as memorized. Nevertheless, the model's ability to generate (new) recognizable pictures of certain individuals could still cause privacy harms.

## 4.2 Extracting Data from Stable Diffusion

We now extract training data from Stable Diffusion: the largest and most popular open-source diffusion model [58]. This model is an 890 million parameter text-conditioned diffusion model trained on 160 million images. We generate from the model using the default PLMS sampling scheme at a resolution of $512 \times 512$ pixels. As the model is trained on publicly-available images, we can easily verify our attack's success and also mitigate potential harms from exposing the extracted data. We begin with a black-box attack.

**Identifying duplicates in the training data.** To reduce the computational load of our attack, as is done in [65], we bias our search towards duplicated training examples because these are orders of magnitude more likely to be memorized than non-duplicated examples [47, 41].

If we search for images that are bit-for-bit identically duplicated in the training dataset, we would significantly undercount the true rate of duplication. Instead, we account for near-duplication. Ideally, we would search for any training examples that are nearly duplicated with a

Original:



Generated:

Figure 3: Examples of the images that we extract from Stable Diffusion v1.4 using random sampling and our membership inference procedure. The top row shows the original images and the bottom row shows our extracted images.

pixel-level $\ell_2$ distance below some threshold. But this is computationally intractable, as it would require an all-pairs comparison of 160 million images in Stable Diffusion's training set, each of which is a $512 \times 512 \times 3$ dimensional vector. Instead, we first *embed* each image to a 512 dimensional vector using CLIP [54], and then perform the all-pairs comparison between images in this lower-dimensional space (increasing efficiency by over $1500\times$). We count two examples as near-duplicates if their CLIP embeddings have a high cosine similarity. For each of these near-duplicated images, we use the corresponding captions as the input to our extraction attack.

### 4.2.1 Extraction Methodology

Our extraction approach adapts the methodology from prior work [11] to images and consists of two steps:

1. *Generate many examples* using the diffusion model in the standard sampling manner and with the known prompts from the prior section.

2. *Perform membership inference* to separate the model's novel generations from those generations which are memorized training examples.

**Generating many images.** The first step is trivial but computationally expensive: we query the Gen function in a black-box manner using the selected prompts as input. To reduce the computational overhead of our experiments, we use the timestep-resampled generation implementation that is available in the Stable Diffusion codebase [58]. This process generates images in a more aggressive fashion by removing larger amounts of noise at each time step and results in slightly lower visual fidelity at a significant ($\sim 10\times$) performance increase. We generate 500 candidate images for each text prompt to increase the likelihood that we find memorization.

**Performing membership inference.** The second step requires flagging generations that appear to be memorized training images. Since we assume a black-box

threat model in this section, we do not have access to the loss and cannot exploit techniques from state-of-the-art membership inference attacks [11]. We instead design a new membership inference attack strategy based on the intuition that for diffusion models, with high probability $\text{Gen}(p; r_1) \neq \text{Gen}(p; r_2)$ for two different random initial seeds $r_1, r_2$. On the other hand, if $\text{Gen}(p; r_1) \approx_d \text{Gen}(p; r_2)$ under some distance measure $d$, it is likely that these generated samples are memorized examples.

The 500 images that we generate for each prompt have different (but unknown) random seeds. We can therefore construct a graph over the 500 generations by connecting an edge between generation $i$ and $j$ if $x_i \approx_d x_j$. If the largest clique in this graph is at least size 10 (i.e., $\geq 10$ of the 500 generations are near-identical), we predict that this clique is a memorized image. Empirically, clique-finding is more effective than searching for *pairs* of images $x_1 \approx_d x_2$ as it has fewer false positives.

To compute the distance measure $d$ among the images in the clique, we use a modified Euclidean $\ell_2$ distance. In particular, we found that many generations were often spuriously similar according to $\ell_2$ distance (e.g., they all had gray background). We therefore instead divide each image into 16 non-overlapping $128 \times 128$ tiles and measure the maximum of the $\ell_2$ distance between any pair of image tiles between the two images.

### 4.2.2 Extraction Results

In order to evaluate the effectiveness of our attack, we select the 350,000 most-duplicated examples from the training dataset and generate 500 candidate images for each of these prompts (totaling 175 million generated images). We first sort all of these generated images by ordering them by the mean distance between images in the clique to identify generations that we predict are likely to be memorized training data. We then take each of these generated images and annotate each as either "extracted" or "not extracted" by comparing it to the training images under Definition 1. We find 94 images are ($\ell_2, 0.15$)-extracted. To ensure that these images not only match

5



Figure 4: Our attack reliably separates novel generations from memorized training examples, under two definitions of memorization—either $(\ell_2, 0.15)$-extraction or manual human inspection of generated images.



Figure 5: Our attack extracts images from Stable Diffusion most often when they have been duplicated at least $k = 100$ times; although this should be taken as an upper bound because our methodology explicitly searches for memorization of duplicated images.

some arbitrary definition, we also manually annotate the top-1000 generated images as either memorized or not memorized by visual analysis, and find that a further 13 (for a total of 109 images) are near-copies of training examples even if they do not fit our 2-norm definition. Figure 3 shows a subset of the extracted images that are reproduced with near pixel-perfect accuracy; all images have an $\ell_2$ difference under 0.05. (As a point of reference, re-encoding a PNG as a JPEG with quality level 50 results in an $\ell_2$ difference of 0.02 on average.)

Given our ordered set of annotated images, we can also compute a curve evaluating the number of extracted images to the attack's false positive rate. Our attack is exceptionally precise: out of 175 million generated images, we can identify 50 memorized images with 0 false positives, and all our memorized images can be extracted with a precision above 50%. Figure 4 contains the precision-recall curve for both memorization definitions.

**Measuring $(k, \ell, \delta)$-eidetic memorization.** In Definition 2 we introduced an adaptation of Eidetic memorization [11] tailored to the domain of generative image models. As mentioned earlier, we compute similarity between pairs of images with a direct $\ell_2$ pixel-space similarity. This analysis is computationally expensive[3] as it requires comparing each of our memorized images against each of the 160 million training examples. We set $\delta = 0.1$ as this threshold is sufficient to identify al-

most all small image corruptions (e.g., JPEG compression, small brightness/contrast adjustments) but has very few false positives.

Figure 5 shows the results of this analysis. While we identify little Eidetic memorization for $k < 100$, this is expected due to the fact we choose prompts of highly-duplicated images. Note that at this level of duplication, the duplicated examples still make up just *one in a million* training examples. These results show that duplication is a major factor behind training data extraction.

**Qualitative analysis.** The majority of the images that we extract (58%) are photographs with a recognizable person as the primary subject; the remainder are mostly either products for sale (17%), logos/posters (14%), or other art or graphics. We caution that if a future diffusion model were trained on sensitive (e.g., medical) data, then the kinds of data that we extract would likely be drawn from this sensitive data distribution.

Despite the fact that these images are publicly accessible on the Internet, not all of them are permissively licensed. We find that a significant number of these images fall under an explicit non-permissive copyright notice (35%). Many other images (61%) have no explicit copyright notice but may fall under a general copyright protection for the website that hosts them (e.g., images of products on a sales website). Several of the images that we extracted are licensed CC BY-SA, which requires "[to] give appropriate credit, provide a link to the license, and indicate if changes were made." Stable Diffusion thus memorizes numerous copyrighted and non-

---

[3]In practice it is even more challenging: for non-square images, Stable Diffusion takes a random square crop, and so to check if the generated image $x$ matches a non-square training image $y$ we must try all possible alignments between $x$ on top of the image $y$.

permissive-licensed images, which the model may reproduce without the accompanying license.

## 4.3   Extracting Data from Imagen

While Stable Diffusion is the best publicly-available diffusion model, there are non-public models that achieve stronger performance using larger models and datasets [56, 60]. Prior work has found that larger models are more likely to memorize training data [11, 9] and we thus study Imagen [60], a 2 billion parameter text-to-image diffusion model. While individual details differ between Imagen's and Stable Diffusion's implementation and training scheme, these details are independent of our extraction results.

We follow the same procedure as earlier but focus on the top-1000 most duplicated prompts for computational reasons. We then generate 500 images for each of these prompts, and compute the $\ell_2$ similarity between each generated image and the corresponding training image. By repeating the same membership inference steps as above—searching for cliques under patched $\ell_2$ distance–we believe 23 of these 1,000 images as memorized training examples.[4] This is significantly higher than the rate of memorization in Stable Diffusion, and clearly demonstrates that memorization across diffusion models is highly dependent on training settings such as the model size, training time, and dataset size.

## 4.4   Extracting Outlier Examples

The attacks presented above succeed, but only at extracting images that are highly duplicated. This "high $k$" memorization may be problematic, but as we mentioned previously, the most compelling practical attack would be to demonstrate memorization in the "low $k$" regime.

We now set out to achieve this goal. In order to find non-duplicated examples likely to be memorized, we take advantage of the fact that while on *average* models often respect the privacy of the majority of the dataset, there often exists a small set of "outlier" examples whose privacy is more significantly exposed [24]. And so instead of searching for memorization across all images, we are more likely to succeed if we focus our effort on these outlier examples.

But how should we find which images are potentially outliers? Prior work was able to train hundreds of models on subsets of the training dataset and then

use an influence-function-style approach to identify examples that have a significant impact on the final model weights [25]. Unfortunately, given the cost of training even a single large diffusion model is in the millions-of-dollars, this approach will not be feasible here.

Therefore we take a simpler approach. We first compute the CLIP embedding of each training example, and then compute the "outlierness" of each example as the average distance (in CLIP embedding space) to its 1,000 nearest neighbors in the training dataset.

**Results.**   Surprisingly, we find that attacking out-of-distribution images is much more effective for Imagen than it is for Stable Diffusion. On Imagen, we attempted extraction of the 500 images with the highest out-of-distribution score. Imagen memorized and regurgitated 3 of these images (which were *unique* in the training dataset). In contrast, we failed to identify *any* memorization when applying the same methodology to Stable Diffusion—even after attempting to extract the 10,000 most-outlier samples. Thus, Imagen appears less private than Stable Diffusion both on duplicated and non-duplicated images. We believe this is due to the fact that Imagen uses a model with a much higher capacity compared to Stable diffusion, which allows for more memorization [9]. Moreover, Imagen is trained for more iterations and on a smaller dataset, which can also result in higher memorization.

## 5   Investigating Memorization

The above experiments are visually striking and clearly indicate that memorization is pervasive in large diffusion models—and that data extraction is feasible. But these experiments do not explain *why* and *how* these models memorize training data. In this section we train smaller diffusion models and perform controlled experiments in order to more clearly understand memorization.

**Experimental setup.**   For the remainder of this section, we focus on diffusion models trained on CIFAR-10. We use state-of-the-art training code [5] to train 16 diffusion models, each on a randomly-partitioned half of the CIFAR-10 training dataset. We run three types of privacy attacks: membership inference attacks, attribute in-

---

[4] Unfortunately, because the Imagen training dataset is not public, we are unable to provide visual examples of successful reconstructions.

[5] We either directly use OpenAI's Improved Diffusion repository (https://github.com/openai/improved-diffusion) in Section 5.1, or our own re-implementation in all following sections. Models trained with our re-implementation achieve almost identical FID to the open-sourced models. We use half the dataset as is standard in privacy analyses [8].



Figure 6: Direct 2-norm measurement fails to identify memorized CIFAR-10 examples. Each of the above images have a $\ell_2$ distance of less than 0.05, yet only one (the car) is actually a memorized training example.

ference attacks, and data reconstruction attacks. For the membership inference attacks, we train class-conditional models that reach an FID below 3.5 (see Figure 11), placing them in the top-30 generative models on CIFAR-10 [16]. For reconstruction attacks (Section 5.1) and attribute inference attacks with inpainting (Section 5.3), we train unconditional models with an FID below 4.

## 5.1 Untargeted Extraction

Before devling deeper into understanding memorization, we begin by validating that memorization does still occur in our smaller models. Because these models are not text conditioned, we focus on *untargeted* extraction. Specifically, given our 16 diffusion models trained on CIFAR-10, we unconditionally generate $2^{16}$ images from each model for a total of $2^{20}$ candidate images. Because we will later develop high-precision membership inference attacks, in this section we directly search for memorized training examples among all our million generated examples. Thus this is not an attack *per se*, but rather verifying the capability of these models to memorize.

**Identifying matches.** In the prior section, we performed targeted attacks and could therefore check for successful memorization by simply computing the $\ell_2$ distance between the target image and the generated image. Here, as we perform an all-pairs comparison, we find that using an uncalibrated $\ell_2$ threshold fails to accurately identify memorized training examples. For example, if we set a highly-restrictive threshold of 0.05, then nearly all "extracted" images are of entirely blue skies or green landscapes (see Figure 6). We explored several other metrics (including perceptual distances like SSIM or CLIP embedding distance) but found that none could reliably identify memorized training images for CIFAR-10.

We instead define an image as extracted if the $\ell_2$ distance to its nearest neighbor in the training set is *abnormally low* compared to all other training images. Figure 7 illustrates this by computing the $\ell_2$ distance between two different generated images and every image in the CIFAR-10 training dataset. The left figure shows a failed extraction attempt; despite the fact that the nearest



Figure 7: Per-image $\ell_2$ thresholds are necessary to separate memorized images from novel generations on a CIFAR-10 model. Each plot shows the distribution of $\ell_2$ distances from a generated image to all training images (along with the image and the nearest training image). **Left** shows a typical distribution for a non-memorized image. **Right** shows a memorized image distribution; while the most similar training image has high absolute $\ell_2$ distance, it is *abnormally* low for this distribution. The dashed black line shows our adaptive $\ell_2$ threshold.

training image has an $\ell_2$ distance of just 0.06, this distance is on par with the distance to many other training images (i.e., all images that contain a blue sky). In contrast, the right plot shows a successful extraction attack. Here, even though the $\ell_2$ distance to the nearest training image is higher than for the prior failed attack (0.07), this value is *unusually small* compared to other training images which almost all are at a distance above 0.2.

We thus slightly modify our attack to use the distance

$$\ell(\hat{x}, x; S_{\hat{x}}) = \frac{\ell_2(\hat{x}, x)}{\alpha \cdot \mathbb{E}_{y \in S_{\hat{x}}}[\ell_2(\hat{x}, y)]}.$$

where $S_{\hat{x}}$ is the set containing the $n$ closest elements from the training dataset to the example $\hat{x}$. This distance is small if the extracted image $x$ is much closer to the training image $\hat{x}$ compared to the $n$ closest neighbors of $\hat{x}$ in the training set. We run our attack with $\alpha = 0.5$ and $n = 50$. Our attack was not sensitive to these choices.

**Results.** Using the above methodology we identify 1,280 unique extracted images from the CIFAR-10 dataset (2.5% of the entire dataset).[6] In Figure 8 we show a selection of training examples that we extract and full results are shown in Figure 17 in the Appendix.

---

[6]Some CIFAR-10 training images are generated multiple times. In these cases, we only count the first generation as a successful attack. Further, because the CIFAR-10 training dataset contains many duplicate images, we do not count two generations of two different (but duplicated) images in the training dataset.

8

Figure 8: Selected training examples that we extract from a diffusion model trained on CIFAR-10 by sampling from the model 1 million times. **Top** row: generated output from a diffusion model. **Bottom** row: nearest ($\ell_2$) example from the training dataset. Figure 17 in the Appendix contains all 1,280 unique extracted images.

## 5.2   Membership Inference Attacks

We now evaluate membership inference with more traditional attack techniques that use white-box access, as opposed to Section 4.2.1 that assumed black-box access. We will show that *all* examples have significant privacy leakage under membership inference attacks, compared to the small fraction that are sensitive to data extraction. We consider two membership inference attacks on our class-conditional CIFAR-10-trained diffusion models.[7]

**The loss threshold attack.** Yeom *et al.* [80] introduce the simplest membership inference attack: because models are trained to minimize their loss on the training set, we should expect that training examples have lower loss than non-training examples. The loss threshold attack thus computes the loss $l = \mathscr{L}(x; f)$ and reports "member" if $l < \tau$ for some chosen threshold $\tau$ and otherwise "non-member". The value of $\tau$ can be selected to maximize a desired metric (e.g., true positive rate at some fixed false positive rate or the overall attack accuracy).

**The Likelihood Ratio Attack (LiRA).** Carlini *et al.* [8] introduce the state-of-the-art approach to performing membership inference attacks. LiRA first trains a collection of *shadow models*, each model on random subsets of the training dataset. LiRA then computes the loss $\mathscr{L}(x; f_i)$ for the example $x$ under each of these shadow models $f_i$. These losses are split into two sets: the losses $\text{IN} = \{l^{\text{in}_i}\}$ for the example $x$ under the shadow models $\{f_i\}$ that *did* see the example $x$ during training, and the losses $\text{OUT} = \{l^{\text{out}_i}\}$ for the example $x$ under the shadow models $\{f_j\}$ that *did not* see the example $x$ during training. LiRA finishes the initialization process by fitting Gaussians $N_{IN}$ to the $\text{IN}$ set and $N_{OUT}$ to $\text{OUT}$ set of losses. Finally, to predict membership inference for a new model $f^*$, we compute $l^* = \mathscr{L}(x, f^*)$ and then measure whether $Pr[l^*|N_{IN}] > Pr[l^*|N_{OUT}]$.

**Choosing a loss function.** Both membership inference attacks use a loss function $\mathscr{L}$. In the case of classification models, Carlini *et al.* [8] find that choosing a loss

function is one of the most important components of the attack. We find that this effect is even more pronounced for diffusion models. In particular, unlike classifiers that have a single loss function (e.g., cross entropy) used to train the model, diffusion models are trained to minimize the reconstruction loss when a random quantity of Gaussian noise $\varepsilon$ has been added to an image. This means that "the loss" of an image is not well defined—instead, we can only ask for the loss $\mathscr{L}(x, t, \varepsilon)$ of an image $x$ for a certain timestep $t$ with a corresponding amount of noise $\varepsilon$ (cf. Equation (1)).

We must thus compute the optimal timestep $t$ at which we should measure the loss. To do so, we train 16 shadow models each on a random 50% of the CIFAR-10 training dataset. We then compute the loss for every model, for every example in the training dataset, and every timestep $t \in [1, T]$ ($T = 1,000$ in the models we use).

Figure 9 plots the timestep used to compute the loss against the attack success rate, measured as the true positive rate (TPR), i.e., the number of examples which truly are members over the total number of members, at a fixed false positive rate (FPR) of 1%, i.e., the fraction of examples which are incorrectly identified as members. Evaluating $\mathscr{L}$ at $t \in [50, 300]$ leads to the most successful attacks. We conjecture that this a "Goldilock's zone" for membership inference: if $t$ is too small, and so the noisy image is similar to the original, then predicting the added noise is easy regardless if the input was in the training set; if $t$ is too large, and so the noisy image is similar to Gaussian noise, then the task is too difficult. Our remaining experiments will evaluate $\mathscr{L}(\cdot, t, \cdot)$ at $t = 100$, where we observed a TPR of 71% at an FPR of 1%.

### 5.2.1   Baseline Attack Results

We now evaluate membership inference using our specified loss function. We follow recent advice [8] and evaluate the efficacy of membership inference attacks by comparing their true positive rate to the false positive rate on a log-log scale. In Figure 10, we plot the membership inference ROC curve for the loss threshold attack and LiRA. An out-of-the-box implementation of LiRA

---

[7]Appendix C.4 replicates these results for unconditional models.





Figure 9: We run membership inference using LiRA and compute the diffusion model loss at different noise timesteps on CIFAR-10. Evaluating $\mathscr{L}(\cdot, t, \cdot)$ at $t \in [50, 300]$ produces the best results.

Figure 10: Membership inference ROC curve for a diffusion model trained on CIFAR-10 using the loss threshold attack, baseline LiRA, and "Strong LiRA" with repeated queries and augmentation (§5.2.2).

achieves a true positive rate of over 70% at a false positive rate of just 1%. As a point of reference, state-of-the-art *classifiers* are much more private, e.g., with a < 20% TPR at 1% FPR [8]. This shows that diffusion models are significantly less private than classifiers trained on the same data. (In part this may be because diffusion models are often trained far longer than classifiers.)

**Qualitative analysis.** In Figure 20, we visualize the least- and most-private images as determined by their easiness to detect via LiRA. We find that the easiest-to-attack examples are all extremely out-of-distribution visually from the CIFAR-10 dataset. These images are even more visually out-of-distribution compared to the outliers identified by Feldman *et al.* [24] who produce a similar set of images but for image *classifiers*. In contrast, the images that are hardest to attack are *all* duplicated images. It is challenging to detect the presence or absence of each of these images in the training dataset because there is another *identical* image in the training dataset that may have been present or absent—therefore making the membership inference question ill-defined.

### 5.2.2 Augmentations Improve Attacks

Membership inference attacks can also be improved by reducing the variance in the loss signal [8, 79]. We study two ways to achieve this for diffusion models. First, because our loss function has randomness (recall that to compute the reconstruction loss we measure the quantity $\mathscr{L}(x, t, \varepsilon)$ for a random noise sample $\varepsilon \sim \mathcal{N}(0, I)$), we can compute a better estimate of the true loss by averaging over different noise samples: $\mathscr{L}(x, t) = \mathbb{E}_{\varepsilon \sim \mathcal{N}(0, I)}[\mathscr{L}(x, t, \varepsilon)]$.

By varying the number of point samples taken to estimate this expectation we can potentially increase the attack success rate. And second, because our diffusion models train on *augmented* versions of training images (e.g., by flipping images horizontally), it makes sense to compute the loss averaged over all possible augmentations. Prior work has found that both these attack strategies are effective at increasing the efficacy of membership inference attacks for classifiers [8, 39], and we find they are effective here as well.

**Improved attack results.** Figure 10 shows the effect of combining both these strategies. Together they are remarkably successful, and at a false positive rate of 0.1% they increase the true positive rate by over a factor of six from 7% to 44%. Figure 19 in the Appendix breaks down the impact of each component: in Figure 19a we increase the number of Monte Carlo samples from 1 (the base LiRA attack) to 20, and in Figure 19b we augment samples with a horizontal flip.

### 5.2.3 Memorization Versus Utility

We train our diffusion models to reach state-of-the-art levels of performance. Prior work on language models has found that better models are often *easier* to attack than less accurate models—intuitively, because they extract more information from the same training dataset [9]. Here we perform a similar experiment.

**Attack results vs. FID.** To evaluate our generative models, we use the standard Fréchet Inception Distance (FID) [32], where lower scores indicate higher quality. Our previous CIFAR-10 results used models that

10



Figure 11: Better diffusion models are more vulnerable to membership inference attacks; evaluating with TPR at an FPR of 1%. As the FID decreases (corresponding to a quality increase) the membership inference attack success rate grows from 7% to nearly 100%.



Figure 12: Evaluating inpainting attacks on 100 CIFAR-10 examples, measuring the $\ell_2$ distance between images and their inpainted reconstructions when we mask out the left half of the image for 100 randomly selected images. We also plot the $\ell_2$ distances for the bird and cat examples shown in Figure 13. When an adversary has partial knowledge of an image, inpainting attacks work far better than typical data extraction.

achieved the best FID (on average 3.5) based on early stopping. Here we evaluate models over the course of training in Figure 11. We compute the attack success rate as a function of FID, and we find that as the quality of the diffusion model increases so too does the privacy leakage. These results are concerning because they suggest that stronger diffusion models of the future may be even less private.

## 5.3  Inpainting Attacks

Having performed untargeted extraction on CIFAR-10 models, we now construct a targeted version of our attack. As mentioned earlier, performing a targeted attack is complicated by the fact that these models do not support textual prompting. We instead provide guidance by performing a form of attribute inference attack [38, 80, 81] that we call an "inpainting attack". Given an image, we first mask out a portion of this image; our attack objective is to recover the masked region. We then run this attack on both training and testing images, and compare the attack efficacy on each. Specifically, for an image $x$, we mask some fraction of pixels to create a masked image $x_m$, and then use the trained model to reconstruct the image as $x_{rec}$. The exact algorithm we use for inpainting is given in Lugmayr *et al.* [48].

Because diffusion model inpainting is stochastic (it depends on the random sample $\varepsilon \sim \mathcal{N}(0, I)$), we create a set of inpainted images $X_{rec} = \{x_{rec}^1, x_{rec}^2, \ldots, x_{rec}^n\}$, where we set $n = 5,000$. For each $x_{rec} \in X_{rec}$, we compute the

diffusion model's loss on this sample (at timestep 100) divided by a shadow model's loss that was not trained on the sample. We then use this score to identify the highest-scoring reconstructions $x_{rec} \in X_{rec}$.

**Results.**  Our specific attack masks out the left half of an image and applies the diffusion model on the right half of the image to inpaint the rest. We repeat this process 5000 times and take the top-10 scoring reconstructions using a membership inference attack. We repeat this attack for 100 images using diffusion models that are trained with and without the images. Figure 12 compares the average distance between the sample and the ten highest scoring inpainted samples. This allows us to show our inpainting attacks have succeed: the reconstruction loss is substantially better in terms of $\ell_2$ distance when the image is in the training set than when not. Figure 13 also shows qualitative examples of this attack. The highest-scoring reconstruction looks visually similar to the target image when the target is in training and does not resemble the target when it is not in training. Overall, these results show that an adversary who has partial knowledge of an image can substantially improve their extraction results. We conduct a more thorough analysis of inpainting attacks in Appendix D.

11



Figure 13: Inpainting-based reconstruction attack on CIFAR-10. Given an image from CIFAR-10 (first column), we randomly mask half of the image (second column), and then inpaint the image for a model which contained this image in the training set (third column) versus inpainting the image for a model which did not contain this image in the training set (fourth column).

| Architecture | | Images Extracted | FID |
|---|---|---|---|
| **GANs** | StyleGAN-ADA [43] | **150** | **2.9** |
| | DiffBigGAN [82] | 57 | 4.6 |
| | E2GAN [69] | 95 | 11.3 |
| | NDA [63] | 70 | 12.6 |
| | WGAN-ALP [68] | 49 | 13.0 |
| **DDPMs** | OpenAI-DDPM [52] | **301** | **2.9** |
| | DDPM [33] | 232 | 3.2 |

Table 1: The number of training images that we extract from different off-the-shelf pretrained generative models out of 1 million unconditional generations. We show GAN models sorted by FID (lower is better) on the top and diffusion models on the bottom. Overall, we find that diffusion models memorize more than GAN models. Moreover, better generative models (lower FID) tend to memorize more data.

## 6   Comparing Diffusion Models to GANs

Are diffusion models more or less private than competing generative modeling approaches? In this section we take a first look at this question by comparing diffusion models to Generative Adversarial Networks (GANs) [30, 61, 55], an approach that has held the state-of-the-art results for image generation for nearly a decade.

Unlike diffusion models that are explicitly trained to memorize and reconstruct their training datasets, GANs are not. Instead, GANs consist of two competing neural networks: a generator and a discriminator. Similar to diffusion models, the generator receives random noise as input, but unlike a diffusion model, it must convert this noise to a valid image in a single forward pass. To train a GAN, the discriminator is trained to predict if an image comes from the generator or not, and the generator is trained to fool the discriminator. As a result, GANs differ from diffusion models in that their generators are only trained using *indirect* information about the training data (i.e., using gradients from the discriminator) because they never receive training data as input, whereas diffusion models are explicitly trained to reconstruct the training set.

**Membership inference attacks.** We first propose a privacy attack methodology for GANs.[8] We initially focus on membership inference attacks, where following Balle *et al.* [5], we assume access to both the discriminator and generator. We perform membership inference using the loss threshold [80] and LiRA [8] attacks, where

we use the discriminator's loss as the metric. To perform LiRA, we follow a similar methodology as Section 5 and train 256 individual GAN models each on a random 50% split of the CIFAR-10 training dataset but otherwise leave training hyperparameters unchanged.

We study three GAN architectures, all implemented using the StudioGAN framework [42]: BigGAN [6], MHGAN [74], and StyleGAN [44]. Figure 14 shows the membership inference results. Overall, diffusion models have higher membership inference leakage, e.g., diffusion models had 50% TPR at a FPR of 0.1% as compared to < 30% TPR for GANs. This suggests that diffusion models are less private than GANs for membership inference attacks under default training settings, even when the GAN attack is strengthened due to having access to the discriminator (which would be unlikely in practice, as only the generator is necessary to create new images).

**Data extraction results.** We next turn our attention away from measuring worst-case privacy risk and focus our attention on more practical black-box extraction attacks. We follow the same procedure as Section 5.1, where we generate $2^{20}$ images from each model architecture and identify those that are near-copies of the training data using the same similarity function as before. Again we only consider non-duplicated CIFAR-10 training images in our counting. For this experiment, instead of using models we train ourselves (something that was necessary to run LiRA), we study five off-the-shelf pre-trained GANs: WGAN-ALP [68], E2GAN [69], NDA [63], DiffBigGAN [82], and StyleGAN-ADA [43]. We also evaluate two off-the-shelf DDPM diffusion model released by Ho *et al.* [33] and Nichol *et al.* [52]. Note that all of these pre-trained models are trained by the origi-

---

[8] While existing privacy attacks exist for GANs, they were proposed before the latest advancements in privacy attack techniques, requiring us to develop our own methods which out-perform prior work.



(a) StyleGAN FID avg = 3.7  (b) MHGAN FID avg = 7.9  (c) BigGAN FID avg = 7.7

Figure 14: Membership inference results on GAN models using the loss threshold and LiRA attacks on the discriminator. Overall, GANs are significantly more private than diffusion models under default training configurations.



(a) StyleGAN

(b) MHGAN

(c) BigGAN

Figure 15: Selected training examples we extract from three GANs trained on CIFAR-10 for different architectures. **Top** row: generated output from a diffusion model. **Bottom** row: nearest ($\ell_2$) example from the training dataset. Figure 25 in the Appendix contains all unique extracted images.

nal authors to maximize utility on the entire CIFAR-10 dataset rather than a random 50% split as in our prior models trained for MIA.

Table 1 shows the number of extracted images for each model and their corresponding FID. Overall, we find that diffusion models memorize more data than GANs, even when the GANs reach similar performance, e.g., the best DDPM model memorizes 2× more than StyleGAN-ADA but reaches the same FID. Moreover, generative models (both GANs and diffusion models) tend to memorize more data as their quality (FID) improves, e.g., StyleGAN-ADA memorizes 3× more images than the weakest GANs.

Using the GANs we trained ourselves, we show examples of the near-copy generations in Figure 15 for the three GANs that we trained ourselves, and Figure 24 in the Appendix shows every sample that we extract for

those models. The Appendix also contains near-copy generations from the five off-the-shelf GANs. Overall, these results further reinforce the conclusion that diffusion models are less private than GAN models.

We also surprisingly find that diffusion models and GANs memorize many of the same images. In particular, despite the fact that our diffusion model memorizes 1280 images and a StyleGAN model we train on half of the dataset memorizes 361 images, we find that *244 unique images are memorized in common*. If images were memorized uniformly at random, we should expect on average 10 images would be memorized by both, giving exceptionally strong evidence that some images ($p < 10^{-261}$) are inherently less private than others. Understanding why this phenomenon occurs is a fruitful direction for future work.

13

## 7   Defenses and Recommendations

Given the degree to which diffusion models memorize and regenerate training examples, in this section we explore various defenses and practical strategies that may help to reduce and audit model memorization.

### 7.1   Deduplicating Training Data

In Section 4.2, we showed that many examples that are easy to extract are duplicated many times (e.g., $> 100$) in the training data. Similar results have been shown for language models for text [11, 40] and data deduplication has been shown to be an effective mitigation against memorization for those models [47, 41]. In the image domain, simple deduplication is common, where images with identical URLs and captions are removed, but most datasets do not compute other inter-image similarity metrics such as $\ell_2$ distance or CLIP similarity. We thus encourage practitioners to deduplicate future datasets using these more advanced notions of duplication.

Unfortunately, deduplication is not a perfect solution. To better understand the effectiveness of data deduplication, we deduplicate CIFAR-10 and re-train a diffusion model on this modified dataset. We compute image similarity using the `imagededup` tool and deduplicate any images that have a similarity above $> 0.85$. This removes 5,275 examples from the 50,000 total examples in CIFAR-10. We repeat the same generation procedure as Section 5.1, where we generate $2^{20}$ images from the model and count how many examples are regenerated from the training set. The model trained on the deduplicated data regenerates 986 examples, as compared to 1280 for the original model. While not a substantial drop, these results show that deduplication can mitigate memorization. Moreover, we also expect that deduplication will be much more effective for models trained on larger-scale datasets (e.g., Stable Diffusion), as we observed a much stronger correlation between data extraction and duplication rates for those models.

### 7.2   Differentially-Private Training

The gold standard technique to defend against privacy attacks is by training with differential privacy (DP) guarantees [21, 22]. Diffusion models can be trained with differentially-private stochastic gradient descent (DP-SGD) [1], where the model's gradients are clipped and noised to prevent the model from leaking substantial information about the presence of any individual image in the dataset. Applying DP-SGD induces a trade-off between privacy and utility, and recent work shows that



Figure 16: Canary *exposure* (a measure of non-privacy) as a function of duplicate count. Inserting a canary twice is sufficient to reach maximum exposure.

DP-SGD can be applied to small-scale diffusion models without substantial performance degradation [19].

Unfortunately, we applied DP-SGD to our diffusion model codebase and found that it caused the training on CIFAR-10 to consistently diverge, even at high values for $\varepsilon$ (the privacy budget, around 50). In fact, even applying a non-trivial gradient clipping or noising on their own (both are required in DP-SGD) caused the training to fail. We leave a further investigation of these failures to future work, and we believe that new advances in DP-SGD and privacy-preserving training techniques may be required to train diffusion models in privacy-sensitive settings.

### 7.3   Auditing with Canaries

In addition to implementing defenses, it is important for practitioners to empirically audit their models to determine how vulnerable they are in practice [36]. Our attacks above represent one method to evaluate model privacy. Nevertheless, our attacks are expensive, e.g., our membership inference results require training many shadow models, and thus lighter weight alternatives may be desired.

One such alternative is to insert canary examples into the training set, a common approach to evaluate memorization in language models [10]. Here, one creates a large "pool" of *canaries*, e.g., by randomly generating noise images, and inserts a subset of the canaries into the training set. After training, one computes the *exposure* of the canaries, which roughly measures how many bits were learned about the inserted canaries as compared to the larger pool of not inserted canaries. This loss-based metric only requires training one model and can also be designed in a worst-case way (e.g., adversarial worst-case images could be used).

To evaluate exposure for diffusion models, we gen-

erate canaries consisting of uniformly generated noise. We then duplicate the canaries in the training set at different rates and measure the maximum exposure. Figure 16 shows the results. Here, the maximum exposure is 10, and some canaries reach this exposure after being inserted only twice. The exposure is not strictly increasing with duplicate count, which may be a result of some canaries being "harder" than others, and, ultimately, random canaries we generate may not be the most effective canaries to use to test memorization for diffusion models.

## 8 Related Work

**Memorization in language models.** Numerous past works study memorization in generative models across different domains, architectures, and threat models. One area of recent interest is memorization in language models for text, where past work shows that adversaries can extract training samples using two-step attack techniques that resemble our approach [11, 47, 41, 40]. Our work differs from these past results because we focus on the image domain and also use more semantic notions of data regeneration (e.g., using CLIP scores) as opposed to focusing on exact verbatim repetition (although recent language modeling work has begun to explore approximate memorization as well [35]).

**Memorization in image generation.** Aside from language modeling, past work also analyzes memorization in image generation, mainly from the perspective of generalization in GANs (i.e., the novelty of model generations). For instance, numerous metrics exist to measure similarity with the training data [32, 3], the extent of mode collapse [61, 15], and the impact of individual training samples [4, 75]. Moreover, other work provides insights into when and why GANs may replicate training examples [50, 26], as well as how to mitigate such effects [50]. Our work extends these lines of inquiry to conditional diffusion models, where we measure novelty by computing how frequently models regenerate training instances when provided with textual prompts.

Recent and concurrent work also studies privacy in image generation for both GANs [70] and diffusion models [65, 78, 34]. Tinsley *et al.* [70] show that StyleGAN can generate individuals' faces, and Somepalli *et al.* [65] show that Stable Diffusion can output semantically similar images to its training set. Compared to these works, we identify privacy vulnerabilities in a wider range of systems (e.g., Imagen and CIFAR models) and threat models (e.g., membership inference attacks).

## 9 Discussion and Conclusion

State-of-the-art diffusion models memorize and regenerate individual training images, allowing adversaries to launch training data extraction attacks. By training our own models we find that increasing utility can degrade privacy, and simple defenses such as deduplication are insufficient to completely address the memorization challenge. We see that state-of-the-art diffusion models memorize $2\times$ more than comparable GANs, and more useful diffusion models memorize more than weaker diffusion models. This suggests that the vulnerability of generative image models may grow over time. Going forward, our work raises questions around the memorization and generalization capabilities of diffusion models.

**Questions of generalization.** Do large-scale models work by generating novel output, or do they just copy and interpolate between individual training examples? If our extraction attacks had failed, it may have refuted the hypothesis that models copy and interpolate training data; but because our attacks succeed, this question remains open. Given that different models memorize varying amounts of data, we hope future work will explore how diffusion models copy from their training datasets.

Our work also highlights the difficulty in defining *memorization*. While we have found extensive memorization with a simple $\ell_2$-based measurement, a more comprehensive analysis will be necessary to accurately capture more nuanced definitions of memorization that allow for more human-aligned notions of data copying.

**Practical consequences.** We raise four practical consequences for those who train and deploy diffusion models. First, while not a perfect defense, we recommend deduplicating training datasets and minimizing over-training. Second, we suggest using our attack—or other auditing techniques—to estimate the privacy risk of trained models. Third, once practical privacy-preserving techniques become possible, we recommend their use whenever possible. Finally, we hope our work will temper the heuristic privacy expectations that have come to be associated with diffusion model outputs: synthetic data does not give privacy for free [13, 14, 59, 2, 53].

On the whole, our work contributes to a growing body of literature that raises questions regarding the legal, ethical, and privacy issues that arise from training on web-scraped public data [7, 65, 72, 77]. Researchers and practitioners should be wary of training on uncurated public data without first taking steps to understand the underlying ethics and privacy implications.

15

|  | NC | MN | JH | MJ | FT | VS | BB | DI | EW |
|---|---|---|---|---|---|---|---|---|---|
| Conceived Project | X |  | X |  |  | X |  |  | X |
| Formalized Memorization Definition | X | X | X | X | X |  | X |  |  |
| Experimented with Stable Diffusion | X | X |  |  |  |  |  |  |  |
| Experimented with Imagen |  | X |  |  |  |  |  |  |  |
| Experimented with CIFAR-10 Diffusion | X |  | X |  |  |  |  |  |  |
| Experimented with GANs |  | X |  |  | X | X |  |  |  |
| Experimented with Defenses | X | X |  | X |  |  |  |  |  |
| Prepared Figures | X | X | X | X |  | X |  | X | X |
| Analyzed Data | X | X | X | X | X | X |  |  |  |
| Wrote Paper | X | X | X | X | X | X | X | X | X |
| Managed the Project | X |  |  |  |  |  |  |  |  |

Table 2: Contributions of each author in the paper.

## Contributions

- Nicholas, Jamie, Vikash, and Eric each independently proposed the problem statement of extracting training data from diffusion models.

- Nicholas, Eric, and Florian performed preliminary experiments to identify cases of data extraction in diffusion models.

- Milad performed most of the experiments on Stable Diffusion and Imagen, and Nicholas counted duplicates in the LAION training dataset; each wrote the corresponding sections of the paper.

- Jamie performed the membership inference attacks and inpainting attacks on CIFAR-10 diffusion models, and Nicholas performed the diffusion extraction experiments; each wrote the corresponding sections of the paper.

- Matthew ran experiments for canary memorization and wrote the corresponding section of the paper.

- Florian and Vikash performed preliminary experiments on memorization in GANs, and Milad and Vikash ran the experiments included in the paper.

- Milad ran the membership inference experiments on GANs.

- Vikash ran extraction experiments on pretrained GANs.

- Daphne and Florian improved figure clarity and presentation.

- Daphne, Borja, and Eric edited the paper and contributed to paper framing.

- Nicholas organized the project and wrote the initial paper draft.

## Acknowledgements and Conflicts of Interest

The authors are grateful to Tom Goldstein, Olivia Wiles, Katherine Lee, Austin Tarango, Ian Wilbur, Jeff Dean, Andreas Terzis, Robin Rombach, and Andreas Blattmann for comments on early drafts of this paper.

Nicholas, Milad, Matthew, and Daphne are employed at Google, and Jamie and Borja are employed at DeepMind, companies that both train large machine learning models (including diffusion models) on both public and private datasets.

Eric Wallace is supported by the Apple Scholars in AI/ML Fellowship.

## References

[1] Martín Abadi, Andy Chu, Ian Goodfellow, H Brendan McMahan, Ilya Mironov, Kunal Talwar, and Li Zhang. Deep learning with differential privacy. In *ACM CCS*, 2016.

[2] Hazrat Ali, Shafaq Murad, and Zubair Shah. Spot the fake lungs: Generating synthetic medical images using neural diffusion models. *arXiv preprint arXiv:2211.00902*, 2022.

[3] Sanjeev Arora, Andrej Risteski, and Yi Zhang. Do GANs learn the distribution? Some theory and empirics. In *International Conference on Learning Representations*, 2018.

[4] Yogesh Balaji, Hamed Hassani, Rama Chellappa, and Soheil Feizi. Entropic GANs meet VAEs: A statistical approach to compute sample likelihoods in GANs. In *International Conference on Machine Learning*, 2019.

[5] Borja Balle, Giovanni Cherubin, and Jamie Hayes. Reconstructing training data with informed adversaries. In *IEEE Symposium on Security and Privacy*, 2022.

[6] Andrew Brock, Jeff Donahue, and Karen Simonyan. Large scale GAN training for high fidelity natural image synthesis. In *International Conference on Learning Representations*, 2019.

[7] Hannah Brown, Katherine Lee, Fatemehsadat Mireshghallah, Reza Shokri, and Florian Tramèr. What does it mean for a language model to preserve privacy? In *ACM Conference on Fairness, Accountability, and Transparency*, 2022.

[8] Nicholas Carlini, Steve Chien, Milad Nasr, Shuang Song, Andreas Terzis, and Florian Tramer. Membership inference attacks from first principles. In *IEEE Symposium on Security and Privacy*. IEEE, 2022.

[9] Nicholas Carlini, Daphne Ippolito, Matthew Jagielski, Katherine Lee, Florian Tramer, and Chiyuan Zhang. Quantifying memorization across neural language models. *arXiv preprint arXiv:2202.07646*, 2022.

[10] Nicholas Carlini, Chang Liu, Úlfar Erlingsson, Jernej Kos, and Dawn Song. The secret sharer: Evaluating and testing unintended memorization in neural networks. In *USENIX Security Symposium*, 2019.

[11] Nicholas Carlini, Florian Tramer, Eric Wallace, Matthew Jagielski, Ariel Herbert-Voss, Katherine Lee, Adam Roberts, Tom Brown, Dawn Song, Ulfar Erlingsson, et al. Extracting training data from large language models. In *USENIX Security Symposium*, 2021.

[12] Andrew Carr. Gretel.ai: Diffusion models for document synthesis. https://gretel.ai/blog/diffusion-models-for-document-synthesis, 2022.

[13] Pierre Chambon, Christian Bluethgen, Jean-Benoit Delbrouck, Rogier Van der Sluijs, Małgorzata Połacin, Juan Manuel Zambrano Chaves, Tanishq Mathew Abraham, Shivanshu Purohit, Curtis P. Langlotz, and Akshay Chaudhari. RoentGen: Vision-language foundation model for chest X-ray generation. *arXiv preprint arXiv:2211.12737*, 2022.

[14] Pierre Chambon, Christian Bluethgen, Curtis P. Langlotz, and Akshay Chaudhari. Adapting pretrained vision-language foundational models to medical imaging domains. *arXiv preprint arXiv:2210.04133*, 2022.

[15] Tong Che, Yanran Li, Athul Paul Jacob, Yoshua Bengio, and Wenjie Li. Mode regularized generative adversarial networks. In *International Conference on Learning Representations*, 2016.

[16] Papers With Code. https://paperswithcode.com/sota/image-generation-on-cifar-10, 2023.

[17] Elise Devaux. List of synthetic data vendors—2022. https://elise-deux.medium.com/new-list-of-synthetic-data-vendors-2022-f06dbe91784, 2022.

[18] Prafulla Dhariwal and Alexander Nichol. Diffusion models beat GANs on image synthesis. *Advances in Neural Information Processing Systems*, 2021.

[19] Tim Dockhorn, Tianshi Cao, Arash Vahdat, and Karsten Kreis. Differentially private diffusion models. *arXiv preprint arXiv:2210.09929*, 2022.

[20] August DuMont Schütte, Jürgen Hetzel, Sergios Gatidis, Tobias Hepp, Benedikt Dietz, Stefan Bauer, and Patrick Schwab. Overcoming barriers to data sharing with medical image generation: a comprehensive evaluation. *NPJ Digital Medicine*, 2021.

[21] C Dwork, F McSherry, K Nissim, and A Smith. Calibrating noise to sensitivity in private data analysis. In *TCC*, 2006.

[22] Cynthia Dwork. Differential privacy: A survey of results. In *TAMC*, 2008.

[23] Benj Edwards. Artist finds private medical record photos in popular AI training data set. https://arstechnica.com/information-technology/2022/09/artist-finds-private-medical-record-photos-in-popula, 2022.

[24] Vitaly Feldman. Does learning require memorization? A short tale about a long tail. In *ACM SIGACT Symposium on Theory of Computing*, 2020.

17

[25] Vitaly Feldman and Chiyuan Zhang. What neural networks memorize and why: Discovering the long tail via influence estimation. *Advances in Neural Information Processing Systems*, 2020.

[26] Qianli Feng, Chenqi Guo, Fabian Benitez-Quiroz, and Aleix M Martinez. When do GANs replicate? on the choice of dataset size. In *IEEE/CVF International Conference on Computer Vision*, 2021.

[27] Matt Fredrikson, Somesh Jha, and Thomas Ristenpart. Model inversion attacks that exploit confidence information and basic countermeasures. In *ACM Conference on Computer and Communications Security (CCS)*, 2015.

[28] Matthew Fredrikson, Eric Lantz, Somesh Jha, Simon Lin, David Page, and Thomas Ristenpart. Privacy in pharmacogenetics: An end-to-end case study of personalized warfarin dosing. In *USENIX Security Symposium*, 2014.

[29] Ian Goodfellow, Yoshua Bengio, and Aaron Courville. *Deep learning*. MIT press, 2016.

[30] Ian Goodfellow, Jean Pouget-Abadie, Mehdi Mirza, Bing Xu, David Warde-Farley, Sherjil Ozair, Aaron Courville, and Yoshua Bengio. Generative adversarial networks. *Advances in Neural Information Processing Systems*, 2014.

[31] Peter Henderson, Koustuv Sinha, Nicolas Angelard-Gontier, Nan Rosemary Ke, Genevieve Fried, Ryan Lowe, and Joelle Pineau. Ethical challenges in data-driven dialogue systems. In *AAAI/ACM Conference on AI, Ethics, and Society*, 2018.

[32] Martin Heusel, Hubert Ramsauer, Thomas Unterthiner, Bernhard Nessler, and Sepp Hochreiter. GANs trained by a two time-scale update rule converge to a local nash equilibrium. *Advances in Neural Information Processing Systems*, 2017.

[33] Jonathan Ho, Ajay Jain, and Pieter Abbeel. Denoising diffusion probabilistic models. *Advances in Neural Information Processing Systems*, 2020.

[34] Hailong Hu and Jun Pang. Membership inference of diffusion models. *arXiv preprint arXiv:2301.09956*, 2023.

[35] Daphne Ippolito, Florian Tramèr, Milad Nasr, Chiyuan Zhang, Matthew Jagielski, Katherine Lee, Christopher A Choquette-Choo, and Nicholas Carlini. Preventing verbatim memorization in language models gives a false sense of privacy. *arXiv preprint arXiv:2210.17546*, 2022.

[36] Matthew Jagielski, Jonathan Ullman, and Alina Oprea. Auditing differentially private machine learning: How private is private SGD? *Advances in Neural Information Processing Systems*, 2020.

[37] Ali Jahanian, Xavier Puig, Yonglong Tian, and Phillip Isola. Generative models as a data source for multiview representation learning. *International Conference on Learning Representations*, 2021.

[38] Bargav Jayaraman and David Evans. Are attribute inference attacks just imputation? *ACM Conference on Computer and Communications Security (CCS)*, 2022.

[39] Bargav Jayaraman, Lingxiao Wang, Katherine Knipmeyer, Quanquan Gu, and David Evans. Revisiting membership inference under realistic assumptions. *Proceedings on Privacy Enhancing Technologies*, 2020.

[40] Nikhil Kandpal, Haikang Deng, Adam Roberts, Eric Wallace, and Colin Raffel. Large language models struggle to learn long-tail knowledge. *arXiv preprint arXiv:2211.08411*, 2022.

[41] Nikhil Kandpal, Eric Wallace, and Colin Raffel. Deduplicating training data mitigates privacy risks in language models. *International Conference on Machine Learning*, 2022.

[42] MinGuk Kang, Joonghyuk Shin, and Jaesik Park. StudioGAN: A Taxonomy and Benchmark of GANs for Image Synthesis. *arXiv preprint arXiv:2206.09479*, 2022.

[43] Tero Karras, Miika Aittala, Janne Hellsten, Samuli Laine, Jaakko Lehtinen, and Timo Aila. Training generative adversarial networks with limited data. In *Advances in Neural Information Processing Systems*, 2020.

[44] Tero Karras, Samuli Laine, and Timo Aila. A stylebased generator architecture for generative adversarial networks. In *IEEE/CVF conference on computer vision and pattern recognition*, 2019.

[45] Salome Kazeminia, Christoph Baur, Arjan Kuijper, Bram van Ginneken, Nassir Navab, Shadi Albarqouni, and Anirban Mukhopadhyay. GANs for

medical image analysis. *Artificial Intelligence in Medicine*, 2020.

[46] Diederik P Kingma and Max Welling. Auto-encoding variational bayes. In *International Conference on Learning Representations*, 2014.

[47] Katherine Lee, Daphne Ippolito, Andrew Nystrom, Chiyuan Zhang, Douglas Eck, Chris Callison-Burch, and Nicholas Carlini. Deduplicating training data makes language models better. In *Association for Computational Linguistics*, 2022.

[48] Andreas Lugmayr, Martin Danelljan, Andres Romero, Fisher Yu, Radu Timofte, and Luc Van Gool. RePaint: Inpainting using denoising diffusion probabilistic models. In *IEEE/CVF Conference on Computer Vision and Pattern Recognition*, 2022.

[49] AnGeL Ministries. File:Anne Graham Lotz (October 2008). `https://commons.wikimedia.org/wiki/File:Anne_Graham_Lotz_(October_2008).jpg`. Accessed on December 2022.

[50] Vaishnavh Nagarajan, Colin Raffel, and Ian J Goodfellow. Theoretical insights into memorization in GANs. In *Neural Information Processing Systems Workshop*, 2018.

[51] Alex Nichol, Prafulla Dhariwal, Aditya Ramesh, Pranav Shyam, Pamela Mishkin, Bob McGrew, Ilya Sutskever, and Mark Chen. GLIDE: Towards photorealistic image generation and editing with text-guided diffusion models. *arXiv preprint arXiv:2112.10741*, 2021.

[52] Alexander Quinn Nichol and Prafulla Dhariwal. Improved denoising diffusion probabilistic models. In *International Conference on Machine Learning*, 2021.

[53] Walter H. L. Pinaya, Petru-Daniel Tudosiu, Jessica Dafflon, Pedro F da Costa, Virginia Fernandez, Parashkev Nachev, Sebastien Ourselin, and M. Jorge Cardoso. Brain imaging generation with latent diffusion models. *arXiv preprint arXi:2209.07162*, 2022.

[54] Alec Radford, Jong Wook Kim, Chris Hallacy, Aditya Ramesh, Gabriel Goh, Sandhini Agarwal, Girish Sastry, Amanda Askell, Pamela Mishkin, Jack Clark, et al. Learning transferable visual models from natural language supervision. In *International Conference on Machine Learning*, 2021.

[55] Alec Radford, Luke Metz, and Soumith Chintala. Unsupervised representation learning with deep convolutional generative adversarial networks. In *International Conference on Learning Representations*, 2016.

[56] Aditya Ramesh, Prafulla Dhariwal, Alex Nichol, Casey Chu, and Mark Chen. Hierarchical text-conditional image generation with CLIP latents. *arXiv preprint arXiv:2204.06125*, 2022.

[57] Aditya Ramesh, Mikhail Pavlov, Gabriel Goh, Scott Gray, Chelsea Voss, Alec Radford, Mark Chen, and Ilya Sutskever. Zero-shot text-to-image generation. In *International Conference on Machine Learning*, 2021.

[58] Robin Rombach, Andreas Blattmann, Dominik Lorenz, Patrick Esser, and Björn Ommer. High-resolution image synthesis with latent diffusion models. In *IEEE/CVF Conference on Computer Vision and Pattern Recognition*, 2022.

[59] Pouria Rouzrokh, Bardia Khosravi, Shahriar Faghani, Mana Moassefi, Sanaz Vahdati, and Bradley J. Erickson. Multitask brain tumor inpainting with diffusion models: A methodological report. *arXiv preprint arXiv:2210.12113*, 2022.

[60] Chitwan Saharia, William Chan, Saurabh Saxena, Lala Li, Jay Whang, Emily Denton, Seyed Kamyar Seyed Ghasemipour, Burcu Karagol Ayan, S Sara Mahdavi, Rapha Gontijo Lopes, et al. Photorealistic text-to-image diffusion models with deep language understanding. *arXiv preprint arXiv:2205.11487*, 2022.

[61] Tim Salimans, Ian Goodfellow, Wojciech Zaremba, Vicki Cheung, Alec Radford, and Xi Chen. Improved techniques for training GANs. *Advances in Neural Information Processing Systems*, 2016.

[62] Reza Shokri, Marco Stronati, Congzheng Song, and Vitaly Shmatikov. Membership inference attacks against machine learning models. In *IEEE Symposium on Security and Privacy*, 2017.

[63] Abhishek Sinha, Kumar Ayush, Jiaming Song, Burak Uzkent, Hongxia Jin, and Stefano Ermon. Negative data augmentation. In *International Conference on Learning Representations*, 2021.

[64] Jascha Sohl-Dickstein, Eric Weiss, Niru Maheswaranathan, and Surya Ganguli. Deep unsupervised learning using nonequilibrium thermody-

namics. In *International Conference on Machine Learning*, 2015.

[65] Gowthami Somepalli, Vasu Singla, Micah Goldblum, Jonas Geiping, and Tom Goldstein. Diffusion art or digital forgery? Investigating data replication in diffusion models. *arXiv preprint arXiv:2212.03860*, 2022.

[66] Yang Song and Stefano Ermon. Generative modeling by estimating gradients of the data distribution. *Advances in Neural Information Processing Systems*, 2019.

[67] Midjourney Team. `https://www.midjourney.com/`, 2022.

[68] Dávid Terjék. Adversarial lipschitz regularization. In *International Conference on Learning Representations*, 2019.

[69] Yuan Tian, Qin Wang, Zhiwu Huang, Wen Li, Dengxin Dai, Minghao Yang, Jun Wang, and Olga Fink. Off-policy reinforcement learning for efficient and effective gan architecture search. In *European Conference on Computer Vision*, 2020.

[70] Patrick Tinsley, Adam Czajka, and Patrick Flynn. This face does not exist... but it might be yours! Identity leakage in generative models. In *IEEE/CVF Winter Conference on Applications of Computer Vision*, 2021.

[71] Rob Toews. Synthetic data is about to transform artificial intelligence. `https://www.forbes.com/sites/robtoews/2022/06/12/synthetic-data-is-about-to-transform-artificial-intelligence/`, 2022.

[72] Florian Tramèr, Gautam Kamath, and Nicholas Carlini. Considerations for differentially private learning with large-scale public pretraining. *arXiv preprint arXiv:2212.06470*, 2022.

[73] Allan Tucker, Zhenchen Wang, Ylenia Rotalinti, and Puja Myles. Generating high-fidelity synthetic patient data for assessing machine learning healthcare software. *NPJ Digital Medicine*, 2020.

[74] Ryan Turner, Jane Hung, Eric Frank, Yunus Saatchi, and Jason Yosinski. Metropolis-hastings generative adversarial networks. In *International Conference on Machine Learning*, 2019.

[75] Gerrit van den Burg and Chris Williams. On memorization in probabilistic deep generative models. *Advances in Neural Information Processing Systems*, 2021.

[76] James Vincent. The lawsuit that could rewrite the rules of AI copyright. `https://www.theverge.com/2022/11/8/23446821/microsoft-openai-github-copilot-class-action-lawsuit`, 2022.

[77] Eric Wallace, Florian Tramèr, Matthew Jagielski, and Ariel Herbert-Voss. Does GPT-2 know your phone number? *BAIR Blog*, 2020.

[78] Yixin Wu, Ning Yu, Zheng Li, Michael Backes, and Yang Zhang. Membership inference attacks against text-to-image generation models. *arXiv preprint arXiv:2210.00968*, 2022.

[79] Jiayuan Ye, Aadyaa Maddi, Sasi Kumar Murakonda, Vincent Bindschaedler, and Reza Shokri. Enhanced membership inference attacks against machine learning models. In *ACM SIGSAC Conference on Computer and Communications Security (CCS)*, 2021.

[80] Samuel Yeom, Irene Giacomelli, Matt Fredrikson, and Somesh Jha. Privacy risk in machine learning: Analyzing the connection to overfitting. In *IEEE Computer Security Foundations Symposium (CSF)*, 2018.

[81] Yuheng Zhang, Ruoxi Jia, Hengzhi Pei, Wenxiao Wang, Bo Li, and Dawn Song. The secret revealer: Generative model-inversion attacks against deep neural networks. In *IEEE/CVF conference on computer vision and pattern recognition*, 2020.

[82] Shengyu Zhao, Zhijian Liu, Ji Lin, Jun-Yan Zhu, and Song Han. Differentiable augmentation for data-efficient GAN training. *Advances in Neural Information Processing Systems*, 2020.

# A   Collected Details for Figures

Table 3: Catalog of figures containing qualitative examples.

| Figure # | Model | Dataset | Who trained it? | Sampling strategy |
|---|---|---|---|---|
| Figure 1 | Stable Diffusion | LAION | Stability AI | PLMS |
| Figure 2 | Stable Diffusion | LAION | Stability AI | PLMS |
| Figure 3 | Stable Diffusion | LAION | Stability AI | PLMS |
| Figure 6 | Uncond Diffusion | CIFAR-10 | Ours | DDIM |
| Figure 7 | Uncond Diffusion | CIFAR-10 | Ours | DDIM |
| Figure 8 | Uncond Diffusion | CIFAR-10 | Ours | DDIM |
| Figure 12 | Uncond Diffusion | CIFAR-10 | Ours | Inpainting |
| Figure 13 | Uncond Diffusion | CIFAR-10 | Ours | Inpainting |
| Figure 15 | StyleGAN, MHGAN, BigGAN | CIFAR-10 | Ours | GAN default |
| Figure 17 | Uncond Diffusion | CIFAR-10 | Ours | DDIM |
| Figure 20 | Uncond Diffusion | CIFAR-10 | Ours | DDIM |
| Figure 22 | Uncond Diffusion | CIFAR-10 | Ours | Inpainting |
| Figure 23 | Uncond Diffusion | CIFAR-10 | Ours | Inpainting |
| Figure 24 | Several different GANs | CIFAR-10 | Original paper authors | GAN default |

## B   All CIFAR-10 Memorized Images



Figure 17: All 1280 images we extract from diffusion models trained on CIFAR-10, after 1 million generations from 16 diffusion models.

## C  Additional Attacks on CIFAR-10

Here, we expand on our investigation of memorization of training data on CIFAR-10.

### C.1  Membership Inference at Different Training Steps



(a) How membership attack success changes as a training example is processed repeatedly throughout training.



(b) How membership attack success changes as more data is processed throughout training.



(c) ROC curve for the membership attack for different training steps.

Figure 18: Membership inference attacks as a function of the amount of training data processed on CIFAR-10.

In Section 5.2.3, we implicitly investigated membership attack success as a function of the number update steps when training a diffusion model. We explicitly model this relationship in Figure 18. First, in Figure 18a we plot membership attack success as a function of the number of times that an example was processed over training. If an example is processed more than 2000 times during training, invariably membership attacks are perfect against that example. Second, in Figure 18b, we plot membership attack success as a function of the total amount of data processed during training. Unsurprisingly, membership attack success increases as more training data is processed. This is highlighted in Figure 18c, where we plot the membership attack ROC curve. At 5M training examples processed, at a FPR of 1% the TPR is 5%, and increases to 99% after 102M examples are processed. Note that this number of processed training inputs is commonly used in diffusion model training. For example, the OpenAI CIFAR-10 diffusion model [9] is trained for 500,000 steps at a batch size of 128, meaning 64M training examples are processed. Even at this number of processed training examples, our membership attack has a TPR > 95% at a FPR of 1%.

---

[9] https://github.com/openai/improved-diffusion

## C.2   Membership Inference with Different Augmentation Strategies



Figure 19: We can improve membership inference attack success rates on CIFAR-10 by reducing noise. In (**a**), membership inference attacks are improved by averaging the loss over multiple noise samples in the diffusion process. In (**b**), attacks are improved by querying on augmented versions of the candidate image.

24

## C.3   Membership Inference Inliers and Outliers





Figure 20: When performing our membership inference attack, the hardest-to-attack examples (left) are all duplicates in the CIFAR-10 training set, and the easiest-to-attack examples (right) are visually outliers from CIFAR-10 images.

## C.4   Membership Inference on Conditional and Unconditional Models

Diffusion models can be conditioned on labels (or prompts for text-to-image models). We compare the difference in membership inference on a CIFAR-10 diffusion model trained unconditionally with a model conditionally trained on CIFAR-10 labels. The conditional and unconditional models reach approximately the same FID after training; between 3.5-4.2 FID. We plot the membership attack ROC curve in Figure 21 and note that the conditional model is marginally more vulnerable. However, it is difficult to tell if this is a fundamental difference between conditional and unconditional models, or because the conditional model contains more parameters than unconditional model (the conditional models contains an extra embedding layer for the one-hot label input).



Figure 21: Membership attack against a conditional and unconditional diffusion model on CIFAR-10.

# D   More Inpainting Attacks on CIFAR-10

Here, we take a deeper dive into the inpainting attacks introduced in Section 5.3. As previously explained, for a target $x$, we create $X_{rec}$ where $|X_{rec}| = 5000$. In Figure 22a, for every $x_{rec} \in X_{rec}$, we plot the normalized $\ell_2$ distance between the reconstruction and target, against the loss (at diffusion timestep 100) of $x_{rec}$. We also plot in Figure 22d, the eight examples from $X_{rec}$ that have the smallest loss on the main model. There is a small positive correlation between loss and $\ell_2$ distance; although some appear to be similar to $x$, there are notable differences.

In Figure 22b we compare the loss of each reconstruction on the main model against the *support* model we will use to form the contrastive loss. We make this correlation more pronounced by dividing the main loss by the support loss in Figure 22c. This has the effect of increasing the correlation between the (now contrastive) loss and $\ell_2$ distance. This has the effect of filtering out examples that are seen as likely under both models, and can be seen by inspecting the eight examples from $X_{rec}$ that have have the smallest $\frac{\text{main model loss}}{\text{support model loss}}$ in Figure 22e. These examples look more visually similar to $x$ in comparison to examples in Figure 22d.

Figure 22 inspected the attack success when $x$ was in the training set. We show in Figure 23 that the attack fails when $x$ was not included in training; using a contrastive loss doesn't signficantly increase the Pearson correlation coefficient. This means our attack is indeed exploiting the fact that the model can only inpaint correctly because of memorisation and not due to generalisation.



(a) Loss (using the main model at diffusion timestep 100) on all 5,000 inpainted examples $X_{rec}$.

(b) Comparison of loss on main and support models (at diffusion timestep 100) on all 5,000 inpainted examples.

(c) Contrastive loss ($\frac{\text{main model loss}}{\text{support model loss}}$) on all 5,000 inpainted examples $X_{rec}$.

(d) 8 inpainted examples with the smallest loss. Leftmost is the original example, second to left is the masked example and the rest are inpainted examples.

(e) 8 inpainted examples with the smallest $\frac{\text{main model loss}}{\text{support model loss}}$. Leftmost is the original example, second to left is the masked example and the rest are inpainted examples.

Figure 22: Example of an inpainting attack (against a model we refer to as the *main* model) on an image of a bird from CIFAR-10 when that image is included in training, and we mask out 60% of the central pixels. In (a) we plot the $L_2$ distance between 5,000 inpainted reconstructions and the original (non-masked out) image and compare this to the loss with respect to the (main) model. In (b), we compare the loss of these reconstructions on the (main) model with a *support model* for which we know the image wasn't contained in the training set. In (c), we compare $L_2$ distances between reconstructions with a contrastive loss which is given as the loss of the image with respect to the main model divided by the loss of the image with respect to the support model, and find there is stronger relationship between smaller $L_2$ distances and smaller losses compared to (a). Figure (d) gives examples of reconstructions with small loss and Figure (e) gives examples of reconstructions with small contrastive loss.

28



(a) Loss (using the main model at diffusion timestep 100) on all 5,000 inpainted examples $X_{rec}$.

(b) Comparison of loss on main and support models (at diffusion timestep 100) on all 5,000 inpainted examples.

(c) Contrastive loss ($\frac{\text{main model loss}}{\text{support model loss}}$) on all 5,000 inpainted examples $X_{rec}$.

(d) 8 inpainted examples with the smallest loss. Leftmost is the original example, second to left is the masked example and the rest are inpainted examples.

(e) 8 inpainted examples with the smallest $\frac{\text{main model loss}}{\text{support model loss}}$. Leftmost is the original example, second to left is the masked example and the rest are inpainted examples.

Figure 23: Example of an inpainting attack (against a model we refer to as the *main* model) on an image of a bird from CIFAR-10 when that image is *not* included in training, and we mask out 60% of the central pixels. In (a) we plot the $L_2$ distance between 5,000 inpainted reconstructions and the original (non-masked out) image and compare this to the loss with respect to the (main) model. In (b), we compare the loss of these reconstructions on the (main) model with a *support model* for which we know the image wasn't contained in the training set. In (c), we compare $L_2$ distances between reconstructions with a contrastive loss which is given as the loss of the image with respect to the main model divided by the loss of the image with respect to the support model, and find there is stronger relationship between smaller $L_2$ distances and smaller losses compared to (a). Figure (d) gives examples of reconstructions with small loss and Figure (e) gives examples of reconstructions with small contrastive loss.

## E   GAN Training Setup

We used on StudioGAN[10] codebase for training GAN in this work. For the StyleGAN and MHGAN architectures, we followed the default hyper-parameters provided in the StudioGAN repository. However, for the BigGAN architecture, we increased the number of training steps to 200,000, which is different from the original hyper-parameters, to increase image fidelity. We trained a total of 256 models for each GAN architecture, with each model being trained on a randomly selected half of the CIFAR-10 dataset. We selected the iteration that achieved the highest FID score on the test set for each model.

## F   Additional GAN Extraction Results

Figure 24 and Figure 25 contain additional examples extracted from GANs trained on CIFAR-10.

---

[10] https://github.com/POSTECH-CVLab/PyTorch-StudioGAN



(a) StyleGAN

(b) MHGAN

(c) BigGAN

Figure 24: Training examples extracted from a CIFAR-10 GAN for different architectures across $10^7$ generations.



(a) WGAN

(b) E2GAN

(c) NDA

(d) DiffAugment-BigGAN

(e) StyleGAN-ADA

(f) DDPM

Figure 25: Training examples extracted from different publicly available pretrained GANs and diffusion (DDPM) models. We use normalized $\ell_2$ distance in pixel space to find memorized training samples. In each pair of images, left and right image corresponds to real and it closely synthetic image. For StyleGAN-ADA and DDPM model we display 120 pairs with smallest normalized $\ell_2$ distance. For others we display all memorized training images. 1M generations

# EXHIBIT D

arXiv:2305.08694v1 [cs.CV] 15 May 2023

# A Reproducible Extraction of Training Images from Diffusion Models

Ryan Webster

Unicaen

`ryan.webster@unicaen.fr`

May 16, 2023

## Abstract

Recently, [5] demonstrated the widely used model Stable Diffusion can regurgitate real training samples, which is troublesome from a copyright perspective. In this work, we provide an efficient extraction attack on par with the recent attack, with several order of magnitudes less network evaluations. In the process, we expose a new phenomena, which we dub template verbatims, wherein a diffusion model will regurgitate a training sample largely in tact. Template verbatims are harder to detect as they require retrieval and masking to correctly label. Furthermore, they are still generated by newer systems, even those which de-duplicate their training set, and we give insight into why they still appear during generation. We extract training images from several state of the art systems, including Stable Diffusion 2.0, Deep Image Floyd, and finally Midjourney v4. We release code to verify our extraction attack, perform the attack, as well as all extracted prompts at `https://github.com/ryanwebster90/onestep-extraction`.

## 1 Introduction

Over the past few years, advances in large scale image generation systems have been brought on by publicly available billions scale datasets [24, 23, 27, 22]. Due to their high quality, generality and ease of use, image generation systems such as Midjourney [17] and Stable Diffusion [27] have garnished millions of activate users, most of which have little technical knowledge. To train such models, largely automated bots search for suitable text and image pairs from all over the web, as is the case with the training set of Stable Diffusion, LAION-2B [23].

The widespread use of these generation systems is a testament to their generalization capacity; users often want to generate an image which doesn't exist or transform existing images to add new content. However, recent demonstrations show that popular systems such as Stable Diffusion can regurgitate exact copies of training images [20, 5, 26, 28]. In [20, 5], highly duplicated images appear to be a necessary but not sufficient precursor to model memorization. Also, several new works suggest the training datasets do have a high level of duplication [28, 1], with [28] showing that almost a third of the two billion images in the Stable Diffusion v1 are near duplicates.

Whilst democratizing the creative process is a promising feature of generative models, they also can negatively and unfairly impact existing artists. This is especially true for artists whose work was scraped during dataset creation and who are not correctly attributed. However, enforcing copyright in the U.S. is often a difficult, complicated and expensive battle [18], not to mention the law is largely undefined for generative models [10]. For Stable Diffusion, it's fairly easy to prove your training data was used, as the training set is known [19], but for closed source systems, one would have to employ a membership inference attack, which is a challenging problem in its own right [12, 5]. Thus, we focus on reproducibility in this work; releasing both the code and an efficient method running on consumer machines.

1

In this work, we provide the following contributions:

- In Sec. 3, we observe that popular models can regurgitate samples with a single sampling step. We use this fact to construct whitebox and blackbox attacks. We also describe *template verbatims*, wherein a training sample is copied largely in tact, with non-semantic variations in fixed image locations.

- In Sec. 5, we show that our attack is largely on par with the one in [5], whilst taking considerably less network evaluations. It can also be used in tandem with [5] as a post filtering.

- Finally, in Sec. 5.2, we extract samples from a variety of other models, including the closed source system Midjourney. We also provide several insights into the nature of template verbatims and why they still appear even in systems that deduplicate their training set.

## 2   Related work

**Billions Scale Datasets**   If the first "web scale" image dataset, LAION-400M, was released just a few years ago [24], even larger datasets have been subsequently released [4, 23]. The most widely used is the LAION-5B dataset, with roughly 5 billion text image pairs and the corresponding english language subset LAION-2B-en [23]. These datasets are automatically collect and text image/text pairs are only selected if they have a high enough CLIP score [21]. The CLIP network [21, 14], is trained to align image and text features with a contrastive loss and can provide a score that corresponds to a caption's relevance to an image. Thus, during construction of LAION-5B CLIP features are computed and the authors released CLIP features alongside the dataset.

**Deduplication**   In [28], the CLIP image features were used to deduplicate LAION-2B, which revealed almost a third of the dataset are near duplicates. In fact, in subsequent work, we noted that around 500M of these are MD5 duplicates; i.e. duplicates at the file level. In [5, 20], it was noted that highly duplicated samples tend to be memorized by diffusion models and in [20], they de-duplicated before training. Likewise, in Stable Diffusion 2.0 [27], the author's used a perceptual hash to deduplicate before training. As we'll see in Sec. 5.3, this is effective at mitigating the verbatims found in [5], but not all. Finally, in SemDeDup [1], it was noted that around 50% of the samples of LAION-400M, which have a very close semantic pair, can simply be removed while keeping or improving the zero-shot performance of CLIP.

**Membership Inference**   As we touched on in the introduction, in order to enforce copyright, owners would have to first prove their data exists within the models training set. For models like Midjourney or DALLE-2, the model parameters and training sets are unknown. In machine learning, the process of determining which training samples were used only from model outputs, is known as *membership inference* and in particular the challenging "black box" setting. Membership inference has been widely studied against GAN generated images, with varying success, for a wide variety of different settings, for instance in [12]. Several very recent approaches have designed black box attacks specifically against diffusion models [16, 9, 13], but conduct studies versus relatively small datasets (<1M samples). Namely, in the recent work in [13] a loss based attack is presented which bears resemblance to our whitebox attack (See Eq. 3.1), however they do so in the unconditional case, and observe better performance later in the generation process.



Figure 1: Training images can be extracted from Stable-Diffusion in one step. In the first row, a verbatim copy is synthesized from the caption corresponding to the image on the second to last column. In the second row, we present verbatim copies that are harder to detect: *template verbatims*. They typically represent many-to-many mappings (many captions synthesize many verbatim templates) and thus the ground truth is constructed with retrieval (right most column). Furthermore, they exhibit variation in fixed locations of the image; here the color of the carpet can change so they must be masked to be correctly detected. Non-verbatims have no match, even when retrieving over the entire dataset. See Sec. 4 for how we construct the ground truth here in this case.

**Extraction Attacks**  A special case of membership inference, is the ability to actually reconstruct training samples from model outputs [6, 5]. Extraction is a much harder problem and typically is only possible for very few samples. In [5], only roughly 100 images were reconstructed from stable diffusion, out of 350K attempted prompts. Thus, this setting typically is only concerned with precision, and number of samples extracted, rather than the typical precision recall in membership inference. Extracted samples however clearly have higher implications to privacy or copyright.

## 3   Attack Model

In our initial experiments, we reproduced a small scale version of [5]. We used the open source de-duplication in [28], which finds near duplicates using compressed CLIP image features and synthesized a small set of the most duplicated images. We found verbatim copies have the property that they can be synthesized in a single iteration. Fig. 1 shows clearly different behaviors for prompts that are copied versus those that are not. We use this as an intuition to construct a whitebox attack presented next.

### 3.1   Whitebox Attack

In this setting, we assume the attacker has both the captions and the model parameters. Recall that conditional diffusion models train a denoising autoencoder $D(z_t, c)$, which will recover the real sample $z_0$ given its noised version $z_t$. At synthesis time, a sample is drawn from a gaussian distribution $\epsilon \sim N(0, 1)$ and given a variance $\sigma_T$ for timesteps $T$ depending on the sampler (see [22, 15] for more details). We propose an easy to compute metric, which can capture the one step synthesis property in Fig. 1 by measuring how much $D(\sigma_T \epsilon, c)$

modifies the noise as follows:

$$\text{DCS}(c) := \|\sigma_1 \epsilon - D(\sigma_1 \epsilon, c)\|_2^2 \qquad (1)$$

Here, $\sigma_1$ is initialized given the Heun sampler implemented in [8] with one time step. We call this error the Denoising Confidence Score (DCS). we can turn this into a binary classifier then by threshing it's values with $\tau_{\text{DCS}}$ as follows

$$F_{\text{DCS}}(c; \tau) = \mathbb{1}_{\text{DCS}(c) \geq \tau_{\text{DCS}}} \qquad (2)$$

Whilst this is "whitebox," we in fact don't need access to the parameters of the diffusion model, just the noise generation process. For latent diffusion models, we just require the first stage downsampling encoder.

## 3.2   Black Box Setting

We consider the setting similar to [5], wherein an attacker has captions but can only invoke `Gen(c, r)` for caption $c$, random seed $r$ and we also assume the ability to control the timesteps $T$ (as is the case for Midjourney). Henceforth, we use `Gen(c, r, T = 1)` when we control the timesteps and simply `Gen(c, r)` for full synthesis. We construct our attack inspired by the observation in Fig 1, that is we still use one iteration for synthesis. We noticed non verbatims normally start as highly blurry images (Fig 1, last row). Blurry images will not have consistent edges (or no edges at all) in contrast to the natural appearing verbatims with clear edges. We thus employ a simple image processing technique by first computing the images edges, and then look for how consistently these same edges appear for other seeds. Letting the operator `Edge()` outputting a binary image from threshing the magnitude of spatial gradients (e.g. with a sobel filter), we define the Edge Consistency Score (ECS) as follows

$$L_{\text{ECS}}(c) = \left\| \left( \frac{1}{J} \sum_{j \leq J} \text{Edge}(\text{Gen}(c, r_j, T = 1)) \right) \geq \gamma \right\|_2^2 \qquad (3)$$

Where $J$ represents generating over several random seeds and $\gamma$ a threshold. Note that the term on the LHS of Eq. 3 is the average image of binary edges, thus $\gamma$ should be chosen proportional to $J$. We construct a binary classifier in the same way as in Eq. 3.1. Whilst crude, we find that this score works decent in practice.

# 4   Constructing a Ground Truth

As we'd like to evaluate the precision of the above attacks, we need to ascertain images that are truly copied by the model. We describe two ways to label images as copied below:

**Matching Verbatims (MV)**   In [5], an image is considered to be a ground truth verbatim copy if its MSE between the generated image from caption $c$ and it's corresponding dataset image $x$ is small enough, i.e.

$$L_{MV}(x, c; J) = \min_{j \leq J} \|x - \text{Gen}(c, r_j)\|_2^2 \qquad (4)$$

We take the minimum over $J$ random seeds $r_j$ as sometimes verbatims appear after a few seeds. Then, the ground truth labels are simply a thresh-hold on this distance

$$\text{IsVerb}(x, c; J, \delta_V) = \mathbb{1}_{L_{MV}(x, c; J) \leq \delta_V} \qquad (5)$$

We chose $\delta_V = .12$. This is slightly more relaxed than what was chosen in [5], and simply prune false positives by hand (such as images of textures or without objects that can be false positives), which given the rarity of positively labeled images is feasible.

4



(a) Midjourney v4 [17]

(b) Deep Image Floyd [25]

(c) Stable diffusion v1 [22]

(d) Stable diffusion v2 [27]

Figure 2: Template verbatims for various networks: Left is generated, middle is retrieved image and right is the extracted mask. Template verbatims originate from images that have variation in fixed spatial locations in **L2B**. For instance, in the top-left, varying the carpet color in an e-commerce image. These images are generated in a many-to-many fashion (for instance, the same prompt will generate the topleft and bottom right images, which come from the "Shaw floors" series of prompts).

**Retrieval Verbatims**  We noticed that some images would not correspond to their matching image, despite having the curious property of one-step synthesis (see Fig. 1). Thus, we retrieved the images with an index [28, 3]. Furthermore, we found that many images which had very few duplicates, had extremely many near duplicates that differed in only one region of the image. These images would commonly be e-commerce images that would vary an aspect of the sale item: e.g. an image of furniture with a large variety of carpet colors. We thus update our verbatim condition to accommodate retrieval and masks as follows

$$L_{TV}(x, c, m_x) = \min_{k \leq K, j \leq J} \|m_x \odot (\texttt{kNN}(\texttt{Gen}(c, r_j), k) - \texttt{Gen}(c, r_j))\|_2^2 \qquad (6)$$

Here, $\texttt{kNN}(x, k)$ is the k-th nearest neighbor on LAION-2B, retrieved via a CLIP image embedding and $m_x$ a spatial mask corresponding to $x$ to mask out the regions of variation. Whilst our mask creation is automated, in practice we selected samples that had an extremely close retrieved sample (Eq. 4 with no mask) and didn't contain an all white mask (or texture, which would pose problems to the MSE). We note this procedure could be potentially be automated, for instance with object detection on the unmasked regions. Finally, we noticed that very rarely, exact verbatims could be retrieved (again Eq. 4 with no mask). We call these retrieval verbatims (RV).

**Evaluation**  Of course, we will not be able to construct the ground truth for every image of L2B, as it entails generating images, retrieval and mask construction. Besides, extraction attacks typically are concerned with precision and number of samples found, rather than recall. We thus only generate and compute the ground truth for the top images selected by our attacks Eq. 3.1 and Eq. 3 and measure precision versus number of verbatims found.

## 5   Results

In this section, we evaluate our white box and black box extraction attacks against several popular diffusion models. We evaluate each in the following way

**Whitebox**  We begin by using the de-duplication in [28] to obtain the 2M most duplicated images and their corresponding prompts. We then compute the DCS Eq. 3.1 for every caption

5

 

Figure 3: Precision recall curves for the whitebox attack and black box attacks (see Sec. 4. For both black box settings, we first pre-filter for the top 30K images selected via the whitebox score, then sort with the black box edge score. On the right, we sort via the black box score, synthesize 500 samples (setting "+Carlini," [5]) and then perform their attack. This makes the attacks much more precise. Note also that these verbatims are not all unique. In general, we found a similar number of MVs as [5], and about 50% more template verbatims. See Table 1.

for the Stable Diffusion v1 network [22]. This attack takes only a single unet evaluation per caption.

**Blackbox**  This setting requires several unet evaluations per caption (the $J$ parameter in Eq. 3), which is too expensive for millions of captions. Thus in practice, we pre-filter using the whitebox DCS for the top 30k samples and compute our black box $L_{\text{ECS}}$ Eq. 3. For stable diffusion V1, this is obviously not black box. Even so, extracting verbatims from 30k images still is a strong indicator of the success of a true black box attack given their rarity (around a 1% chance of being randomly selected). For black box attacks against stable diffusion v2, this is a purely black box procedure. We compute Eq. 3 for $J = 4$ samples and but still only one timestep of the Heun sampler; for a total of 4 unet evaluations per caption. In [5], they performed 500 full generations. Assuming a conservative estimate of 16 iterations per generation (although they used 50 in the paper), makes our attack $500 * 16/4 = 2000\text{x}$ times more efficient than the attack in [5].

**Post filtering with Carlini et. al**  Our attack is not incompatible with the one in [5]. For those images we deem most likely to be verbatims (given our whitebox or black box method), we then synthesize 500 samples per caption and mark captions as verbatims when inter-sample synthesis is overly repetitive (i.e. there is many duplicate synthesis images).

## 5.1   Analysis

Fig. 4 shows the precision of the attacks versus the number of verbatims found for Stable Diffusion v1 and v2. Our whitebox attack has much higher precision than the black box variants. The black box attacks start with low precision, as there were some samples that were "adversarial" to the method, such as images of textures or that were mostly backgrounds. When combining our black box attack with [5], our black box attack becomes much more precise.

## 5.2   What Makes Prompts Prone to Regurgitation?

It is still unclear why diffusion models will regurgitate some samples and not others. Duplication alone is not a sufficient condition for the model to memorize the sample. The authors

6




(a) Multi-modal duplication rates for exact verbatims Eq. 4 versus non-verbatims. Exact verbatims tend to be multimodal duplicates (duplicates in text and image) more often than other sample highly duplicated in image feature space only.

(b) Duplication rates for exact verbatims versus template verbatims. Template verbatims may be highly duplicated w.r.t. their mask, but without the masks they have relatively low levels of duplication as they variable parts of the image.

Figure 4: Histograms of duplication rates.

in [5] found that anomaly detection was not successful at detecting them. As we de-duplicate with image features, we explore what percentage of these samples are multi-modal duplicates. In Fig. 4 we show the percentage of features that share the same prompt within a duplicate group. The verbatim samples show a significantly higher rate of multimodal duplication than non-verbatims (randomly chosen in the top 2M most duplicated).

**Template Verbatims** Template verbatims are more difficult to label as ground truth, not only because they require retrieval and masking, but also because they're not highly duplicated, as shown in Fig. 4. Note that Stable Diffusion v2 did deduplicated **L2B** before training. Unsurprisingly, we did not find any examples of exact verbatims being copied on Stable Diffusion v2, however, we still found many template verbatims, see Tab 1. Thus, a more relaxed duplication detection, such as the semantic duplicates found in SemDeDup [1], may be necessary to weed out these samples. We leave this for future work.

## 5.3    Extracting Verbatims in Other Models

| Model | Deduplicated Training? | Retrieved | Template | Exact |
|---|---|---|---|---|
| Stable Diffusion V1 [22] | No | 37 | 45 | 71 |
| Stable Diffusion V2 [27] | Yes | 0 | 21 | 4 |
| Deep Image Floyd [25] | Yes | 0 | 15 | 2 |
| Midjourney v4 [17] | Unknown | 5 | 8 | 2 |
| OpenJourney (from [7]) | No | 14 | 29 | 73 |
| RealisticVision (from [7]) | No | 15 | 32 | 90 |

Table 1: Number of ground truth verbatims extracted from several models. For deep floyd and Midjourney, we use the top 500 prompts sorted from Eq. 3 from SDV1 (i.e. we don't perform the attack, just extract images). De-duplicated models seem less susceptible to exact verbatims, but are still vulnerable to template verbatim extractions. See Sec. 5.3

Having obtained our ground truth for Stable Diffusion V1 and V2, we test whether these prompts are also verbatim copied by a variety of other models, such as state of



Figure 5: Several failure cases in ground truth construction. In the top left (Midjourney, generation on right), some samples fall just below our ground truth MSE for matching verbatims, and thus are not marked as extracted. Note however, this sample shows little to no variation in generation, and thus is still a failure mode of the model. The remaining images demonstrate failures with retrieval; a different crop or small distortion will not be labeled as ground truth, even if by inspection these are clearly copied.

the art diffusion model DeepIF [25], and the closed source system MidJourney [17]. For Midjourney, this was done manually through discord for around 100 prompts, and we swept over the number of time steps until a verbatim was found. Tab. 1 shows the total number of ground truth verbatims extracted. With Midjourney [17], the model is entirely black box, and likewise for the training set. Still, we find it still regurgitates some of the same prompts as other models, which are known to be trained on **L2B**. Interestingly, it is also less susceptible to the exact verbatim regurgitation like SDV2, so we hypothesize that Midjourney de-duplicated their training set before training. Finally, we note the popular stable diffusion checkpoint model openjourney, which was fine tuned from SDV1 using images and prompts from midjourney, and typically generates fantasy and surreal images better than the original model. In contrast, realistic vision, which is also a checkpoint, focuses on more photographic realism. Both models are corrupted and regurgitate the same prompts, and for realistic vision, the problem is exacerbated.

## 5.4 Limitations

As is noted in [26], images patches can appear in generated images with no variation, but perhaps cut and pasted in various spatial locations around the image. During our experiments, we also noted this phenomena was common. Our template verbatim ground truth construction clearly does not handle this case. Fig 5 shows several failure cases for the ground truth construction. In many images, the retrieved image is cropped and scaled slightly different (bottom left), and thus was not labeled as a template verbatim. In general, for future work, it may be worth while to explore more flexible copy detection, such as those which are invariant to some permutations of patches [2].

# 6    Discussion and Conclusion

In this work, we presented an extraction attack successful versus several widely used diffusion models. Our attack was on par with previous methods, whilst requiring significantly less network evaluations. Furthermore, we automated labeling of template verbatims, i.e. images that showed non meaningful variations in fixed locations in the image. We shed insight into why these images still appear even in models which have deduplicated their training data, such as Stable Diffusion 2.0 and deep image floyd; they are not highly duplicated in the standard sense, but likely are highly duplicated w.r.t. a mask.

Verbatim copied images are a small part of a larger set of issues generative models face today. Our results should be interpreted as more of a theoretical one; this is something real world systems *can* do, but it appears to happen very rarely. The larger issues are the non-transparency of the datasets used to train generative models and the fact that images generated don't provide *attribution* alongside their generation. Indeed, a common use case of current generation systems is to generate in the style of a living artist. Likely, future iterations should include an attribution mechanism to accommodate for this. In general, this may be a difficult problem from a technical standpoint, but maybe not infeasible. For instance, by using the "public" and "private" paradigm in the privacy literature. The public model could be a general generation system, with smaller systems, for instance trained via [11], to generate a specific style with attribution. In any case, on going discussion, such as those raised in [19] and their resolution, will likely shape future generation systems to be more fair and overall more useful.

# References

[1]  Amro Abbas, Kushal Tirumala, Dániel Simig, Surya Ganguli, and Ari S. Morcos. Semdedup: Data-efficient learning at web-scale through semantic deduplication, 2023.

[2]  Connelly Barnes, Eli Shechtman, Adam Finkelstein, and Dan B Goldman. Patch-match: A randomized correspondence algorithm for structural image editing. In *ACM SIGGRAPH 2009 papers*, pages 1–11. ACM, 2009.

[3]  Romain Beaumont. Clip retrieval. `https://github.com/rom1504/clip-retrieval`, 2022.

[4]  Minwoo Byeon, Beomhee Park, Haecheon Kim, Sungjun Lee, Woonhyuk Baek, and Saehoon Kim. Coyo-700m: Image-text pair dataset. `https://github.com/kakaobrain/coyo-dataset`, 2022.

[5]  Nicholas Carlini, Jamie Hayes, Milad Nasr, Matthew Jagielski, Vikash Sehwag, Florian Tramèr, Borja Balle, Daphne Ippolito, and Eric Wallace. Extracting training data from diffusion models. *arXiv preprint arXiv:2301.13188*, 2023.

[6]  Nicholas Carlini, Florian Tramer, Eric Wallace, Matthew Jagielski, Ariel Herbert-Voss, Katherine Lee, Adam Roberts, Tom Brown, Dawn Song, Ulfar Erlingsson, Alina Oprea, and Colin Raffel. Extracting training data from large language models, 2021.

[7]  CivitAI. CivitAI, 2023.

[8]  Katherine Crowson. K-diffusion. `https://github.com/crowsonkb/k-diffusion`, 2022.

[9]  Jinhao Duan, Fei Kong, Shiqi Wang, Xiaoshuang Shi, and Kaidi Xu. Are diffusion models vulnerable to membership inference attacks?, 2023.

[10]  Giorgio Franceschelli and Mirco Musolesi. Copyright in generative deep learning, 2021.

[11]  Rinon Gal, Yuval Alaluf, Yuval Atzmon, Or Patashnik, Amit H. Bermano, Gal Chechik, and Daniel Cohen-Or. An image is worth one word: Personalizing text-to-image generation using textual inversion, 2022.

[12] Jamie Hayes, Luca Melis, George Danezis, and Emiliano De Cristofaro. Logan: Membership inference attacks against generative models, 2018.

[13] Hailong Hu and Jun Pang. Membership inference of diffusion models, 2023.

[14] Gabriel Ilharco, Mitchell Wortsman, Ross Wightman, Cade Gordon, Nicholas Carlini, Rohan Taori, Achal Dave, Vaishaal Shankar, Hongseok Namkoong, John Miller, Hannaneh Hajishirzi, Ali Farhadi, and Ludwig Schmidt. Openclip repository. July 2021.

[15] Tero Karras, Samuli Laine, Miika Aittala, Janne Hellsten, Jaakko Lehtinen, and Timo Aila. Analyzing and improving the image quality of stylegan. In *Proceedings of the IEEE/CVF Conference on Computer Vision and Pattern Recognition*, pages 8110–8119, 2020.

[16] Tomoya Matsumoto, Takayuki Miura, and Naoto Yanai. Membership inference attacks against diffusion models, 2023.

[17] Midjourney. Midjourney, 2023.

[18] Neil W. Netanel. Making sense of fair use. *Lewis & Clark Law Review*, 15, 2011.

[19] Matt Novak. Getty images sues ai company over hideous frankenphotos. `https://www.forbes.com/sites/mattnovak/2023/02/06/getty-images-sues-ai-company-over-hideous-frankenphotos/?sh=5da9fe6240b2`, 2023.

[20] OpenAI. Pre-training Mitigations for DALLE2.

[21] Alec Radford, Jong Wook Kim, Chris Hallacy, Aditya Ramesh, Gabriel Goh, Sandhini Agarwal, Girish Sastry, Amanda Askell, Pamela Mishkin, Jack Clark, et al. Learning transferable visual models from natural language supervision. In *International Conference on Machine Learning*, pages 8748–8763. PMLR, 2021.

[22] Robin Rombach, Andreas Blattmann, Dominik Lorenz, Patrick Esser, and Björn Ommer. High-resolution image synthesis with latent diffusion models. In *Proceedings of the IEEE/CVF Conference on Computer Vision and Pattern Recognition*, pages 10684–10695, 2022.

[23] Christoph Schuhmann, Romain Beaumont, Richard Vencu, Cade Gordon, Ross Wightman, Mehdi Cherti, Theo Coombes, Aarush Katta, Clayton Mullis, Mitchell Wortsman, et al. Laion-5b: An open large-scale dataset for training next generation image-text models. *arXiv preprint arXiv:2210.08402*, 2022.

[24] Christoph Schuhmann, Richard Vencu, Romain Beaumont, Robert Kaczmarczyk, Clayton Mullis, Aarush Katta, Theo Coombes, Jenia Jitsev, and Aran Komatsuzaki. Laion-400m: Open dataset of clip-filtered 400 million image-text pairs. *arXiv preprint arXiv:2111.02114*, 2021.

[25] Alex Shonenkov et al. Deep image floyd. `https://github.com/deep-floyd/IF`, 2023.

[26] Gowthami Somepalli, Vasu Singla, Micah Goldblum, Jonas Geiping, and Tom Goldstein. Diffusion art or digital forgery? investigating data replication in diffusion models. *arXiv preprint arXiv:2212.03860*, 2022.

[27] StabilityAI. Stable diffusion 2.0. `https://github.com/Stability-AI/stablediffusion`, 2022.

[28] Ryan Webster, Julien Rabin, Loic Simon, and Frederic Jurie. On the de-duplication of laion-2b, 2023.

# EXHIBIT E

# Measuring the Success of Diffusion Models at Imitating Human Artists

Stephen Casper [* 1]   Zifan Guo [* 1]
Shreya Mogulothu [1]   Zachary Marinov [1]   Chinmay Deshpande [2]   Rui-Jie Yew [1 3]   Zheng Dai [1]
Dylan Hadfield-Menell [1]

## Overview

Modern diffusion models have set the state-of-the-art in AI image generation. Their success is due, in part, to training on Internet-scale data which often includes copyrighted work. This prompts questions about the extent to which these models learn from, imitate, or copy the work of human artists.

This work suggests that questions involving copyright liability should factor in a model's *capacity* to imitate an artist. Tying copyright liability to the capabilities of the model may be useful given the evolving ecosystem of generative models. Specifically, much of the legal analysis of copyright and generative systems focuses on the use of protected data for training (Sag, 2018; Lemley & Casey, 2020). However, generative systems are often the result of multiple training processes. As a result, the connections between data, training, and the system are often obscured.

In our approach, we consider simple image classification techniques to measure a model's ability to imitate specific artists. Specifically, we use Contrastive Language-Image Pretrained (CLIP) (Radford et al., 2021) encoders to classify images in a zero-shot fashion. Our process first prompts a model to imitate a specific artist. Then, we test whether CLIP can be used to reclassify the artist (or the artist's work) from the imitation. If these tests match the imitation back to the original artist, this suggests the model can imitate that artist's expression.

Our approach is simple and quantitative. Furthermore, it uses standard techniques and does not require additional training. We demonstrate our approach with an audit of Stable Diffusion's (Rombach et al., 2022) capacity to imitate 70 professional digital artists with copyrighted work online. When Stable Diffusion is prompted to imitate an artist from this set, we find that the artist can be identified from the imitation with an average accuracy of 81.0%. Finally, we



*Figure 1.* **Identifying human artists from Stable Diffusion Imitations.** For each artist, we generate an imitation image from Stable Diffusion with the prompt "Artwork from < artist name >." Next, we encode the image with a CLIP image encoder (Radford et al., 2021). We also encode labels corresponding to $n$ total artists plus one or more 'default' labels with a CLIP text encoder. Finally, we classify the image among all labels using a geometric similarity measure between the encodings. If the label reliably corresponds to the correct artist, we consider the model to have the capability to imitate that artist.

also show that a sample of the artist's work can be matched to these imitation images with a high degree of statistical reliability. Overall, these results suggest that Stable Diffusion is broadly successful at imitating individual human artists. Code is available here.

---
*Equal contribution ¹MIT ²Harvard University ³Brown University. Correspondence to: Stephen Casper <scasper@mit.edu>.

Accepted to the *1ˢᵗ Workshop on Generative AI and Law*, co-located with the *International Conference on Machine Learning*, Honolulu, Hawaii, USA. 2023. Copyright 2023 by the author(s).

arXiv:2307.04028v1 [cs.CV] 8 Jul 2023

**Measuring the Success of Diffusion Models at Imitating Human Artists**



*Figure 2.* **Example images generated by Stable Diffusion from prompts of the form "Artwork from ⟨artist's name⟩".** Using the method depicted in Figure 1, we show that the artists used in the prompts can often be classified from these imitations of their work.

## 1. Background

**Contrastive Language-Image Pretraining (CLIP):** CLIP (Radford et al., 2021) is a technique for training AI systems that encode images and text into fixed-length vector representations. CLIP image and text encoders are trained to produce similar encodings of image/caption pairs and dissimilar encodings of image/caption non-pairs. The more geometrically distant two encodings of images or captions are, the less related they are according to the encoder, and vice versa. Using this principle, Radford et al. (2021) introduced a method to classify an image among a set of labels based on the distances between encodings. We use this

method in our proposed test.

**Diffusion Models:** Diffusion models (Sohl-Dickstein et al., 2015) such as Stable Diffusion (Rombach et al., 2022) and Midjourney (Midjourney, 2022), are capable of generating images from arbitrary, user-specified prompts. Their success has largely been due to training on large amounts of text/image data, often including copyrighted works (Schuhmann et al., 2021). Modern image-generation diffusion models are trained using CLIP-style encoders. When given an encoding of a caption, a diffusion model is trained to generate an image corresponding to the caption (Ramesh et al., 2022). Accordingly, a diffusion model that generates

**Measuring the Success of Diffusion Models at Imitating Human Artists**



*Figure 3.* **Results from human artists strongly outperform baselines.** Success rates for classifying artists from Stable Diffusion's attempts to imitate them. Professional artists can be classified from imitations over 81.0% of the time on average. This compares to 8.6% for a baseline in which we used random names instead of artists' names and 1.4% for a random guess baseline.

images from these embeddings is trained to be the inverse of a CLIP image encoder.

**Legal Motivation:** In the United States, *Newton v. Diamond, 388 F.3d 1189, 1195 (9th Cir. 2004)* established that copyright infringement "is measured by considering the qualitative and quantitative significance of the copied portion in relation to the plaintiff's work as a whole". However, the subjective nature of these determinations makes practical enforcement complicated. (Balganesh et al., 2014; Kaminski & Rub, 2017; Balagopalan et al., 2023). In evaluating copyright questions involving AI systems, legal analyses have focused on how copyrighted work is used in the system's training data (Sag, 2018; Lemley & Casey, 2020), but such a focus on training data does not connect liability to an AI system's ability to copy an artist. In contrast, we show how standard image classification techniques can be used to help determine how successful AI image generators are at imitating individual human artists. This approach is *consistent*, *quantitative*, and connected to the *capabilities* of the resulting AI system. Our goal, however, is not to automate determinations of infringement but to demonstrate how tried and tested image classification techniques from machine learning can be used to analyze legal claims.

## 2. Experiments

We conduct two complementary experiments to evaluate Stable Diffusion's ability to imitate human artists. First, we classify human artists from imitations of their work, and second, we match real work from human artists to imitations. Both experiments suggest that Stable Diffusion is broadly successful at imitating human artists.

### 2.1. Identifying Artists from Imitations

**Method:** We used CLIP encoders to classify artists from Stable Diffusion's imitations of them. We selected 70 artists from the LAION-aesthetics dataset (Schuhmann et al., 2021), the dataset used to train Stable Diffusion. We selected these 70 as artists who may potentially be harmed by digital imitations using several criteria: each artist is alive, has a presence on digital art platforms (Instagram, DeviantArt, and ArtStation), publishes artwork or sells their artwork (e.g., prints or digital works), and has more than 100 images in the LAION dataset.

Figure 1 outlines our method. We prompted Stable Diffusion (v1.5) to generate images in the style of each artist, using prompts of the form "Artwork from <artist's name>". Example images are in Figure 2. We then used CLIP encoders to classify each image among a set of 73 labels. The 73 labels consisted of each of the 70 artist's prompts ("Artwork from <artist's name>") plus three default labels: "Artwork", "Digital Artwork", and "Artwork from the public domain." These additional labels lend insight into how confident CLIP is that an image imitates a particular artist's style instead of some more generic style. We then classified each imitation image among these labels using the technique from Radford et al. (2021). CLIP-based classification produces a probability of an image matching each label, and we evaluate the model on the correctness of its most-likely prediction and confidence in the correct artists.

**Results:** We repeated the experiment with the 70 artists ten times to reduce the effect of random variation. On average, CLIP correctly classified 81.0% of the generated images as works made by artists whose names were used to generate them. Over the ten trials, 69 of the 70 artists were correctly classified in a plurality of the ten trials. Overall, these results suggest that Stable Diffusion has a broad-ranging ability to imitate the styles of individual artists. We compared these results to two baselines. First, we implemented a random-name baseline by running the same experiment with 70 random names from a random name generator. Since Stable Diffusion was not trained on artists with these names (unless a random name is coincidentally the same as some artist's), this experiment serves as a proxy for how Stable Diffusion would handle artists not in its training data. In this case, only 6 names (8.6%) were guessed correctly. Second, a random guess would only result in a successful classification every 1 in 73 attempts (1.4%) on average. We visualize results from our main experiment alongside the controls in Figure 3.

**Results are Robust to Different Sets of Artists:** To test whether our 70 artists were especially classifiable, we ran the original experiment but with a larger set of indiscriminately-selected artists and found similar results. We selected the 250 artists with the highest number of images in the LAION dataset and found that CLIP correctly classified 81.2% of

Measuring the Success of Diffusion Models at Imitating Human Artists





*Figure 4.* **Matching human artwork to imitations from Stable Diffusion:** (Top) Method: We compared the encoding of one real image per artist to 10 imitations of that artist and 690 imitations of the other artists. Then we aggregated these results with a statistical rank sum test. (Bottom) Results: Artwork generated by Stable Diffusion with the prompt "Artwork from <artist's name>" is significantly more similar to real artwork by the artist in question than artwork generated to imitate other artists. Artists for which the experiment resulted in a (Bonferroni-corrected) p-value below 0.05 are highlighted in red. This occurred for 90% (63/70) of the artists.

the images. This demonstrates that successful classification transcends a particular specific set of artists.

## 2.2. Matching Artwork to Imitations

**Method:** Our first experiment tested how easily artists could be identified from diffusion model imitations of them. To provide a complementary perspective, we also directly study the similarity of artists' digital works to Stable Diffusion's imitations of them. For each of the 70 artists, we retrieve the top result obtained by Google Image searching "<artist's name> art." As before, we then use Stable Diffusion to generate 10 images for each artist with the prompt "Artwork from [artist's name]." We then compare the real images and generated images. Distances are measured by first encoding images using the CLIP image encoder and calculating the cosine distance between encodings.

**Results:** For each artist, we calculate whether real images from artists are more similar to imitations of that artist or other artists. The significance was calculated using a rank

sum test with a Bonferroni correction factor of 70. Results are in Figure 4. 90% (63/70) of the experiments produce $p$ values less than 0.05. This compares to an average of 22.8% (16/70) for a control experiment using random artist assignments of real images. These results further support that Stable Diffusion is broadly successful at imitating artists.

## 3. Conclusion

We have demonstrated how AI image classification can help to measure the success of diffusion models imitating human artists. We argue that these methods can provide a practical way to tie questions about copyright liability to the *capabilities* of a model instead of its training data alone. By matching imitation images to both artists' names and works, we find that Stable Diffusion is broadly successful at imitating human digital artists. We hope that future work can use image classification to analyze legal claims and to test defenses against AI imitation of copyrighted work.

Measuring the Success of Diffusion Models at Imitating Human Artists

## Acknowledgements

We thank Taylor Lynn Curtis and Lennart Schulze for feedback.

## References

Balagopalan, A., Madras, D., Yang, D. H., Hadfield-Menell, D., Hadfield, G. K., and Ghassemi, M. Judging facts, judging norms: Training machine learning models to judge humans requires a modified approach to labeling data. *Science Advances*, 9(19):eabq0701, 2023.

Balganesh, S., Manta, I. D., and Wilkinson-Ryan, T. Judging similarity. *Iowa L. Rev.*, 100:267, 2014.

Kaminski, M. E. and Rub, G. A. Copyright's framing problem. *UCLA L. Rev.*, 64:1102, 2017.

Lemley, M. A. and Casey, B. Fair learning. *Tex. L. Rev.*, 99: 743, 2020.

Midjourney. Midjourney, 2022. URL https://www.midjourney.com/.

Radford, A., Kim, J. W., Hallacy, C., Ramesh, A., Goh, G., Agarwal, S., Sastry, G., Askell, A., Mishkin, P., Clark, J., et al. Learning transferable visual models from natural language supervision. In *International conference on machine learning*, pp. 8748–8763. PMLR, 2021.

Ramesh, A., Dhariwal, P., Nichol, A., Chu, C., and Chen, M. Hierarchical text-conditional image generation with clip latents. *arXiv preprint arXiv:2204.06125*, 2022.

Rombach, R., Blattmann, A., Lorenz, D., Esser, P., and Ommer, B. High-resolution image synthesis with latent diffusion models. In *Proceedings of the IEEE/CVF Conference on Computer Vision and Pattern Recognition*, pp. 10684–10695, 2022.

Sag, M. The new legal landscape for text mining and machine learning. *J. Copyright Soc'y USA*, 66:291, 2018.

Schuhmann, C., Vencu, R., Beaumont, R., Kaczmarczyk, R., Mullis, C., Katta, A., Coombes, T., Jitsev, J., and Komatsuzaki, A. Laion-400m: Open dataset of clip-filtered 400 million image-text pairs. *arXiv preprint arXiv:2111.02114*, 2021.

Sohl-Dickstein, J., Weiss, E., Maheswaranathan, N., and Ganguli, S. Deep unsupervised learning using nonequilibrium thermodynamics. In *International Conference on Machine Learning*, pp. 2256–2265. PMLR, 2015.

*Newton v. Diamond*, 388 F.3d 1189, 1195 (9th Cir. 2004).

# EXHIBIT F



```
46   You must give any Third Party recipients of the Model or Derivatives of the Model a copy of this License;
47   You must cause any modified files to carry prominent notices stating that You changed the files;
48   You must retain all copyright, patent, trademark, and attribution notices excluding those notices that do not pertain to a
49   You may add Your own copyright statement to Your modifications and may provide additional or different license terms and c
50   5. Use-based restrictions. The restrictions set forth in Attachment A are considered Use-based restrictions. Therefore You
51   6. The Output You Generate. Except as set forth herein, Licensor claims no rights in the Output you generate using the Moc
52
53   Section IV: OTHER PROVISIONS
54
55   7. Updates and Runtime Restrictions. To the maximum extent permitted by law, Licensor reserves the right to restrict (rem@
56   8. Trademarks and related. Nothing in this License permits You to make use of Licensors' trademarks, trade names, logos or
57   9. Disclaimer of Warranty. Unless required by applicable law or agreed to in writing, Licensor provides the Model and the
58   10. Limitation of Liability. In no event and under no legal theory, whether in tort (including negligence), contract, or @
59   11. Accepting Warranty or Additional Liability. While redistributing the Model, Derivatives of the Model and the Complemer
60   12. If any provision of this License is held to be invalid, illegal or unenforceable, the remaining provisions shall be ur
61
62   END OF TERMS AND CONDITIONS
63
64
65
66
67   Attachment A
68
69   Use Restrictions
70
71   You agree not to use the Model or Derivatives of the Model:
72   - In any way that violates any applicable national, federal, state, local or international law or regulation;
73   - For the purpose of exploiting, harming or attempting to exploit or harm minors in any way;
74   - To generate or disseminate verifiably false information and/or content with the purpose of harming others;
75   - To generate or disseminate personal identifiable information that can be used to harm an individual;
76   - To defame, disparage or otherwise harass others;
77   - For fully automated decision making that adversely impacts an individual's legal rights or otherwise creates or modifies
78   - For any use intended to or which has the effect of discriminating against or harming individuals or groups based on onli
79   - To exploit any of the vulnerabilities of a specific group of persons based on their age, social, physical or mental char
80   - For any use intended to or which has the effect of discriminating against individuals or groups based on legally protect
81   - To provide medical advice and medical results interpretation;
82   - To generate or disseminate information for the purpose to be used for administration of justice, law enforcement, immigr
```

Copyright (c) 2022 Robin Rombach and Patrick Esser and contributors

CreativeML Open RAIL-M
dated August 22, 2022

Section I: PREAMBLE

Multimodal generative models are being widely adopted and used, and have the
potential to transform the way artists, among other individuals, conceive and
benefit from AI or ML technologies as a tool for content creation.

Notwithstanding the current and potential benefits that these artifacts can bring
to society at large, there are also concerns about potential misuses of them,
either due to their technical limitations or ethical considerations.

In short, this license strives for both the open and responsible downstream use of
the accompanying model. When it comes to the open character, we took inspiration
from open source permissive licenses regarding the grant of IP rights. Referring to
the downstream responsible use, we added use-based restrictions not permitting the
use of the Model in very specific scenarios, in order for the licensor to be able
to enforce the license in case potential misuses of the Model may occur. At the
same time, we strive to promote open and responsible research on generative models
for art and content generation.

Even though downstream derivative versions of the model could be released under
different licensing terms, the latter will always have to include - at minimum -
the same use-based restrictions as the ones in the original license (this license).
We believe in the intersection between open and responsible AI development; thus,
this License aims to strike a balance between both in order to enable responsible
open-science in the field of AI.

This License governs the use of the model (and its derivatives) and is informed by
the model card associated with the model.

NOW THEREFORE, You and Licensor agree as follows:

1. Definitions

- "License" means the terms and conditions for use, reproduction, and Distribution
as defined in this document.
- "Data" means a collection of information and/or content extracted from the
dataset used with the Model, including to train, pretrain, or otherwise evaluate
the Model. The Data is not licensed under this License.
- "Output" means the results of operating a Model as embodied in informational
content resulting therefrom.
- "Model" means any accompanying machine-learning based assemblies (including
checkpoints), consisting of learnt weights, parameters (including optimizer
states), corresponding to the model architecture as embodied in the Complementary
Material, that have been trained or tuned, in whole or in part on the Data, using
the Complementary Material.

https://github.com/runwayml/stable-diffusion/blob/main/LICENSE

- "Derivatives of the Model" means all modifications to the Model, works based on the Model, or any other model which is created or initialized by transfer of patterns of the weights, parameters, activations or output of the Model, to the other model, in order to cause the other model to perform similarly to the Model, including - but not limited to - distillation methods entailing the use of intermediate data representations or methods based on the generation of synthetic data by the Model for training the other model.
- "Complementary Material" means the accompanying source code and scripts used to define, run, load, benchmark or evaluate the Model, and used to prepare data for training or evaluation, if any. This includes any accompanying documentation, tutorials, examples, etc, if any.
- "Distribution" means any transmission, reproduction, publication or other sharing of the Model or Derivatives of the Model to a third party, including providing the Model as a hosted service made available by electronic or other remote means - e.g. API-based or web access.
- "Licensor" means the copyright owner or entity authorized by the copyright owner that is granting the License, including the persons or entities that may have rights in the Model and/or distributing the Model.
- "You" (or "Your") means an individual or Legal Entity exercising permissions granted by this License and/or making use of the Model for whichever purpose and in any field of use, including usage of the Model in an end-use application - e.g. chatbot, translator, image generator.
- "Third Parties" means individuals or legal entities that are not under common control with Licensor or You.
- "Contribution" means any work of authorship, including the original version of the Model and any modifications or additions to that Model or Derivatives of the Model thereof, that is intentionally submitted to Licensor for inclusion in the Model by the copyright owner or by an individual or Legal Entity authorized to submit on behalf of the copyright owner. For the purposes of this definition, "submitted" means any form of electronic, verbal, or written communication sent to the Licensor or its representatives, including but not limited to communication on electronic mailing lists, source code control systems, and issue tracking systems that are managed by, or on behalf of, the Licensor for the purpose of discussing and improving the Model, but excluding communication that is conspicuously marked or otherwise designated in writing by the copyright owner as "Not a Contribution."
- "Contributor" means Licensor and any individual or Legal Entity on behalf of whom a Contribution has been received by Licensor and subsequently incorporated within the Model.

Section II: INTELLECTUAL PROPERTY RIGHTS

Both copyright and patent grants apply to the Model, Derivatives of the Model and Complementary Material. The Model and Derivatives of the Model are subject to additional terms as described in Section III.

2. Grant of Copyright License. Subject to the terms and conditions of this License, each Contributor hereby grants to You a perpetual, worldwide, non-exclusive, no-charge, royalty-free, irrevocable copyright license to reproduce, prepare, publicly display, publicly perform, sublicense, and distribute the Complementary Material, the Model, and Derivatives of the Model.

3. Grant of Patent License. Subject to the terms and conditions of this License and where and as applicable, each Contributor hereby grants to You a perpetual, worldwide, non-exclusive, no-charge, royalty-free, irrevocable (except as stated in this paragraph) patent license to make, have made, use, offer to sell, sell, import, and otherwise transfer the Model and the Complementary Material, where such license applies only to those patent claims licensable by such Contributor that are necessarily infringed by their Contribution(s) alone or by combination of their Contribution(s) with the Model to which such Contribution(s) was submitted. If You institute patent litigation against any entity (including a cross-claim or counterclaim in a lawsuit) alleging that the Model and/or Complementary Material or a Contribution incorporated within the Model and/or Complementary Material constitutes direct or contributory patent infringement, then any patent licenses granted to You under this License for the Model and/or Work shall terminate as of the date such litigation is asserted or filed.

Section III: CONDITIONS OF USAGE, DISTRIBUTION AND REDISTRIBUTION

4. Distribution and Redistribution. You may host for Third Party remote access purposes (e.g. software-as-a-service), reproduce and distribute copies of the Model or Derivatives of the Model thereof in any medium, with or without modifications, provided that You meet the following conditions:
Use-based restrictions as referenced in paragraph 5 MUST be included as an enforceable provision by You in any type of legal agreement (e.g. a license) governing the use and/or distribution of the Model or Derivatives of the Model, and You shall give notice to subsequent users You Distribute to, that the Model or Derivatives of the Model are subject to paragraph 5. This provision does not apply to the use of Complementary Material.
You must give any Third Party recipients of the Model or Derivatives of the Model a copy of this License;
You must cause any modified files to carry prominent notices stating that You changed the files;
You must retain all copyright, patent, trademark, and attribution notices excluding those notices that do not pertain to any part of the Model, Derivatives of the Model.
You may add Your own copyright statement to Your modifications and may provide additional or different license terms and conditions - respecting paragraph 4.a. - for use, reproduction, or Distribution of Your modifications, or for any such Derivatives of the Model as a whole, provided Your use, reproduction, and Distribution of the Model otherwise complies with the conditions stated in this License.
5. Use-based restrictions. The restrictions set forth in Attachment A are considered Use-based restrictions. Therefore You cannot use the Model and the Derivatives of the Model for the specified restricted uses. You may use the Model subject to this License, including only for lawful purposes and in accordance with the License. Use may include creating any content with, finetuning, updating, running, training, evaluating and/or reparametrizing the Model. You shall require all of Your users who use the Model or a Derivative of the Model to comply with the terms of this paragraph (paragraph 5).
6. The Output You Generate. Except as set forth herein, Licensor claims no rights in the Output You generate using the Model. You are accountable for the Output you

generate and its subsequent uses. No use of the output can contravene any provision as stated in the License.

Section IV: OTHER PROVISIONS

7. Updates and Runtime Restrictions. To the maximum extent permitted by law, Licensor reserves the right to restrict (remotely or otherwise) usage of the Model in violation of this License, update the Model through electronic means, or modify the Output of the Model based on updates. You shall undertake reasonable efforts to use the latest version of the Model.

8. Trademarks and related. Nothing in this License permits You to make use of Licensors' trademarks, trade names, logos or to otherwise suggest endorsement or misrepresent the relationship between the parties; and any rights not expressly granted herein are reserved by the Licensors.

9. Disclaimer of Warranty. Unless required by applicable law or agreed to in writing, Licensor provides the Model and the Complementary Material (and each Contributor provides its Contributions) on an "AS IS" BASIS, WITHOUT WARRANTIES OR CONDITIONS OF ANY KIND, either express or implied, including, without limitation, any warranties or conditions of TITLE, NON-INFRINGEMENT, MERCHANTABILITY, or FITNESS FOR A PARTICULAR PURPOSE. You are solely responsible for determining the appropriateness of using or redistributing the Model, Derivatives of the Model, and the Complementary Material and assume any risks associated with Your exercise of permissions under this License.

10. Limitation of Liability. In no event and under no legal theory, whether in tort (including negligence), contract, or otherwise, unless required by applicable law (such as deliberate and grossly negligent acts) or agreed to in writing, shall any Contributor be liable to You for damages, including any direct, indirect, special, incidental, or consequential damages of any character arising as a result of this License or out of the use or inability to use the Model and the Complementary Material (including but not limited to damages for loss of goodwill, work stoppage, computer failure or malfunction, or any and all other commercial damages or losses), even if such Contributor has been advised of the possibility of such damages.

11. Accepting Warranty or Additional Liability. While redistributing the Model, Derivatives of the Model and the Complementary Material thereof, You may choose to offer, and charge a fee for, acceptance of support, warranty, indemnity, or other liability obligations and/or rights consistent with this License. However, in accepting such obligations, You may act only on Your own behalf and on Your sole responsibility, not on behalf of any other Contributor, and only if You agree to indemnify, defend, and hold each Contributor harmless for any liability incurred by, or claims asserted against, such Contributor by reason of your accepting any such warranty or additional liability.

12. If any provision of this License is held to be invalid, illegal or unenforceable, the remaining provisions shall be unaffected thereby and remain valid as if such provision had not been set forth herein.

END OF TERMS AND CONDITIONS

Attachment A

Use Restrictions

You agree not to use the Model or Derivatives of the Model:
- In any way that violates any applicable national, federal, state, local or international law or regulation;
- For the purpose of exploiting, harming or attempting to exploit or harm minors in any way;
- To generate or disseminate verifiably false information and/or content with the purpose of harming others;
- To generate or disseminate personal identifiable information that can be used to harm an individual;
- To defame, disparage or otherwise harass others;
- For fully automated decision making that adversely impacts an individual's legal rights or otherwise creates or modifies a binding, enforceable obligation;
- For any use intended to or which has the effect of discriminating against or harming individuals or groups based on online or offline social behavior or known or predicted personal or personality characteristics;
- To exploit any of the vulnerabilities of a specific group of persons based on their age, social, physical or mental characteristics, in order to materially distort the behavior of a person pertaining to that group in a manner that causes or is likely to cause that person or another person physical or psychological harm;
- For any use intended to or which has the effect of discriminating against individuals or groups based on legally protected characteristics or categories;
- To provide medical advice and medical results interpretation;
- To generate or disseminate information for the purpose to be used for administration of justice, law enforcement, immigration or asylum processes, such as predicting an individual will commit fraud/crime commitment (e.g. by text profiling, drawing causal relationships between assertions made in documents, indiscriminate and arbitrarily-targeted use).

# EXHIBIT G



You can use this both with the 🖊️ Diffusers library and the RunwayML GitHub repository.

🔗 Diffusers

```
from diffusers import StableDiffusionPipeline
import torch

model_id = "runwayml/stable-diffusion-v1-5"
pipe = StableDiffusionPipeline.from_pretrained(model_id, torch_dtype=to
pipe = pipe.to("cuda")

prompt = "a photo of an astronaut riding a horse on mars"
image = pipe(prompt).images[0]

image.save("astronaut_rides_horse.png")
```

For more detailed instructions, use-cases and examples in JAX follow the instructions here.

🔗 Original GitHub Repository

1. Download the weights

   - v1-5-pruned-emaonly.ckpt - 4.27GB, ema-only weight. uses less VRAM - suitable for inference

   - v1-5-pruned.ckpt - 7.7GB, ema+non-ema weights. uses more VRAM - suitable for fine-tuning

2. Follow instructions here.

🔗 Model Details

   - **Developed by:** Robin Rombach, Patrick Esser

   - **Model type:** Diffusion-based text-to-image generation model

   - **Language(s):** English

   - **License:** The CreativeML OpenRAIL M license is an Open RAIL M license, adapted from the work that BigScience and the RAIL Initiative are jointly carrying in the area of responsible AI licensing. See also the article about the BLOOM Open RAIL license on which our license is based.

- **Model Description:** This is a model that can be used to generate and modify images based on text prompts. It is a <u>Latent Diffusion Model</u> that uses a fixed, pretrained text encoder (<u>CLIP ViT-L/14</u>) as suggested in the <u>Imagen paper</u>.

- **Resources for more information:** <u>GitHub Repository</u>, <u>Paper</u>.

- **Cite as:**

```
@InProceedings{Rombach_2022_CVPR,
    author      = {Rombach, Robin and Blattmann, Andreas and Lorenz,
    title       = {High-Resolution Image Synthesis With Latent Diffus
    booktitle   = {Proceedings of the IEEE/CVF Conference on Compute
    month       = {June},
    year        = {2022},
    pages       = {10684-10695}
}
```

## 🔗 Uses

### 🔗 Direct Use

The model is intended for research purposes only. Possible research areas and tasks include

- Safe deployment of models which have the potential to generate harmful content.
- Probing and understanding the limitations and biases of generative models.
- Generation of artworks and use in design and other artistic processes.
- Applications in educational or creative tools.
- Research on generative models.

Excluded uses are described below.

### 🔗 Misuse, Malicious Use, and Out-of-Scope Use

*Note: This section is taken from the <u>DALLE-MINI model card</u>, but applies in the same way to Stable Diffusion v1.*

The model should not be used to intentionally create or disseminate images that create hostile or alienating environments for people. This includes generating images that people would foreseeably find disturbing, distressing, or offensive; or content that propagates historical or current stereotypes.

### 🔗 Out-of-Scope Use

The model was not trained to be factual or true representations of people or events, and therefore using the model to generate such content is out-of-scope for the abilities of this model.

### 🔗 Misuse and Malicious Use

Using the model to generate content that is cruel to individuals is a misuse of this model. This includes, but is not limited to:

- Generating demeaning, dehumanizing, or otherwise harmful representations of people or their environments, cultures, religions, etc.

- Intentionally promoting or propagating discriminatory content or harmful stereotypes.

- Impersonating individuals without their consent.

- Sexual content without consent of the people who might see it.

- Mis- and disinformation

- Representations of egregious violence and gore

- Sharing of copyrighted or licensed material in violation of its terms of use.

- Sharing content that is an alteration of copyrighted or licensed material in violation of its terms of use.

### 🔗 Limitations and Bias

### 🔗 Limitations

- The model does not achieve perfect photorealism

- The model cannot render legible text

- The model does not perform well on more difficult tasks which involve compositionality, such as rendering an image corresponding to "A red cube on top of a blue sphere"

- Faces and people in general may not be generated properly.

- The model was trained mainly with English captions and will not work as well in other languages.

- The autoencoding part of the model is lossy.

- The model was trained on a large-scale dataset LAION-5B which contains adult material and is not fit for product use without additional safety mechanisms and considerations.

- No additional measures were used to deduplicate the dataset. As a result, we observe some degree of memorization for images that are duplicated in the

2/8/24, 9:23 AM
runwayml/stable-diffusion-v1-5 · Hugging Face
Case 3:23-cv-00201-WHO    Document 164-2    Filed 02/08/24    Page 112 of 115

training data. The training data can be searched at https://rom1504.github.io/clip-retrieval/ to possibly assist in the detection of memorized images.

## 🔗 Bias

While the capabilities of image generation models are impressive, they can also reinforce or exacerbate social biases. Stable Diffusion v1 was trained on subsets of LAION-2B(en), which consists of images that are primarily limited to English descriptions. Texts and images from communities and cultures that use other languages are likely to be insufficiently accounted for. This affects the overall output of the model, as white and western cultures are often set as the default. Further, the ability of the model to generate content with non-English prompts is significantly worse than with English-language prompts.

## 🔗 Safety Module

The intended use of this model is with the Safety Checker in Diffusers. This checker works by checking model outputs against known hard-coded NSFW concepts. The concepts are intentionally hidden to reduce the likelihood of reverse-engineering this filter. Specifically, the checker compares the class probability of harmful concepts in the embedding space of the `CLIPTextModel` *after generation* of the images. The concepts are passed into the model with the generated image and compared to a hand-engineered weight for each NSFW concept.

## 🔗 Training

**Training Data** The model developers used the following dataset for training the model:

- LAION-2B (en) and subsets thereof (see next section)

**Training Procedure** Stable Diffusion v1-5 is a latent diffusion model which combines an autoencoder with a diffusion model that is trained in the latent space of the autoencoder. During training,

- Images are encoded through an encoder, which turns images into latent representations. The autoencoder uses a relative downsampling factor of 8 and maps images of shape H x W x 3 to latents of shape H/f x W/f x 4

- Text prompts are encoded through a ViT-L/14 text-encoder.

- The non-pooled output of the text encoder is fed into the UNet backbone of the latent diffusion model via cross-attention.

- The loss is a reconstruction objective between the noise that was added to the latent and the prediction made by the UNet.

Case 3:23-cv-00201-WHO   Document 164-2   Filed 02/08/24   Page 113 of 115

Currently six Stable Diffusion checkpoints are provided, which were trained as follows.

- `stable-diffusion-v1-1`: 237,000 steps at resolution 256x256 on laion2B-en. 194,000 steps at resolution 512x512 on laion-high-resolution (170M examples from LAION-5B with resolution >= `1024x1024`).

- `stable-diffusion-v1-2`: Resumed from `stable-diffusion-v1-1`. 515,000 steps at resolution 512x512 on "laion-improved-aesthetics" (a subset of laion2b-en, filtered to images with an original size >= `512x512`, estimated aesthetics score > `5.0`, and an estimated watermark probability < `0.5`. The watermark estimate is from the LAION-5B metadata, the aesthetics score is estimated using an improved aesthetics estimator).

- `stable-diffusion-v1-3`: Resumed from `stable-diffusion-v1-2` - 195,000 steps at resolution 512x512 on "laion-improved-aesthetics" and 10 % dropping of the text-conditioning to improve classifier-free guidance sampling.

- `stable-diffusion-v1-4` Resumed from `stable-diffusion-v1-2` - 225,000 steps at resolution 512x512 on "laion-aesthetics v2 5+" and 10 % dropping of the text-conditioning to improve classifier-free guidance sampling.

- `stable-diffusion-v1-5` Resumed from `stable-diffusion-v1-2` - 595,000 steps at resolution 512x512 on "laion-aesthetics v2 5+" and 10 % dropping of the text-conditioning to improve classifier-free guidance sampling.

- `stable-diffusion-inpainting` Resumed from `stable-diffusion-v1-5` - then 440,000 steps of inpainting training at resolution 512x512 on "laion-aesthetics v2 5+" and 10% dropping of the text-conditioning. For inpainting, the UNet has 5 additional input channels (4 for the encoded masked-image and 1 for the mask itself) whose weights were zero-initialized after restoring the non-inpainting checkpoint. During training, we generate synthetic masks and in 25% mask everything.

- **Hardware:** 32 x 8 x A100 GPUs

- **Optimizer:** AdamW

- **Gradient Accumulations**: 2

- **Batch:** 32 x 8 x 2 x 4 = 2048

- **Learning rate:** warmup to 0.0001 for 10,000 steps and then kept constant

🔗 **Evaluation Results**

Evaluations with different classifier-free guidance scales (1.5, 2.0, 3.0, 4.0, 5.0, 6.0, 7.0, 8.0) and 50 PNDM/PLMS sampling steps show the relative improvements of the checkpoints:



Evaluated using 50 PLMS steps and 10000 random prompts from the COCO2017 validation set, evaluated at 512x512 resolution. Not optimized for FID scores.

## 🔗 Environmental Impact

**Stable Diffusion v1 Estimated Emissions** Based on that information, we estimate the following CO2 emissions using the Machine Learning Impact calculator presented in Lacoste et al. (2019). The hardware, runtime, cloud provider, and compute region were utilized to estimate the carbon impact.

- **Hardware Type:** A100 PCIe 40GB
- **Hours used:** 150000
- **Cloud Provider:** AWS
- **Compute Region:** US-east
- **Carbon Emitted (Power consumption x Time x Carbon produced based on location of power grid):** 11250 kg CO2 eq.

## 🔗 Citation

```
@InProceedings{Rombach_2022_CVPR,
    author    = {Rombach, Robin and Blattmann, Andreas and Lorenz,
    title     = {High-Resolution Image Synthesis With Latent Diffus
    booktitle = {Proceedings of the IEEE/CVF Conference on Compute
    month     = {June},
    year      = {2022},
    pages     = {10684-10695}
}
```

*This model card was written by: Robin Rombach and Patrick Esser and is based on the*
*DALL-E Mini model card*.



**Company**

TOS

Privacy

About

Jobs

**Website**

Models

Datasets

Spaces

Pricing

Docs

© Hugging Face