```
             IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF CALIFORNIA
                   SAN FRANCISCO DIVISION


SARAH ANDERSEN, ET AL              3:23-CV-00201-WHO

         VERSUS                    MAY 8, 2024

STABILITY AI LTD., STABILITY       SAN FRANCISCO, CA
AI, INC., MIDJOURNEY, INC.,
DEVIANT ART, INC., RUNWAY AI,
INC.,


          BEFORE THE HONORABLE WILLIAM H. ORRICK
                UNITED STATES DISTRICT JUDGE


               TRANSCRIPT OF MOTIONS HEARING


A P P E A R A N C E S :

For the Plaintiffs:        JOSEPH R. SAVERI, ESQUIRE
                           CHRISTOPHER K.L. YOUNG, ESQUIRE
                           KATHLEEN JORDAN MCMAHON, ESQUIRE
                           JOSEPH SAVERI LAW FIRM
                           601 CALIFORNIA STREET
                           SAN FRANCISCO, CA 94108

                           MATTHEW BUTTERICK, ESQUIRE
                           MATTHEW BUTTERICK ATTORNEY AT LAW
                           1920 HILLHURST AVENUE #406
                           LOS ANGELES, CA 90027

                           LAURA MATSON, ESQUIRE
                           LOCKRIDGE GRINDAL NAUEN PLLP
                           100 WASHINGTON AVENUE S
                           MINNEAPOLIS, MN 55401


     ----------------------------------------------------
                   BETH A. KRUPA, RMR, CRR
                 United States Court Reporter
                     401 West Evans Street
                      Florence, Sc  29501
                   Beth_krupa@scd.uscourts.gov

               (Stenotype/Computer-Aided Transcription)
```

APPEARANCES CONTINUED:

For Defendant Stability:
                         JOSEPH CHARLES GRATZ, ESQUIRE
                         MORRISON & FOERSTER LLP
                         425 MARKET STREET
                         SAN FRANCISCO, CA 94105
                         Jgratz@mofo.com

For Defendant Midjourney:
                         ANGELA DUNNING, ESQUIRE
                         CLEARY GOTTLIEB STEEN & HAMILTON
                         1841 PAGE MILL ROAD
                         PALO ALTO, CA 94304-1248

For Defendant DeviantArt:
                         ANDREW MICHAEL GASS, ESQUIRE
                         LATHAM & WATKINS, LLP
                         505 MONTGOMERY STREET
                         SAN FRANCISCO, CA 94111

For Defendant Runway AI:
                         DAVID JASON SILBERT, ESQUIRE
                         PAVEN MALHOTRA, ESQUIRE
                         KEKER, VAN NEST & PETERS LLP
                         633 BATTERY STREET
                         SAN FRANCISCO, CA 94111-1809

------------------------------------------------------
                  BETH A. KRUPA, RMR, CRR
                 United States Court Reporter
                     401 West Evans Street
                      Florence, Sc  29501
                  Beth_krupa@scd.uscourts.gov

           (Stenotype/Computer-Aided Transcription)

```
1          (Proceedings commenced at 2:09 p.m.)
2               THE CLERK:  Calling case No. 23-201, Andersen
3     versus Stability AI Limited, et al.  Counsel, if you
4     would please come forward and state your appearance for
5     the record.
6               MR. SAVERI:  Good afternoon, Your Honor.
7     Joseph Saveri on behalf of the plaintiffs.
8               MS. MATSON:  Good afternoon, Your Honor.  Laura
9     Matson on behalf of plaintiffs.
10              MS. MCMAHON:  Good afternoon, Your Honor,
11    Kathleen McMahon on behalf of plaintiffs.
12              MR. BUTTERICK:  Your Honor, good afternoon.
13    Matthew Butterick on behalf of plaintiffs.
14              MR. YOUNG:  Good afternoon, Your Honor.  Chris
15    Young on behalf of plaintiffs.
16              MR. GASS:  Good afternoon, Your Honor.  Andy
17    Gass from Latham & Watkins on behalf of defendant
18    DeviantArt.
19              MR. MALHOTRA:  Good afternoon, Your Honor.
20    Paven Malhotra of Keker Van Nest & Peters on behalf of
21    defendant Runway.
22              MR. SILBERT:  Good afternoon.  David Silbert
23    from the Keker firm on behalf of defendant Runway.
24              MR. GRATZ:  Good afternoon, Your Honor.  Joe
25    Gratz from Morrison & Foerster on behalf of
```

1   Stability, Inc.

2       MS. DUNNING:  Hi.  Good afternoon, Your Honor.

3   Angela Dunning from Cleary Gottlieb on behalf of

4   defendant Midjourney.

5       THE COURT:  Great.

6       MR. SAVERI:  Your Honor, before we get started

7   I also wanted to introduce to the Court three of our

8   plaintiffs who came to court today.  And so Sarah

9   Andersen, Karla Ortiz and Kelly McKernan are also here

10  today and I wanted to introduce them to the Court.

11      THE COURT:  Terrific.  I'm glad you're here.

12      MS. DUNNING:  I'll introduce Max Sills, the

13  general counsel of Midjourney as well.

14      THE COURT:  Glad you're here, too.

15      All right.  So you got my tentative and

16  I'll -- I assume that the defendants had some

17  conversation about how things would proceed, so why don't

18  you lead off.

19      I am -- I'm going to be pretty strict on time,

20  because there are other things going on in this building

21  today.

22      MR. SAVERI:  Your Honor, the plaintiffs have

23  also divided and some of the attorneys at counsel table

24  are going to share the argument on our side, too.

25      THE COURT:  Terrific.

1          MR. GASS:  Thank you, Your Honor.  Again, Andy

2     Gass on DeviantArt.  I'll be as efficient as I can.  For

3     the purpose of this discussion, let's assume that the

4     tentative stands and is correct with respect to the

5     compressed copy issue.  We're not going to contest that

6     for purposes of this conversation.

7          What I want to do is discuss why defendant

8     DeviantArt should, nevertheless, be dismissed from the

9     case even to the extent that that ruling stands.  And I

10     want to start by pointing out two respects in which

11     DeviantArt is differently situated from the other

12     defendants in this case.

13          First, as Your Honor knows, DeviantArt didn't

14     develop any generative AI models.  All DeviantArt is

15     alleged to have done is take the Stability AI Stable

16     Diffusion model, download it and upload a version of it

17     that it labeled DreamUp to offer to users.

18          Second, and probably more importantly for

19     purposes of this conversation, there are no allegations

20     in this complaint, the first amended complaint that

21     plaintiffs were able to extract anything from DreamUp,

22     the DeviantArt implementation of the model that resembled

23     or as an output, a copyright infringement of any of the

24     plaintiffs' works.

25          There's no allegation that DeviantArt itself

1    ever extracted from the model, any output that is a

2    copyright infringement of the plaintiffs' works.  There's

3    no allegation that any of DeviantArt's users have ever

4    extracted any output from DeviantArt's implementation of

5    the model that's a copyright infringement of the

6    plaintiffs' works.

7              So what we're left with is the bare fact that

8    you can be actionably liable for copyright infringement

9    on nothing more than having downloaded a model that you

10   weren't involved in creating or developing, you didn't

11   scrape the internet, you didn't train it, you did nothing

12   but download the model and then upload it where,

13   according to Paragraph 93 of the first complaint, the

14   outputs of the model are very unlikely to be similar to

15   the outputs of any given work that the model was trained

16   on.

17             So where does that leave us?  That leaves us

18   with the idea that an actor situated the way DeviantArt

19   is, is somehow liable for copyright infringement for the

20   vestigial ghost copies that are in the model somehow, but

21   they never accessed, didn't see at any point in the

22   process and were never used by anyone.

23             So where does that leave us?  That, Your Honor,

24   is a classic fair use, and our motion addresses this.

25   This is an easier case than cases like Sega versus

1   Accolade that talk about, sort of, copying that was

2   actually done at great pains by the defendant in the

3   service of creating a noninfringing output, which indeed

4   is fair use under binding Ninth Circuit precedent.

5       Here we have the, sort of, quintessential

6   transformative use of these copies.  We're going to

7   assume that there's been a prima facie act of

8   infringement, right?

9       But evidently, we all agree was in the service

10  of offering this tool to the public, whose primary, if

11  not sole purpose, is to create new outputs that do not

12  infringe the rights of the works in suit.

13      So we pointed this out in our opening brief.

14  Again, sort of on the assumption that there is a copy,

15  it's -- that this copy is fair use.  Critically, this is

16  not the training issue.

17      We're not asking you to rule on a motion to

18  dismiss that training generative AI model is fair use.

19  We're asking Your Honor to rule that the hundreds of

20  thousands of similarly situated entities to DeviantArt

21  who have done nothing more than download the model and

22  make it available can't be dragged into discovery and put

23  to the costs of defending a full-blown litigation without

24  something more, some other allegation that there was

25  something beyond an intermediate invisible copy that no

1    one ever accessed.

2         Plaintiffs in their opposition suggested that

3    there are disputed facts that preclude resolution of this

4    issue on a Rule 12 motion.  They didn't point to what

5    those facts are.

6         Again, the premise of this argument, you don't

7    get to fair use unless there's been a prima facie act of

8    infringement, so we're assuming they're right about these

9    copies.  There are no allegations in the complaint that

10   there's some market under the fourth fair use factor for

11   licensing these vestigial ghost invisible copies in

12   models to be put out as -- as tools for the public to

13   generate new works of art.

14        There's really no basis for the Court, I think,

15   to properly deny this part of the motion.  They certainly

16   haven't even engaged with us on it.  So I think the

17   prudent course of action here is, evidently, there's

18   going to be a second amended complaint.

19        If plaintiffs would like to try to allege some

20   more relevant facts that suggest why there's something

21   more going on here than an invisible back-end copy never

22   accessed or used by anyone, never outputted by anyone,

23   they can try to do that.

24        I think it will be hard for them, because, in

25   fact, the model doesn't output works that look like the

1      works in the suit, but they should be allowed to try.

2      But the havoc that would be wreaked by allowing suit to

3      proceed against someone situated the way DeviantArt is in

4      this case is hard to overstate and I know that Your Honor

5      is confronted all the time with people who warn of the

6      drastic consequences of a ruling against them.

7              Here we really have an enumerable just encumber

8      of parties who are no differently situated by DeviantArt

9      who could be subject to this kind of plan.  And I -- I

10     think given that there's no real basis to -- offered to

11     oppose the fair use ruling that we're seeking, that's

12     the, again, the conservative and prudent approach here.

13     With that, I'll sit down.

14             THE COURT:  Thank you.

15             MS. MATSON:  Thank you, Your Honor.  Counsel

16     for DeviantArt asserts that if -- oh, I'm sorry.  Laura

17     Matson from Lockridge Grindal Nauen on behalf of

18     plaintiffs.

19             THE COURT:  So I am interested in why you had

20     examples for the other defendants of similarity and none

21     for DeviantArt, why is that?

22             MS. MATSON:  Your Honor, throughout the

23     complaint we allege that Stable Diffusion 1.4 functions

24     in the same way or a very similar way to the other Stable

25     Diffusion models.

1          So, you know, in Paragraph 133 we include

2     images, examples of a researcher extracting training

3     data, training images directly from Stable Diffusion 1.4

4     and we make allegations that the reproduction and

5     extraction of those images happens and is possible with

6     Stable Diffusion 1.4.

7          Now, with regard to the examples from the other

8     models, in those cases, we far exceeded the pleading

9     burden to assert that --

10          THE COURT:  But okay.  So now answer my

11     question.  Why didn't you do this with respect to

12     DeviantArt since you did do it -- whether you exceeded

13     the burden -- the pleading burden or not, why didn't you

14     do it with respect to DeviantArt?

15          MS. MATSON:  I -- Your Honor, I can't answer

16     that question.  I'm sorry.  I was not personally involved

17     in that.  I could defer to one of my co-counsel if you

18     would like the answer on that.

19          But, Your Honor, that is a part of the process

20     of developing the complaint.  We were able to generate

21     examples, distinct examples for each of the other models

22     and exceeded the burden.

23          And with regard to DeviantArt, we were able to

24     show that this had been done by a researcher at

25     Paragraph 133.  I can't give you a good answer as to why

1    we did not include an exhibit for DeviantArt.

2              THE COURT:  Okay.  All right.  Thank you.

3              MS. MATSON:  Your Honor, the reason that

4    DeviantArt is liable for infringement is because it has

5    copied -- statutory copies of protected works under the

6    Copyright Act.  Under the definition 17 U.S.C. 101, it

7    has copied and as you know, copyright infringement is a

8    strict liability offense.

9              You know, I'll point you to ITC Textile case.

10   I can provide the citation if you would like, but in that

11   case, you know, Walmart was infringing even though it

12   didn't know that the T-shirt it sold was infringing.

13             So I think DeviantArt attempts here to fear

14   monger about the potential consequences of other

15   potential factual scenarios, what we have here is a

16   defendant that is infringing that has copied in violation

17   of the Copyright Act.  So with --

18             THE COURT:  But I mean, often in this court

19   when a defendant is being sued, there's an example of the

20   specific problem that the plaintiff, herself or himself,

21   is suffering.

22             And here you have the general, you've got

23   Stable Diffusion 1.4 and 1.5 and you described

24   what's -- what's contained there, but there's no -- but

25   there's nothing further and that's really my concern at

1    this point.

2              MS. MATSON:  The description, Your Honor, what

3    the plaintiffs are suffering is that there are copies of

4    their copyright protected work that are contained within

5    this model.

6              They are compressed.  They are contained within

7    this model and we have alleged that they're reproducible.

8    DeviantArt is essentially asking us to prove our

9    allegations before the case has even gotten off the

10   ground by demanding that we meet this higher threshold by

11   providing additional examples and exhibits.

12             We have plausibly alleged that Stable

13   Diffusion 1.4 functions in exactly the same way as these

14   others and we have plausibly alleged that the plaintiffs'

15   protected work is contained within these models and is

16   reproducible.

17             And we've provided examples and, you know, as I

18   mentioned, Paragraph 133, the Carlini study shows that

19   this can be done with regard to this specific model.

20             With regard to the fair use question, Your

21   Honor, this is just simply not the appropriate time to

22   address that issue.  Fair use is a highly factual

23   intensive analysis and a motion to dismiss is not the

24   place where that is to occur.

25             And I would point Your Honor to a recent case

1    out of the District of Delaware, Thomson Reuters

2    Entertainment Centre v. Ross Intelligence, Inc., which is

3    2023 Westlaw 6210901.  That is a case that also dealt

4    with AI technology and considered the fair use question

5    at a much later stage in the case.

6              And upon doing a thorough analysis of each

7    factor, ultimately determined that these are all

8    questions for the jury.  There are so many detailed

9    questions about the way that these technologies function

10   and the market issues that my colleague raised as well.

11             That said, you know, we -- we do allege that

12   there are -- that plaintiffs have been harmed in the

13   marketplace for their work because of these technologies,

14   which would undercut the fair use determination.

15             I'm happy to talk through the factors of fair

16   use, Your Honor, but our contention is that this is just

17   simply an inappropriate time to be addressing that

18   question.  Would you like to --

19             THE COURT:  No, I know those factors.

20             MS. MATSON:  All right.  Those are my primary

21   responses to DeviantArt.

22             THE COURT:  Great.  Thank you.

23             MS. MATSON:  Thank you very much.

24             MR. GASS:  Your Honor, just two points in

25   reply.  This will be not more than three sentences.  One,

1    plaintiffs do not allege that anyone ever used

2    DeviantArt's product to create any of these infringing

3    outputs and that absence speaks volumes and is,

4    obviously, relevant to the question whether DeviantArt,

5    as opposed to someone else, is liable for some act of

6    copyright infringement.

7              Two, the Thomson Reuters case that opposing

8    counsel references, of course, decides, you know,

9    slightly different context, because it concerns the

10   training of a model, not someone who merely implemented a

11   preexisting model.

12             But in the training context, which is a heavier

13   boulder to push up the hill, the Court decided that

14   everything turns on whether the outputs look like

15   something that the model was trained on.

16             And so there's fact questions, let's go to the

17   jury on that.  Here, we don't have any allegations that

18   even the implementer of the model has been responsible

19   for outputs that look like copyrighted works that the

20   plaintiff saw.

21             So, again, we would respectfully ask that Your

22   Honor, assuming you stick to your guns on the compressed

23   copies issue, find this to be fair use and at the very

24   least require plaintiffs to plead some more facts.

25             THE COURT:  All right.  Thank you.

1          MS. DUNNING:  Hi, Your Honor.  Angela Dunning

2    on behalf of Midjourney.  So Midjourney is also

3    separately situated from the other defendants insofar as

4    Your Honor's tentative found that there were sufficient

5    allegations stated with respect to the compressed copies

6    issue and Stable Diffusion, but not Midjourney.

7          In fact, there are no allegations specifically

8    as to what Midjourney was trained on, nor are there

9    allegations or citations to papers or that sort of thing

10   that would allow plaintiffs to draw that conclusion with

11   respect to how Midjourney platform was trained or what it

12   contains.

13         If you look at the actual papers that they have

14   cited, including Carlini, there's only one that mentions

15   Midjourney.  None of them actually talk about compressed

16   copies or stored copies.  And the one paper that mentions

17   Midjourney certainly doesn't say that.

18         It is telling, Your Honor, that despite the

19   many months this case has been proceeding, plaintiffs

20   have yet to be able to show a single example of a work

21   they've extracted from Midjourney through prompting that

22   looks like their copyright registered works.

23         The only way they were able to do that for

24   purposes of this complaint was to input their own images

25   into the platform and ask it to spit something out that

1   looked as much like that image as possible and that

2   simply doesn't allow any inference as to what Midjourney

3   was trained on.

4           It doesn't allow any inference that the

5   Midjourney platform or model contains compressed copies

6   of their registered works.  I want to spend most of the

7   time talking about the Lanham Act issues, because I think

8   that those are extraordinary claims to have pursued.

9           But the last point I'll make on the direct

10  infringement claim is the registration issue.  This Court

11  has held that registration, covering previously published

12  material, does not confer registration over those

13  individual works comprising a collective work.

14          Here many of the registrations that they are

15  suing under are -- were previously work that cannot be

16  covered by that registration or in some instances, only

17  text.

18          If they are allowed to amend this claim with

19  respect to Midjourney -- and I would submit as to all

20  defendants -- they should be permitted to proceed only as

21  to those works that are actually covered by a

22  registration for that work and not these previously

23  published materials that by law cannot be covered by the

24  registration.

25          Turning to the trade dress issue, Your Honor,

1   which I think is -- I would really very much like to

2   clarify.  Plaintiffs are seeking to hold Midjourney

3   vicariously liable for infringement of unregistered trade

4   dress in the style and design of their artworks, but they

5   haven't identified the trade dress elements, specific

6   trade dress elements that they claim is their trade dress

7   nor have they made any attempt, as they must, to plead

8   facts to show that it is nonfunctional and has developed

9   secondary meaning.

10          Secondary meaning means that those style

11  elements have come in the minds of the relevant consuming

12  public, and after lengthy exclusive use to associate

13  the -- with a single producer or source.

14          This claim simply fails as a matter of law.

15  The -- the law presumes that trade dress and product

16  design is functional and not protectable.  It is a heavy

17  burden as this Court acknowledged in ArkSoft to overcome

18  that presumption.

19          Plaintiffs don't come close and to allow the

20  claim to proceed would contravene well established

21  Supreme Court precedent, overhaul fundamental principles

22  of trademark law and work an unprecedented end run on

23  copyright law.

24          THE COURT:  Gee, there's that end run,

25  overwhelming --

1      MS. DUNNING:  Well, Your Honor, Walmart and

2   Dastar, Traffix, has repeatedly warned about this exact

3   effort.  The trademark law, the Lanham Act should not be

4   used to extend protection to things that we have said

5   under copyright and trade and patent law should not be

6   protected or that should be protected only for a limited

7   time.

8      And I'll circle back to that, but I want to

9   start with the basic flaw that they haven't even

10  identified trade dress that could be protectable.

11     Ms. Anderson claims trade dress in drawings

12  that are simple, cartoony and often strictly in black and

13  white.  Is she claiming only black and white cartoons or

14  can they also be color?

15     She says she's known for her Sarah Scribbles

16  character, a young woman with dark hair, big eyes and a

17  striped shirt.  Is that part of the claimed trade dress

18  or not?

19     The complaint doesn't say.  It's not clear what

20  elements are required to -- to infringe her trade dress.

21  We don't know what colors.  We don't know if color is

22  even required.

23     And that's one of the problems, if you can't

24  tell what the trade dress is, you can't avoid infringing

25  these so-called exclusive rights.

1          Another insurmountable problem is, of course,

2     that no one can claim exclusive rights to simple cartoony

3     drawings in black and white or otherwise or girls in

4     striped shirts with dark hair.

5          She doesn't allege, nor could she, that she is

6     the only one who creates artwork in that style or even

7     that she originated those style elements or was the first

8     to put them together.

9          I believe Walt Disney and Charles Schulz and

10    Betty Boop and any infinite number of artists who have

11    come before and are drawing now, would find

12    it -- remarkable if Ms. Andersen was to turn around and

13    sue and claim that they were infringing her trade dress

14    and simple cartoony black and white drawings.

15          And so they haven't identified the trade dress

16    because to do that is to show how absurd the claim would

17    be.  There's a reason no claim like this has ever been

18    permitted.  These style elements are not protectable by

19    copyright law.

20          And if you allow that sort of protection, you

21    put in the hands of individual people, the ability to

22    tell other people what art they can and cannot make.

23          It's also not surprising that there's no effort

24    to plead secondary meaning.  Now, counsel suggested in

25    their opposition that secondary meaning isn't required,

1    and they cited a Ninth Circuit case that predates the

2    united Supreme Court decision in Walmart that says in no

3    uncertain terms when you are claiming trade dress in a

4    product design, as opposed to the packaging, you must

5    show secondary meaning.

6         And what does that mean?  I've used it for a

7    long time.  I've spent a lot of money on this.  I have

8    taken these efforts over an extended period of time to

9    make sure people associate these elements of my trade

10   dress only with me, that they serve as a designation of

11   source for me and me alone, that that is their primary

12   significance.

13        But there are no facts of any kind like that in

14   the complaint.  There are no facts about what she has

15   sold, where she sold it, what her revenue is, the

16   advertisement.

17        There are no surveys.  There are no consumer

18   statements with respect to what elements of her style may

19   or may not be associated solely with her.

20        THE COURT:  Are you arguing that all of those

21   things should be included in a complaint in order to get

22   past a motion to dismiss?

23        MS. DUNNING:  Yes, Your Honor.  Numerous cases

24   have held that in order to satisfy the pleading burden,

25   to show secondary meaning, you must plead those sorts of

1    facts.  It is not enough -- and we've cited this in our

2    brief -- it's not enough to simply say -- to remotely

3    recite the element of the claim that we have secondary

4    meaning and it associates to me.

5          Actual facts about how it's been used are

6    important, and it comes back to the fact that the trade

7    dress is not registered.  If it's not registered, these

8    are common law rights.

9          Common law rights turn on where it's been used,

10   how it's been used.  You actually have to prove that up.

11   There's no registration that provides that presumption.

12   And so without those facts, the Court can't even make a

13   determination that Ms. Andersen has developed any kind of

14   rights in her work under the Lanham Act.

15         Now, that takes us to, again, the Supreme

16   Court's decision in Traffix, Walmart and Dastar, because

17   there the Supreme Court has over and over again

18   recognized that product design almost invariably -- this

19   is the Supreme Court's words -- almost invariably serves

20   a purpose other than source identification.

21         What is the purpose here?  It's the aesthetic.

22   It's what it looks like.  This is a classic case of

23   attempting to get protection over something that is a

24   functional design.

25         The whole purpose of this art is what it looks

1    like, that affects its quality, that's why people buy it.

2    Plaintiffs allege that in their own complaint.  The

3    aesthetics are what makes it attractive to consumers.

4            It is nothing without the aesthetic, it doesn't

5    function without the aesthetic, and the Supreme Court and

6    the Ninth Circuit in art attacks have held, as plain as

7    day, that you cannot get protection under the Lanham Act

8    for an element that is functional, that affects its

9    quality, that affects whether consumers want to buy that.

10           China patterns, decorative masks, jewelry, even

11   Salvador Dalí and Andy Warhol got nowhere in arguing that

12   their art styles were protectable.  Art -- art styles are

13   not protectable under trademark law and we cited McCarthy

14   who said that in about the clearest possible terms.

15   There is no trademark protection for the style of art.

16           THE COURT:  All right.  You are done with your

17   time, so is there one more thing that you just need to

18   tell me?

19           MS. DUNNING:  With respect to the false

20   endorsement claim, Your Honor, the plaintiffs have

21   abandoned that claim by failing to address the First

22   Amendment issue.  The Ninth Circuit decision of Brown

23   affirmed dismissal with prejudice of a claim for false

24   endorsement where the use of the plaintiff, Jim Brown's

25   likeness, was plainly artistically relevant to the work

1    and there was no explicitly misleading content.

2              Nobody told people Jim Brown endorsed this --

3              THE COURT:  Was that a motion to dismiss case?

4              MS. DUNNING:  It was a motion to dismiss case,

5    Your Honor.  And the only -- and here plainly, what this

6    platform can generate in terms of art is artistically

7    relevant.  Telling people that they can make art in a

8    particular style is artistically relevant.

9              Plaintiffs have not argued otherwise.  They

10   didn't address the issue, nor did they claim, because

11   they can't, that there was anything explicitly misleading

12   about a discord post where 4,700 names that came off of

13   Wikipedia were listed as art styles somebody could try.

14             And having abandoned that argument, it

15   is -- under Brodsky and we cite it in our papers.  They

16   can't come back -- they said it shouldn't be decided on a

17   motion to dismiss, but that was a motion to dismiss case,

18   Your Honor.

19             THE COURT:  Thank you.

20             MS. DUNNING:  Thank you, Your Honor.

21             MR. YOUNG:  Hi, Your Honor.  Chris Young for

22   plaintiffs.  I have a couple of comments with respect to

23   the infringement claim and the inclusion of plaintiffs'

24   work in the LAION database, and Ms. McMahon will handle

25   the Lanham Act portion.

1          THE COURT:  Okay.

2          MR. YOUNG:  So with respect to Midjourney

3    training on LAION, plaintiffs have pointed out

4    specifically admissions from individuals associated with

5    Midjourney including at the highest levels, the CEO David

6    Holz, who he indicated that Midjourney has at least

7    trained on some, if not all, of the LAION database.

8          I'll draw your attention to Paragraph 266 and

9    274 of the complaint where moderators of Midjourney on

10   the discord have said that Midjourney was using a

11   modified version of the LAION-400M dataset and the

12   updated LAION-5B dataset for its models.

13         In addition, Stability CEO, Mostaque, said

14   Midjourney is using a LAION-400M based model, which

15   taking all inferences in plaintiffs' favor indicates that

16   Midjourney also incorporated the LAION images and as this

17   Court has already recognized, the inference is that all

18   images, all registered images in those databases have

19   been scraped and used by Midjourney to train the models.

20         With respect to the research papers, true only

21   one of the papers -- well, two of the papers mentioned

22   Midjourney models specifically, and I point your

23   attention to Paragraph 138, which is Mr. Webster who

24   specifically mentioned he tested the Midjourney model.

25         In Paragraph 119, where Professor Yu mentioned

1    just describing how these models behaved, Midjourney

2    model.  I think all of the academics and all of the

3    research can be broadly generalized because they all

4    describe the behaviors of these CLIP-guided diffusion

5    models to also apply to the Midjourney model.

6         Because as alleged in the complaint, Midjourney

7    model is also a CLIP-guided diffusion model.  So unless

8    there are any further questions about the infringement

9    piece, I have just argued, I would like to pass to

10   Ms. McMahon.

11        THE COURT:  Thank you.

12        MR. YOUNG:  Thank you, Your Honor.

13        MS. MCMAHON:  Good afternoon, Your Honor.  Your

14   Honor, plaintiffs have sufficiently alleged that

15   Midjourney violated the Lanham Act under the theory of

16   vicarious trade infringement.

17        Plaintiffs have identified their trade dress

18   consisting of a set of reoccurring visual elements and

19   artistic techniques together -- taken together for

20   particular combination of which are distinctive to each

21   of the named plaintiffs.

22        I would like to point Your Honor to

23   Paragraph 319 of the first amended complaint where

24   plaintiffs allege in detail each of the individual named

25   plaintiffs' trade dress.

1          Additionally, the Ninth Circuit -- excuse me.

2   The Ninth Circuit has consistently held that when looking

3   at trade dress, all the elements are to be taken as a

4   whole and not their individual constituent parts.  So,

5   Your Honor, we propose that the plaintiffs have plausibly

6   alleged that, at least at a motion to dismiss phase.

7          Now, my opposing counsel wants us to get into

8   consumer testimonies and states that we needed to allege

9   that in the amended complaint, but that's more

10  appropriate for a motion for a summary judgment rather

11  than at a 12(b)(6) motion to dismiss phase.

12         We believe that Your Honor's tentative ruling

13  that came out yesterday hit the mark as to the Lanham

14  Act.  So we would submit also as well that once discovery

15  proceeds, that we can show that there is secondary

16  meaning, that consumers do associate our clients'

17  products with a particular source, and we intend to show

18  that throughout discovery.

19         In terms of what my opposing counsel stated as

20  to the false endorsement claim, I would like to briefly

21  touch on as well.  She cites to the Brown case.  The

22  Brown case would only be applicable if it were expressive

23  speech and the speech at issue here is not expressive

24  speech.  It is commercial speech, Your Honor.

25         So we would submit that Brown is inapplicable

1    in these circumstances given the nature of the commercial

2    speech rather than the expressive speech.

3            THE COURT:  All right.  Thank you.

4            MS. MCMAHON:  Thank you, Your Honor.

5            MS. DUNNING:  Can I just --

6            THE COURT:  No.  You overran your time, I'm

7    afraid.

8            Who's next?

9            MR. SILBERT:  Good afternoon, Your Honor.

10   David Silbert from the Keker firm on behalf of defendant

11   Runway.  I would like to start, if I may, with the

12   inducement claim against Runway, which is Count 12 of the

13   first amended complaint.

14           I want to start there because there really is a

15   gaping hole in the complaint with respect to the

16   allegations of inducement against Runway in particular.

17   And that hole is, allegations that show that the model,

18   whatever the accused model is, was distributed with the

19   intent to have others use it in an infringing way,

20   specifically in an infringing way.

21           And that has to be shown by clear expression or

22   other affirmative acts by the defendant that are designed

23   to foster infringement.  That's the standard -- everybody

24   agrees that's the standard that's set forth in the MGM v.

25   Grokster case.

1          And I would respectfully ask the Court to take

2     another hard look at Page 15 of plaintiffs' opposition to

3     Runway's motion to dismiss, which is where they lay out

4     what they say is the evidence of that type of activity

5     for Runway.  There really is -- there are no -- really

6     zero allegations in the complaint that are directed --

7          THE COURT:  You know, you ought to just look at

8     me.

9          MR. SILBERT:  Excuse me?

10          THE COURT:  Just keep -- if you're going to

11     focus on somebody, you focus on me, not somebody else in

12     the courtroom.

13          MR. SILBERT:  I'm sorry, Your Honor.  I wasn't

14     aware of that.  I apologize.

15          There really are no allegations in the

16     complaint that are directed to Runway about that specific

17     issue.  And so what the plaintiffs point to in -- on that

18     page and in their opposition is they cite to

19     Paragraph 224 -- and they say 225, but they quote it, so

20     that's a typo.  They mean 224 -- where they say

21     defendants Runway and others routinely advertise that the

22     model is -- the model's ability to mimic the style of

23     other artworks.

24          That paragraph in the complaint, Paragraph 224,

25     actually is not about Runway at all.  It's about

1    Stability, Stability AI, which is a different defendant
2    entirely.
3            And that pattern repeats itself throughout
4    their -- the paragraphs in the complaint that they point
5    to where they say acts were taken, affirmative acts were
6    taken, the acts, the specific comments, et cetera, were
7    taken by Stability AI, an entirely different company and
8    different defendant than Runway.
9            So, again, the requirement to plead inducement
10   is to plead those types of affirmative acts and I would
11   invite plaintiffs' counsel to identify paragraphs in the
12   complaint.
13           It's not in their opposition.  We've given it a
14   hard look.  It's not there.  And it's not there for a
15   good reason, which is -- and we explained some of this in
16   our briefing -- Runway is a company that was founded by
17   three art students who met in art school.
18           It's a company that's very, very involved with,
19   embedded with the artistic and creative community.  I
20   don't think they're going to find any statements like the
21   type they attribute to Stability or maybe other
22   defendants for Runway.
23           I certainly am not aware of any.  I do know
24   that they haven't pled those, anything like that in the
25   complaint.

1          THE COURT:  Okay.

2          MR. SILBERT:  So that's point one.  I would

3   like to address one other point if I have time, which is

4   the compression issue, and I want to -- I understand the

5   Court's tentative.

6          I want to speak for a moment to what is alleged

7   in the complaint about the allegation that there are

8   compressed, somehow, compressed images of plaintiffs'

9   registered works in these models.

10         And first, I would start with what's not

11  alleged in the complaint, and Ms. Dunning alluded to this

12  some, but we really do think this is a situation where

13  silence speaks louder than words.

14         There is no allegation that plaintiffs' legal

15  team, or for that matter, anyone else has been able to

16  elicit something that looks like a compressed copy, a

17  mirror copy, et cetera, of any of their registered works

18  by entering some text prompt from -- certainly Runway's

19  accused products, and I believe that's true for all of

20  the accused products.

21         Now, that is true notwithstanding the fact that

22  they -- plaintiffs have, essentially, unlimited access to

23  those products and have had for at a minimum over a year

24  that this case has been pending.

25         So right away, I think that the allegation is

1    that those images, their registered works are somehow

2    compressed and contained in the model.  And the fact that

3    emerges most loudly from the complaint, we believe, is

4    they have not been unable to get them out.

5          They say they're there.  They're unable to do

6    anything to get them out.  And I think that speaks quite

7    a lot about whether there -- the Court could reasonably

8    plausibly assume that they're there at all.

9          Now, when you then look to what they do plead

10   in the alternative, because they can't say that they can

11   get them out and don't say that, what they point to in

12   the alternative for Runway, and for other defendants as

13   well, is this image variation tool where they input their

14   own image into the tool, and it's a variation tool, and

15   they input their images input and they say create a

16   variation of this image and then something comes out that

17   they say looks like the original image.

18         And, you know, I think it's fairly clear

19   why -- if you have to input an image to get something out

20   that looks like that image, that's not a plausible way to

21   allege that the thing that the image is there in the

22   first place.  What they're trying to allege is, it's

23   there in compressed form in the first place already.

24         So I don't think that helps.  Ms. Dunning

25   talked some about the scientific papers, Carlini and

1    others, we ask the Court to take judicial notice of those

2    papers.  Plaintiffs oppose that, which I think in a way

3    itself speaks volumes, but we really would invite also a

4    very close reading of those papers.

5         They stand for, at the most, the proposition

6    that a very, very small, very small number of very, very

7    popular images on which some implementation of a model

8    was overtrained, could be elicited by a team of data

9    scientists from companies like Google or DeepMind, et

10   cetera, who are trying to do that.

11        I don't see how they stand for the proposition

12   that plaintiffs' registered works, which is what the case

13   is about, that's what they have standing to sue, for

14   copyright infringement, how those, copies of those

15   particular images are contained in any model and

16   especially when compared with, again, the brute fact that

17   they've been unable to elicit any copy of their works

18   from those models.

19        And the last thing I'll say is I fully

20   understand the approach of let's sort this out on summary

21   judgment.  I mean, they've alleged something about

22   compression.  Let's see where things go and sort it out

23   on summary judgment.

24        I understand that approach.  I don't think it's

25   the right approach for this issue, and for this case,

1  because the scope of the case truly is different.  If

2  that allegation is in, if the allegation that the model

3  is infringing, then that really does change the scope of

4  the case significantly.

5       Mr. Gass spoke to that about he talked about

6  hundreds of thousands of people who downloaded the model,

7  et cetera.  Even if one were to look at something like

8  third-party discovery where there's many people who are

9  potentially using, downloading the model, et cetera, I

10 think we're going to look -- we've already seen, by the

11 way, plaintiffs have already served seven third-party

12 subpoenas in the case.

13      I don't know where things are going to go, but,

14 of course, if they can plead facts that show that there

15 are, in fact, compressed copies of those images in the

16 model, then they can proceed on that theory and the

17 consequences are the consequences and that's the scope of

18 the case.

19      What we respectfully are arguing is they really

20 haven't done that.  They just haven't done it as to their

21 registered works and that -- so we would ask the Court,

22 again, to please take a hard look at that issue.

23           THE COURT:  Thank you.

24           MR. YOUNG:  Chris Young for the plaintiffs,

25 Your Honor.  So I just want to make a couple of comments

1   about the inducement claim with respect to Runway and the

2   comments about the RJN and I'll pass off the baton to

3   Ms. Matson who is going to handle the infringement piece

4   with respect to Runway.

5          Counsel for Runway has said that with respect

6   to Runway that plaintiffs have not alleged any -- any

7   distribution of the Runway model with some sort of intent

8   to assist or induce infringement by third parties.

9          However, plaintiffs have alleged certain facts

10  about Runway's model and what Runway's model has -- is

11  known for amongst the AI art using community.

12         In Paragraph 358, for example, plaintiffs have

13  alleged that Runway has become known amongst users of AI

14  image art models and particularly notorious for its

15  ability to imitate and mimic artist's work.  In other

16  words, make copies of artist's work.

17         Even backing up, assuming that the models are

18  contained compressed copies, as Your Honor has seemed to

19  recognize in the tentative order, by distributing the

20  model and not doing anything to restrict the access of

21  those models, and we know from what Stability has done

22  with respect to certain plaintiff's names, that there is

23  some ability to at least control what these models are

24  able to emit or what prompts you can feed in.

25         There is control over these model's behavior

1     and under the pleadings standards, if we think that's
2     enough to plead up an inducement claim with respect to
3     Runway.  A couple of comments about the RJN, unless Your
4     Honor has any questions about the inducement?
5               THE COURT:  Go ahead.
6               MR. YOUNG:  With respect to the request for
7     judicial notice, we would just rest on our papers, but we
8     would comment that regardless of whether or not Your
9     Honor does take judicial notice of the study, the Court
10    still must draw inferences in plaintiff's favor rather
11    than draw any conclusions about the merits of the
12    studies.
13              So unless there are comments, I'm going to pass
14    it off to Ms. Matson.
15         (Reporter clarification.)
16              THE COURT:  Not yet, no.
17              MS. MATSON:  Thank you, Your Honor.  Defendants
18    here misconstrue the medium that the work is affixed to
19    for the work itself, so they're very focused on output.
20    We rely here on Nimmer.  A work is no less than a motion
21    picture or audio visual work, whether the images are
22    embodied in a videotape or other format.
23              So here they're contained within this model.
24    Defendants are very focused on the output, but we
25    plausibly allege that the output -- that the images can

be reproduced.  They are contained in whole.  They are compressed in whole.

The fact of their compression does not change the definition of copying under the Copyright Act and, you know, as to Runway and really all the other defendants, these models, it is supported by multiple academic studies that these models compress.

I'll point you to Paragraph 119, Yaodong Yu, compression is all there is.  Paragraph 133, the Carlini study in which he says diffusion models are explicitly trained to reconstruct the training set and they memorize and regenerate images used for training.

Webster at Paragraph 138 tested multiple models and found stored copies of training images in all of them.  So while defendants might contest the conclusions of these studies, that's not the test here at a motion to dismiss.

This is not statistical information.  This is the expression itself contained in the protected work in the models.  And that -- the fact that that compression has also been admitted by Emad Mostaque.

We have quotes throughout the complaint in which he discusses the fact of the compression as to not just one model but all of them.  This is how these diffusion models function.

```
 1              May I be permitted to discuss DeviantArt one --
 2              THE COURT:  Sure.  You've got a couple minutes.
 3              MS. MATSON:  Your Honor, at Paragraph 397,
 4     DeviantArt CTO Chris Nell discusses Stable Diffusion 1.4
 5     and the way in which DeviantArt interacted with Stable
 6     Diffusion 1.4 it was implementing it in DreamUp.
 7              He says that they did not -- they did not
 8     conduct any additional training, but they modified the
 9     prompt tuning which then modifies the output.
10              So DeviantArt has modified the prompt tuning to
11     produce very particular types of stylized outputs, which
12     does not mean that the protected content is not copied
13     within the model and cannot be extracted from the model,
14     but that they're modifying what the outputs ultimately
15     look like.
16              So at Paragraph 397, you know, DeviantArt has,
17     perhaps, done a better job of concealing their
18     infringement, but we do plausibly allege that that model
19     functions exactly as the others and was trained in the
20     same way as the others and they have not updated or
21     modified the training at all.
22              THE COURT:  Okay.  Thank you.
23              MS. MATSON:  Thank you.
24              MR. SILBERT:  Your Honor.
25              THE COURT:  You've got your one minute.
```

1          MR. SILBERT:  Thank you, Your Honor.  David

2    Silbert on behalf of Runway.  I'm glad that counsel

3    pointed out Paragraph 358 of the complaint in support of

4    the -- their inducement allegations.

5          I think it perfectly exemplifies the issue.

6    What Paragraph 358 says, I'm reading the whole paragraph,

7    "Runway intends to cause further infringement with Stable

8    Diffusion 1.5."

9          So I'll stop reading.  That's a conclusion.

10    And then it goes on, "In February 2023, Stability CEO

11    Mostaque said that Stable Diffusion 1.5 was, quote, the

12    most popular model by far for a for-profit company,

13    closed quote."  That's the entire paragraph.

14          Again, first of all, even if that statement

15    were imputed to Runway, all it says is it's a popular

16    model.  I don't understand how it would apply.  But,

17    again, it's aligning Runway with Stability that's

18    consistently done.  That's what we think is

19    inappropriate.

20          I just -- with respect to counsel's comments

21    about outputs, and I believe -- I hope I made myself

22    clear, but the reason we're focusing on their inability

23    to get an output that looks like their images is because

24    their allegation is and their compression allegation is

25    that those images are somehow there in the model.  That's

1    the allegation.

2           We don't think that that's true, but one thing

3    that we pointed out is that they've never been able to

4    get one out of the model despite effectively unlimited

5    opportunities to try and that that's a relevant fact to

6    consider whether they plausibly allege that it's there.

7           With respect to the Carlini and other papers,

8    the Webster paper that counsel mentioned specifically

9    says in the last paragraph, this is something that is

10   copying of an image.  It's something that can happen, but

11   it would happen very rarely.

12          That's what it says in the conclusion of the

13   paper, the Carlini paper where they use some

14   implementation that, I guess, was trained on 175 million

15   images, which would be a very small number.

16          I don't know what implementation that was, that

17   those data -- a team of data scientists was able, despite

18   having a whole strategy to do it, to get a

19   hundred -- essentially less than one in a million images

20   were they able to reproduce.

21          So, again, the question is, how much does that

22   demonstrate that, specifically, plaintiffs' copyrighted

23   images are somehow stored in a model when plaintiffs

24   themselves haven't been able to elicit them.

25          THE COURT:  All right.  Thank you.

1            MR. SILBERT:  Thank you.

2            MR. GRATZ:  Good afternoon, Your Honor.  Joe

3    Gratz for Stability.  We've been going for a while, the

4    issues have been explored.  We don't have anything in

5    particular to add other than we're happy to answer any

6    questions, Your Honor.

7            THE COURT:  Well, you might be the guy who is

8    going to rebut whatever the plaintiffs have in store for

9    you, so you do well to save your time.

10            MR. GRATZ:  I might, Your Honor.  Thank you.

11            THE COURT:  All right.  Do the plaintiffs have

12    any arguments they want to make with respect to the

13    tentative?

14        (Reporter clarification.)

15            MR. YOUNG:  Sorry, Madam Court Reporter, Chris

16    Young for the plaintiffs, we just like a couple of

17    moments to discuss amongst ourselves.

18            THE COURT:  Yeah, go ahead.

19        (Discussion held off the record.)

20            MR. YOUNG:  Your Honor, all plaintiffs have

21    left to say is just a couple of comments about the DMCA

22    claim and specifically about the 1202(b) claims.

23    Plaintiffs acknowledge Your Honor's tentative on the

24    1202(a) and just rest on their paper or concede it.

25            With respect to the 1202(b), plaintiffs

1    acknowledge the Court's tentative ruling, however, the
2    plaintiffs request the Court either depart from Judge
3    Tigar's recent order on the motion for reconsideration or
4    to defer ruling because presently pending before Judge
5    Tigar in the Doe 1 case is a fully briefed motion to
6    dismiss where the identicality requirement is at front
7    and center of the DMCA issue there as opposed to only on
8    a motion to reconsider.
9          On the merits, focusing on the identicality
10   requirement.  Plaintiffs would just note that this
11   identicality requirement is found nowhere in
12   Section 1202.  In fact, close examination of the DMCA
13   finds the mention of the word identical in 1201, and
14   1201(d)(2) specifically which discusses a specific
15   exemption as to nonprofit entities from Section 1201
16   liability, examination of the legislative materials and
17   senate report.
18         And that's at S. Rept. 105-190 indicates that
19   Congress was well aware what it was doing when it was
20   using the word identical in -- when drafting the DMCA
21   talking about that same exemption that was just discussed
22   and also mentioning the word identical with respect to
23   the WPI -- WIPO treaty that it was ratifying and
24   enacting.
25         We would ask this Court to follow ADR

1    International, the Southern District of Texas case that

2    was cited in our brief, that recognized that this

3    identicality requirement that some courts have been

4    reading into Section 1202 liability, as being extra

5    statutory and found nowhere in the statutory text.

6         And as ADR International explains, the original

7    case that originated that seemed to originate -- excuse

8    me.  The original district court opinion that originated

9    this identicality requirement Kirk Kara, cited cases for

10   the proposition that -- which had the word identical

11   nowhere to be found.

12        In fact, cited words such as substantially

13   similar or copied them.  One final note, Your Honor,

14   reading the entire statutory scheme together, it would

15   make -- it would seem that it would make sense to

16   read -- the word copy in the DMCA consistent with the

17   Copyright Act.

18        And I think everyone would agree with that --

19   the definition of copy as encompassed in 17 U.S.C. 103

20   would equally apply to the DMCA.  So unless Your Honor

21   has any questions about that point, I think plaintiff

22   would submit.

23        THE COURT:  Well, I don't have a question

24   specifically on that, but since you raised the opinions

25   of one of my colleagues in a related issue, is there any

1    reason why I shouldn't follow Judge Chhabria's decision

2    in the Kadrey case, precluding copy and derivative claim?

3              MR. YOUNG:   Are we talking about the Kadrey

4    case with respect to infringing on the models or model

5    infringement or DMC --

6              THE COURT:   Yes.

7              MR. YOUNG:   So just a couple of comments.   The

8    models at issue at Kadrey are very different than the

9    models at issue here.   Those models are text based

10   models, there's language models and the copyright issues

11   there were books as opposed to images.

12             Also, in this case we have alleged ample --

13   more facts, there are much -- many more facts in this

14   case.   Unlike the language models, image models have been

15   the subject of lots of studies which plaintiffs have

16   alleged.   There were no such allegations in the Kadrey

17   case.

18             Plaintiffs have also provided output examples

19   as -- not to support any type of output theory, but to

20   really show what we mean by when the models are storing

21   compressed copies.   There are no allegations of that type

22   in the Kadrey case either.

23             So there are ample distinctions between what

24   was alleged here versus what was alleged in the Kadrey

25   case.

1          THE COURT:  Thank you.

2          MR. YOUNG:  Thank you, Your Honor.

3          MR. GRATZ:  With respect to the 1202(b) claim,

4     there is no need to defer ruling waiting for Judge Tigar.

5     This issue was squarely teed up both in the original

6     motion to dismiss, which was decided and the motion to

7     reconsider that motion to dismiss which he has decided.

8          They are teeing it up again in another motion

9     to dismiss, but I have no reason to believe that's going

10    to change anything.

11          With respect to identicality, this is in Doe 1,

12    it's Frasuji [phonetic], which was affirmed by the Ninth

13    Circuit.  It's in Kirk Kara.  There's the Southern

14    District of Texas case, ADR, that they are citing, which,

15    one, if the Southern District of Texas did not adopt an

16    identicality requirement, that wouldn't, I think,

17    particularly matter here.

18          But the way that it's doing it is by

19    distinguishing a prior case in which the -- in which

20    the -- in which the works were not identical.  And

21    it's -- I'm sorry.  The Southern District of Texas case,

22    the ADR is following a case in which the DMCA claim was

23    dismissed because of the works were not directly copied,

24    were not identical.

25          It also, Your Honor, the -- they say it's not

1    in the legislative history, it's in -- it comes from the

2    text and it comes from the word remove.  Did the word

3    removed have any meaning here?  You have to be removing

4    it from their work, not something that kind of looks like

5    their work.

6            Otherwise, if I have, you know, I make my own

7    painting based on a photograph and I, you know, do my own

8    creative work and make a painting and that photograph had

9    a signature at the bottom, and I don't reproduce the

10   signature, they would say I've removed the signature by

11   not putting it on there.  It's got to be the same work,

12   and the way to implement that is through the identicality

13   requirement.

14           With respect to Kadrey, my other colleagues may

15   have other comments on this during our brief rebuttal

16   time, but Kadrey is on point.  It's another open course

17   model where everyone can look at it and do whatever they

18   want to it to try to get things out of it and have not

19   been able to.

20           THE COURT:  Okay.  Thank you.  All right.  So

21   the plaintiffs are done?  Did somebody want to

22   make -- would you like to make --

23           MS. DUNNING:  Your Honor, I think it is telling

24   that when presented with Judge Chhabria's questions about

25   that theory, it was abandoned in the amended complaint

1    that the same firm filed.

2          So to your question about why you shouldn't

3    just follow Judge Chhabria's decision in Kadrey, you

4    absolutely should.

5          THE COURT:  Well, I just heard that there are

6    significant distinctions between the kinds of works.  Do

7    you concede that they're not?

8          MS. DUNNING:  Well, no, Your Honor.  So, again,

9    they have -- they are citing to papers that they then

10   tell you they don't want you to look at for the

11   proposition that these -- these images, they haven't been

12   able to extract from the models are actually in there

13   somewhere.

14         That was also the theory in Kadrey and when

15   presented with the fact that they hadn't identified that

16   or any example of that, they abandoned that claim, rather

17   than trying to shore it up.

18         In this case, they came back with their

19   amendment and pointed to studies -- they do use the word

20   compression a couple of them in a couple of places, but

21   they're not talking about compressed copies.  They're not

22   talking about storage of copies.

23         They're talking about the ability under certain

24   circumstances to have the model generate a work that

25   looks very similar, but even in the language that they

1   used today, they talked about going back and

2   reconstructing it from training, not that it exists in

3   the model.

4          This concept that the model itself contains

5   copies that just reside in there, 5 billion images.  I

6   think Judge Chhabria indicated at the hearing made his

7   head explode and -- so we are -- we would ask Your Honor

8   as my colleague did, to actually look at the papers

9   they're citing because they don't say what they claim,

10  and then they've asked you not to look at them after

11  citing them and misrepresenting them.

12         And I -- I think if you'll allow me one final

13  point on the trade dress claim.  I just feel compelled to

14  point out.  There are two different plaintiffs in this

15  case who claim rights to black and white cartoons.

16         THE COURT:  I think you've made this point.

17  Thank you.  All right.

18         MS. DUNNING:  Thank you.

19         MR. YOUNG:  Your Honor, just two brief points

20  responding to my colleagues on the other side.  With

21  respect to the DMCA, it's telling that there was no

22  response to the statutory text argument or the

23  legislative intent argument, so we would submit on that

24  basis.

25         With respect to the -- just a final thought

1  with respect to Judge Chhabria's opinion in Kadrey.  I

2  think it's important to remember here we are at Rule 12

3  and plausibility.  What Judge Chhabria did in a different

4  case with different facts has limited bearing on this

5  case here where we have -- alleged ample -- more facts,

6  which the Court must make all the reasonable inferences

7  in plaintiffs' favor.

8           With respect to the, you know, weighing all the

9  papers.  The defendants are asking you to weigh the

10  merits of the papers, which is inappropriate at Rule 12

11  and I think unless there are any questions, Your Honor

12  may have, I think plaintiffs would submit.

13           THE COURT:  Okay.  Thank you.

14           MR. YOUNG:  Thank you very much.

15           THE COURT:  All right.  Thank y'all very much.

16  There is -- there was much to go through.  There is much

17  to come, and I'll get an order out as soon as I can.

18           MR. SAVERI:  Your Honor, Joseph Saveri.  Just

19  to remind the Court, right now we are -- with respect to

20  discovery, we are estopped because I think at the last

21  hearing, you suggested that we should not pursue or

22  proceed with a number of the discovery, just basic

23  housekeeping things in light of where we are with the

24  pleading.

25           And so the case has been going on for a while.

1    We haven't made any progress.  I'd look for your guidance
2    about whether we can start to proceed with the basic case
3    management things that have been held in abeyance.
4            THE COURT:  So here's -- I think I'll give you
5    my answer in the opinion, but if I happen to stick with
6    my tentative, which I often but not always do, then I
7    would think that it would make sense -- and maybe what
8    I'll do is set a case management conference to discuss,
9    but I would think about pushing forward because there
10   would be claims that existed and we ought to get moving
11   with things, and then it's a question of how that can
12   happen as efficiently as possible.
13           MR. SAVERI:  You get my point, Your Honor.
14   Thank you.  So I think we would be looking for some
15   signal about what -- we're, obviously, anxious to
16   proceed.  We would like to get back in front of Your
17   Honor case management conference state, so whatever
18   guidance you could provide on that would be --
19           THE COURT:  I'll try to be explicit in that,
20   Mr. Saveri.  All right.  Thank you-all.
21       (Proceedings concluded at 3:11 p.m.)
22
23
24
25

```
         *************************************************
              CERTIFICATE OF REPORTER
         I certify that the foregoing is a correct
    transcript of the proceedings taken from my
    stenographic notes in the above-entitled matter.

     /s/ Beth A. Krupa_____        __ May 20, 2024_____
    Beth A. Krupa, RMR, CRR        Date
    Official Court Reporter
    U.S. District Court
    District of South Carolina
```

Beth A. Krupa, RMR, CRR