**LATHAM & WATKINS LLP**
Andrew M. Gass (SBN 259694)
*andrew.gass@lw.com*
Michael H. Rubin (SBN 214636)
*michael.rubin@lw.com*
Brittany N. Lovejoy (SBN 286813)
*brittany.lovejoy@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: 415.391.0600

Sarah F. Mitchell (SBN 308467)
*sarah.mitchell@lw.com*
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: 213.485.1234

Simeon Botwinick (*pro hac vice*)
*simeon.botwinick@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: 202.637.2200

*Attorneys for Defendant DeviantArt, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

SARAH ANDERSEN, et al.,

Plaintiffs,

vs.

STABILITY AI LTD., et al.,

Defendants.

CASE NO. 3:23-cv-00201-WHO (LJC)

**DEFENDANT DEVIANTART, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR DISCOVERY SANCTIONS AGAINST DEVIANTART**

Judge: Hon. Lisa J. Cisneros

**PUBLIC REDACTED**

# TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 3

A. The DreamUp [redacted] ..... 3

B. DeviantArt Has Consistently Identified Mr. Trofimov's Importance, and Did Not Oppose His Deposition ..... 3

C. Mr. Surovenko's Work on Recommendation Systems and Mr. Trofimov's Work on DreamUp ..... 5

D. Counsel for DeviantArt Informed Plaintiffs of Mr. Surovenko's Departure Within Days of Learning About It ..... 7

E. Mr. Surovenko Was Not the Source of Peter Gorniak's Rule 30(b)(6) Deposition Testimony ..... 8

III. LEGAL STANDARD ..... 10

A. Federal Rule of Civil Procedure 30(d)(2) ..... 10

B. 28 U.S.C. Section 1927 ..... 11

C. Inherent Authority ..... 12

IV. ARGUMENT ..... 13

A. Plaintiffs Do Not Identify Harrassing, Knowingly Frivoulous, or Otherwise Egregious Conduct ..... 14

i. Mr. Trofimov Was Entitled to the Canadian Discovery Process Irrespective of the Date of His Engagement By Counsel for DeviantArt ..... 14

ii. DeviantArt Informed Plaintiffs of Mr. Surovenko's Departure Within a Reasonable Timeframe & Mr. Surovenko, Too, Was Entitled to the Canadian Discovery Process ..... 15

iii. DeviantArt Opposed Plaintiffs' Letters Rogatory Motion in Good Faith ..... 17

iv. Plaintiffs' Cited Cases Support Denial of the Motion ..... 22

B. Plaintiffs' Motion is Frivolous and Intended to Extract Payments from DeviantArt for Plaintiffs' Own Discovery Expenses ..... 24

V. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*All. to End Repression v. City of Chicago*,
899 F.2d 582 (7th Cir. 1990) ....................25

*Allianz Sigorta, A.S. v. Ameritech Indus., Inc.*,
No. 15-cv-1665, 2016 WL 1127705 (E.D. Cal. Mar. 23, 2016) ....................14

*Am. Unites for Kids v. Rousseau*,
985 F.3d 1075 (C.D. Cal. 2022) ....................12, 13, 22, 25

*Bangkok Broad. & T.V. Co., Ltd. v. Iptv Corp.*,
No. 09-cv-3803, 2010 WL 11523703 (C.D. Cal. Feb. 12, 2010) ....................25

*Bombardier Inc. v. Mitsubishi Aircraft Corp.*,
331 F.R.D. 427 (W.D. Wash. 2019) ....................15

*Brooke v. Stillman*,
No. 20-cv-17236, 2021 WL 4948929 (9th Cir. Oct. 25, 2021) ....................22

*Cakebread v. Berkeley Millwork & Furniture Co.*,
218 F. Supp. 3d 1040 (N.D. Cal. 2016) ....................13

*Caputo v. Tungsten Heavy Powder, Inc.*,
96 F.4th 1111 (9th Cir. 2024) ....................12, 18, 19, 20

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991) ....................13

*Coates v. Johnson & Johnson*,
85 F.R.D. 731 (N.D. Ill. 1980) ....................11

*Dahl v. City of Huntington Beach*,
84 F.3d 363 (9th Cir. 1996) ....................23

*Edwards Lifesciences Corp. v. Meril Life Scis.*,
No. 19-cv-06593, 2022 WL 566792 (N.D. Cal. Jan. 14, 2022) ....................23

*Elasticsearch, Inc. v. GmbH*,
No. 19-cv-05553, 2021 WL 1753796 (N.D. Cal. May 4, 2021) ....................17

*Est. of Blas Through Chargualaf v. Winkler*,
792 F.2d 858 (9th Cir. 1986) ....................12

*Famuyide v. Chipotle Mexican Grill, Inc.*,
No. 23-cv-01127, 2026 WL 772120 (D. Minn. Mar. 18, 2026) ....................23

*Fink v. Gomez*,
239 F.3d 989 (9th Cir. 2001) ....................12

*First Fin. Ins. Co. v. Butler Chamberlain-Neilsen Ranch Ltd.*,
No. 10-cv-2004, 2010 WL 4502151 (N.D. Cal. Nov. 2, 2010) ....................11

*Foy v. First Nat'l Bank*,
868 F.2d 251 (7th Cir. 1989) ....................25

*Garpeg, Ltd. v. United States*,
583 F. Supp. 789 (S.D.N.Y. 1984) ....................15

*Goldberg v. Dufour*,
No. 16-21301, 2020 WL 373206 (D. Vt. Jan. 23, 2020) ....................14

*Heroic Era, Ltd. v. Evony, LLC*,
No. 10-cv-2458, 2011 WL 5834852 (N.D. Cal. Nov. 21, 2011) ....................11

*In re Keegan Mgmt. Co., Sec. Litig.*,
78 F.3d 431 (9th Cir. 1996) ....................12

*Khan v. City & Cnty. of San Francisco*,
No. 24-cv-09289, 2026 WL 714308 (N.D. Cal. Mar. 15, 2026) ....................22

*Lahiri v. Universal Music & Video Distribution Corp.*,
606 F.3d 1216 (9th Cir. 2010) ....................11

*Lake v. Gates*,
130 F.4th 1064 (9th Cir. 2025) ....................11

*Lardizabal v. Arvest Cent. Mortg. Co.*,
No. 22-cv-345, 2023 WL 2229261 (S.D. Cal. Feb. 24, 2023)....................17

*Lee v. Pep Boys-Manny Moe & Jack of California*,
No. 12-cv-05064, 2015 WL 9268118 (N.D. Cal. Dec. 21, 2015)....................11, 23

*MGIC Indem. Corp. v. Moore*,
952 F.2d 1120 (9th Cir. 1991) ....................22

*Oakley, Inc. v. Grangeville Depot LLC*,
336 F.R.D. 191 (D. Idaho 2020) ....................10

*Optrics, Inc. v. Barracuda Networks, Inc.*,
No. 17-cv-04977,2019 WL 5485890 (N.D. Cal. Oct. 25, 2019) ....................2, 17, 22

*Pacific Harbor Cap., Inc. v. Carnival Air Lines, Inc.*,
210 F.3d 1112 (9th Cir. 2000) ....................23

*Primus Auto. Fin. Servs., Inc. v. Batarse*,
115 F.3d 644 (9th Cir. 1997) .................... *passim*

*Sokos v. Hilton Hotels Corp.*,
283 F. Supp. 2d 42 (D.D.C. 2003) .......... 25

*SPS Techs., LLC v. Briles Aerospace, Inc.*,
No. 18-cv-9536, 2020 WL 12740646 (C.D. Cal. Apr. 14, 2020) .......... 1, 2, 14

*United States v. Blodgett*,
709 F.2d 608 (9th Cir. 1983) .......... 11

*United States v. San Francisco*,
132 F.R.D. 533 (N.D. Cal. 1990) .......... 25

*Van v. Black Angus Steakhouses*,
No. 17-cv-06329, 2018 WL 11322708 (N.D. Cal. Sept. 26, 2018) .......... 11

*Viasat, Inc. v. Space Sys./Loral, LLC*,
No. 13-cv-2074, 2014 WL 12577593 (S.D. Cal. June 30, 2014) .......... 15

**RULES**

Fed. R. Civ. P.
26 .......... 17, 20
28 .......... 1, 14
30 .......... 10, 11
32 .......... 16

## I. INTRODUCTION

Plaintiffs' Motion for Sanctions (ECF No. 730) ("Mot."), seeks to have DeviantArt pay the natural discovery costs associated with the Plaintiffs' pursuit of foreign depositions of former DeviantArt employees. Plaintiffs' allegations of misconduct are incorrect and based on distortions of the record. But the relief sought in the Motion is also wholly unwarranted because Plaintiffs would always have been required to bear the costs associated with pursuing letters rogatory and Canadian court process, because those are the required steps to compel a foreign deposition. Plaintiffs' attempt to force DeviantArt to pay for Plaintiffs' discovery is improper and should be denied.

With respect to Mr. Trofimov, DeviantArt has consistently identified him as a relevant witness, and did not oppose his deposition or adding him as a custodian. Plaintiffs' sole argument for misconduct is that DeviantArt "withheld" its legal representation of Mr. Trofimov "for months." Mot. at 7. This is simply not true. DeviantArt and its counsel had been trying to contact Mr. Trofimov since Plaintiffs made clear their intent to depose him to offer representation, but did not hear back from him until June 2026, and Mr. Trofimov did not agree to retain Latham & Watkins until August. Counsel for DeviantArt then immediately alerted Plaintiffs of their representation *one day* after they were retained by Mr. Trofimov. And even if DeviantArt's counsel had represented Mr. Trofimov previously (which it did not), such representation would not have relieved Plaintiffs of their obligation to pursue discovery through the Canadian courts, because foreign third parties must be subpoenaed through their home country's statutory scheme. *See SPS Techs., LLC v. Briles Aerospace, Inc.*, No. 18-cv-9536, 2020 WL 12740646, at *1 (C.D. Cal. Apr. 14, 2020) ("[t]he proper method for . . . obtaining deposition testimony in Canada for use in a United States action is to proceed by means of a letter rogatory"); *see also* Fed. R. Civ. P. 28(b)(1) ("A deposition may be taken in a foreign country . . . under a letter of request, whether or not captioned a 'letter rogatory' . . . ."). Plaintiffs' demand for DeviantArt to pay costs for Mr. Trofimov in connection with their letters rogatory motion, the proceedings in Canadian court, and his deposition are thus entirely baseless and not made in good faith.

Second, with respect to Mr. Surovenko, Plaintiffs present a misleading account in an attempt to manufacture misconduct, but their attempts fall short on every front. DeviantArt's counsel informed Plaintiffs of Mr. Surovenko's departure within days of counsel learning about it. Plaintiffs cite no authority requiring disclosure on the date an employer first receives notice of an employee's intent to resign, and this Court has already recognized that such a requirement would likely be impracticable. But even if Mr. Surovenko's deposition had been noticed while he was still employed at DeviantArt, the foreign discovery process would have been required all the same, because, once again, Mr. Surovenko, who is a Canadian resident, remained entitled to the protections of Canadian law. *See SPS Techs.*, 2020 WL 12740646, at *1.

DeviantArt's good faith litigation position that Mr. Surovenko's deposition would not be sufficiently "importan[t]" under the proportionality standard governing foreign non-party depositions, and that any relevant information could be obtained from "alternative means"—for example from Mr. Trofimov (whose deposition DeviantArt did not oppose) or Mr. Gorniak (who oversaw DreamUp's development)—does not compel a different outcome. *See Optrics, Inc. v. Barracuda Networks, Inc.*, No. 17-cv-04977, 2019 WL 5485890, at *1 (N.D. Cal. Oct. 25, 2019). DeviantArt's witnesses have repeatedly confirmed that Mr. Trofimov—not Mr. Surovenko—was responsible for the development of DreamUp's CLIP-token pipeline. Indeed, the discussions between Mr. Gorniak and Mr. Surovenko that Plaintiffs claim reflect Mr. Gorniak's reliance on Mr. Surovenko to provide 30(b)(6) testimony in this case were actually efforts by Mr. Gorniak to learn more about *Mr. Trofimov's* work on DreamUp after Mr. Trofimov had left DeviantArt. Mr. Surovenko's only arguable contribution to DreamUp is the fact that he downloaded images to AWS months before DreamUp's development began for an entirely unrelated project. Thereafter, Mr. Trofimov independently selected a particular subset of those images to separately download from AWS for use in developing a model in the CLIP-token pipeline. The parties' disagreement over whether Mr. Surovenko's conduct amounts to a "key task" uniquely "important" enough to compel an ex-U.S. deposition of a former employee does not smack of the sort of "egregious" bad faith conduct that calls for an "extraordinary remedy." DeviantArt's opposition to Plaintiffs' motion for letters rogatory was submitted in good faith.

For the reasons set forth below, the Court should deny Plaintiffs' Motion in its entirety and award DeviantArt its reasonable attorneys' fees and costs incurred in opposing the Motion if the Court deems just.

## II. FACTUAL BACKGROUND

### A. The DreamUp [redacted]

In 2022, DeviantArt launched DreamUp, an image-generator based on an AI diffusion model called Stable Diffusion. ECF No. 431 ¶¶ 346, 351. DeviantArt played no role in the training of Stable Diffusion. ECF No. 223 at 31. In order to differentiate DreamUp's output from the base Stable Diffusion model by accounting for DeviantArt community preferences, DeviantArt built a process to [redacted]. Botwinick Dec. ¶ 3.

Stable Diffusion uses a latent embedding space called "CLIP" to guide generation. ECF No. 431 ¶¶ 82–83. DeviantArt's [redacted] uses proprietary DeviantArt models to adjust the [redacted] but otherwise does not alter the operation of the underlying Stable Diffusion model. Botwinick Dec. ¶ 3.

The development of this [redacted] was conducted primarily by Georgii Trofimov, with Peter Gorniak in a supervisory role, and lasted approximately 5 months, from July to November 2022. Botwinick Dec. ¶ 5. One model within the [redacted] is called the [redacted]. Botwinick Dec. ¶ 6. Mr. Trofimov used a set of [redacted] Botwinick Dec. ¶ 7.

### B. DeviantArt Has Consistently Identified Mr. Trofimov's Importance, and Did Not Oppose His Deposition

As DeviantArt and its witnesses have consistently explained, former employee Georgii Trofimov built the models that are part of the DreamUp [redacted]. Botwinick Dec. ¶¶ 4–5, 8–9; Ex. A[1] (Gorniak 30(b)(6) Dep.) at 67:1–69:21, 82:1–84:18; Ex. B (Nell Dep.) at 243:21–244:23. Mr. Trofimov designed the models, trained them, and, crucially,

[1] All Exhibits are attached to the Botwinick Declaration.

selected and downloaded the approximately [redacted] used to develop one of the models, Ex. A (Gorniak 30(b)(6) Dep.) at 67:1–69:21, 82:1–84:18; *id.* (Gorniak 30(b)(6) Dep.) at 109:9–19.

Mr. Trofimov left DeviantArt in November 2022, before this lawsuit began. Gorniak Dec. ¶ 3. Although DeviantArt was willing to provide counsel to Mr. Trofimov, and although Latham & Watkins repeatedly attempted to contact Mr. Trofimov to offer that counsel to him, Mr. Trofimov did not agree to engage Latham & Watkins until August 2026. Botwinick Dec. ¶¶ 12–14.

DeviantArt has never opposed Plaintiffs' efforts to obtain discovery from Mr. Trofimov. In January 2026, when Plaintiffs asked DeviantArt to add Mr. Trofimov as a document custodian, DeviantArt agreed without opposition. Botwinick Dec. ¶ 11. And in April 2026, when Plaintiffs moved for issuance of letters rogatory to obtain the depositions of Messrs. Surovenko and Trofimov, DeviantArt did not file an opposition to the motion as to Mr. Trofimov. *See also* ECF No. 508 at 1 n.1.

In March 2026, Plaintiffs asked whether counsel for DeviantArt represented Mr. Trofimov. Botwinick Dec. ¶ 12. Counsel for DeviantArt responded accurately that "[o]ur law firm does not presently represent [. . .] Mr. Trofimov in connection with this lawsuit," but that "[w]e will let you know if this changes." *Id.* In April 2026, after Plaintiffs filed their motion for letters rogatory, counsel for DeviantArt reached out to Mr. Trofimov by sending a letter to his last known address to see whether he would agree to discuss his work on DreamUp and to explore whether he was interested in legal representation. *Id.* ¶ 11. Counsel for DeviantArt received no reply to their letter. *Id.*

Counsel for DeviantArt attempted again to reach out to Mr. Trofimov in May 2026, after the Court granted Plaintiffs' motion for letters rogatory. *Id.* ¶ 13. Around that same time, Mr. Gorniak also reached out to Mr. Trofimov, to let him know that he might need to give a deposition in connection with this lawsuit, and that if that happened, DeviantArt would be willing to pay for his legal counsel. Ex. C (Gorniak Dep.) at 20:24–22:19.

However, Mr. Trofimov did not even respond to Latham & Watkins' outreach email until June 4, *after* Plaintiffs had already initiated the Canadian judicial process on May 29, 2026, Pet. to the Court, *Andersen et al. v. Nikolay Surovenko and Georgii Trofimov*, No. S-264070 (May 29, 2026) (No. 1). Although Latham & Watkins informed Mr. Trofimov of its offer to represent him, he did not pursue Latham & Watkins's offer of representation until July 17, 2026, after the Canadian court ordered his deposition, and he did not formally engage Latham & Watkins until August 5, 2026. Botwinick Dec. ¶ 14. Latham & Watkins informed Plaintiffs of that engagement the very next day on August 6, 2026 and offered to coordinate deposition scheduling. *Id.* Plaintiffs requested an extension of the deposition schedule to accommodate Plaintiffs' counsel's schedule, and DeviantArt agreed. *Id.*; ECF No. 701.

### C. Mr. Surovenko's Work on Recommendation Systems and Mr. Trofimov's Work on DreamUp

Mr. Surovenko's involvement in DreamUp was limited and indirect. Separate and apart from DreamUp, DeviantArt's machine-learning engineers sometimes worked with [redacted] from DeviantArt's website. Mr. Surovenko had downloaded a set of approximately 100 million images before DreamUp development began, for use in a project to improve the general DeviantArt website's recommendation tools. Ex. D (Surovenko Dep.) at 208:17–209:4. Mr. Trofimov months later selected a subset of approximately [redacted] from that much larger dataset to use in connection with developing the [redacted] without Mr. Surovenko's involvement in that selection process. Botwinick Dec. ¶ 5 ("[redacted]"); Ex. A (Gorniak 30(b)(6) Dep.) at 83:13–18 ("Q. . . . . Who was responsible for the development process with respect to this step of the pipeline? A. Georgii Trofimov"); *see also id.* (Gorniak 30(b)(6) Dep.) at 146:13–149:14.

At some point before April 2022, in connection with a project focused on improving DeviantArt's general website recommendation systems (called [redacted] Mr. Surovenko downloaded a set of approximately [redacted]. Ex. D (Surovenko Dep.) at

208:17–23 ("Q. Do you recall earlier today you testified that you downloaded [redacted]? A. Yes. Q. And you testified that those [redacted] were downloaded for development of [redacted] [a recommendation project]; correct? A. Yes."). Mr. Surovenko stored the [redacted] on a DeviantArt [redacted], where the [redacted] could be accessed more quickly for his work. Gorniak Dec. ¶ 5.

At that juncture, DeviantArt had not yet begun work on DreamUp, whose development did not begin until [redacted] (Botwinick Dec. ¶ 5), and Mr. Surovenko had no knowledge that his [redacted] might be used for the development of DreamUp's [redacted], Ex. D (Surovenko Dep.) at 76:23–77:3 ("Q. At the time you requested those [redacted], did you also request [redacted] project that Georgii Trofimov was working on for DreamUp? [. . .] THE WITNESS: No."); *id.* at 77:20–23 ("Q. At the time you requested the [redacted], did you know that they would be used for the DreamUp [redacted] A. No.").

Mr. Surovenko used a script he wrote to download the [redacted] automatically. Ex. D (Surovenko Dep.) at 209:5–7. As is always the case when [redacted] are downloaded from [redacted] Mr. Surovenko input the necessary parameters for his download, which in this case consisted of setting the [redacted]. Ex. A (Gorniak 30(b)(6) Dep.) at 68:4–22; Ex. D (Surovenko Dep.) at 209:5–11. This is the [redacted] process referred to in the Motion. The process was automated across all [redacted] Ex. D (Surovenko Dep.) at 209:5–210:11. Mr. Surovenko selected the [redacted] because these were the only parameters compatible with [redacted], Ex. D (Surovenko Dep.) at 209:12–15, which DeviantArt used for various projects at the time, ECF No. 508-6 ¶¶ 3–7.

A few months later, Mr. Trofimov decided to use [redacted] to help develop the [redacted] Botwinick Dec. ¶ 5. Mr. Trofimov selected a set of [redacted] that Mr. Surovenko had downloaded—less than [redacted] that Mr. Surovenko had downloaded for an entirely different purpose—and downloaded those [redacted] to use for the [redacted]. Botwinick Dec.

¶¶ 5, 7. To DeviantArt's present understanding, the sole reason Mr. Trofimov downloaded them from the [redacted] is because doing so would be faster than re-downloading them from [redacted] Gorniak Dec. ¶ 20.

To be clear, it was Mr. Trofimov, not Mr. Surovenko, who selected the specific [redacted] for development of the [redacted], and downloaded them from [redacted] for use in connection with the [redacted] When Mr. Trofimov later selected the specific [redacted] to develop the [redacted] Mr. Surovenko was not involved in the selection process. Ex. D (Surovenko Dep.) at 87:7–12 ("Q. Did [Trofimov] ever identify specific [redacted] that he wanted [for the [redacted]]? A. No. Q. Did he ever identify any [redacted] to you that he wanted? A. No."); *see also* Ex. A (Gorniak 30(b)(6) Dep.) at 160:7–11 ("Q Did Mr. Trofimov seek approval from anyone at DeviantArt before he selected the dataset that was used to train the [redacted] [. . .] THE WITNESS: No."); *id.* 160:19–21 ("Q Mr. Surovenko selected the [redacted] correct? A No.").

**D. Counsel for DeviantArt Informed Plaintiffs of Mr. Surovenko's Departure Within Days of Learning About It**

In January 2026, Plaintiffs requested via email deposition availability for several foreign witnesses (but did not serve notices), including for Mr. Surovenko. Botwinick Dec. ¶ 15. DeviantArt did not immediately revert with deposition dates for these witnesses, as the parties had both just begun the process of coordinating deposition logistical issues. *Id.* These issues included working out availability of multiple witnesses across various time zones, deposition locations for witnesses in Canada and Israel for whom Plaintiffs requested in-person depositions, the possibility of remote depositions, the drafting of a remote deposition protocol, and the finalization of Rule 30(b)(6) corporate representative topics to ensure that multiple-day depositions for witnesses testifying in personal and corporate capacities could be conducted over consecutive days to minimize burden on the witnesses. *Id.* During this time period, a war in the Middle East broke out, which further complicated scheduling across DeviantArt's witnesses,

several of whom reside in Israel. *Id.* At this time, Plaintiffs, too, had not yet provided their witnesses' availability, despite Defendants having requested dates in December 2025. *Id.*

Mr. Surovenko left DeviantArt on March 6, 2026, Gorniak Dec. ¶ 8, after providing two weeks' notice, Ex. D (Surovenko Dep.) at 45:8–10. DeviantArt's counsel informed Plaintiffs of Mr. Surovenko's departure on March 12, three days after counsel learned that he had left the company, and less than a week after Mr. Surovenko's departure. Botwinick Dec. ¶ 16.

Plaintiffs raised the topic of Mr. Surovenko leaving DeviantArt at the March 19, 2026 discovery status hearing and stated their intent to leave the issue alone as a "one-off." Ex. E (March 19, 2026 Hr'g Tr.) at 17:10–13. The Court agreed that intervention did not seem like it would be helpful or necessary. *Id.* at 16:16–17:9.

Plaintiffs thereafter sought and were granted the right to issue letters rogatory for the depositions of Mr. Surovenko (and Mr. Trofimov). ECF Nos. 473, 534. During this period Latham & Watkins did not represent Mr. Surovenko (or Mr. Trofimov). Botwinick Dec. ¶¶ 14, 18.

In the July joint status report, ECF No. 663, Plaintiffs notified DeviantArt for the first time that in May they had filed a petition with the Supreme Court of British Columbia ("BC Court") to order Mr. Trofimov and Mr. Surovenko's deposition, that a hearing had occurred earlier in July, and that the BC Court subsequently ordered the deposition. Botwinick Dec. ¶ 17. Counsel for DeviantArt then attempted to reach out to Mr. Surovenko to determine whether he was interested in Latham & Watkins' representation for his deposition. *Id.* ¶ 18. Mr. Surovenko did not respond until late July. *Id.* Within a week of engaging Mr. Surovenko, counsel notified Plaintiffs of their representation of Mr. Surovenko and offered to coordinate scheduling his deposition. *Id.* Plaintiffs requested an extension of the deposition schedule to accommodate their counsel's schedule, to which DeviantArt agreed. *Id.*; ECF No. 701.

### E. Mr. Surovenko Was Not the Source of Peter Gorniak's Rule 30(b)(6) Deposition Testimony

Mr. Gorniak oversaw Mr. Trofimov's work in building DreamUp, but lacked certain technical details about its development that Mr. Trofimov—who left DeviantArt before this

litigation was filed—would possess. Gorniak Dec. ¶¶ 3, 7. Mr. Gorniak therefore consulted Mr. Surovenko before Mr. Surovenko departed DeviantArt to determine whether Mr. Surovenko recalled any information about DreamUp's development from Mr. Trofimov, since the two were colleagues on the Machine Learning team. Gorniak Dec. ¶¶ 5–6, 8–14; Ex. D (Surovenko Dep.) at 92:11–93:22. Mr. Gorniak checked with Mr. Surovenko twice: once in April 2025 to ask about a storage location referenced in the development code for DreamUp and again in February 2026 after Mr. Gorniak learned that Mr. Surovenko would be leaving to confirm that his work was not part of DreamUp. Gorniak Dec. ¶¶ 5, 10. In neither instance was Mr. Surovenko able to remember any specific information about DreamUp, other than to point Mr. Gorniak to potentially relevant source code repositories that DeviantArt uses to [redacted] in the present day. Gorniak Dec. ¶¶ 12–14. Mr. Gorniak subsequently investigated those repositories on his own and determined that they were not used by Mr. Trofimov for DreamUp, or by Mr. Surovenko for [redacted] Gorniak Dec. ¶ 13; *see also* Ex. A (Gorniak 30(b)(6) Dep.) at 242:13–17 ("Q. Did DeviantArt use that package [identified by Mr. Surovenko] to download any [redacted] described in Exhibit 109? A. No."). Mr. Surovenko also pointed Mr. Gorniak to the location where Mr. Surovenko had downloaded [redacted] for his own *non-DreamUp* use. Gorniak Dec. ¶ 5; Ex. D (Surovenko Dep.) at 92:11–93:22.

Mr. Gorniak's conversations with Mr. Surovenko pre-dated and were unrelated to Mr. Gorniak's preparation for his 30(b)(6) testimony. Mr. Gorniak was not informed that he would be providing 30(b)(6) testimony in connection with any topic—nor had he even seen those 30(b)(6) topics—until months later in May. Gorniak Dec. ¶ 17, Botwinick Dec. ¶ 20. In fact, Plaintiffs and DeviantArt did not finalize DeviantArt's corporate Rule 30(b)(6) topics until May 2026, Botwinick Dec. ¶ 19—more than two months after Mr. Surovenko left DeviantArt. On May 28, DeviantArt internally identified Mr. Gorniak as its witness to testify on its behalf about topics relating to DreamUp's technical development and informed Mr. Gorniak of his topics. *Id.* Mr. Surovenko could thus not have helped Mr. Gorniak prepare for Mr. Gorniak's 30(b)(6) topics because Mr. Gorniak was not even informed of those topics when he spoke with Mr. Surovenko about DreamUp in February. After February, Mr. Surovenko and Mr. Gorniak did not speak again about this

litigation. Gorniak Dec. ¶ 15; Ex. C (Gorniak Dep.) at 19:17–21; Ex. D (Surovenko Dep.) at 90:25–91:3.

To be sure, at his Rule 30(b)(6) corporate deposition, Mr. Gorniak named Mr. Surovenko as a source that Mr. Gorniak consulted in connection with the topics he was designated on. However, Mr. Gorniak's discussions with Mr. Surovenko were not specifically to prepare for the deposition; again, they occurred *before* Mr. Gorniak was even aware of his 30(b)(6) responsibilities. Gorniak Dec. ¶ 17. To the extent his testimony suggests otherwise, that simply reflects Mr. Gorniak's confusion regarding the legal nomenclature embedded in the questions asked of him as well as his desire to include all the sources he investigated for potentially relevant information. *See* Gorniak Decl. ¶ 16. And, at any rate, Mr. Surovenko was ultimately *not* able to provide any materially new information to Mr. Gorniak and was *not* the source of the information Mr. Gorniak provided at his deposition about DreamUp. Gorniak Dec. ¶¶ 14, 18. Indeed, neither Mr. Gorniak nor Mr. Surovenko identified at their depositions any substantive information about DreamUp's technical development that Mr. Gorniak learned from Mr. Surovenko. Mr. Gorniak confirmed that the code package Mr. Surovenko alerted him to turned out after investigation to not have been used for DreamUp, and Mr. Surovenko confirmed that he never provided Mr. Gorniak with any information about the [redacted] that was used in DreamUp. Ex. A (Gorniak 30(b)(6) Dep.) at 242:13–17 ("Q Did DeviantArt use that [code] package [identified by Mr. Surovenko] to download any [redacted] []? [. . .] THE WITNESS: No."); Ex. D (Surovenko Dep.) at 92:11–16 ("You had a conversation with [Mr. Gorniak] about the [redacted] that was used in V1 of DreamUp; correct? [. . .] THE WITNESS: No.").

## III. LEGAL STANDARD

### A. Federal Rule of Civil Procedure 30(d)(2)

Federal Rule of Civil Procedure 30(d)(2) covers conduct that occurs *during* a deposition, not before. The rule provides that a court "may impose an appropriate sanction . . . on a person who impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2). Courts consistently apply the rule only to in-deposition conduct. *See, e.g.*, *Oakley, Inc.*

*v. Grangeville Depot LLC*, 336 F.R.D. 191, 195 (D. Idaho 2020) ("Once a deposition has been commenced, protection against abuse is governed by Rule 30(d)."); *see also Coates v. Johnson & Johnson*, 85 F.R.D. 731, 733 (N.D. Ill. 1980) ("a Rule 30(d) motion is appropriate only during the taking of the deposition."). Plaintiffs cite no authority suggesting otherwise.

Indeed, the rule is designed to address "obstructive tactics that unreasonably *prolong a deposition* on the person engaged in such obstruction," Fed. R. Civ. P. 30(d)(2) advisory committee's notes to 1993 amendment (emphasis added)—for example, "where counsel engaged in repeated, unnecessary objections that slowed the progress of the examination, impeded the flow of information from the witness, and unnecessarily prolonged the proceedings." *Lee v. Pep Boys-Manny Moe & Jack of California*, No. 12-cv-05064, 2015 WL 9268118, at *6 (N.D. Cal. Dec. 21, 2015) (citation omitted). To qualify for sanctions, the complained-of conduct must actually impede the fair examination of the witness. *See Van v. Black Angus Steakhouses*, No. 17-cv-06329, 2018 WL 11322708 (N.D. Cal. Sept. 26, 2018) (finding even improper deposition conduct not sanctionable because it did not impede examination of the witness).

Because, Rule 30(d)(2) only covers tactics that "unreasonably prolong" a deposition, it does not apply to the conduct that Plaintiffs complain of here.

**B. 28 U.S.C. Section 1927**

Sanctions under 28 U.S.C. Section 1927 are "an extraordinary remedy," *United States v. Blodgett*, 709 F.2d 608, 610–11 (9th Cir. 1983), intended only when an attorney "multiplies the proceedings in any case unreasonably and vexatiously." District courts' "authority to sanction attorneys under § 1927 . . . must be exercised with restraint and discretion." *Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1223 (9th Cir. 2010). To warrant sanctions, conduct must be "egregious"—which requires more than "questionable," "ill-conceived," or "misplaced" arguments. *See Heroic Era, Ltd. v. Evony, LLC*, No. 10-cv-2458, 2011 WL 5834852, at *2 (N.D. Cal. Nov. 21, 2011); *First Fin. Ins. Co. v. Butler Chamberlain-Neilsen Ranch Ltd.*, No. 10-cv-2004, 2010 WL 4502151, at *3 (N.D. Cal. Nov. 2, 2010).

Rather, Section 1927 sanctions "must be supported by a finding of subjective bad faith." *Lake v. Gates*, 130 F.4th 1064, 1070 (9th Cir. 2025) (citation omitted). Bad faith requires

that an attorney either (1) knowingly or recklessly raise a frivolous argument, or (2) argue a non-frivolous claim for the purpose of harassing an opponent. *See id*; *see also In re Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996) ("For sanctions to apply, if a filing is submitted recklessly, it must be frivolous, while if it is not frivolous, it must be intended to harass."). Plaintiffs do not allege that DeviantArt acted with intent to harass (and indeed, it did not). To be "frivolous," a filing or argument must be "'baseless and made without reasonable and competent inquiry' or made up of 'legal or factual contentions so weak as to constitute objective evidence of improper purpose.'" *Caputo v. Tungsten Heavy Powder, Inc.*, 96 F.4th 1111, 1155 (9th Cir. 2024) (citation omitted). Such an argument must be "patently lacking in any basis in either law or fact." *Id*.

Because sanctions under Section 1927—and under a court's inherent authority—are "an extraordinary remedy," they are only "to be exercised with extreme caution." *In re Keegan Mgmt. Co.*, 78 F.3d at 437. Where an opposing party's position has a legitimate foundation and is made in good faith—even if it ultimately does not prevail—an award of sanctions is not justified. *See Est. of Blas Through Chargualaf v. Winkler*, 792 F.2d 858, 861 (9th Cir. 1986) (reversing the district court's Section 1927 sanctions because, though the complained-of motion was unsuccessful, it was not made in bad faith).

**C. Inherent Authority**

Courts also possess inherent authority to sanction parties for bad faith conduct. *See Fink v. Gomez*, 239 F.3d 989, 991 (9th Cir. 2001). Inherent authority sanctions likewise require "more than just "mere recklessness." *Id.* at 993. The requirement of a specific finding of bad faith is a "high threshold" designed to "ensure[] that restraint is properly exercised." *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997) (citation omitted) (cited in Mot. at 9, 10, 12). Like sanctions under 28 U.S.C. Section 1927, inherent authority sanctions are "an extraordinary remedy, one to be exercised with extreme caution." *In re Keegan Mgmt. Co.*, 78 F.3d at 437.

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1088 (C.D. Cal. 2022) (citing

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)). Imposing sanctions under the court's inherent authority "should be reserved for the 'rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundation, or brought for an improper purpose.'" *Primus*, 115 F.3d at 649 (citation omitted). An argument made in good faith does not warrant sanctions under a court's inherent authority. *See Cakebread v. Berkeley Millwork & Furniture Co.*, 218 F. Supp. 3d 1040, 1046 (N.D. Cal. 2016) ("A district court must make a specific finding of 'bad faith' [to impose sanctions under its inherent powers].") (citation omitted).

In addition to finding bad faith, a court "acting under its inherent authority to impose compensatory sanctions must apply a 'but-for' causation standard," meaning that it must determine "but for the sanctionable misconduct, would there be any harm warranting compensatory relief?" *Am. Unites for Kids*, 985 F.3d at 1089–90. If a sanction is available, it "must be limited to compensating for the specific harm," otherwise "the sanction would appear to be punitive." *Id.* at 1090. "Any punitive sanction imposed under a court's inherent authority against a party in civil litigation requires criminal-type safeguards." *Id.* at 1095.

## IV. ARGUMENT

Plaintiffs' Motion does not clear the "high threshold" required for the "extraordinary remedy" of sanctions. Plaintiffs identify no conduct that rises to frivolous argument, harassment, or egregious circumstances—nor can they establish that the foreign discovery process would not have occurred "but for" DeviantArt's alleged conduct, because both Mr. Trofimov and Mr. Surovenko are Canadian residents who were entitled to the protections of Canadian law regardless of any of the conduct Plaintiffs complain of. As to both witnesses, DeviantArt's disclosures were timely and appropriate: counsel notified Plaintiffs of Mr. Trofimov's retention just one day after he was engaged, and of Mr. Surovenko's departure within days of counsel learning about it—at a time when no depositions for either side had been scheduled. DeviantArt's statements in the letters rogatory proceedings were correct, were made in good faith, and reflected a reasonable application of the proportionality standard for compelling foreign non-party depositions. Plaintiffs' Motion thus fails to clear even the threshold for sanctions and instead reveals itself as an improper attempt to shift ordinary foreign discovery costs onto DeviantArt.

**A. Plaintiffs Do Not Identify Any Harassing, Knowingly Frivolous, or Otherwise Egregious Conduct**

***i. Mr. Trofimov Was Entitled to the Canadian Discovery Process Irrespective of the Date of His Engagement By Counsel for DeviantArt***

Plaintiffs' argument that counsel for DeviantArt "frustrated Plaintiffs' efforts to secure the testimony of former employee Georgii Trofimov" and thereby engaged in misconduct warranting sanctions, Mot. at 7, is wrong both as a matter of fact and law.

Mr. Trofimov, as a foreign, former DeviantArt employee who left before this lawsuit commenced, would have been entitled to the protections of the Canadian discovery process whether or not he was represented by DeviantArt's counsel. The ordinary process for securing foreign testimony is the letters rogatory process. *See* Fed. R. Civ. P. 28(b)(1) ("A deposition may be taken in a foreign country . . . under a letter of request, whether or not captioned a 'letter rogatory' . . . ."); *see also SPS Techs., LLC v. Briles Aerospace, Inc.*, No. 18-cv-9536, 2020 WL 12740646, at *1 (C.D. Cal. Apr. 14, 2020) ("[t]he proper method for . . . obtaining deposition testimony in Canada for use in a United States action is to proceed by means of a letter rogatory" with the Canada Evidence Act maintaining discretion to command the attendance of a party for examination). Canadian courts maintain discretion to command a deposition of a Canadian-national witness—like Mr. Trofimov—in compliance with the Canadian Evidence Act. *See also Allianz Sigorta, A.S. v. Ameritech Indus., Inc.*, No. 15-cv-1665, 2016 WL 1127705, at *2 (E.D. Cal. Mar. 23, 2016) (the Canada Evidence Act "provides that a Canadian court may, upon application by 'a court . . . outside Canada,' order a deposition"); *see also Goldberg v. Dufour*, No. 16-21301, 2020 WL 373206, at *4 (D. Vt. Jan. 23, 2020) ("Under the Canada Evidence Act, a Canadian court maintains the discretion to 'command the attendance of [a] party or witness for the purpose of being examined.'"). Mr. Trofimov had no obligation to waive those protections and accept service via some other form, even if he had been represented by U.S. counsel at the time Plaintiffs sought his deposition—which he was not, as Latham & Watkins did not represent Mr. Trofimov until August 5, 2026. Botwinick Dec. ¶ 14. Nor does the fact that Mr. Trofimov

ultimately retained DeviantArt's U.S.-based counsel change the analysis. *Cf., e.g.*, *Garpeg, Ltd. v. United States*, 583 F. Supp. 789, 799 (S.D.N.Y. 1984) (third-party intervenor's requested relief of forced waiver of foreign law's protections denied as "no court has ever compelled a foreign citizen or corporation to waive rights conferred upon it by foreign law"); *Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 331 F.R.D. 427, 433 n.4 (W.D. Wash. 2019) (rejecting that a non-party sharing counsel with a party would deem a non-party as having asserted a legally cognizable interest in ongoing litigation). Tellingly, Plaintiffs cite no authority that requires a foreign witness to waive the protections of their home country's laws simply because they have retained American counsel. To counsel's knowledge, no such authority exists.

And although it had no legal obligation to do otherwise, it is not even true that DeviantArt's counsel "chose to sit on their hands and wait for Plaintiffs to jump through extraterritorial hoops" (Mot. at 2:23-24), before offering to represent Mr. Trofimov. Counsel for DeviantArt reached out to Mr. Trofimov in April and May 2026, before the Canadian process was initiated. Botwinick Dec. ¶¶ 13–14. But Mr. Trofimov did not respond until July 2026, after Plaintiffs had already petitioned the Canadian Court, and did not engage Latham & Watkins until August 5, 2026. *Id.* ¶ 14.

At bottom, Plaintiffs do not point to any conduct that warrants shifting costs here. DeviantArt had no affirmative obligation to offer to provide counsel to Mr. Trofimov. Nor, having provided that counsel, did it have any affirmative obligation to compel Mr. Trofimov to waive the mechanisms of service required under Canadian law. *See Viasat, Inc. v. Space Sys./Loral, LLC*, No. 13-cv-2074, 2014 WL 12577593, at *4-5 (S.D. Cal. June 30, 2014) (requiring letters rogatory for discovery from Canadian non-party as non-party "is not a United States national or resident and therefore cannot be served with a subpoena under Rule 45").

**ii. *DeviantArt Informed Plaintiffs of Mr. Surovenko's Departure Within a Reasonable Timeframe & Mr. Surovenko, Too, Was Entitled to the Canadian Discovery Process***

Plaintiffs' claim that DeviantArt "actively concealed" Mr. Surovenko's departure, Mot. at 1, is not supported by the record. DeviantArt's counsel informed Plaintiffs of Mr. Surovenko's

departure within mere days of learning about it. Botwinick Dec. ¶ 16. And Plaintiffs cite no authority requiring DeviantArt to have alerted Plaintiffs of Mr. Surovenko's impending departure when it received two weeks' notice—nor would any such requirement be practical, as this Court has already once noted. Moreover, there is no evidence that an earlier disclosure would have materially changed the circumstances or that the timing of DeviantArt's disclosure was in any way in bad faith.

DeviantArt's counsel informed Plaintiffs of Mr. Surovenko's departure only three days after counsel learned that he had left the company, and less than a week after Mr. Surovenko had departed. *Id.* DeviantArt itself only had two weeks' notice of Mr. Surovenko's intent to leave. Mot. at 10. At that juncture, neither party had scheduled or noticed depositions due to ongoing discussions between the parties to coordinate deposition schedules, procedures, logistics, and locations. Botwinick Dec. ¶ 15.

Plaintiffs cite no authority showing that this disclosure was untimely, let alone to an extent that would warrant sanctions. To the contrary, when Plaintiffs raised the disclosure at a status conference, the court acknowledged that requiring any earlier disclosure might be impracticable, explaining that "the company might not be aware that a particular employee is looking for another job," and that "employee disciplinary" or "privacy concerns" can be additional complicating factors. Ex. E (March 19, 2026 Hr'g Tr.) at 16:20–17:4.

Nor do Plaintiffs articulate with any clarity how the purported delay in disclosure prejudiced them or was the but-for cause of their need to conduct a foreign deposition. Even if DeviantArt had notified Plaintiffs of Mr. Surovenko's impending departure the very day that Mr. Surovenko gave his two weeks' notice, it is unlikely that Mr. Surovenko's deposition could have been scheduled in that short timeframe. *See* Fed. R. Civ. P. 32(a)(5)(A) (deposition noticed within 14 days considered "short notice" and eligible for protective order). Indeed, it is unlikely that Plaintiffs would have voluntarily proceeded with his deposition at that time, given that they were still serving requests for the production of additional documents, serving an additional 17 requests from April to June 2026. Botwinick Dec. ¶ 17. Plaintiffs are also wrong to assume that DeviantArt would have been required to make Mr. Surovenko available for deposition through Rule 30 rather

than requiring foreign service if Mr. Surovenko's deposition had been scheduled in the days before he left DeviantArt. Mot. at 10. As a foreign resident, Mr. Surovenko would have been entitled to avail himself of foreign service requirements unless he qualified under Rule 30(b)(1) as an "officer, director, or managing agent" of DeviantArt. *See Elasticsearch, Inc. v. GmbH*, No. 19-cv-05553, 2021 WL 1753796, at *1 (N.D. Cal. May 4, 2021) (explaining the standard for party witnesses when the party is a corporation). Plaintiffs make no attempt to establish that Mr. Surovenko held any such role. *See Lardizabal v. Arvest Cent. Mortg. Co.*, No. 22-cv-345, 2023 WL 2229261, at *4 (S.D. Cal. Feb. 24, 2023) ("[t]he examining party maintains the burden to establish that the deponent is a managing agent").

**iii. *DeviantArt Opposed Plaintiffs' Letters Rogatory Motion in Good Faith***

Plaintiffs' demand for costs associated with responding to DeviantArt's opposition to Plaintiffs' motion for letters rogatory is meritless. Reasonable disagreements over relevance—or more specifically, here, the "importance" of a particular witness to a litigation—do not qualify as the "rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundation." *Primus*, 115 F.3d at 649.

When considering whether to compel a foreign non-party to sit for a deposition, courts perform a balancing act, weighing the potential "importance of the discovery in resolving the issues" against the "burden or expense of the proposed discovery." Fed. R. Civ. P. 26(b)(1). Mere relevance is not enough; the sought discovery must be proportional to the needs of the case. *Id.* Courts "exercise special vigilance to protect foreign litigants from the danger [of[ unnecessary, or unduly burdensome, discovery." *Optrics*, 2019 WL 5485890, at *1. Among other factors, courts consider the "importance of the discovery to this litigation" and "whether alternative means are available to obtain the discovery." *Id.* at *2.

DeviantArt's opposition to the Motion for Letters Rogatory explained why Mr. Surovenko's deposition was not proportional to the needs of the case. DeviantArt made two primary arguments: (1) "Mr. Surovenko had no formal responsibility for the development of DreamUp," and (2) "the information Plaintiffs seek from Mr. Surovenko can be readily obtained via 'alternative means.'" ECF No. 508 at 1.

It is within the context of the legal standard for compelling a foreign non-party to sit for a deposition that each of the arguments below were made. Properly viewed against that legal backdrop, as well as DeviantArt and its counsel's reasonable investigation of the facts surrounding events that had occurred years earlier, *see* Gorniak Dec. ¶¶ 5–14 (investigation into DreamUp); Botwinick Dec. ¶¶ 13, 18 (attempts to speak with potential witnesses)—and at a time when Mr. Trofimov, the individual who built the relevant product, had already left the company—there is no basis for finding that that DeviantArt's statements were "'baseless and made without reasonable and competent inquiry' or made up of 'legal or factual contentions so weak as to constitute objective evidence of improper purpose.'" *Caputo*, 96 F.4th at 1155 (citation omitted).

Below, DeviantArt addresses each of the statements cited by Plaintiffs:

**Mr. Surovenko was "not knowledgeable about Plaintiffs' requested subjects."** Mot. at 1, 5–6 (citing ECF No. 508 at 9:19–20). Plaintiffs' motion intentionally omits the "requested subjects" quoted in this sentence in order to create a conflict of facts that does not exist. Plaintiffs' motion for letters rogatory claimed that Mr. Surovenko was knowledgeable about two specific subjects: (1) [redacted] and (2) "DA's knowledge that its conduct was infringing, or that it acted with reckless disregard for the copyright owner's rights." ECF No. 473 at 4–5. These are *not* the 30(b)(6) topics that Plaintiffs argue Mr. Gorniak consulted Mr. Surovenko about, which concerned the [redacted] *Compare* Mot. at 4. And the topics Plaintiffs' letters rogatory motion sought testimony regarding were more than covered by other deponents that DeviantArt identified in its opposition to Plaintiffs' motion for letters rogatory, ECF No. 508 at 8, in addition to Mr. Trofimov whose deposition DeviantArt did not oppose, *see*, *e.g.*, Ex. B (Nell Dep.) at 159:2–162:12 (describing the DreamUp [redacted]); Ex. C (Gorniak Dep.) at 125:20–131:7 (discussing the components of the [redacted]); Ex. A (Gorniak 30(b)(6) Dep.) at 168:3–170:18 (ethics and legality associated with copyright owners' works); Ex. F (Levy Dep.) at 286:16–287:5 (copyright-related discussions in connection with the [redacted]).

Moreover, as explained above, Mr. Surovenko was also *not* the source of Mr. Gorniak's knowledge in connection with his designated 30(b)(6) topics. *Supra* p. 18. DeviantArt and Plaintiffs did not finalize 30(b)(6) topics until May 18, 2026, Botwinick Dec. ¶ 19, and Mr. Gorniak was not aware that he had been designated as a witness for DeviantArt's 30(b)(6) deposition until May 28, 2026, Gorniak Dec. ¶ 17; Botwinick Dec. ¶ 20. Rather, Mr. Gorniak had spoken to Mr. Surovenko earlier in the case, on the chance that Mr. Surovenko might have remembered information about DreamUp that he learned from Mr. Trofimov, but found that Mr. Surovenko was ultimately not able to provide substantive new information about DreamUp. Gorniak Dec. ¶¶ 10–11.

**Mr. Surovenko's "testimony would have little 'importance' to this litigation."** Mot. at 6, 13 (citing ECF No. 508 at 4:15–16). This statement is a subjective application of the governing legal standard for a letters rogatory motion to the known facts. DeviantArt's argument was not "baseless and made without reasonable and competent inquiry." *Caputo*, 96 F.4th at 1155. To the contrary, this was a good faith argument based on DeviantArt's representation of the facts, including Mr. Gorniak's determination that Mr. Surovenko "had no formal responsibility for the development of DreamUp" and had not downloaded or modified any image data "specifically for DreamUp." ECF No. 508-6 ¶ 9. DeviantArt's counsel understood based on its discussions with Mr. Gorniak that he and Mr. Trofimov—whose deposition and role as a custodian DeviantArt did not oppose—and not Mr. Surovenko, were responsible for the development of DreamUp and [redacted], and that Mr. Surovenko's testimony would therefore have been at best cumulative, rather than "important" to the litigation.[2] Botwinick Dec. ¶ 21.

**Mr. Surovenko "did not perform any key tasks in connection with DreamUp's development."** Mot. at 2, 6, 11, 13 (citing ECF No. 508 at 4:18–19). Plaintiffs' central argument for Mr. Surovenko having performed "key tasks" and "directly contribut[ing]" to DreamUp is the

---

[2] Likewise, DeviantArt's statement in the April joint status report that Mr. Surovenko's work at DeviantArt was "irrelevant" to Plaintiffs' claims, Mot. at 6 (citing ECF No. 470 at 18:15), was made solely to inform the court of the status of DeviantArt's expected position on Plaintiffs' anticipated Motion for Letters Rogatory. It reflected DeviantArt and its counsel's good faith belief that Mr. Surovenko's work at DeviantArt, which was focused on recommendations systems and other non-DreamUp projects, did not satisfy the proportionality standard necessary to compel a foreign third-party deposition.

fact that when Mr. Trofimov was developing DreamUp, he selected a relatively small set of [redacted] from a significantly larger set downloaded months earlier by Mr. Surovenko for an unrelated project. The facts of Mr. Surovenko's earlier work are laid out above, *supra* at 5–7, but several bear repeating to demonstrate the subjective reasonableness of DeviantArt's litigation position.[3]

*First*, Mr. Surovenko's work was not part of DreamUp or its [redacted]. Mr. Surovenko was working on improving general website recommendations systems, which pre-dated DreamUp by years. Ex. D (Surovenko Dep.) at 116:22–23. Mr. Surovenko did not know that any [redacted] he downloaded for his recommendations project would later be used by Mr. Trofimov for [redacted] development. Ex. D (Surovenko Dep.) at 77:20–23. Mr. Surovenko thus did not "download[] [redacted] (Mot. at 1). He downloaded approximately [redacted] as part of his recommendations system work without intent or even knowledge that some subset of those images might be used in connection with developing the DreamUp [redacted], Ex. D (Surovenko Dep.) at 77:20–23, and did so months before DreamUp was developed, Ex. D (Surovenko Dep.) at 208:17–23; Botwinick Dec. ¶ 5. *Mr. Trofimov* then independently selected a fraction of those [redacted] to download for use in developing the [redacted] *See* Botwinick Dec. ¶ 5; Ex. A (Gorniak 30(b)(6) Dep.) at 109:16–19. DeviantArt's statement that Mr. Surovenko did not perform any "key tasks" in connection with DreamUp's development was made in good faith and not "patently lacking in any basis in . . . fact." *Caputo*, 96 F.4th at 1155.[4]

*Second*, Plaintiffs' argument that Mr. Surovenko performed "key tasks" because he "[redacted]

---

[3] Plaintiffs also claim that Mr. Surovenko was improperly left off DeviantArt's initial disclosures because DeviantArt failed to identify him as having "discoverable information." Mot. at 6. However, these are disclosures of the individuals who "the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i). DeviantArt does not presently intend to rely on any "discoverable information" from Mr. Surovenko in support of its defenses in this case.

[4] Nor did the specific [redacted] Mr. Surovenko downloaded "directly" "ma[ke] it into DreamUp." (Mot. at 6). Rather, Mr. Trofimov downloaded distinct copies of a subset of those [redacted] and thereafter used those copies to generate [redacted], and it was those [redacted] that were used to [redacted]. Ex. C (Gorniak Dep.) at 129:20–130:3 ([redacted]).

[redacted]," Mot. at 1, misrepresents Mr. Surovenko's actions. Mr. Surovenko [redacted] for an unrelated project. Further, Plaintiffs are wrong that those were "key" tasks; rather, they were automated processes dictated by industry standards. As explained above, *supra* at 6, the [redacted] that Plaintiffs characterize as "key" were simply standard, automated download parameters that Mr. Surovenko set to comply with the requirements of [redacted]—which DeviantArt used for multiple projects unrelated to DreamUp. Ex. D (Surovenko Dep.) at 209:12–15; ECF No. 508-6 ¶¶ 3–7. Mr. Surovenko ran an automated script that applied those parameters uniformly across all [redacted], and he performed this work with no intent or knowledge that any of those [redacted] would be used for DreamUp. Ex. D (Surovenko Dep.) at 209:5–210:11; Ex. D (Surovenko Dep.) at 76:23–77:3; 77:20–23.

*Third*, although Plaintiffs argue that Mr. Surovenko "was involved in model experiments," related to the CLIP-token model (Mot. at 2, 6), Mr. Gorniak and Mr. Surovenko were both clear that Mr. Surovenko's experiments did not involve models that were included in DreamUp but, rather, were "a series of small experiments" for models that were "never launched." *See* Ex. A (Gorniak Dep.) at 50:25–51:11 ("Q. When you say that 'Georgii and Nikolay are currently doing lots of experiments with [redacted],' you are referring to DeviantArt's [redacted] [used in DreamUp]; correct? A No."); Ex. D (Surovenko Dep.) at 208:12–16 ("Q. And, to your knowledge, was any of the work that you did explor[ing] [redacted] – was that work included in the DreamUp product that was launched? A. No, that was not included."); *see also* Ex. D (Surovenko Dep.) at 124:1-4. The testimony Plaintiffs cite simply shows Mr. Gorniak confirming that Mr. Surovenko participated in a group of "experiments with guiding the model with -- using other models." *See* Plaintiffs' Ex. A. at 64:4–14. Mr. Gorniak acknowledges that DreamUp-related PBG projector model was among those experiments, but never contradicts his testimony that Mr. Surovenko did not work on that particular experiment. *See id.* Both Mr. Gorniak and Mr. Surovenko instead testified that work on the Dream-Up related PBG projector model was done by Mr. Trofimov. Ex. A (Gorniak 30(b)(6) Dep.) at 83:13–18 ("Q And then on line 13, there's the next bullet point which

begins with, "The PBG projector." Who was responsible for the development process with respect to this step of the pipeline? A Georgii Trofimov."); Ex. D (Surovenko Dep.) at 124:1-4 ("THE WITNESS: [. . .] So we tried different experiments. I think mostly, like, approaches that ended up working were made by Georgii, and I think his ideas went into this [i.e. DreamUp].").[5]

DeviantArt's position was—and remains—that the above actions do not qualify as "key tasks" or "direct contributions" to DreamUp that render Mr. Surovenko's testimony "important" rather than simply cumulative of witnesses like Mr. Trofimov's and Mr. Gorniak's. ECF No. 508 at 1; *Optrics*, 2019 WL 5485890, at *2. Plaintiffs can—and did) disagree—but their disagreement does not render DeviantArt's statements baseless or made in bad faith.

### iv. *Plaintiffs' Cited Cases Support Denial of the Motion*

Plaintiffs' cited case law only demonstrates that sanctions in this case are unwarranted, as they should be reserved for "rare and exceptional case[s.]" *Primus*, 115 F.3d at 649–50. Indeed, *half* of the cases Plaintiffs cite in the Motion entirely *reversed, vacated, or denied* sanctions. *See id.* (reversing sanctions because the district court failed to make a specific finding of bad faith); *Am. Unites for Kids*, 985 F.3d at 1090–96 (vacating sanctions due to insufficient finding of bad faith to support compensatory sanctions and absence of procedural safeguards necessary for punitive sanctions); *MGIC Indem. Corp. v. Moore*, 952 F.2d 1120, 1122 (9th Cir. 1991) (reversing sanctions under 28 U.S.C. § 1927 where the district court's findings were "as consistent with negligence as with bad faith"); *Brooke v. Stillman*, No. 20-cv-17236, 2021 WL 4948929, at *1 (9th Cir. Oct. 25, 2021) (reversing sanctions where sanctioned party had insufficient opportunity to respond); *Khan v. City & Cnty. of San Francisco*, No. 24-cv-09289, 2026 WL 714308, at *2–3 (N.D. Cal. Mar. 15, 2026) (denying request for spoliation sanctions where moving party failed to file a separate motion).

---

[5] Plaintiffs briefly claim that Mr. Surovenko "was knowledgeable on the tools used to download [redacted]." Mot. at 2. However, the referenced tool was not used by Mr. Trofimov to download [redacted] for DreamUp. Gorniak Dec. ¶ 21; see also Ex. A (Gorniak 30(b)(6) Dep.) at 242:13–17 ("Q Did DeviantArt use that package to download [redacted] described in Exhibit 109? . . . THE WITNESS: No."). Mr. Surovenko's use of a downloader tool for his own projects, but not for DreamUp, does not constitute a "key task" or "direct contribution" to DreamUp.

Plaintiffs' remaining cited cases granted or affirmed certain sanctions under readily distinguishable and significantly more extreme circumstances. Specifically, sanctions were warranted only where parties defied specific court discovery orders (*see Dahl v. City of Huntington Beach*, 84 F.3d 363, 367 (9th Cir. 1996) (counsel served discovery requests duplicative of prior disallowed requests); *Edwards Lifesciences Corp. v. Meril Life Scis*., No. 19-cv-06593, 2022 WL 566792, at *3 (N.D. Cal. Jan. 14, 2022) (defendant refused to produce documents that the court had previously ordered be produced)); engaged in obstructionist misconduct *during* a deposition (*see Lee v. Pep Boys-Manny Moe & Jack of California*, No. 12-cv-05064, 2015 WL 9268118, at *4–7 (N.D. Cal. Dec. 21, 2015) (counsel repeatedly instructed the witness to not answer basic questions about employment history based on a frivolous privacy objection, refused to meet and confer about the objections, made improper speaking objections, and prematurely terminated a deposition)); or made repeated, objectively false misrepresentations in bad faith (*see Pacific Harbor Cap., Inc. v. Carnival Air Lines, Inc*., 210 F.3d 1112, 1118–20 (9th Cir. 2000) (counsel falsely advised his client that a TRO was not in effect and made misrepresentations to the court about compliance with the TRO)). Plaintiffs do not argue that DeviantArt violated any court orders or engaged in any improper conduct during a deposition. And Plaintiffs fall far short of the "high threshold" to support a finding of bad faith misrepresentations warranting sanctions. *See Primus*, 115 F.3d at 649–50 (high threshold not met and reversing sanctions despite finding a party's argument "clearly lacks merit," because even that does not amount to an "explicit finding that he or she acted in bad faith").

*Famuyide v. Chipotle Mexican Grill, Inc*., No. 23-cv-01127, 2026 WL 772120 (D. Minn. Mar. 18, 2026)—an unpublished District of Minnesota order—is the only case Plaintiffs discuss in any detail, and it too demonstrates that sanctions are inappropriate here. *See* Mot. at 9. There, the court relied on specific sanctions rules inapplicable here (FRCP 37(a)(5)(A) and a local rule authorizing sanctions for failure to meet and confer), in addition to only a passing reference to the court's inherent authority and FRCP 30(d)(2), to impose monetary sanctions in response to a bad faith course of conduct before, during, and after defendant's FRCP 30(b)(6) deposition. 2026 WL 772120 at *28–29. Specifically, Defendant's counsel agreed in writing to withdraw objections to

multiple FRCP 30(b)(6) deposition topics but then, five weeks later, at 9 p.m. on the night before the deposition, filed a protective order on those same topics, and refused to produce a witness on those topics at the deposition the morning after the filing, thus delaying examination on the previously agreed-to topics. *Id.* at *8, *28–29. Further, defendant's objections to the deposition topics were based on misstatements of the written topics and/or were legally baseless, and defendants misrepresented to the court that plaintiff's counsel had been informed of defendants' intent to file a motion for a protective order. *Id.* The court also noted that counsel's conduct "demonstrated a complete lack of professional courtesy," and made "concerning" and "dismissive" statements during the deposition. *Id.* at *29 n.18, *30. That discovery misconduct is worlds away from even Plaintiffs' version of the events here, which, as explained above, is incorrect, if not a deliberate distortion of the record.

### B. Plaintiffs' Motion is Frivolous and Intended to Extract Payments from DeviantArt for Plaintiffs' Own Discovery Expenses

Plaintiffs' Motion also fails because the costs Plaintiffs seek would have been incurred regardless of any alleged misconduct. Plaintiffs request reimbursement for filing its letters rogatory motion, retention of B.C. Counsel, proceedings before the Supreme Court of British Columbia, and even the costs of taking the depositions themselves. Mot. at 14. But both Mr. Surovenko and Mr. Trofimov were foreign former employees residing in Canada who were entitled to the protections of the Canadian discovery process as a matter of law. *See supra* Sections IV.a.i-ii. Plaintiffs would have been required to pursue letters rogatory and retain Canadian counsel to compel either witness's deposition irrespective of any of the alleged conduct. A court exercising its inherent authority to impose compensatory sanctions "must apply a 'but-for' causation standard," and any sanction "must be limited to compensating for the specific harm" or else "the sanction would appear to be punitive." *Am. Unites for Kids*, 985 F.3d at 1089–90. Because Plaintiffs cannot show that "but for the sanctionable misconduct" they would not have incurred these costs, their request for blanket reimbursement of all foreign discovery expenses amounts to an improper request for punitive sanctions. *Id.* at 1090, 1095.

For these reasons, this Court should not only deny Plaintiffs' Motion in its entirety, but should also consider awarding DeviantArt its reasonable attorneys' fees and costs incurred in opposing this Motion. Courts have repeatedly recognized that "a frivolous motion for sanctions"—such as a motion "brought as a litigation tactic"—"can be grounds for sanctions itself." *Bangkok Broad. & T.V. Co., Ltd. v. Iptv Corp.*, No. 09-cv-3803, 2010 WL 11523703, at *6 (C.D. Cal. Feb. 12, 2010); *see, e.g.*, *All. to End Repression v. City of Chicago*, 899 F.2d 582, 583 (7th Cir. 1990) (awarding attorneys' fees for defending against a frivolous sanctions motion, and noting that a court's later disagreement with a party's position "hardly makes the advocacy sanctionable"); *Foy v. First Nat'l Bank*, 868 F.2d 251, 258 (7th Cir. 1989) (similar); *Sokos v. Hilton Hotels Corp.*, 283 F. Supp. 2d 42, 57 (D.D.C. 2003) (similar); *United States v. San Francisco*, 132 F.R.D. 533, 538 (N.D. Cal. 1990) (similar).

Plaintiffs' Motion is exactly the type of meritless sanctions filing that courts have cautioned against: it rests on distortions of the record and seeks reimbursement of costs that would have been incurred regardless. DeviantArt accordingly requests that the Court order Plaintiffs to pay DeviantArt's reasonable fees and costs incurred in opposing this Motion, if the Court deems it just.

## V. CONCLUSION

For the foregoing reasons, the Motion should be denied in its entirety.

Dated: September 15, 2026

Respectfully submitted,

*/s/ Brittany N. Lovejoy*

**LATHAM & WATKINS LLP**
Andrew M. Gass (SBN 259694)
*andrew.gass@lw.com*
Michael H. Rubin (SBN 214636)
*michael.rubin@lw.com*
Brittany N. Lovejoy (SBN 286813)
*brittany.lovejoy@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: 415.391.0600

Sarah F. Mitchell (SBN 308467)
*sarah.mitchell@lw.com*
355 South Grand Avenue, Suite 100

Los Angeles, CA 90071
Telephone: 213.485.1234

Simeon Botwinick (*pro hac vice*)
*simeon.botwinick@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: 202.637.2200

*Counsel for Defendant DeviantArt, Inc.*